1  KATHLEEN E. FINNERTY - (SBN 157638) (Counsel for Service)
   NANCY J. DOIG - (SBN 226593)
2  GREENBERG TRAURIG, LLP
   1201 K Street, Suite 1100
3  Sacramento, CA  95814-3938
   Telephone:  (916) 442-1111
4  Facsimile:  (916) 448-1709
   finnertyk@gtlaw.com, doign@gtlaw.com
5
   Attorneys for Plaintiff
6  ASPEX EYEWEAR, INC.

7              **UNITED STATES DISTRICT COURT**

8          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

9  _____

   ASPEX EYEWEAR, INC.                    )  CASE NO.  _____
10                                        )
                          Plaintiff,      )  **COMPLAINT FOR INJUNCTIVE**
11                                        )  **RELIEF AND DAMAGES FOR:**
   v.                                     )  **-  BREACH OF CONTRACT;**
12                                        )  **-  PROMISSORY ESTOPPEL;**
                                          )  **-  ANTITRUST VIOLATIONS;**
13 VISION SERVICE PLAN; MARCHON           )  **-  TORTIOUS INTERFERENCE**
   EYEWEAR, INC.; ALTAIR EYEWEAR,         )     **WITH PROSPECTIVE**
14 INC.                                   )     **ECONOMIC ADVANTAGE;**
                                          )  **-  FALSE ADVERTISING; AND**
15                        Defendants.     )  **-  UNFAIR BUSINESS**
                                          )     **PRACTICES**
16                                        )
   _____)  **(JURY TRIAL REQUESTED)**
17

18        As and for its Complaint against Defendants Vision Service Plan ("VSP"),

19 Marchon Eyewear, Inc. ("Marchon") and Altair Eyewear, Inc. ("Altair") (collectively

20 "defendants"), Plaintiff Aspex Eyewear, Inc. ("Aspex") complains and alleges as

21 follows:

22                              **I.**

23                    <u>**NATURE OF THE ACTION**</u>

24        This is an action for breach of contract, promissory estoppel, antitrust, tortious

25 interference, false advertising and unfair business practices arising out of defendants'

26 illegal efforts to destroy Aspex's business by de-listing Aspex as an approved supplier

27 of prescription eyewear frames for VSP's insured subscribers, thereby illegally

28 excluding Aspex from the prescription eyewear frames market, including the submarket

                                    1

consisting of prescription eyewear frames purchased by participating providers in VSP's provider network.  Aspex seeks a temporary restraining order, preliminary and permanent injunctive relief, damages, attorneys' fees and costs.

## II.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) because this is a civil action between citizens of different states, and the amount in controversy exceeds $75,000.00.  This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1337(a) because this is a civil action arising under federal antitrust laws, 15 U.S.C. §§2, 15 and 26.

2.      This Court has personal jurisdiction over VSP and Altair based upon their citizenship in the State of California.  This Court has personal jurisdiction over Marchon by virtue of its significant, systematic and continuous contacts with the State of California and because the wrongful acts of defendants occurred and were substantially conducted in, and emanated from, the State of California.

3.      Venue is proper in the United States District Court for the Eastern District of California under 28 U.S.C. §1391(a)(2) and because VSP and Altair reside in this jurisdiction and the wrongful conduct at issue occurred in this District.

## III.

## PARTIES

4.      Plaintiff Aspex is a corporation duly organized and existing under the laws of the state of Delaware having its principal place of business at 2755 S.W. 32nd Avenue, Pembroke Park, Florida.

5.      Defendant VSP is a California not-for-profit corporation having its principal place of business at 3333 Quality Drive, Rancho Cordova, California.

6.      Defendant Marchon Eyewear, Inc. is a New York corporation having its principal place of business located at 35 Hub Drive, Melville, New York and, upon information and belief, is a for profit entity and a wholly owned subsidiary of VSP.

7.     Defendant Altair Eyewear, Inc. is a California corporation having its principal place of business at 10875 International Drive, Rancho Cordova, California and, upon information and belief, is a for profit entity and a wholly owned subsidiary of VSP.

## IV.
## FACTUAL ALLEGATIONS

8.     Aspex is an eyewear manufacturing and distribution company with a hard-earned and well-deserved reputation for being a technology leader.  Even though it is a relatively small company, Aspex has consistently been an innovator in the industry.

9.     VSP is a giant conglomerate.  Upon information and belief, VSP's annual insurance-related revenues exceed $2 billion and it is by far the dominant vision insurance company in the United States.  VSP's total revenues (including non-insurance subsidiaries such as Marchon and Altair) are in excess of $3.3 billion.  Indeed, Marchon alone, which VSP purchased in 2008, is one of the three largest eyewear distributors in the United States.

10.     On its website, VSP claims to have over 55 million subscribers, which means that approximately 1 in 6 individuals in the United States is covered under its insurance plans.

11.     VSP also claims to have contracts with 33,000 clients, including more than 100 health insurance plans.

12.     As part of its business of selling vision insurance, VSP maintains a large network of optometrists and other retailers who sell vision-related products and services covered under VSP's insurance plans.

13.     VSP's network is so large that it provides VSP with enormous power in both local and national eyewear markets.  According to VSP's website, its network includes more than 26,000 doctors in nearly 20,000 offices across the country.  As a result, VSP claims that its doctors' offices are, on average, only four miles from where its subscribers live or work.

14.     Upon information and belief, VSP has contracted with all, or nearly all of the optometrists in many geographic areas.  Thus, in many instances, even non-VSP subscribers have no alternative but to do business with VSP's member optometrists.

**A.     How VSP's Subscribers Use Their Benefits To Purchase Eyewear**

15.     VSP's individual "subscribers" typically access their insurance benefits by doing business with optometrists in VSP's network.  Thus, a subscriber who needs eyeglasses can visit a local VSP optometrist to obtain a prescription and purchase eyewear.  Such optometrists typically stock a range of types, brands, and styles of eyeglass frames to meet their customers' (*i.e.*, the VSP subscribers') needs and preferences.

16.     Upon information and belief, VSP does not restrict its subscribers' benefits to particular eyewear brands.  In fact, VSP tells subscribers in their Evidence of Coverage Documents that their benefits can be applied toward any eyewear frames they choose, and such documents do not include a limit to particular brands of eyewear frames.  For example, the Evidence of Coverage and Disclosure for the Healthy Families program states, "A frame allowance of $75 will be provided by the vision plan. The frame benefit provides a subscriber choice to select a frame that fits their lifestyle." Similarly, an advertisement for the individual vision care plan offers potential subscribers a "[f]rame of your choice covered up to $120." Although the benefits are "capped" at a particular dollar amount, VSP allows each subscriber to select eyewear frames according to his/her own preferences for style, fit and function, without regard to brand.

17.     VSP maintains a list of approved eyewear manufacturers.  For many years, VSP has informed eyewear manufacturers (including Aspex) that the only requirements for placement on the approved list are that (i) the manufacturer must notify VSP of its desire to be included by submitting an application to VSP; and (ii) the manufacturer must disclose its pricing information -- either directly to VSP, or

1  indirectly, by including its prices in the "Frames Data" book published by Jobson
2  Medical Information, LLC.

3      18.    Aspex submitted an application to VSP for inclusion on the approved list
4  approximately 15 years ago, and discloses its pricing information to VSP via the
5  "Frames Data" book.  Accordingly, Aspex has been on VSP's approved list
6  continuously for the past 15 years.

7      19.    Upon information and belief, any manufacturer that meets these two
8  requirements is added to VSP's approved list.  As a result, VSP's list includes all or
9  substantially all of the frame vendors in the industry.  Aspex is not aware of any
10  manufacturer which has disclosed its pricing information and is not on VSP's approved
11  list.  Similarly, Aspex is not aware of any manufacturer who was removed from VSP's
12  approved list after having complied with these two requirements.

13      **B.    Aspex's Sales & Marketing To Providers In VSP's Network**

14      20.    There are two main types of eyewear retailers in the United States.  One
15  type is independent eye care professionals (mainly optometrists) ("independent ECPs").
16  The vast majority of independent ECPs -- over 26,000 of them -- are in VSP's network.
17  The other type are large retail chains, including general merchandise (e.g., Wal-Mart,
18  Target, Costco) and specialty stores (e.g., Pearl Vision).  Upon information and belief,
19  VSP's network generally does not include such retail chains.

20      21.    Selling frames to independent ECPs requires different sales strategies,
21  personnel and advertising than would be required to sell frames to large retail chains.

22      22.    In reliance upon its expectation of continuing "approved" status, Aspex
23  changed its position by building a marketing/sales operation that is focused on selling to
24  independent ECPs.

25      23.    As a result, Aspex today derives approximately 70% of its sales from
26  independent ECPs, the vast majority of which are within VSP's network.

27
28

**C.    Aspex's Patented Technology**

24.    As stated, Aspex is an innovator in the eyewear industry and its products incorporate technology protected by certain patents.

25.    In particular, Aspex owns an undivided ½ interest in United States Patent No. US RE37,545F1 (the "'545 Patent"), entitled "Auxiliary Lenses for Eyeglasses" which is a reissue of United States Patent No. 5,568,207 (which issued on October 22, 1996) to inventor Richard Chao.

26.    Aspex sells magnetic, clip-on eyewear products that incorporate technology covered by the '545 Patent.

27.    Within the past few years, Aspex has learned that other companies, including competitor Marchon, manufactures and sells magnetic clip on eyewear that infringes certain claims of the '545 Patent.

28.    Aspex is also the exclusive licensee of United States Patent No. 5,737,054 (the "'054  Patent").  The '054 Patent is directed to  technology useful for magnetic clip-on eyewear.

29.    Several years ago, Aspex learned that Altair was manufacturing and selling magnetic clip-on eyewear that infringes the Licensed Patents.

30.    Accordingly, Aspex has sued (i) Marchon, for infringing the '545 Patent, and (ii) Altair, for infringing the '054 Patent (the "Underlying Patent Cases").

31.    Marchon and Altair are wholly-owned subsidiaries of defendant VSP.

**D.    VSP's Unlawful Attempt To Destroy Aspex's Business**

32.    VSP has expressed displeasure with Aspex's enforcement of its legitimate rights concerning the '545 Patent and '054 Patent against its wholly owned subsidiaries, Marchon and Altair.

33.    In fact, VSP repeatedly has demanded that Aspex dismiss the Underlying Patent Cases in exchange for no consideration.

34.    Despite the massive disparity in size and market power between Aspex and VSP, Aspex has refused to yield to VSP's bullying.

35.    To ratchet up the pressure on Aspex -- and to secure an unfair competitive advantage for its subsidiaries, Marchon and Altair -- VSP has threatened to retaliate against Aspex by barring VSP subscribers from using VSP insurance benefits to purchase Aspex eyewear.

36.    Specifically, VSP has stated that it intends to send a letter to every provider in its enormous network, advising each that VSP will no longer reimburse its subscribers for purchases of Aspex's products.

37.    Upon information and belief, VSP has yet to carry through with its threat to send such a letter.

38.    However, over the past two months, VSP has initiated a precise and calculated call campaign informing Aspex's best customers of its plan to harm Aspex. Several of Aspex's direct customers (*i.e.*, retailers who purchase eyewear from Aspex in order to re-sell it to their customers) have told Aspex representatives that they know that VSP is planning to "de-list" Aspex's products.

39.    As a result of this communicated information, retailers are becoming reluctant to purchase Aspex's products.  Given VSP's commanding market share, a large fraction of the retailers' sales comes from purchases by VSP subscribers.  If VSP were to bar its subscribers from using their benefits to purchase Aspex-branded products, then those subscribers would almost certainly not purchase Aspex-branded products and would instead be likely to purchase Altair and Marchon's competing products.

40.    As well, such retailers are less willing (and may be unwilling entirely) to stock merchandise that may only be purchased by a subset (*i.e.,* non-VSP subscribers) of their customers.

41.    Aspex learned of VSP's actions from numerous conversations with its customers, who have told Aspex that they were contacted by VSP and were told of VSP's plan to de-list Aspex.

42. The customers who reported this information to Aspex were, for the most part, its best and most loyal customers.

43. VSP can easily identify and target Aspex's best customers because VSP knows (i) how much it has paid towards purchases of Aspex products; and (ii) the specific retailers who submitted the claims and received such payments.

44. As a result of VSP's actions, many of Aspex's customers have substantially reduced their orders for Aspex products. Even worse, some of Aspex's best customers have decided not to carry Aspex products at all. Accordingly, Aspex has lost significant sales.

45. Aspex also has learned that certain competitors have become aware of VSP's imminent de-listing of Aspex. At least one such competitor has instructed its salespeople to use this information to persuade retailers to purchase the competitor's products rather than Aspex's products.

46. VSP has not told some accounts that its actions are in retaliation for Aspex's exercise of its legitimate patent rights. Other Aspex customers have been told, vaguely, that the de-listing is due to "ongoing litigation," creating the misleading inference that there is something wrong with Aspex's products.

47. In fact, nothing is wrong with Aspex's products and VSP has no legitimate business reason to prevent its subscribers from purchasing Aspex products. Indeed, VSP has not even provided a pretextual reason for its proposed action. It has admitted that its aim is to harm Aspex and strong-arm it into abandoning the Underlying Patent Cases.

48. Aspex is suffering in other ways, as well. For example, if Aspex continues to lose sales it will soon begin to lose its sales people. Because such employees are paid on commission, they are directly impacted by VSP's conduct. They cannot be expected to stay with Aspex while VSP destroys their source of income.

49. VSP's threats of future action against Aspex have harmed Aspex in the form of damage to its reputation, loss of goodwill, and lost sales.

50.      However, these effects would be dwarfed by the damage that would be caused if VSP were to carry through on its threat to adopt a formal, written policy barring subscribers from using their benefits to purchase Aspex-branded products. Given the ubiquity of VSP's plans, the breadth of its provider network and its tens of millions of insured subscribers, the impact on Aspex would be devastating.

51.      Indeed, VSP's influence goes far beyond even its massive number of subscribers (55 million), because VSP has contracted with all or nearly all of the optometrists in many geographic areas.

52.      Upon information and belief, VSP (i) will continue to advise retailers and others that it will soon act to "cut off" its subscribers from using their benefits to purchase Aspex-branded products; and (ii) will carry though on its threat to adopt a written policy in that regard.

53.      In addition to the claims for relief set forth below, defendants' conduct is unlawful because they have (individually and in concert) attempted, conspired and/or acted in furtherance of a plan to affect interstate commerce by extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951.  Specifically:

       (a)   Aspex is engaged in interstate commerce because, among other things, it sells its products to independent optometrists in several different states.  VSP's statements have obstructed, delayed and affected such interstate commerce by causing Aspex's independent optometrist customers to reduce or eliminate their purchases of Aspex's products.  If VSP were to carry through with its threat to de-list Aspex, the effect on interstate commerce would be even greater; and

       (b)   Defendants have threatened Aspex with economic harm by threatening to de-list Aspex.  The purpose of such threats is and was to induce Aspex to surrender property, including, without limitation:  (i) a dismissal of Aspex's claims for past infringement

of its patent rights as pled in the Underlying Patent Cases; and (ii) a covenant not to sue Defendants (*i.e.*, a license) for ongoing and future use of Aspex's patented technology.

54.     The harm Aspex has suffered and will continue to suffer -- in the form of lost sales, lost future profits, loss of goodwill, damage to reputation and other harm -- is irreparable and cannot be adequately compensated by money damages.  Accordingly, Aspex seeks a preliminary and permanent injunction barring VSP from engaging in the conduct as described above.


# V.
## PLAINTIFF'S CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Breach of Contract)

55.     Aspex realleges and incorporates by reference all allegations contained in paragraphs 1-54.

56.     VSP offered to include Aspex and others in the industry in VSP's list of approved frame manufacturers provided that (i) the manufacturer notified VSP of its desire to be approved, by submitting an application to VSP; and (ii) the manufacturer disclosed its pricing information.  This was an offer to contract with VSP.

57.     Aspex accepted VSP's offer by undertaking the requested performance -- namely, by submitting an application to VSP and disclosing (and continuing thereafter to disclose) its pricing information.

58.     As a result of Aspex's acceptance by performance, a binding contract was formed between Aspex and VSP.

59.     The terms of the contract bar VSP from de-listing Aspex, provided Aspex continues to perform by disclosing and updating its prices.

60.     For the past 15 years and continuing through today, Aspex has continued to perform by disclosing and updating its pricing information.

61. By telling Aspex's customers that Aspex is about to be de-listed, VSP has breached the contract. Any effort to formally de-list Aspex would also be in breach of the contract.

62. As a result, Aspex is threatened with immediate and irreparable harm, and has suffered damages.

WHEREFORE, Aspex prays for relief as set forth below.

## SECOND CLAIM FOR RELIEF
### (Promissory Estoppel)

63. Aspex realleges and incorporates by reference all allegations contained in paragraphs 1-62.

64. VSP promised Aspex and others in the industry that they would be added to VSP's list of approved frame manufacturers provided that (i) the manufacturer notified VSP of its desire to be approved, by submitting an application to VSP; and (ii) the manufacturer disclosed its pricing information.

65. VSP promised Aspex and others in the industry that they would remain on the approved list if they continued to disclose and update their pricing information.

66. Aspex notified VSP of its desire to be added to VSP's approved list, by submitting an application. Aspex also disclosed is pricing data to VSP by including it within the "Frames Data" book. Accordingly, VSP added Aspex to its list of approved frame manufacturers.

67. In reliance upon its expectation of continuing "approved" status, Aspex changed its position by building a marketing/sales operation that is focused on selling to independent ECPs, the vast majority of which are within VSP's network.

68. Aspex's reliance was reasonable and foreseeable.

69. Aspex continues to disclose and regularly update its pricing information in the "Frames Data" book. Nevertheless, VSP has been telling Aspex's customers that Aspex is about to be de-listed, in breach of its promise as described above. VSP's threat to formally de-list Aspex would also constitute a breach of such promise.

70.    VSP's actions have harmed and will continue to harm Aspex.  For example, Aspex has already lost customer orders.  Furthermore, if Aspex is de-listed it will be forced to dismantle some or all of its existing marketing/sales operation, which is focused on selling to VSP's network.  Indeed, the potential loss of access to VSP's network threatens the viability of Aspex's business.

71.    Aspex is threatened with immediate and irreparable harm and damages, and to avoid injustice, it is necessary to enforce VSP's promise.

WHEREFORE, Aspex prays for relief as set forth below.

### THIRD CLAIM FOR RELIEF
### (Antitrust: Violation Of Section 2 Of The Sherman Act, 15 U.S.C. §2)

72.    Aspex realleges and incorporates by reference all allegations contained in paragraphs 1-71.

**A.    The Relevant Markets and Submarkets**

**1.    The "Eye Care Insurance Market"**

73.    An economically significant and relevant product market is the "Eye Care Insurance Market," consisting of insurance products that cover eye examinations, eye care, eye care medical procedures such as laser and Lasik surgery, and eye wear products such as prescription contact lenses, prescription lenses for glasses, and prescription eyewear frames and related or ancillary products. The Eye Care Insurance Market is recognized in the eye care industry and in the insurance and health insurance industries as a discrete and economically-significant market in that:

(a)    there are significant providers, such as defendant VSP, offering and providing health insurance for eye care and eye wear products and services that do not participate in, or offer insurance, in other segments of the insurance or health insurance industry;

(b)    there are significant participants offering and providing insurance and health insurance products that do not offer health insurance products for eye care and eye wear products and services;

(c)    the industry recognizes eye care health insurance as a discrete and specialized industry and market;

(d)    consumers, employers and other groups interested in obtaining eye care insurance are not able to substitute other forms of insurance or health insurance to satisfy their demand and needs for eye care insurance;

(e)    there is no elasticity of demand, or a very low elasticity of demand, between eye care insurance and other forms of insurance or health insurance;

(f)    a small, but non-transitory price increase for eye care insurance products and services will not cause a significant number of purchasers of eye care insurance to switch to other forms of insurance or health insurance; and,

(g)    a small, but non-transitory price decrease for other forms of insurance or health insurance will not cause a significant number of purchasers of eye care insurance to switch to other forms of insurance or health insurance.

74.    The Eye Care Insurance Market operates, in and substantially affecting interstate commerce, on a national basis in that such products and services are recognized in the eye care industry and in the insurance and health insurance industries as operating geographically on a national basis, in that:

(a)    providers of eye care insurance products and services, such as defendant VSP, offer their products and services nationally;

(b)    purchasers of eye care insurance products and services look to national suppliers, such as defendant VSP, for such products and services and are freely able to substitute one national supplier for another national supplier; and,

(c)  there are little, if any, significant costs associated with supplying such insurance on a national basis.

2.  **The "Prescription Eyewear Frames Market" (the "Frames Market")**

75.  An economically significant and relevant product market is the "Prescription Eyewear Frames Market" or the "Frames Market" consisting of prescription eyewear frames and related or ancillary products.  The Prescription Eyewear Frames Market is recognized in the eye care industry and in the insurance and health insurance industries as a discrete and economically-significant market in that:

(a)  there are significant providers, such as plaintiff Aspex and defendants Altair and Marchon, offering and providing such prescription eye wear products and services that do not offer other products;

(b)  there are significant participants offering and providing other products that do not offer prescription eye wear products;

(c)  the industry recognizes prescription eyewear products as discrete and specialized industry and market;

(d)  there are distinct and separate distribution channels for such products, including distributors, wholesalers and retailers who specialize in selling such products;

(e)  consumers interested in obtaining prescription eye wear are unable to substitute other products to satisfy their needs and demands for such products;

(f)  there is no elasticity of demand, or a very low elasticity of demand, between prescription eye wear products and other products;

(g)  a small, but non-transitory price increase for prescription eye wear products will not cause a significant number of purchasers of such products to switch to other products that could be substituted for prescription eye wear products; and,

(h)   a small, but non-transitory price decrease for other products will not cause a significant number of purchasers of prescription eye wear products to switch to buying such other products as a substitute for prescription eye wear products.

76.   The Prescription Eyewear Frames Market operates in, and substantially affects interstate commerce, on a national basis in that such products are recognized in the eye care industry and in the insurance and health insurance industries as operating geographically on a national basis, in that:

(a)   providers of such products, such as plaintiff Aspex and defendants Altair and Marchon, offer their products nationally;

(b)   purchasers of such products look to national suppliers, such as plaintiff Aspex and defendants Altair and Marchon, for such products and services and are freely able to substitute one national supplier for another national supplier; and,

(c)   there are little, if any, significant costs associated with supplying such products across state lines on a national basis.

**3.   The "VSP Participating Providers Eyewear Frames Submarket" and the "VSP Subscriber Eyewear Frames Submarket" (the "VSP Eyewear Frames Submarkets")**

77.   Within the Prescription Eyewear Frames Market there exist two submarkets in which VSP has the monopoly power in that it has the power to exclude competitors:  (i) an Eyewear Frames Submarket consisting of Frames sold to VSP's network of participating providers consisting of independent eye care practitioners (the "VSP Participating Providers Eyewear Frames Submarket"); and (ii) an Eyewear Frames Submarket consisting VSP's insured subscribers and their dependants (the "VSP Subscriber Eyewear Frames Submarket") (collectively referred to as the "VSP Eyewear Frames Submarkets" or the "Submarkets").  Such Submarkets exist and are relevant submarkets because:

(a)    VSP's power to exclude competitors from the Submarkets arises because its providers and subscribers are "locked in."

(b)    VSP has power over its subscribers because if they do not use in-network providers, and purchase approved frames, they will lose the value of the insurance they purchased from VSP.

(c)    VSP exercises power over providers by requiring them to abide by VSP's rules and regulations.  For example, VSP requires its providers to maintain certain minimum inventory levels.  Only "approved" eyewear frames count toward such minimums.  Thus, in order to stock non-approved eyewear, providers would be required to maintain inventory levels well in excess of the VSP-mandated minimum.  In addition, VSP's providers know that any excess, non-approved inventory would be more difficult to sell because it would be attractive only to non-VSP subscribers.

(d)    By contrast, VSP uses various means to ensure that their network providers sell eyewear made by VSP's subsidiaries.  For example, VSP provides financial incentives to providers in connection with their sales of Altair-branded eyewear.

**B.    Defendants' Market Power And Ability To Exclude Competitors**

78.    Defendant VSP is the dominant supplier of eye care insurance in the Eye Care Insurance Market, upon information and belief, accounting for more than 65% of all insurance policies written, and premiums received, in such market.  VSP has market and monopoly power in such market in that it has the power to control prices or exclude competitors, or is dangerously close to having such power.

79.    In addition, VSP's market and monopoly power is also evidenced by the fact that it has most providers of eye care and prescription eyewear products in its approved network of participating providers, and in many areas ninety percent, or more,

1     of all such providers are participating providers in VSP's approved network of

2     providers.

3        80.     Among other means, defendant VSP is able to exert and extend its market

4     power in the Eye Care Insurance Market through its network of approved eye care

5     participating providers who, in order to remain in VSP's approved network of

6     participating providers, must abide by VSP's rules and regulations regarding the

7     products and services for which VSP will provide coverage and reimbursement. VSP is

8     able to exert and extend its market power in this fashion because, if a participating

9     network provider fails to abide by VSP's rules and regulations, it would be threatened

10     with termination as a participating provider which would effectively foreclose them

11     from treating and selling to consumers who are covered by VSP's eye care insurance,

12     such consumers accounting for, upon information and belief,  more than seventy-five

13     percent (75%) of the total amount of such provider's patient/customer.

14        81.     As a result of defendant VSP's market dominance and power in the Eye

15     Care Insurance Market, and as a result of its dominance and power over the provider

16     network, which represents the necessary and essential distribution channel -- the

17     bottleneck -- to the ultimate consumers in the Prescription Eyewear Frames Market,

18     listing and approval by defendant VSP constitutes an essential resource for competitors

19     and participants in the Prescription Eyewear Frames Market. Indeed, defendant VSP

20     recognizes this in its Network Provider Manual by stating that it will approve any

21     supplier of Prescription Eyewear Frames if such supplier simply provides defendant

22     VSP with its price lists.  As a result, virtually all domestic and foreign suppliers of

23     prescription eyewear frames sold in the United States -- more than 450 brands -- are

24     included as a covered product in VSP's Network Provider Manual and, upon

25     information and belief, defendant VSP has never de-listed or refused to approve any

26     supplier of Prescription Eyewear Frames that supplies VSP with its price lists.

27        82.     Plaintiff Aspex, and Defendants Altair and Marchon, are significant

28     participants in the Prescription Eyewear Frames Market.  Through defendants Altair and

Marchon, defendants have in excess of twenty percent (20%) of all sales of products in the Prescription Eyewear Frames Market.

**C.     Defendants' Unlawful, Exclusionary Conduct**

**1.     Defendants' Improper Denial of an Essential Facility Necessary For Plaintiff Compete in the Frames Market and Submarkets**

83.     Defendants' threat to "de-list" -- i.e., to boycott -- plaintiff Aspex's eyewear frames and, thereby, refuse to pay for plaintiff's frames, has no legitimate business purpose and is being done solely and exclusively to reduce Aspex's ability to compete in the Prescription Eyewear Frames Market, and to reduce competition in that market. Such threat, if put into practice, will foreclose a very substantial portion of the Prescription Eyewear Frames Market, and will foreclose virtually all of the Frames Submarkets, for Aspex as a result of defendant VSP's market power and monopoly or near-monopoly position in the Eye Care Insurance Market, and the power that VSP, as an essential resource or facility, can and does exert over its network of approved providers who constitute more than half (and more than ninety percent in some areas) of the channels of distribution for the sale and distribution of Prescription Eyewear Frames products, including plaintiff Aspex's products.

84.     Neither the providers nor the subscribers in the Submarkets have consented to VSP's exclusion of competing eyewear frame manufacturers from the Submarkets.  Such consent is absent because:

(a)     VSP does not tell its subscribers and providers that it will exclude competing eyewear frame manufacturers;

(b)     In fact, VSP has represented to subscribers and providers alike that VSP will pay for any manufacturer's frames;

(c)     Most VSP subscribers do not individually consent to and/or negotiate their agreements with VSP because such agreements typically are obtained by the subscribers' employers;

(d)  Indeed, in many instances, VSP does not even contract directly with its subscribers' employers -- instead, the VSP plan is "bundled" by a health insurer, which health insurer, in turn, contracts with employers to cover their employees; and

(e)  Many VSP subscribers are dependents/relatives of VSP members and therefore do not contract directly with VSP.

85.  The effects of such anticompetitive conduct in the Submarkets -- *i.e*., price increases and/or reduced consumer choice -- do not impose market discipline within the Eye Care Insurance Market because:

(a)  VSP's subscribers and providers lack sufficient data to evaluate the effects of VSP's anticompetitive actions and accordingly cannot consider such effects when deciding whether to do business with VSP;

(b)  VSP's subscribers would incur costs to switch to another insurer, including (for example) the cost and inconvenience of choosing a new optometrist; and

(c)  Most of VSP's providers depend on VSP for a substantial fraction of their income, such that leaving the provider network would threaten the viability of the providers' businesses.

86.  Aspex has made a substantial investment to promote and sell its products in and to the Submarkets. For example, Aspex employs salespeople who sell directly to independent ECPs, nearly all which are in VSP's network. Aspex has developed long-term relationships with these independent ECPs, and those relationships are the foundation for Aspex's overall marketing strategy. Aspex has also invested in advertising and other marketing activities directed at independent ECPs.

87.  By de-listing Aspex, and/or by threatening to do so, VSP has unnecessarily excluded Aspex from the Submarkets and/or has handicapped Aspex's ability to compete in the Submarkets.

88.   VSP has monopoly power, or a dangerous probability of acquiring such power in the Submarkets.

89.   Through their actual and threatened boycott of plaintiff Aspex's products, and with the specific intent to achieve such result, defendants threaten to and, if successful, will use and extend defendant VSP's market and monopoly or near-monopoly position, as an essential facility, into the Prescription Eyewear Frames Market and Submarkets, thereby unlawfully affecting and reducing competition in that market and affecting and reducing plaintiff's ability to compete in that market.

90.   VSP had and has a duty to provide plaintiff Aspex with access to VSP's essential facility of listing and approval because:

      (a)   defendant VSP is a monopolist with control over its listing and approval of eyewear frames which is a facility that is essential to compete in the Prescription Eyewear Frames Market;

      (b)   plaintiff Aspex is unable practicably or reasonably to duplicate the facility;

      (c)   Aspex has been denied access to the facility by the defendant for the sole purpose of eliminating plaintiff as a competitor, or severely handicapping plaintiff as a competitor; and,

      (d)   VSP providing access to its essential facility was and is feasible.

**2.   Defendants' Improper Leveraging To Exclude Into the Frames Market and Submarkets To Exclude Plaintiff From Such Markets**

91.   In addition to denying Aspex access to VSP's essential facility of VSP's listing and approval, VSP's conduct also constitutes unlawful monopoly leveraging in that VSP used its monopoly in the Eye Care Insurance market to unnecessarily exclude or handicap Aspex in the related Prescription Eyewear Frames Market and Submarkets.

**3.   Violation of §2 of the Sherman Act, 15 U.S.C. §2, and Relief Sought**

92.   As a result of the foregoing, in violation of Section 2 of the Sherman Act, 15 U.S.C. §2, defendants have monopolized or have attempted to monopolize the Eye

Care Insurance Market and Prescription Eyewear Frames Market, and have abused and sought to extend their dominant market position in the Eye Care Insurance Market.

93.    As a direct and proximate result of defendants' violations, plaintiff Aspex has suffered injury to its business and property, and is threatened with injury to its business or property within the meaning of Section 4 and 16 of the Clayton Act, 15 U.S.C. §§16 and 24.

94.    Aspex is threatened with immediate and irreparable harm and damages. As a result, plaintiff Aspex is entitled injunctive relief restraining and enjoining defendant's violations, and is entitled to three-fold the damages sustained by plaintiff as a result of defendants violations, plus plaintiff's attorneys fees and cost.

WHEREFORE, Aspex prays for relief as set forth below.

**FOURTH CLAIM FOR RELIEF**
**(Intentional Interference With Prospective Economic Advantage)**

95.    Aspex realleges and incorporates by reference all allegations contained in paragraphs 1-94.

96.    Aspex has existing business relationships with numerous retailers and other providers within VSP's network.  For years, these retailers purchased Aspex products for resale to their customers, including VSP's subscribers.

97.    Absent some intervening action, Aspex would continue to profit from these relationships in the future.

98.    Defendants, individually and in concert with each other, have intentionally interfered with these business relationships by leaking information about VSP's forthcoming policy to bar its subscribers from using VSP benefits to purchase Aspex-branded products.

99.    Upon information and belief, defendants intend to increase such interference by de-listing Aspex.

100.    As set forth above, VSP's conduct is unlawful and/or unfair because, among other things, it:

(a)     has no legitimate business purpose;

(b)     is animated by a desire to harm and/or retaliate against Aspex;

(c)     has caused and will cause grave harm to Aspex without any corresponding legitimate benefit to VSP;

(d)     is tortious;

(e)     violates the Hobbs Act, 18 U.S.C. §1951;

(f)     violates the antitrust laws, Section 2 of the Sherman Act, 15 U.S.C. §2; and

(g)     violates California law, including but not limited to Business & Professions Code §§ 17200 and 17500.

101.    Defendants' conduct is intentional, and defendants are fully aware of its illegality and the harm it will cause Aspex.

102.    As a result of the foregoing, Aspex is threatened with immediate and irreparable harm and has suffered and will continue to suffer harm including harm that cannot be adequately compensated by money damages.

WHEREFORE, Aspex prays for relief as set forth below.

## FIFTH CLAIM FOR RELIEF
### (False Advertising - California Business & Professions Code § 17500)

103.    Aspex realleges and incorporates by reference all allegations contained in paragraphs 1-102.

104.    As set forth above, VSP has engaged in advertising to the public and offering plans to the public that provide set levels of reimbursement for eyewear frames of an individual subscriber's choice.  This advertising consists of online advertising, and upon information and belief, written and print material.

105.    VSP has engaged in the advertising described above with the intent of inducing members of the public to subscribe to VSP for vision benefits.

106.    VSP's advertising was untrue or misleading and likely to deceive the public in that it implies a subscriber will be reimbursed up to a set amount for any

eyewear frame of his or her choice without limitation as to the brand the subscriber could purchase, and VSP now intends to not cover Aspex frames.

107. In making and disseminating the statements here alleged, VSP knew or should have known that the statements were untrue or misleading and thus it acted in violation of California Business and Professions Code § 17500.

108. As a result of the foregoing, Aspex will suffer immediate and irreparable harm, and has suffered and will continue to suffer harm including harm that cannot be adequately compensated by money damages.

WHEREFORE, Aspex prays for relief as set forth below.

## SIXTH CLAIM FOR RELIEF
### (Unfair Business Practices - Business and Professions Code §§17200, et. seq.)

109. Aspex realleges and incorporates by reference all allegations contained in paragraphs 1-108.

110. California Business and Professions Code § 17200 et seq. prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business practice.

111. As set forth above, VSP's conduct is unlawful and unfair because, among other things, it:

  (a)    has no legitimate business purpose;

  (b)    is animated by a desire to harm and/or retaliate against Aspex;

  (c)    has caused and will cause grave harm to Aspex without any corresponding legitimate benefit to VSP;

  (d)    is tortious;

  (e)    violates the Hobbs Act, 18 U.S.C. §1951;

  (f)    violates the antitrust laws, Section 2 of the Sherman Act, 15 U.S.C. §2;

  (g)    threatens an incipient violation of the antitrust laws;

  (h)    violates the spirit and purpose of the antitrust laws, which is to promote fair competition on even terms and prevent the possession

1    and use of market power to destroy or limit competition;

2        (i)    violates California law, including but not limited to Business &

3        Professions Code § 17500.

4    112.    Accordingly, VSP has committed unlawful acts as defined by California

5    Business Professions Code §17200.

6    113.    VSP's conduct is intentional, and VSP is fully aware that it is illegal and

7    unfair.

8    114.    VSP is fully aware of the harm its conduct will cause Aspex.

9    115.    As a result of the foregoing, Aspex will suffer immediate and irreparable

10    harm, and has suffered and will continue to suffer harm including harm that cannot be

11    adequately compensated by money damages.

12    WHEREFORE, Aspex prays for relief as set forth below.

13    **VI.**

14    **PRAYER FOR RELIEF**

15    WHEREFORE, Plaintiff Aspex prays that:

16    A.    A temporary restraining order and a preliminary and permanent

17        injunction issue and be entered by the Court against Defendants enjoining

18        them from: (i) barring or otherwise preventing VSP's subscribers and/or

19        provider network from using VSP insurance benefits for the purchase of

20        Aspex's products; (ii) telling, advising, or otherwise communicating, to

21        anyone that VSP may in the future bar or otherwise prevent VSP's

22        subscribers and/or provider network from using VSP insurance benefits

23        for the purchase of Aspex's products; and (iii) ordering defendants to

24        issue effective communications to all VSP subscribers and participating

25        providers that Aspex is a VSP-approved manufacturer and distributor of

26        eyewear and, as such, subscribers' frame allowances can be applied to

27        Aspex frames on equal terms with all other VSP-approved

28        manufacturers;

B.     Judgment be entered awarding Plaintiff its compensatory damages and three-fold its damages sustained as a result of defendants' violations of the antitrust laws, in amount to be determined at trial;

C.     Judgment be entered ordering that Defendants disgorge the improper benefit received or obtained by them as a result of their unlawful conduct;

C.     Judgment be entered awarding Plaintiff interest, attorneys fees and other costs of suit;

D.     Judgment be entered awarding Plaintiff punitive damages in an amount to be determined as appropriate to punish Defendants and deter like conduct; and,

E.     Granting such other and further relief as the Court may deem just, proper or appropriate.

DATED: March 17, 2010            GREENBERG TRAURIG, LLP


By:    /S/ Nancy J. Doig
        Kathleen E. Finnerty (SBN 157638)
        Nancy J. Doig (SBN 226593)
Attorneys for Plaintiff
ASPEX EYEWEAR, INC.

COMPLAINT