1  KATHLEEN E. FINNERTY - (SBN 157638) (Counsel for Service)
   NANCY J. DOIG - (SBN 226593)
2  GREENBERG TRAURIG, LLP
   1201 K Street, Suite 1100
3  Sacramento, CA  95814-3938
   Telephone:  (916) 442-1111
4  Facsimile:  (916) 448-1709
   finnertyk@gtlaw.com, doign@gtlaw.com
5
   Attorneys for Plaintiff
6  ASPEX EYEWEAR, INC.

7

8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11 ASPEX EYEWEAR, INC.                    ) CASE NO.  2:10-CV-00632-MCE-GGH
                                          )
12        Plaintiff,                      ) **DECLARATION OF JOHN A.**
                                          ) **RAYCRAFT**
13 v.                                     )
                                          )
14 VISION SERVICE PLAN; MARCHON           ) **DATE:**   May 13, 2010
   EYEWEAR, INC.; ALTAIR EYEWEAR, INC. )   **TIME:**   2:00 P.M.
15                                        ) **CTRM:**   7
          Defendants.                     ) **JUDGE:** Hon. Morrison C. England, Jr.
16                                        )
                                          )
17 ————————————————————————)

18            **DECLARATION OF JOHN A. RAYCRAFT**

19 I, JOHN A. RAYCRAFT, declare as follows:

20        1.     I am a consultant with over 35 years of progressively responsible management

21 experience, focused in the vision insurance industry.  I have been engaged by counsel for

22 plaintiff Aspex Eyewear, Inc. ("Aspex") to provide expert opinions in connection with this

23 matter. I make this declaration in support of Aspex's motion for a preliminary injunction.

24        2.     Attached as Exhibit 1 is a true copy of my initial report in this matter, with

25 exhibits.  The information contained in the report is true to the best of my knowledge,

26 information and belief.  Although my analysis and opinions are described in the report, for

27 convenience some of the salient points are summarized below.

28

3.    First, I have concluded that VSP occupies a dominant position in the vision insurance market. For example, based upon publicly available data, I estimated that VSP's share of the market exceeds 50%. (*See* pp. 4-5.) As explained in my report, this figure is conservative. (*See* p. 5.)

4.    In that regard, firms in the vision care industry often exaggerate their numbers of subscribers by counting insured members ("funded lives," in industry parlance) alike with members of discount plans. (*See* p. 4.) To guard against this, I have relied upon survey data published by the American Optometric Association ("AOA"), a respected industry organization. (*See* pp. 4-5.) However, I believe that firms' practice of inflating these numbers is so pervasive that it is likely that the AOA's survey has unintentionally captured a significant number of *uninsured* discount plan members. (*See id.*)

5.    If we are able to discern how many *uninsured discount plan members* are counted in the AOA data, we could re-calculate VSP's market share by excluding those individuals. Excluding *uninsured* discount plan members would yield a more precise (and higher) estimate of VSP's share of the vision *insurance* market. (*See id.*)

6.    I also have concluded that VSP's influence is so great that it can effectively bar frame manufacturers such as Aspex from doing business with independent ECPs. (*See* pp. 5-6.) Indeed, I have opined that VSP's plan to de-list Aspex would effectively bar Aspex from the ECP market. (*See* p. 6.) I considered the following key factors:

        a.    the vast majority of such ECPs are in VSP's network;

        b.    the ECPs in the network are significantly dependant upon VSP and VSP's members for their patient base;

        c.    unlike large specialty retail and discount chains, independent ECPs are small businesses with limited resources including limited inventory/display space;

        d.    as such, they face significant pressure not to purchase inventory that would be unattractive to a large fraction of their patients (*i.e.*, those patients covered by VSP);

1    e. thus, once VSP de-lists Aspex, it is likely that VSP's eye doctors (*i.e.*,

2     the large majority of the private practice eye doctors in the U.S.) will

3     stop purchasing Aspex's products altogether; and

4    f. ECPs will be further motivated to abandon Aspex because VSP and its

5     subsidiaries Marchon and Altair use other means (including consignment

6     of inventory and, more recently, rebate programs) to steer ECPs toward

7     VSP-owned eyewear brands.

8   7. Given that Aspex (like defendant Marchon) is primarily focused on independent

9 ECPs, being shut out of that market would likely cause devastating and irreparable harm to the

10 company. (*See* p. 6.)

11   I declare under penalty of perjury that the foregoing is true and correct.

12 Executed this 9th day of April, 2010.

13

14             John A. Raycraft

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# EXHIBIT 1

## John A. Raycraft
*Consultant to the Vision Care Industry*

### THE ASSIGNMENT

I was retained by Greenberg Traurig, LLP as an expert as it relates to the case of Aspex Eyewear, Inc. (Aspex) v. Vision Service Plan (VSP). I have been asked to (i) describe and quantify the Managed Vision Care market and sub-markets in which Aspex and VSP operate; (ii) indentify available data to determine market share and/or market influence as it may exist in said markets; and (iii) describe the potential impact, if any, de-listing by VSP may have on Aspex.

My resume/CV, delineating my qualifications to undertake this assignment, is attached as Exhibit A.

What follows is a report of my initial analysis and opinions in this matter. This report and my opinions may be supplemented or revised as additional information becomes available through discovery or otherwise.

### THE PARTIES

#### A. Vision Service Plan (VSP)

VSP is a not-for-profit corporation founded in 1955. It was originally licensed by the Attorney General's office as a Knox-Mills plan and has been regulated by the Department and its predecessor, the Department of Corporations as a Knox-Keene specialized vision health care service plan since the mid-seventies. VSP and its affiliated vision service plans arrange for the provision of vision care and eyewear coverage for their union, private employer, government agency client groups and individual members and insureds. VSP arranges for covered services through contracts with optometrists, ophthalmologists, optical laboratories and eyewear manufacturers across the U.S. [1]

VSP and its affiliated vision service plans provide eyecare coverage to its members in all fifty (50) states under the federally registered service mark "Vision Service Plan" or "VSP". VSP claims 55 million (55,000,000) members nationwide and that 1 in 6 people in the U.S. rely on VSP plans for eyecare/eyewear coverage. VSP plans have 35 thousand (35,000) clients, including more than 100 health plans. In addition, the VSP plans contract with over 50% of the companies on the 2007 Fortune 500 list and Fortune Magazine's "Best Companies to Work For" that provide fully insured vision plans. [1]

The VSP plans have a network of +/- 26 thousand (26,000+/-) private-practice doctors located in rural and metropolitan areas throughout the nation. The doctor network is so comprehensive that Americans have a choice of two (2) VSP doctors within 2.1 miles in urban and suburban neighborhoods and 8.8 miles in rural areas. VSP and its affiliates employ 4200 people nationwide. [1,2]

Altair Eyewear is a VSP affiliate frame company that develops frame technologies and delivers a mix of private-label and designer brands to private-practice optometrists and ophthalmologists. It claims that it is the only frame company that exclusively supports private-practice eye doctors throughout the U.S. and that it provides a unique service and delivery system to enhance profitability. According to Altair it distributes over eight hundred thousand (800,000) frames annually using a telemarketing sales force and free consignment inventory at doctor locations. [1]

*12003 S. 46th Street  [1] Phoenix  AZ  85044*
*480.759.0172*

Marchon Eyewear, acquired by VSP in 2008, was founded in 1983 and today claims to be one of the world's largest manufacturers and distributors of quality prescription eyeglass frames and sunglasses. Marchon Eyewear maintains global operations. Marchon Eyewear states that it has one of the few fully-integrated global design, manufacturing, distribution and sales operations in the eyewear industry. With over two thousand employees (2,000) and sales representatives worldwide, Marchon Eyewear's sales force is one of the largest in the eyewear industry. Similar to VSP (which arranges for private-practice eyecare) Marchon Eyewear primarily services independent optometrists and ophthalmologists. Marchon Eyewear handles approximately fifty thousand (50,000) customer accounts in 100 countries. [1]

OSS Holdings is an affiliate of Marchon Eyewear. OSS Holdings' primary product is OfficeMate Software Solutions ("OfficeMate"), an industry leader in eye care business software solutions for more than fifteen thousand (15,000) eye care professionals in over seven thousand (7,000) offices. [1]

### B. Aspex Eyewear, Inc.

Aspex is a corporation duly organized and existing under the laws of the state of Delaware. Aspex is an eyewear manufacturing company located in Pembroke Park, Florida. Aspex is a relatively small company; however, it is an innovator in the eyewear industry with proprietary products. Aspex's target market is the private-practice eyecare professional (ECP). As a result, Aspex today derives approximately 70% of its sales from independent ECPs, the vast majority of which are within the VSP network. [3]

THE MARKETS

The industry is divided into various sub-markets. During my 29 years of experience in the industry, I have been extensively involved in each of these sub-markets.

### A. The retail market

The retail market for eyecare/eyewear is comprised primarily of large specialty retail chains (e.g., LensCrafters, Pearl Vision, Eye Masters, Sterling Optical, EyeCare Centers of America (ECCA) to list but a few. In addition, this market includes the Big box stores (e.g., Wal-Mart, Costco, Target etc.) This market is driven primarily by the desire to sell retail products and services. The large specialty chains and big box stores employ or contract with optometrists for the purpose of their customers obtaining an eyeglass or contact lens prescription to facilitate the sale of eyewear in a retail environment. The chain or big box store typically does not receive significant revenue from the examination. This market was created by optical laboratories and frame manufacturers to promote the sale of their products. While there is not a definitive data source, this market is currently believed, by many in the industry, to comprise approximately 40 to 50% of the market for fully funded eyecare/eyewear benefits. This is based on analyzing claim data from fully funded plans in companies of which I have been affiliated and from information provided in the 2008 AOA Third Party/Managed Care Survey.

### B. The independent private practice provider (ECP) market

This market for eyecare/eyewear is comprised of independent, self-employed optometrists and ophthalmologists. This market is driven by ECPs for the primary purpose of providing eye health. Eyecare and eyewear are provided in a more clinical environment. In my experience, independent ECPs view the retail market as their major

2

competition and typically view it as less professional. While there is not a definitive data source, many in the industry believe it to comprise 50 to 60% of the market for fully funded eyecare/eyewear benefits. This is based on analyzing claim data from fully funded plans in companies of which I have been affiliated and from information provided in the 2008 AOA Third Party/Managed Care Survey.[4]

Depending on the data source, there are between 36,000 and 37,000 full time equivalent optometrists in the workforce. [4]  There is also a small number of dispensing ophthalmologists. Most ophthalmologists do not dispense eyewear. Of the optometrists, 75.3% reported that they were self employed.[4]  This would indicate that approximately 27,800 independent ECPs are in private practice.

### C. The Insurance market

In my experience, the insurance market, including pre-paid and indemnity encompasses both of the above sub-markets. This market provides a funded benefit to patients/members through the collection of premiums and the payment of claims to individuals and contracted providers. Various insurance companies including VSP provide these pre-paid and indemnity products. These products are sold to employee groups, associations, government subdivisions, trade unions and individuals much the same way as medical benefits are sold. The insurance market is highly regulated by the states through various agencies. This market provides significant barriers to entry both regulatorily and financially. For example, state insurance regulators typically require insurance firms to show that they are adequately capitalized and meet other regulatory standards which vary by state.  The companies providing this coverage can be either for-profit or not-for-profit. These programs include the concepts of Premium, Deductibles, Co-payments, Co-insurance, Exclusions, Coverage limits, Out-of pocket maximums, Capitation, In-network provider, out-of network provider, Prior authorization and an Explanation of benefits etc.

Another barrier to entry is the need to assemble a network of doctors at the same time as acquiring customers/subscribers.  Generally, to attract customers/subscribers, firms must show that they already have a large network of doctors.  However, in my experience it is difficult to persuade a doctor to join a new network unless the insurer has sufficient existing customers to drive new patients to the doctor's office.

### D. The discount market

The discount market is not regulated and provides few barriers to entry. The market model is based on selling discount access that will presumably be accepted at various locations within both the retail sub-market and the independent ECP sub-market. The discounts vary widely between issuers (from 15 to 60%) [5] and in many cases will include presumed discounts for goods and services in addition to vision, e.g., dental, pharmacy, chiropractic, medical, road side assistance, etc.[5] The issuers for these plans are many. Commercial discount programs are generally available to consumers without regard to income, age or physical condition. Most charge a monthly or annual fee or are offered to members of organizations such as AARP, AAA, retail chains, individuals, etc. Various forms of discount plans are marketed and available in both the retail and independent ECP sub-markets. Discounts are negotiated with both retail and independent ECPs willing to provide the discounts. In many cases discount benefits are offered in conjunction with insured and pre-paid plans to offer some level of benefit in the absence of or following the exhaustion of funded coverage. There is generally no limit on the number of times the discount can be utilized. This is a hi-growth sub-market due to the

3

relative absence of any barriers to entry. It is also subject higher levels of abuse, misrepresentation, false advertising and consumer fraud due the lack of regulation.

### E. The eyeglass frame market

The eyeglass frame market is comprised of many manufacturers that market their products to both the retail sub-market and the independent ECP sub-market. This sub-market is an integral part of goods and services being provided through all of the sub-markets. In my experience with various frame manufacturers, laboratories and importers, these manufacturers supply eyeglass frames for spectacle Rx's and for plano eyewear (sunglasses, readers etc.). The frames are promoted primarily through various branding strategies by purchasing licensing rights to use trademarked names in their marketing and promotional efforts. e.g., Disney, Fendi, Nike, Nautica, Oscar de la Renta, Sophia Lauren etc. Frames are also marketed on the basis of unique material, features, and price. Some frame manufacturers sell extensively to both the retail and independent ECP sub-markets, however, a large number focus their efforts on one sub-market or the other. This is due to the significant differences between how their respective supply chains operate. For example, Marchon and Aspex both focus on the ECP submarket. To build an effective sales force and marketing and distribution strategy to effectively sell to both sub-markets is beyond the means or capabilities of many frame manufacturers except for the very large.

### ANALYSIS OF MARKET POWER

VSP and Aspex operate in distinct sub-markets of the vision care industry. The Industry is divided into various sub-markets. The two major sub-markets are generally described as the retail market and the independent provider (ECP) market. While the vision care insurance industry is involved in both markets VSP operates almost exclusively within the independent provider (ECP) market. This market does contain some small chains that are (ECP) provider owned. My experience over many years of analyzing the available data suggests that the independent (ECP) market, measured by where people obtain their eye care and eyewear is between 50 and 60% of the whole. VSP operates primarily in three (3) of these sub-markets, the insurance sub-market, the independent provider (ECP) sub-market and the frame sub-market. VSP does offer a discount product and therefore also operates in the discount sub-market but to my belief and understanding only to a very limited degree.

The vision care insurance industry is further divided between funded plans and discount plans. While discount plans are not insurance, many vision plans offer both and include the discount membership in their total membership. For example, EyeMed, part of the LensCrafters organization, claims one hundred and fifty nine million (159,000,000)[8] members. From my experience at ECPA, Cigna and in working closely with ColeVision, prior to its acquisition by EyeMed Vision/LensCrafters, I am reasonably confident that well over 50% of those are discount members. This is also true of how many other plans in the market publish their membership numbers. For this reason, publicly-reported data from such firms cannot be used to reliably estimate VSP's market share.

Instead, I have estimated VSP's market share using other information, including data published by the AOA. According to the available data in the public domain, VSP is reported to have 22% market share of the vision care market (see chart/Exhibit B).[4] This number, however, must be adjusted because it includes those that do not compete with VSP -- e.g., Medicare HMO's, Medicare fee-for service, Medicaid, other government plans and those that have no 3rd party coverage. Eliminating those from the market percentages shown in the chart would suggest that VSP's share of the vision insurance market is in excess of fifty percent (50.5%). It is interesting to note that the "typical" O.D.

4

*John A. Raycraft*

*12003 S. 46th Street   Phoenix, AZ 85044    480.759.0172*

patient profile consisted of 50.5% of patients covered by private plans such s VSP.[4] Further, this figure is conservative because none of the competitors providing vision care break their membership numbers down between funded and discount membership, and there is no hard data available that I am aware of to support a precise percentage of each. However, it is my belief, if all of the discount membership were eliminated from the reported numbers, which could be more than 50%, leaving only funded lives, VSP's market share of the funded market would be significantly higher than is reflected by the available data. This is further supported by the fact that VSP claims it has contracted with over 50% of the companies on the 2007 Fortune 500 list and Fortune Magazine's "Best Companies to Work For" that provide fully insured vision plans. [1]

The sub-market of ECP's (independent eye care providers), is a separate and distinct market for eyecare and eyewear delivery. From many years of working for and with VSP and many years of competing against VSP in the independent (ECP) market place, in which VSP primarily operates, I know from experience that VSP is the dominant and most formidable force in the market for the provision of vision care/vision wear by a considerable margin.

In this regard, it is also possible to estimate share of the private-practice eye doctors who are in VSP's network. Depending on the data source, there are between 36,000 and 37,000 full time equivalent Optometrists in the workforce. Of these 75.3 % reported that they were self employed in a survey by the AOA in 2007. That result in roughly 27,800 ECP's in private practice. [4]

VSP claims they have +/- 26,000 providers. [2] The vast majority of these providers are Optometrists. There is a small number of dispensing Ophthalmologists on the VSP panel of providers however, not believed to be a significant number. The number of VSP providers would thus be approximately 94% of the total available independent Optometrists in the workforce.

VSP plays a significant role in the practice and financial decisions of independent ECP's. Some ECP's report VSP members comprise 80% or more of their practice. [7] VSP itself states that the eye doctors in its network are "significantly dependent on VSP and VSP's members for their patient base." [1]

VSP is clearly a dominant force in the delivery of managed vision care and the distribution of eyewear.

The available data supports that between 45 and 50% of eyeglass frames are provided through the independent ECP's, [4] of which VSP holds considerable financial influence over a majority of them.

There is no available public data with respect to market share enjoyed by frame manufacturers. Marchon is, however, one of the 3 largest including Safilo and Luxottica.

It is public knowledge that VSP has also partnered with Essilor, the largest ophthalmic lens maker and wholesale laboratory operator in the US, and Ziess, another large lens manufacturer, among others.

In addition, VSP can effectively preclude frame manufacturers from competing in the distinct sub-market of the independent private practice provider. Through Altair, Marchon and VSP's Direct Connect program (a frame purchasing program for VSP providers requiring the use of approved vendors) they can control or significantly influence the frame selections of their contracted providers and effectively create a substantial barrier to entry in the market for any supplier it chooses to not approve. Through Altair and

5

Marchon they provide their contracted providers with consignment frames and returning up to 4% of annual net on Marchon and Altair purchases.[6] This means no out of pocket inventory expense for their participating providers and provides a considerable financial incentive for stocking the Marchon and Altair frame lines.

In order for frame manufacturers to have the ability to sell to VSP providers through VSP they must be on the VSP approved supplier list.

One could argue that frame manufacturers can sell directly to VSP's ECP network, this is true, and they can and do. However, given that the typical ECP has limited frame space compared to the chains and big box stores like WalMart, Costco, etc., they will fill their frame boards with frames they can get at no cost or frames that are approved for coverage for VSP members, a significant percentage if not the majority of their patient base.

70% of Aspex Eyewear Inc.'s products are sold to independent ECPs,[3] a distinct and identifiable sub-market as previously described. Aspex's sales force and marketing strategy is focused on the independent ECP sub-market of which VSP and its above referenced companies has significant control and/or influence through its panel/network of contracted providers and membership/patient base.

In my opinion, should Aspex be de-listed as an approved supplier by VSP, Aspex would lose its ability to sell their products to VSP patients, a considerable blow in and of itself. Moreover, The ECPs would have little if no reason to stock Aspex products in preference to stocking products they can sell to all of their patients, thus effectively shutting Aspex out of the market. Frame space is limited and very valuable to the ECPs. This action, if taken by VSP, I believe would create irreparable harm to Aspex.


John A. Raycraft                                      4/8/2010

John A. Raycraft                                      Date

6

John A. Raycraft
12003 S. 46th Street    Phoenix   AZ  85044    480.759.0172

# FOOTNOTES

Footnotes:

[1] Vision Service Plan, DMHC File No. 933-0049, Re: Amendment to Notice Proposing Certain Changes, Exhibit E-1, July 8, 2008.

[2] VSP web-site: www.vsp.com, VSP facts.

[3] Complaint filed 03/17/2010, Case 2:10-at-0036, Aspex Eyewear, Inc. v. Vision Service Plan; Marchon Eyewear, Inc.; Altair eyewear, Inc. United States District Court for the Eastern District of California.

[4] American Optometric Association (AOA) 2008 State of the Profession/Third Party/Managed Care Survey available at: www.aoa.org.

[5] New Benefits at: www.newbnefits.com

[6] http://portal.eyemedvisioncare.com/wps/portal/emweb/about_eyemed/key_facts

[7] American Optometric Association (AOA). Managed Care / So many plans, so little time: Coping with multiple managed care plans. An article by, Peter G. Shaw-McMinn, O.D. www.aoa.org.

[8] https://vspglobal.com/cms/newsroom/loyalty-launch.html

# EXHIBIT A

# Resume of
# John A. Raycraft
# Addendum to resume
# Board service

*John A. Raycraft*

*12003 S. 46th Street   Phoenix   AZ  85044    480.759.0172*

## John A. Raycraft
*Consultant to the Vision Care Industry*

**JOHN A. RAYCRAFT**
12003 S. 46th Street, Phoenix, AZ 85044
(480) 759-0172 cell (480) 229-0001
**E-mail: jaraycraft@qwest.net**

### SUMMARY OF PROFESSIONAL BACKGROUND

Senior Executive with over 35 years of progressively responsible management experience, directing large numbers of employees in companies with revenues exceeding $4 billion. Managed businesses, both public and private, through start-up, survival, turnaround and growth modes. Developed the flexibility to meet the needs of organizations both large and small.

- Vision Care; Insurance / Reinsurance / Managed Care
- Capital Acquisition
- Investor Relations
- Public speaking
- Sales & Marketing Management
- B to B and B to C distribution
- Strategic Planning
- Effective written & verbal communication skills; Published numerous articles
- Strong executive leadership; Mentoring abilities; Innovator
- Crisis manager; Turnaround strategic developer; Motivator
- Well organized and analytical
- Comfortable in an entrepreneurial and changing environment
- Excellent finance and accounting knowledge

### EMPLOYMENT HISTORY

**2001-2003**

**President and CEO** (February 2001 – November 2003)
CIGNA VISION CARE, Inc. (a subsidiary of CIGNA)
This was a start-up venture for CIGNA to create a line extension within the CIGNA Health Services division of CIGNA Health Care. Eleven vendor contracts were re-negotiated and national cap rates were established resulting in reduced administrative overhead and a 28% reduction in medical costs. Vision care insurance policies were filed in all 50 states and Puerto Rico. A web based "Optical Shop" was created through negotiations with various optical suppliers to provide material discounts to CIGNA members and a transaction based revenue stream for CIGNA. A national vision care provider network and administrative capability for CIGNA was created through a private label outsourcing arrangement to provide increased revenue for CIGNA and a better solution for multi-site clients. Due to continuing prioritization issues within CIGNA Medical there were insufficient available resources to support the vision care initiative. Under my direction, the administration of the Private Label alliance was incorporated into CIGNA Dental and the Vision Care entity was dissolved.

**2000-2001**

**Consultant (acting SVP Sales & Marketing)** (August 2000 – November 2000)
MEDICAL EYE SERVICES and THE EYE CARE NETWORK (subsidiary).
Medical Eye Services is a California domiciled, privately held corporation providing routine eye care as an employee benefit, both, as a California Knox Keene approved specialized health plan and as a specialty eye care vendor for a number of insurance companies providing health care insurance to California employers. Medical Eye Services also operates in four other western states on a limited basis through vended relationships with various insurance carriers. This was a consulting position wherein I was asked to provide a strategic direction and operational plan for the reorganization of the sales, marketing and service areas of the company based on my successful experience in the industry while the company sought to permanently fill the position. The project was completed and delivered to the president of the company in November of 2000.

*12003 S. 46th Street   Phoenix  AZ  85044*
*480.759.0172*

**1991-2000**       **President and CEO** (May 1993 – March 2000)
**Member of Board of Directors** (August 1993 – March 2000)
**President** (August 1992 - May 1993)
**Executive Vice President** (May 1991 - August 1992)
FIRST AMERICAN HEALTH CONCEPTS, INC. (FAHC) /EYE CARE PLAN OF
AMERICA/FIRST AMERICAN REINSURANCE CO. /FIRST AMERICAN ADMINISTRATORS,
INC. / ECPA - CALIFORNIA (HMO)
First American Health Concepts, Inc. was a publicly traded company (AMEX:FAH), which
marketed and administered third-party managed vision care plans nationwide under the name
of Eye Care Plan of America (ECPA).  The company was headquartered in Phoenix, Arizona
with sales offices in Atlanta, Columbus, Boston, Denver, Dallas, San Francisco and Los
Angeles.  FAHC served over 20 million members and maintained the largest provider network
of its type.

Responsibilities included the conception of strategic plans to carry out the goals and objectives
of the Board of Directors. Implemented all actions necessary to achieve results toward goals
and objectives. Worked as a member of the Board of Directors to establish goals and
objectives and develop policies consistent with the Board's business standards. Developed and
maintained a sound organizational structure within the company, including evaluation of staff
performance and setting the tone, direction and vision of the Company. Developed systems
and controls to monitor and measure company performance. Provided market and industry
leadership.

During the period of my direction and leadership the company was transformed from an
obscure, unknown plan in Arizona into a fully operational, full service managed vision care plan
operating in all fifty states and Puerto Rico. This was accomplished through the creation of
three subsidiaries comprised of a reinsurance company, a Knox-Keene licensed HMO in
California and a third-party administration company.

Under my leadership the company's revenue growth was in excess of 400% accompanied by
increases in total assets, shareholders equity and working capital. At no time during my tenure
as CEO was the company ever in the red. One hundred percent of the company's growth and
development was accomplished out of free cash flow and without the need for debt or dilution
to the shareholders. The company is now a market leader with a history of strong solid growth
and productivity. The company was sold to LensCrafters in May of 2000.

**1990-1991**       **President and CEO**
AVP VISION PLAN and
**Executive Vice President & Member of the Board of Directors**
OPTICS EAST, INC.
Optics East, Inc. is the parent corporation for five subsidiary companies with over 24 years of
service to the optical and ophthalmic/optometric industries.  The five subsidiary companies are:
Continental Sales of America, a major importer-exporter of ophthalmic eyewear through the
U.S., Mexico, Central and South America, Continental Optical Laboratory, one of the largest
fabricators of optical lenses in the U.S. providing prescription eyeglass lenses to customers
throughout the U.S., AVP Vision Plan providing comprehensive vision care services in
California through a statewide network of optometrists, ophthalmologists and opticians and was
the third largest provider of pre-paid vision care in California and two Mexican subsidiaries
providing wholesale eyewear distribution for Mexico, Central and South America.

AVP Vision Plan was sold to Foundation Health in 1991.

**Responsibilities are the same as shown above with First American Health Concepts, Inc.**

*John A. Raycraft*
*12003 S. 46th Street   Phoenix   AZ  85044    480.759.0172*

1981-1989

**Manager, Professional Relations Division**
CALIFORNIA VISION SERVICE PLAN (VSP)
Vision Service Plan is a prepaid employee benefit vision care plan.  Since it's beginning in 1955, it has experienced very strong annual growth and operates 4 ophthalmic laboratories. I believe my contributions contributed significantly to the growth of the company during my tenure.

Responsibilities included working closely with the President and Board of Directors in the administration, planning, directing and control of all matters affecting or relating to provider relations.  This position was very broad in scope and included the direction of staff, who in turn were responsible for various administrative areas including auditing, panel doctor membership, customer service, corporate publications, convention and exhibit coordination, general administrative processing and the administration of 70 contract ophthalmic laboratories throughout the United States.

In addition to the above responsibilities, regular participation and contribution to long-range corporate strategic planning was required. Formulation and administration of corporate policy and procedure, budget formulation and analysis were attended to while assisting the Vice President of Provider Relations, the President and Board of Directors as requested.

1986-1988

**Chairman of the Board and President**
VSP CREDIT UNION
VSP Credit Union achieved a 44% growth in total assets and a 23% growth in total income while maintaining one of the highest dividend rates in the industry, during my tenure.

In order for the Credit Union to provide a higher level of service and significant expansion to the scope of available services and benefits, VSP Credit Union merged with the Golden 1 Credit Union (the largest credit union in the state of California).  This merger was effectively accomplished under my direction April 1, 1988.

## EDUCATION
**California State University, Sacramento**
B.A. in Economics; Minor in Money and Banking, Business and Finance; Special Emphasis in accounting; Alpha Gamma Sigma Honor Society (life member) ARJC; Member of Economics Club.

Continuing Education
**National University**, MBA program, Information Systems Management
(20 units remain for completion)

## MILITARY

1965-1968

**United States Army**
Honorable discharge

*John A. Raycraft*
*12003 S. 46th Street    Phoenix  AZ  85044    480.759.0172*

Addendum to resume of John A. Raycraft

8/25/2009

Since leaving CIGNA in November of 2003 I had acquired two (2) Aerospace machining shops: Precision Industrial Solutions, LLC and BC Grinding, LLC. BC Grinding was closed in April of this year due to the economic turndown in manufacturing.

I also have a consulting business currently servicing two (2) clients.

In addition to the above, I sit on 4 corporate boards and manage the investments of 2 family trusts.

## BOARD SERVICE 1981 to Present

**Public Board Service**

*(Previous)*

CIGNA Vision Care, Inc.

First American Health Concepts, Inc.

IP Voice.com

**Private Board Service**

*(Current)*

Starmount Life Insurance Company

Ocular Insight, Inc.

Arizona Tooling & Machining Association (ATMA)

Precision Industrial Solutions, LLC

*(Previous)*

First American Reinsurance, Inc.

First American Administrators, Inc.

Eye Care Plan of America-California, Inc.

Joray Corporation, (Kachina Testing Laboratories)

Optics East, Inc.

AVP Vision Plan

Continental Sales, Inc.

Spa Savings Centers of Southern California, Inc.

VSP Credit Union

**Charitable Board Service**

*(Previous)*

Joe Foss Institute

# EXHIBIT B

Optometry's Career™ | Optometry's Meeting® | AOA News | Optometric Career Center® | Ask a Question

**Find an Optometrist** ▶

Jan Malcolm Lane is logged in. [Log Out]

Advertise in OD | Survey | Practice Benefits | Residency Programs | Ask a Question/Find a Service | Jobs

AOA & AFF.Homes                              Search AOA.org                    A⁻ A⁺ | print for friends

## Doctor Center

Practice Advancement

Member Benefits & Services

Manuals/ Guides/ Surveys

2008 Third Party/Managed
Care Survey National
Highlights

**1. Third-Party/Managed Care and Optometric Patients.** Optometrists were asked to estimate the percentage of their patients in 2007 sponsored (covered) by, and the amount of their practice revenue coming from, various third party and managed care sources. The "typical" OD patient profile consisted of 53.5 percent of patients covered by private plans and 26.1 percent covered by public health plans (e.g., Medicare, Medicaid, other government programs). Nearly 53.5 percent of the patients (up from 45.6 percent in 2005) in the typical practice were in private and/or public managed care plans (e.g., health maintenance organizations, preferred provider organizations, VSP, etc.). One-fifth (20.4 percent) of patients had no third party coverage for OD services. Revenue in 2007 from private plans accounted for 53.2 percent of total revenue; from public plans, 24.5 percent. Out-of-pocket payments (including cost-sharing amounts from patients covered by third-parties) represented 32.2 percent of total revenue. Revenue from all managed care type plans (HMOs, preferred provider plans, VSP, etc.) was 43.3 percent of total patient revenue, compared with 39.3 percent in 2005.

Third Party/Managed Care and Optometric Patients Practice Revenue Sources By Industry, 2007

| SOURCE | % PATIENT | % REVENUE |
|---|---|---|
| VSP | 22.0 | 18.0 |
| Other self-directed vision plans | 9.7 | 8.8 |
| HMOs (private sector) | 6.4 | 5.2 |
| Other managed care | 8.4 | 7.8 |
| Other private indemnity/discount plans | 4.0 | 3.5 |
| Medicare HMOs | 4.4 | 3.5 |
| Medicare fee-for-service | 13.3 | 12.2 |
| Medicaid | 8.8 | 6.6 |
| Other government plans | 2.6 | 2.2 |
| No 3rd party coverage | 20.4 | ------ |
| Patient out-of-pocket payments | ------ | 32.2 |
| TOTAL | 100.0% | 100.0% |

**2. Managed Care Patient Volume, Gross and Net Income.** Increased participation in managed care yielded higher patient volumes for most optometrists (65.3 percent), enhancing gross income for half of reporting ODs (50.0 percent). More than one-third of optometrists (35.5 percent) in the study reported improved net income from managed care.

Managed Care Patient Volume, Gross and Net Income, 1993-2007

| CATEGORY | 1993 | 1997 | 1999 | 2001 | 2003 | 2005 | 2007 |
|---|---|---|---|---|---|---|---|
| Volume increased | 54.8% | 64.0% | 67.6% | 58.7% | 56.3% | 67.9% | 65.3% |
| Gross income increased | 40.7% | 47.1% | 41.7% | 40.4% | 39.0% | 51.2% | 50.0% |
| Net income increased | 28.7% | 22.8% | 25.4% | 26.1% | 35.5% | 38.3% | 35.5% |

**3. Health Plan Participation.** Optometrists increased their participation in a variety of managed care and

AOA Sections

Meetings & Continuing Education

Legal Tools

Managed Care & Insurance

Third Party Center

Licensure

AOA Programs

Archives & Museum

Ask Your AOA

State Advocacy

Joint Board Certification Project Team

*John A. Raycraft*

*12003 S. 46th Street   Phoenix   AZ  85044    480.759.0172*