SCOTT W. HANSEN (admitted pro hac vice)
LAURA A. BRENNER (admitted pro hac vice)
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202
Telephone: 414-298-1000
Facsimile: 414-298-8097
shansen@reinhartlaw.com
lbrenner@reinhartlaw.com

BILL WARNE (Bar No. 141280)
MEGHAN BAKER (Bar No. 243765)
Downey Brand
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Telephone: 916-520-5510
Facsimile: 916-520-5910
wwarne@downeybrand.com
mbaker@downeybrand.com

Attorneys for Defendant
VISION SERVICE PLAN

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASPEX EYEWEAR, INC., | CASE NO. 2:10 CV 00632 JAM - GGH |
| Plaintiff, | **VISION SERVICE PLAN'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| VISION SERVICE PLAN; MARCHON EYEWEAR, INC.; ALTAIR EYEWEAR, INC., | **Date: May 19, 2010** |
| Defendants. | **Time: 9:30 a.m.** |
| | **Ctrm: Courtroom No. 6** |
| | **Judge: Hon. John A. Mendez** |

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................1

ARGUMENT ...............................................................................................................5

I.     ASPEX FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON
       THE MERITS. ..................................................................................................6

       A.      Aspex Alleged No "Implied Contract" That Requires VSP to
               Designate Aspex as an In-Network Supplier While Aspex Sues It............8

       B.      Aspex Does Not Have a Likelihood of Success On Its "Promissory
               Estoppel" Claim.................................................................................11

       C.      Reimbursing Purchases Of Aspex Frames As Out-Of-Network
               Purchases Does Not Violate The Sherman Act.......................................13

       D.      Aspex Cannot Establish a Likelihood of Success on its Unfair
               Competition Claims. ..........................................................................22

       E.      Aspex Cannot Show a Likelihood of Success on its Tortious
               Interference Claim. ............................................................................27

II.    ASPEX FAILED TO CLEARLY DEMONSTRATE A LIKELIHOOD OF
       IRREPARABLE HARM. .................................................................................28

III.   The Balance of Equities and Public Interest Favor Denial of Aspex's
       Motion for a Preliminary Injunction ...................................................................30

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION
1074526.1

## FEDERAL CASES

*Aguilar v. Int'l Longshoreman's Union Local # 10*, 966 F.2d 443 (1992)..................11, 13

*Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536 (9th Cir. 1991) ........16, 18, 19

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP,* 592 F.3d 991 (9th Cir. 2010)................................................................ 18

*Am. Trucking Assoc., Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009)......... 5, 6

*Anderson v. United States*, 612 F.2d 1112 (9th Cir. 1979)................................ 6

*Apple, Inc. v. Psystar Corp.,* 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008)................... 21

*Arntz Contracting Co. v. St. Paul Fire and Marine Ins.,* 47 Cal.App. 4th 464 (1st Dist. 1996)................................................................ 28

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp*, 472 U.S. 585, 105 S.Ct. 2847 (1985)................................................................ 15

*Bhan v. NME Hosp., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985).................................... 16

*Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832 (2d Dist. 1999)............................... 9

*Blatt v. Univ. of S. Cal,* 5 Cal. App. 3d 935 (2d Dist. 1970).....................................11, 13

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998) ......24, 25

*Brunswick Corp. v. Pueblo Bowl-O-Matic,* 429 U.S. 477, 502 Ed.2d 701, 97 S. Ct. 690 (1977)................................................................ 15

*California Computer Products, Inc. v. International Business Machines Corp.,* 613 F.2d 727 (9th Cir. 1979) ................................................ 16

*California Emergency Physicians Medical Group v. Pacificare of California*, 111 Cal. App. 4th 1127 (2003)................................................ 9

*Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86 (3d Cir. 1992) ................................ 28

*Cel-Tech Commc'n, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999)....22, 23

*Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363 (2001) ..................................22, 23, 24

*Commonwealth of Pa. ex rel. Zimmerman v. Pepsico*, 836 F.2d 173 (3d Cir. 1988)....... 27

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION

1074526.1

*Cotter v. Desert Palace, Inc.*, 880 F.2d 1142 (9th Cir. 1989)..........................................29

*Deauville Corp. v. Federated Dep't Stores, Inc.*, 756 F.2d 1183, 1190-1191
    (5th Cir. 1985)..........................................................................................................20

*Dooley v. Crabb Boat Owners Ass'n*, 271 F. Supp. 2d 1207 (N.D. Cal. 2003) ..............25

*Eastman Kodak Company v. Image Technical Serv. Co.*, 504 U.S. 451, 112 S.Ct.
    2072, 119 L.Ed.2d 265 (1991)..............................................................................22

*FDIC v. Faulkner*, 991 F.2d 262 (5th Cir. 1993) .........................................................29

*Forro Precision, Inc. v. IBM Corp.*, 673 F.2d 1045 (9th Cir. 1982)..............................17

*Graddon v. Knight,* 138 Cal. App. 2d 577 (1st Dist. 1956)............................................12

*Greyhound Computer Corp., Inc. v. IBM Corp.*, 559 F.2d 488 n.18 (9th Cir. 1977).......17

*Hercules Inc. v. U.S.*, 516 U.S. 417 (1996)..............................................................9, 10

*House of Materials, Inc. v. Simplicity Pattern Co.*, 298 F.2d 867 (2d Cir. 1962).........7, 15

*In re Managed Care Litigation*, 135 F. Supp. 2d 1253 (S.D. Fla. 2001).......................25

*Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir. 1999) .................6, 7, 8, 10, 12

*Lange v. TIG Ins. Co.*, 68 Cal. App. 4th 1179 (1998) ...................................................11

*Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1426-427 (9th Cir. 1993) .......20

*Los Angeles Memorial Coliseum Comm'n v. NFL*, 634 F.2d 1197 (9th Cir. 1980) .........29

*Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825
    (9th Cir. 2001).........................................................................................6, 7, 8, 14, 28

*Millennium Laboratories of California, Inc. v. Brian Slattery Assocs., Inc.*, 2009
    WL 862164, *3 (S.D. Cal. March 27, 2009) .........................................................6

*Milton H. Greene Archives, Inc. v. Julien's Auction House LLC*, 2009 WL
    2762262 .................................................................................................................26

*Newcal Indus. v. Ikon*, 513 F.3d 1038 (9th Cir. 2008) ...................................................22

*Patriot Scientific Corp. v. Korodi*, 504 F. Supp. 2d 952 (S.D. Cal. 2007) .....................12

*People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656 (2005).........23

*Pool Water Prod. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001)..........................16

*Reborn Enters., Inc. v. Fine Child, Inc.*, 590 F. Supp. 1423 (S.D.N.Y. 1984) .............7, 15

*Rosal v. First Fed. Bank of Cal.*, 671 F. Supp. 2d 1111 (N.D. Cal. 2009) .....................11

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION

*Sampson v. Murray*, 415 U.S. 61 (1974) ..................................................................... 29

*Scripps Clinic v. Superior Ct.*, 108 Cal. App. 4th 917 (2003) ..........................7, 22

*Smith v. City and County of San Francisco,* Cal. App. 3d 38 (1990)........................... 12

*Smithfield Foods, Inc. v. UFCW*, 633 F. Supp. 2d 214 (E.D.Va. 2008)...................... 25

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ................................. 6

*Sulmeyer v. Coca Cola Co.,* 515 F.2d 835 (5th Cir. 1975)..................................... 18

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.,* 512 F.2d 1264
    (9th Cir. 1975)................................................................................. 17

*United States v. Aluminum Co. of America,* 148 F.2d 416 (2nd Cir. 1945).................... 17

*United States v. Brecht*, 540 F.2d 45 (2d Cir. 1976) ...................................24, 25

*United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377 (1956) .......................... 21

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006)............................................. 25

*United States v. Grinnell Corp.,* 384 U.S. 563 (1966).......................................... 21

*United States v. United Shoe Machinery Corp.,* 110 F. Supp. 295 (D. Mass. 1953) ....... 17

*United States v. Vigil*, 523 F.3d 1258 (10th Cir. 2008) ........................................ 25

*United States v. Williams*, 952 F.2d 1504 (6th Cir. 1991) .................................... 25

*Unterberger v. Red Bull North America, Inc.*, 162 Cal. App. 4th 414 (2008)............... 10

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004)........... 18

*Viacom Int'l, Inc. v. Icahn,* 747 F. Supp. 205 (S.D.N.Y. 1990) ..........................24, 25

*VP Racing Fuels, Inc. v. Gen. Petroleum Corp.*, 673 F. Supp. 2d 1073 (E.D. Cal.
    2009)................................................................................................... 27

*Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365 (2008)................................. 5, 6

*Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101
    (2nd Cir. 2003)................................................................................... 29

*Zimco Restaurants, Inc. v. Bartenders and Culinary Workers Union*, 165 Cal.
    App. 2d 235 (1958) ............................................................................ 10

*Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870 (9th Cir. 1982) ....................................6, 15

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION
1074526.1

## CASES

18 U.S.C. § 1951(a) ................................................................................................. 24

Cal. Bus. & Prof. Code § 17200 ............................................................................ 22

Cal. Bus. & Prof. Code § 17500 ............................................................................ 26

Cal. Health and Safety Code § 1360 ................................................................26, 27

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## PRELIMINARY STATEMENT

Aspex's case rests on the flawed premise that companies must do business with companies that sue them. Aspex has been suing VSP's affiliates since 2002, and now VSP. The lawsuits have no merit. Every claim Aspex raised against VSP's Altair subsidiary in 8 years of fighting has been dismissed on its merits and affirmed on appeal, or depends on a patent that the U.S. Patent and Trademark Office has determined is invalid and should never have been issued in the first place. The final straw came last Fall. Aspex sued Marchon, another VSP subsidiary, a second time. Aspex alleged patent infringement against the same Marchon eyeglass frames that Aspex had told a federal court in the prior suit between them did not infringe the patent. Marchon had settled the first case, believing it had purchased peace; then Aspex sued again.

For 8 years VSP has helped enrich Aspex by reimbursing some of the costs patients incurred to buy Aspex frames. And Aspex has been using those profits to keep suing, first Altair, then Marchon and now VSP, despite repeated warnings that doing so would rupture its relationship with VSP.

So last Fall, VSP decided to begin a graduated withdrawal from Aspex. Rather than stop covering Aspex frames altogether, VSP chose the intermediate step of covering them as out-of-network purchases, like it does for frames purchased at Wal-Mart, Costco, Sears, Target, Lenscrafters, Pearl Vision and other frame retailers. This, it was entitled to do, for no one is obliged to support a party who keeps suing it.

## STATEMENT OF FACTS

VSP sells vision care insurance to governments, private sector businesses, union trust funds and other groups of individuals. (Brooks Decl. ¶¶ 2-3.) Its policies typically

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

include an eyeglass frame allowance that covers more or less of the purchase price, depending on how much the frame costs. (*Id.* ¶ 2.) VSP has nothing to do with the choice of frames; that is up to the patient. Patients can buy frames in-network from doctors who accept VSP insurance or out-of-network from anyone else. VSP's out-of-network frame allowance is less than its typical in-network frame allowance. (*Id.* ¶ 8.) But a patient who uses the out-of-network allowance can end up paying less after deducting the allowance by buying the frame at a discount-focused mass merchandiser like Wal-Mart, Costco, Sears or Target, for example. (*Id.*)

VSP tries to manage the rising cost of vision health care and also give patients a meaningful selection of eye doctors. (*Id.* ¶ 5.) It does that by contracting with optometrists and ophthalmologists who agree to accept VSP insurance. (*Id.*) VSP's competitors also contract with the same doctors, who likewise agree to accept their payment plans, too. (*Id.* ¶¶ 4, 6.) According to the American Optometric Association, the typical private practice eye doctor accepts 5.4 HMO vision plans, 5.2 PPO vision plans, and 10.5 other vision plans. (Langenfeld Decl. ¶ 7.) VSP faces vigorous competition and doctors who service VSP clients usually service VSP's competitors, too. (*Id.*; Brooks Decl. ¶ 6.)

VSP also owns two companies that sell eyeglass frames. VSP started Altair from scratch for that purpose many years ago and it remains quite small. (Langenfeld Decl. ¶ 46). In 2008, VSP bought Marchon. Marchon is larger than Altair but not as large as some of its competitors. (*Id.* ¶ 47.) Competition among frame manufacturers is intense, with at least 450 different brands. No one has a dominate market share. (*Id.*)

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

1074526.1

VSP covers as many frame models as possible. The more frames it covers, the more choice its clients have. If VSP refused to cover many frame manufacturers, its insurance would become less valuable and potential clients would look for better options. (*Id.* ¶ 33.) VSP's partial withdrawal from covering Aspex frames would not be in VSP's interest if Aspex were not so litigious.

Aspex. manufactures frames. (Compl. ¶ 8.) It competes with Altair, Marchon and hundreds of other frame manufacturers. (*Id.* ¶ 81.) Aspex also does business internationally. (*See* Aspex's website, [www.aspexeyewear.com](www.aspexeyewear.com).) Aspex has not identified any entry barriers, a fact supported by the huge numbers of competitors. (Langenfeld Decl. ¶ 40.) Part of Aspex's competitive strategy involves suing competitors for patent infringement. Altair and Marchon are not alone; in the last decade Aspex commenced over 40 patent infringement lawsuits in the United States. (Baker Decl. ¶ 2, Ex. A.**)**

Aspex first sued Altair in 2002 in New York. (Bodine Decl. ¶ 1; Wright Decl. ¶ 1.) It alleged infringement of three patents. Eventually the court ruled that none of Aspex's products infringed any of the patents. (Bodine Decl. ¶¶ 1, 3, 5, Ex. F.) The court of appeals affirmed that decision but interpreted one claim of one patent differently than the trial court and remanded that part of the case. (*Id.* ¶ 6, Ex. G.) While that was happening, the United States Patent and Trademark Office ("P.T.O.") agreed to re-examine whether that remaining patent should have been issued in the first place. After considering prior art that Aspex never showed the original examiner, the P.T.O. determined the patent to be invalid for a long list of reasons. (*Id.* ¶ 8, Ex. H.) But Aspex continues to sue Altair in New York on its sole surviving claim. (*Id.*)

- 3 -
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
1074526.1

Several times during the New York litigation, Altair tried to find a non-litigation solution and warned Aspex that VSP was not likely to keep underwriting Aspex's litigation by reimbursing purchases of Aspex frames. (Wright Decl. ¶¶ 2-4; Bodine Decl. 2, 4.)

Last September, Aspex sued Marchon—for the second time. Aspex first sued Marchon in the U.S. District Court for the Central District of California alleging infringement of the '545 patent. (Paek Decl. ¶ 2.) Marchon had redesigned the accused eyeglass frames before the lawsuit, so the question arose whether Aspex claimed the new design also infringed the patent. (*Id.* ¶ 3.) At a scheduling conference on May 7, 2007, the court ordered the parties to confer and Aspex to decide whether the new designs infringed the patent. Marchon gave Aspex 64 samples of the old and new designs. They met and conferred. And Aspex informed the court that it did not accuse any of the new designs of infringing the patent. (*Id.* ¶ 4.) Marchon later agreed to pay Aspex for the alleged past infringement. The case was then settled and dismissed with prejudice. (*Id.* ¶ 4, Ex. B.) Marchon thought it had bought peace and that Aspex had no complaint about its new designs. Then last Fall, Aspex sued again, asserting the same patent against the same new design frames. (*Id.* ¶ 6; Brooks Decl. ¶ 10.)

Aspex's act of apparent duplicity caused VSP to re-think its relationship with Aspex. VSP came to the conclusion that it was bad business to keep doing business as usual with someone who used its money to run up the operating costs of Marchon and Altair by suing them and refusing to settle. (Brooks Decl. ¶ 10.) Rather than disengage completely, VSP decided to take the smaller step of reducing coverage of Aspex frames to out-of-network status. (*Id.* ¶ 11.) Out-of-network status applies to all eye care

- 4 -
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
1074526.1

professionals who do not have agreements with VSP, and there are many.  It also applies to all frames purchased through retailers and mass merchandisers like Lenscrafters, Pearl Vision, Wal-Mart, Costco, Sears, Target and others.  (*Id.* ¶ 8.)

Aspex filed its latest complaint against VSP, Marchon and Altair in this court on March 17, 2010 demanding that VSP continue to do business with it as in the past and that VSP advise eye doctors that Aspex's reimbursement status would never be changed. Aspex asserted six claims against VSP:  breach of contract, promissory estoppel, antitrust, tortious interference, false advertising and unfair competition.  (*See* Compl.) VSP responded with a motion to dismiss and supporting memorandum ("VSP Mem.") showing that for each of its claims, Aspex failed to state a claim upon which relief can be granted.

## ARGUMENT

Aspex relied on an obsolete standard for granting preliminary injunctive relief when it wrote that this court can grant relief merely by showing the possibility of irreparable injury.  (Mot. 6:12-15.)  Recently, the Supreme Court explicitly rejected this test, finding it "too lenient" for the "extraordinary" remedy of  preliminary injunctive relief, *see Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365, 375 (2008), and cautioned that a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 129 S.Ct. at 375-76.  Following *Winter*, the Ninth Circuit explicitly held that any and all pre-*Winters* cases that "suggested a lesser standard . . . are no longer controlling, or even viable." *Am. Trucking Assoc., Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

1074526.1

The movant must clearly establish that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 129 S.Ct. at 374; *accord Am. Trucking*, 559 F.3d at 1052; *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126-27 (9th Cir. 2009).

Additionally, when the movant seeks a mandatory (rather than prohibitory) injunctive relief – as Aspex does here – the court subjects the request to "heightened scrutiny," *Millennium Laboratories of California, Inc. v. Brian Slattery Assocs., Inc.*, 2009 WL 862164, *3 (S.D. Cal. March 27, 2009), and will not issue an injunction in "doubtful cases," *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979). Additionally, the court will not issue mandatory relief unless "extreme or very serious" harm will occur that cannot be compensated with damages. *Anderson*, 612 F.2d at 1115.

Aspex does not meet the test for a preliminary injunction.

## I.    ASPEX FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS.

Aspex failed to demonstrate a likelihood of success on any claim.

### A.    VSP Has the Right to Stop Doing Business With a Company That Sues It.

Aspex's claims derive from the mistaken premise that companies must continue doing business with those who sue them. A company has the right to deal with whomever it pleases, and it does not have to do business with those who choose to sue it. *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825, 835 (9th Cir. 2001); *see also Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 890 (9th Cir. 1982); *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1358 (Fed. Cir. 1999); *Reborn Enters., Inc. v. Fine*

*Child, Inc.*, 590 F. Supp. 1423, 1443 (S.D.N.Y. 1984); *House of Materials, Inc. v. Simplicity Pattern Co.*, 298 F.2d 867, 872 (2d Cir. 1962). Even doctors may refuse to serve patients who sue them. *Scripps Clinic v. Superior Ct.*, 108 Cal. App. 4th 917 (2003).

A company's decision not to do business with those who sue it is not "wrongful," even if the suing party characterizes the decision as "retaliatory" or claims it creates pressure to settle rather than lose the business. *Intergraph*, 195 F.3d at 1350, 1366; *Marin Tug*, 271 F.3d at 828 – 835. *Intergraph* is a good example. Intergraph sought to enjoin Intel from altering their business relationship after Intergraph sued Intel and its other customers for patent infringement. *Intergraph*, 195 F.3d at 1350. Intergraph claimed that the Intel business was essential to its survival because it used Intel components to make its own products. *Id*. at 1349, 1351. Intel previously had designated Intergraph a "strategic customer" that received special benefits and technical assistance from Intel. *Id*. at 1350. After Intergraph sued Intel and its customers and refused to settle the dispute, Intel removed Intergraph's special designation and refused to provide it with the same benefits and assistance. *Id*. Intergraph argued that Intel was retaliating for the lawsuits and sued Intel, claiming violations of antitrust laws, negligence, breach of contract, tortious interference with business relations, breach of contract and fraud. *Id*. Intel countered that its decision to change its relationship with Intergraph was a lawful exercise of its independent business discretion and that it was not required to do business with an entity suing it. *Id*.

The court agreed with Intel and vacated an improvidently awarded preliminary injunction. *Id*. at 1352. Consistent with the general rule that anyone has the right to

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

1074526.1

cease doing business with someone that sues it, the Court held that Intel's refusal to do business with Intergraph was supported by "a sound business reason" and concluded that no law requires courts to "weld together two business entities which have shown a propensity for disagreement, friction, and even adverse litigation." *Id*. at 1358 (citation omitted). *See also*, *Marin Tug*, 271 F.3d at 834 – 835 (tug operator did not state a tort claim based on Shell Oil's refusal to continue to do business with it after it sued Shell, even if the refusal was based on Shell's attempt to influence settlement or retaliate against the tug operator).

Aspex's protestations aside, VSP has a legitimate lawful business interest in avoiding the steep burden of defending itself and underwriting Aspex's lawsuits by subsidizing purchases of its frames. While Aspex is free to litigate to the bitter end, it must accept that doing so will change its relationship with VSP.

**B.** **Aspex Alleged No "Implied Contract" That Requires VSP to Designate Aspex as an In-Network Supplier While Aspex Sues It.**

Aspex failed to show a likelihood of success on its breach of contract claim. Aspex does not claim an express contract requires VSP to treat it as an "in-network" frame supplier. Rather, it claims there is an "implied" contract, and an implied term of this implied contract is that VSP may not alter its current reimbursement status and method for any frame manufacturer. (Pl. Mem. 9:16-10:3) According to Aspex, once any frame manufacturer is approved by VSP, an "implied" contract is formed that requires VSP to retain that designation forever, no matter what other circumstances may arise. (Compl. ¶¶ 58, 59; Pl. Mem. 9:23-10:1.) Aspex alleges that VSP breached that implied duty when it decided to change Aspex's "in-network" designation due to Aspex's lawsuits and advised doctors about the upcoming change. (Pl. Mem. 10:2-5.)

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Aspex's claim fails because it offered no evidence of any conduct that implied a promise never to change its relationship under these circumstances. An implied contract "consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words." *Cal. Emergency Physicians Med. Group v. Pacificare of California*, 111 Cal. App. 4th 1127, 1134 (2003). In order to plead a cause of action for implied contract, "the facts from which the promise is implied must be alleged." *Id.*

Despite its generalized assertions, Aspex offered no facts demonstrating an implied, mutual understanding that VSP would never alter its in-network status no matter how adversarial or unsatisfactory their relationship becomes. Aspex did not allege any history of business relationships with similarly litigious suppliers, and certainly not a history that implies an agreement never to change Aspex's in-network status no matter how badly the relationship devolves.

To support its implied contract claim, plaintiff cited two cases—*Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (2d Dist. 1999) and *Hercules Inc. v. U.S.*, 516 U.S. 417, 424 (1996). (Pl. Mem. 9:20-22.) Neither case supports its claim. In *Binder*, the defendant conceded for the purpose of the motion that there was a contract precluding termination without good cause. The only issue was the meaning of the term "good cause." *Binder*, 75 Cal. App. 4th at 848, 853, 854. *Hercules* did address the contract issue and held that the plaintiff failed to prove facts to show an implied contract.

In *Hercules*, a company that manufactured "Agent Orange" for the government during the Vietnam War subsequently was sued in product liability cases. It sued the federal government, claiming that the context in which the government compelled it to

manufacture Agent Orange created an implied-in-fact agreement to indemnify it for losses to third parties. *Hercules*, 516 U.S. at 426. The court disagreed, noting that the facts concerning how the relationship was formed did not support an implied agreement. "The circumstances surrounding the contract are only relevant to the extent that they help us deduce what the parties to the contract agreed to in fact. These conditions here do not, we think, give rise to an implied-in-fact indemnity agreement." *Id.* The court also found that there was no reason to think that a contracting officer ever would have agreed to the open-ended indemnification alleged by the plaintiff. *Id.* at 427.

Likewise, Aspex points to no facts that support its argument about the terms of an implied-in-fact contract, and there is no reason to believe that VSP would have agreed to do business forever with a vendor that kept suing it.

Aspex's claim also fails because it offered no evidence that VSP agreed to any particular time period for providing it with an "in-network" designation. A contract that is silent as to duration is terminable at the will of either party. *Unterberger v. Red Bull North America, Inc.*, 162 Cal. App. 4th 414, 420 (2008); *Zimco Restaurants, Inc. v. Bartenders and Culinary Workers Union*, 165 Cal. App. 2d 235, 240 (1958); *Intergraph*, 195 F.3d at 1366.

VSP and Aspex, at best, had an "at will" business relationship that could be terminated by either party upon reasonable notice. Because Aspex did not offer any facts demonstrating an agreement for a specific term, the alleged "implied" contract would be indefinite as to duration and therefore terminable at the will of either party.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
1074526.1

## C. Aspex Is Not Likely to Prove Its "Promissory Estoppel" Claim.

As an alternative to its implied contact claim, Aspex seeks the same result using promissory estoppel. (VSP Mem. Sec. II.) That argument also fails because Aspex offered no evidence of (1) a specific promise by VSP never to change Aspex's in-network status if Aspex sued it or its affiliates, or (2) that Aspex changed its position to its detriment as a result.

### 1. VSP Made No Promise to Aspex.

Essential to any promissory estoppel claim is an actual promise. *Rosal v. First Fed. Bank of Cal.*, 671 F. Supp. 2d 1111, 1130 (N.D. Cal. 2009). The promise must be unambiguous and not unenforceably vague. *Id.* It must be specific. *Aguilar v. Int'l Longshoreman's Union Local # 10*, 966 F.2d 443, 446 (1992). And it must objectively indicate a clear intent by the promisor to be bound by the promise; a statement cannot be transformed into a promise simply because someone subjectively interpreted it as a commitment. *Lange v. TIG Ins. Co.*, 68 Cal. App. 4th 1179, 1185-86 (1998).

Aspex relied on the *Aguilar*, *Lange* and *Blatt* cases to support its promissory estoppel argument. (Pl. Mem. 10:11-12.) Those cases show why Aspex's promissory estoppel claim has no merit because in each case, as here, the plaintiff failed to allege a specific promise. *See Aguilar*, 966 F.2d at 444-446 (representations contained in application materials were not the type of clear and definite promise required for a promissory estoppel claim); *Lange*, 68 Cal. App. 4th at 1185 (respondent's interpretation of statement did not make it an unambiguous, binding promise); *Blatt v. Univ. of S. Cal,* 5 Cal. App. 3d 935, 942-43 (1970) (attorney who met honor society's criteria but was not accepted failed to state a claim for promissory estoppel; "the alleged promises or

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

1074526.1

representations were such that it cannot be said that they induced action" ... of a *definite and substantial character* on the part of the promisee.") (emphasis in original).[1] *See also Intergraph*, 195 F.3d at 1366 (defendant's statement that plaintiff would be a "strategic customer in present and future programs" did not constitute a binding obligation to continue business with the plaintiff).

Aspex offered no evidence of such a promise beyond its generalized assertion that VSP "promised" *all* frame manufacturers that they would remain on the approved list so long as they continued to update their pricing information in a third-party publication. (Compl. ¶ 65). According to Aspex, adding it to the "approved" list constituted the promise. But *Aguilar* rejected the notion that a similar application process could support promissory estoppel. A willingness to begin doing business with someone is a far cry from a promise to do business on the same terms forever no matter how sour the relationship becomes.

## 2. Aspex's Alleged "Reliance" Was Not Reasonable, Detrimental or Foreseeable.

Aspex's promissory estoppel claim also fails because Aspex offered no evidence demonstrating that it made substantial, detrimental changes to its position because of the alleged promise and that VSP should have foreseen that it would do so. *See Patriot Scientific Corp. v. Korodi*, 504 F. Supp. 2d 952, 967-68 (S.D. Cal. 2007) (conclusory allegations about reliance are not sufficient to state a claim); *Smith v. City and County of San Francisco*, 225 Cal. App. 3d 38, 48 (1990).

---

[1] The other case cited by Aspex involved an alleged promise that was far clearer than the purported promisee. *See Graddon v. Knight,* 138 Cal. App. 2d 577 (1956) (defendant bank estopped from denying a promise to obtain fire insurance after a bank officer asked homeowner if he wanted full insurance coverage and the homeowner said yes.)

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

1074526.1

Aspex's inability to demonstrate foreseeable, detrimental reliance is due to the lack of a clear and unambiguous promise in the first place. As the Ninth Circuit explained in *Aguilar,* "definiteness and certainty are required so that the promissor should reasonably foresee reliance by the promisee." *Aguilar*, 966 F.2d at 447. If Aspex relied on anything, it was its own unreasonable expectation that VSP's agreement to begin doing business with Aspex was an agreement to do so forever, no matter what. Such reliance is neither reasonable nor foreseeable.

Aspex's alleged "reliance" also was unreasonable because it was warned for *five years* that VSP would stop covering Aspex frames if Aspex kept suing Altair and later, Marchon. After those repeated warnings, Aspex acted at its own peril. (Bodine Decl. ¶¶ 2, 7; Wright Decl. ¶ 3; Fessler Decl. ¶ 4.)

Finally, Aspex failed to show that it made any substantial, detrimental changes in its position in reliance on the "promise" it inferred. Like the alleged promise in *Blatt,* the alleged "promises" were not of the type that would have induced action of a *definite and substantial character,* and as in *Blatt*, Aspex's suggestion about what it would have done without the "promise" falls flat. *Blatt,* 5 Cal. App. 3d at 943-44. At best, Aspex claims it kept selling its prescription eyeglass frames to doctors who sell vision-related products and services. It offered no evidence that it would not have sold its frames to the doctors without the "promise" by VSP. The evidence does not support promissory estoppel.

### D. Reimbursing Purchases Of Aspex Frames As Out-Of-Network Purchases Does Not Violate The Sherman Act.

Aspex offers an array of antitrust theories, all based on Section 2 of the Sherman Act, which prohibits unlawful monopolization and attempted monopoly. All of them fail because:

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

1074526.1

- VSP's desire not to subsidize lawsuits against itself or its affiliates is a legitimate business reason for changing its relationship with Aspex.

- Aspex demonstrated no injury to the over 450 other brands of frames that it competes with; just injury to itself, which cannot support an antitrust claim.

- Even if VSP were a monopolist in a market that could be limited to insurance companies, changing reimbursement for Aspex frames could not drive enough business to Marchon or Aspex to turn them into monopolists in the frame market.

- Nothing that happens to Aspex could possibly enhance or extend VSP's alleged monopoly over eye care insurance because Aspex does not compete in that alleged market.

- Aspex has defined the market far too narrowly; properly defined, VSP is far from a monopolist, and VSP insurance certainly is not essential to competing in the frame market.

**1.      Aspex's Antitrust Claims All Depend on the Flawed Premise That VSP Must Do Business With a Company That Sues It.**

As discussed earlier, companies have the right to refuse to do business with those who sue them.  In *Intergraph* the court held that Intel did not violate antitrust laws by changing how it did business with a former collaborator that insisted on suing Intel and its customers for patent infringement because Intel had a legitimate business interest in not subsidizing a party that kept suing it.  *Intergraph*, 195 F.3d at 1358.  The Ninth Circuit reached the same conclusion in *Marin Tug,* 271 F.3d at 834 – 835,  after Shell refused to sell petroleum to a tug boat company that sued it, even though the refusal, in turn, prevented the tug boat company from hauling Shell's products for downstream customers.  *Id.*  The desire not to subsidize litigation against oneself is a legitimate business reason for refusing to deal, or for changing the relationship, with the suing

party.[2]  Even in a case in which an actual monopolist controlled the means to destroy its

sole remaining competitor, the Supreme Court wrote:

> Since the jury was unambiguously instructed that Ski Co.'s refusal to deal with
> Highlands 'does not violate Section 2 if valid reasons exist for that refusal,'
> [internal citation omitted] we must assume that the jury concluded that there were
> no valid business reasons for the refusal.  The question then is whether that
> conclusion finds support in the record.

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp*, 472 U.S. 585, 605 (1985).

VSP's business reason for changing its coverage of Aspex products is undisputed,

legitimate and not anticompetitive.  VSP decided to cover Aspex products as out-of-

network purchases because Aspex had been suing Altair for 8 years in New York and

then sued Marchon a second time based on claims Marchon thought it had settled and

dismissed 18 months earlier.  VSP decided it was bad business to keep enriching a

company that uses its profits to keep suing VSP's affiliates.  This was a legitimate

business reason for VSP's decision.  It will have a debatable affect on one company and

no affect on the other 450+ brands in that competitive market.  All of Aspex's antitrust

claims should be dismissed because VSP has a legitimate business reason for its decision.

**3.      Aspex's Antitrust Claims All Fail Because Aspex Claims
Injury to Itself, Not to Competition.**

The antitrust laws protect competition, not individual competitors.  *Brunswick

Corp. v. Pueblo Bowl-O-Matic,* 429 U.S. 477, 502 Ed.2d 701, 97 S. Ct. 690 (1977).  As

long as consumers can buy competitive products at competitive prices, it is of no antitrust

concern that consumers may buy those products elsewhere.  *Pool Water Prod. v. Olin*

---

[2] As discussed in VSP's Motion to Dismiss brief, *Marin Tug* and *Intergraph* follow the well-established
rule that a company has the right to deal with whomever it pleases, and does not have to do business with
those who choose to sue it.  (VSP Mem. Sec. I.)  *See also Zoslaw v. MCA Distrib. Corp.,* 693 F.2d 870, 890
(9th Cir. 1982); *Reborn Enters., Inc. v. Fine Child, Inc.,* 590 F. Supp. 1423, 1443 (S.D.N.Y. 1984); *House
of Materials, Inc. v. Simplicity Pattern Co.,* 298 F.2d 867, 872 (2d Cir. 1962).

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION

1074526.1

*Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001). Aspex must suffer an injury because of an injury to competition in the market in which it competes. *Bhan v. NME Hosp., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985). According to Aspex, the market in which it competes includes at least 450 other brands, none of which will be affected in the slightest by VSP's decision. (Compl. ¶ 81.) Aspex offered no evidence that consumers will be unable to buy competitive frames at competitive prices. Because there is no evidence of injury to competition, all of Aspex's antitrust claims should be dismissed.[3]

**4.      Aspex Failed to Support Its Attempted Monopoly Claim.**

Aspex argues that VSP is using its power in the alleged insurance market to drive enough frame sales from Aspex to either Marchon or Altair to make them monopolists in the frame market. The facts fail to support this claim.

To prevail, Aspex must prove that VSP has monopoly power in its own market, is using that power with specific intent to eliminate competition (not just a competitor) in the frame market and has a dangerous probability of gaining monopoly power in the frame market as a result. *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547 (9th Cir. 1991); *California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727, 735 (9th Cir. 1979). According to Aspex, that will occur because reducing insurance coverage will drive unspecified business from itself to Marchon and Altair.

There are several fatal flaws in Aspex's attempted monopolization argument. VSP's motivation is a legitimate business reason, not an anticompetitive one. Even Aspex concedes that VSP's coverage change will not affect its 450 other competitors, so

---

[3] *See also* Memorandum of Marchon Eyewear, Inc. in Opposition to Motion for Preliminary Injunction.

- 16 -
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

1074526.1

there is no evidence that competition in the frame market will be affected. Any alleged

injury is to Aspex, not to its market competitors.

Even more fundamentally, there is not enough Aspex market share to matter, even

if we indulge in the extreme speculation that Aspex will (a) lose all of it and (b) 100% of

Aspex's sales will go to Marchon and Altair. Aspex's share of the prescription frames

market is 1.7%. (Langenfeld Decl ¶ 46.) Marchon's 13% market share and Altair's 1.7%

market share (*Id.*), *combined*, add up to just 14.7%. (*Id.* ¶ 47.) So even if Aspex's entire

market share could shift to Marchon and Altair (an obvious impossibility), their new total

would just reach 16.4%. This small change would have no effect on competition in the

frame market. (*Id.* ¶¶ 47-49 and Ex. B.) It does not begin to show a dangerous

probability that either Marchon or Altair will gain monopoly power in the frame market.

*See Greyhound Computer Corp., Inc. v. IBM Corp.,* 559 F.2d 488, 497 n.18

(9th Cir. 1977) ("We have expressed doubt that a 50% share of the market is sufficient to

establish monopoly power per se."); *Twin City Sportservice, Inc. v. Charles O. Finley &*

*Co., Inc.,* 512 F.2d 1264, 1274 (9th Cir. 1975) ("We do, however, wish to remind the trial

court when considering this case on remand of Judge Learned Hand's famous dictum that

while 90% of the market "is enough to constitute a monopoly; it is doubtful whether sixty

or sixty-four per cent would be enough; and certainly thirty-three per cent is not.") (citing

*United States v. Aluminum Co. of America,* 148 F.2d 416, 424 (2nd Cir. 1945)); *Forro*

*Precision, Inc. v. IBM Corp.,* 673 F.2d 1045, 1058-1059 (9th Cir. 1982) (35% market

share held insufficient to establish market power); *United States v. United Shoe*

*Machinery Corp.,* 110 F. Supp. 295, 346 (D. Mass. 1953) (any market share less than

50% insufficient), *aff'd per curiam,* 347 U.S. 521 (1954)); *Sulmeyer v. Coca Cola Co.,*

- 17 -

515 F.2d 835, 850 (5th Cir. 1975) (22% market share insufficient), *cert. denied*, 424 U.S. 934 (1976).

### 5. There Is No Evidence Supporting Aspex's Unlawful Monopoly Claim.

An unlawful monopolization claim requires Aspex to prove that VSP used unlawful means to obtain or maintain a monopoly in a properly defined market. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP,* 592 F.3d 991 (9th Cir. 2010).

Like its attempted monopoly claim, Aspex's unlawful monopoly claim fails because refusing to deal with a serial litigant like Aspex is not unlawful and Aspex is not being injured because of an injury to competition. It also fails because Aspex's frames sales have no effect on competition in the market in which VSP competes. Aspex sells frames. VSP sells insurance. Nothing that happens to Aspex can enlarge or maintain the number of insurance policies VSP sells. If anything, reducing reimbursement for Aspex frames could cause some customers to choose a competing alternative to VSP insurance, which would not strengthen VSP. (Langenfeld Decl. ¶ 33.)

### 6. Neither the Law Nor the Evidence Supports Aspex's Essential Facilities Argument.

"Essential facilities" is the rarest animal in the antitrust zoo. The Supreme Court has never recognized "such a doctrine." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 413 (2004). Ninth Circuit decisions recite its elements but not a single case Aspex cited found a facility essential.

The seminal Ninth Circuit decision is *Alaska Airlines, Inc., v. United Airlines et al,* 948 F.2d 536 (1991). The court stated, "[a] facility that is controlled by a single firm will be considered "essential" only if control of the facility carries with it the power to

1074526.1

*eliminate* competition in the downstream market." *Id.* at 544 (emphasis in original.)  The court added in a footnote that "[t]he power to eliminate competition must not be momentary, but must be relatively permanent." *Id.* at 544 n. 11.  And in all of the cases the court discussed in which the elements were met, the party that controlled the facility appeared to act with specific intent to eliminate the downstream competition.

The facts of this case do not support an essential facilities claim.  Aspex earns at least 30% of its revenue through retail distribution channels in which VSP insurance is not even alleged to be relevant.  Aspex sells the rest through private ECPs who accept, on average, 5.4 HMO vision plans, 5.2 PPO vision plans and 10.5 other plans.  There is no shortage of competing plans blocking Aspex access to the market.  (Langenfeld Decl. ¶¶ 7 and 30.)

Besides robust competition in VSP's own market, the downstream frame market is vigorously competitive, with hundreds of competing manufactures.  (*Id.* ¶ 40, Compl. ¶ 81.)  VSP cannot eliminate competition in that market.  (*Id.* ¶ 43.)  If VSP were to try to corner the frame market by declining in-network coverage for the 85% of frames made by competitors of Marchon or Altair, no one would buy its insurance.  VSP's competitors would rejoice.  *Alaska Airlines,* 948 F.2d at  545 (finding that it is "basic economic theory" that parties will stop using a service that provides access to a limited percentage of the available product).

Aspex's essential facilities argument collapses because VSP's insurance is not essential; VSP cannot eliminate competition in the frames market; and VSP clearly has no specific intent to do so.  It just does not want to keep enriching one company that uses VSP money to sue it.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

### 7. VSP is Far From a Monopolist.

What we have said so far assumed *arguendo* that VSP is a monopolist in Aspex's narrowly described market, and Aspex's claims failed anyway. Those claims become even more futile with properly defined relevant markets.

Monopoly power is the power to raise market prices or exclude competition from a properly defined market. It is not enough to eliminate a single competitor. It is the power to eliminate competition that defines a monopolist. *See Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1426-427 (9th Cir. 1993) ("We note that in order to prove Brunswick's possession of monopoly power, it was incumbent on L.A. Land to show that Brunswick had the power to exclude *competition* from the relevant market generally, not just to exclude a particular *competitor*"). *Deauville Corp. v. Federated Dep't Stores, Inc.,* 756 F.2d 1183, 1190-1191 (5th Cir. 1985)("the intentional elimination of even a substantial competitor alone will not ordinarily suffice to allow the issue of market power to go to the jury").

Aspex failed to show that VSP has monopoly power. Aspex inappropriately excluded from the relevant market formidable competitors for VSP's customers by narrowly defining submarkets that ignore other managed eye care providers, discount plans, government sponsored plans like Medicare and Medicaid and self-payment options. (Langenfeld Decl. at ¶¶ 19-27.) And Aspex ignores that excluding frame manufacturers from coverage undermines the value of VSP's insurance.

Aspex's expert, John Raycraft, says, for example, that there are narrow submarkets in the eye care industry. Without explaining why he differentiates VSP from all of its possible competitors, he opines that VSP has in excess of 50% market share in

the funded "eye care insurance" submarket if one eliminates all government insurance and non-third-party plans from that submarket. (Raycraft Rep. at 4-5; Langenfeld Decl. ¶ 24.) He failed to provide any economic analysis to support his conclusion. (*Id.* ¶¶ 19-24.)

Mr. Raycraft's analysis cannot support a relevant market conclusion. (*Id.* ¶¶ 19-24.) He ignored the Supreme Court's instructions that "[A] product . . . may be of such a character that substitute products must also be considered, as customers may turn to them if there is a slight increase in the price of the main product." *United States v. Grinnell Corp.,* 384 U.S. 563, 571 (1966). He did not undertake any surveys or price tests to determine whether consumers might find various products interchangeable or determine how consumers analyze their choices when deciding how to pay for eye care. *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 406 (1956) (A relevant market is "composed of products that have reasonable interchangeability for the purposes for which they are produced-price, use and qualities considered.") His conclusions are not economically plausible. (Langenfeld Decl. ¶ 19.)

Aspex also argues that prescription frames purchased by VSP's clients and consumers constitute a single "locked-in" submarket. (Pl. Mem. 12:11-12.) This argument fails because VSP clients have hundreds of brands and thousands of brand models to choose from. They are not locked into any brand, and certainly not to a Marchon or Altair brand.

"Lock-in" occurs when a there is a "*single-brand aftermarket* dependent on a specific company's primary product . . . ." *Apple, Inc. v. Psystar Corp.,* 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (emphasis added); *citing Eastman Kodak Company v. Image*

*Technical Serv. Co*., 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1991) (owners of Kodak-brand equipment forced to buy only Kodak replacement parts); *also see Newcal Indus. v. Ikon,* 513 F.3d 1038, 1049 (9th Cir. 2008) (Ikon customers forced to use only Ikon replacement equipment). Aspex offered no evidence that VSP locks anyone into purchasing a single eyeglass brand; they can use VSP insurance to buy frames manufactured by hundreds of manufacturers, including Aspex. No one is locked in. (Langenfeld Decl. ¶¶ 30-31.) Otherwise, VSP insurance would have little value. (*Id.* ¶ 33; *see supra* at p. 19.)

### E. Aspex Cannot Establish a Likelihood of Success on its Unfair Competition Claims.

Aspex asserts that VSP's removal of Aspex from its in-network list for reimbursement purposes violates California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200. (Pl. Mem. 19:8 – 26:21.) But that claim fails as well because VSP's decision not to fund Aspex's lawsuits against it is not unfair or unlawful.

Unfair competition includes "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. But courts may not impose their own notions of the day as to what is fair or unfair. *Scripps*, 108 Cal. App. 4th at 938 (citing *Cel-Tech Commc'n, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 185 (1999). Guidance comes from the legislature or prior legal precedent. *See e.g.*, *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001) (relying on federal antitrust law cases in determining unilateral pricing policy did not constitute violation of unfair competition law).

In support of its motion, Aspex alleged that VSP's conduct was (1) unfair because it threatens a violation of antitrust laws (Pl. Mem. 19:27 – 20:12); and (2) unlawful because it violates the Hobbs Act. (*Id.* 20:13 – 22:20.) Aspex also asserts that VSP's

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

1074526.1

advertising is false or misleading under the false advertising law and the Knox-Keene Act. (*Id.* at 22:21 – 26:21). Aspex cannot establish an unfair competition claim on any of these bases.

### 1. VSP's Proposed Change is not "Unfair."

As discussed above, VSP's decision was not "unfair" because companies are free not to do business with those that sue them, and such decisions are legitimate and not wrongful. (*See supra*, *see* IA and VSP Mem. Sec. I; *see also People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 667 (2005) (holding that defendant's refusal to do business with independent dealers did not constitute unfair competition); *Scripps*, 108 Cal. App. 4th at 937-941 (physicians' refusal to continue to treat patients who had sued them for malpractice was not "unfair" under the Unfair Competition Law).

Aspex failed to demonstrate any prospect of an antitrust violation. (*See supra*, Sec. I.D.) For the purpose of the Unfair Competition Law, a plaintiff who relies on an alleged antitrust violation as the basis for the "unfair" conduct must show conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition. *Chavez*, 93 Cal. App. 4th at 375 (citing *Cel-Tech,* 20 Cal. 4th at 187). That does not mean that any conduct that remotely resembles an antitrust violation will constitute unfair competition. To the contrary:

> [i]f the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason – because it unreasonably restrains competition and harms consumers – the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

1074526.1

*Chavez,* 93 Cal. App. 4th at 375 (sustaining demurrer for failure to state a claim under antitrust law or Unfair Competition law). Aspex's unfair competition law claims fail for the same reasons its antitrust claims fail.

### 2. Aspex's "Hobbs Act" Claim Also Fails.

Aspex claims it felt pressure to settle when warned that VSP might stop underwriting its serial adversary, and that VSP violated federal extortion laws. Aspex is wrong. A "threat" to sever or change a business relationship in response to a lawsuit is not wrongful or unlawful just because the other party feels economic pressure to settle.

Congress enacted the Hobbs Act primarily to combat labor racketeering. *United States v. Brecht*, 540 F.2d 45, 51 (2d Cir. 1976). The Hobbs Act imposes criminal penalties on anyone who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to so do . . . " 18 U.S.C. § 1951(a).

There is a difference between the "extortion" required for a Hobbs Act violation and the business negotiations between Aspex and VSP. (VSP Mem. Sec. VII B.) "Extortion as defined in the Hobbs Act consists of the use of wrongful means to achieve a wrongful objective." *Viacom Int'l, Inc. v. Icahn*, 747 F. Supp. 205, 210 (S.D.N.Y. 1990). But unlike the use or threatened use of physical violence, the "use of economic fear in business negotiations between private parties is not 'inherently' wrongful." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998).

Most Hobbs Act cases involve some type of racketeering or corruption. *Brecht*, 540 F.2d at 51. Not surprisingly, the cases cited by Aspex involve the explicit threats of violence, political corruption, systematic schemes to defraud, and other types of criminal

conduct that the Hobbs Act was designed to prevent. *See* Pl. Mem. 20:19-22:20;

*Dooley v. Crabb Boat Owners Ass'n*, 271 F. Supp. 2d 1207 (N.D. Cal. 2003) (physical

confrontation, explicit threats of violence, damage to property and other forms of

intimidation); *United States v. Vigil*, 523 F.3d 1258 (10th Cir. 2008) (public corruption);

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) (threats, violence and other forms of

misconduct); *Smithfield Foods, Inc. v. UFCW*, 633 F. Supp. 2d 214 (E.D.Va. 2008)

(threats of violence); *United States v. Brecht*, 540 F.2d 45 (2d Cir. 1976) (request for

illegal kickbacks); *United States v. Williams*, 952 F.2d 1504 (6th Cir. 1991) (request for

illegal kickbacks); *In re Managed Care Litigation*, 135 F. Supp. 2d 1253, 1257 (S.D. Fla.

2001) (concerted action and threats of economic harm by a group of HMOs that

attempted to force individual physicians to go along with a systematic, fraudulent

scheme).[4]

Aspex cannot ignore the difference between its negotiations with VSP and the

type of criminal extortion addressed by the Hobbs Act. *See Brokerage Concepts*, 140

F.3d at 501 (no Hobbs Act violation even though pharmacy felt economic fear that HMO

would refuse to include it in its provider network unless it gave into HMO's demands);

*Viacom*, 747 F. Supp. at 213 (no Hobbs Act violation when alleged victim gives

something to the defendant but receives something in return, even if defendant used

plaintiff's "economic fear" to induce the exchange).

Aspex offered no evidence of extortion. VSP was patient for 8 years, and then it

took the halfway step of changing coverage rather than terminating coverage altogether.

---

[4] In the *Managed Care* case, the physicians subsequently withdrew their Hobbs Act allegations. *In re Managed Care Litigation*, 298 F. Supp. 2d 1259, 1279 n. 9 (S.D. Fla 2003).

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION

1074526.1

The alleged "threats" obviously had no impact, for Aspex sued again and again. Aspex also mischaracterized its negotiations with VSP to suggest that VSP demanded that Aspex "abandon" its patent claims. (Pl. Mem. at 20:15-17.) VSP's written proposal is attached to the Fessler Declaration as Exhibit A, and shows the inaccuracy of Aspex's representation about it.[5] None of the communications between VSP and Aspex even approach extortion under the Hobbs Act.

### 3. Aspex's Advertising Claims Fail Because VSP's Advertising is Not Misleading or Deceptive.

Aspex alleges that VSP violated the Unfair Competition Law by violating California's false advertising statute, Cal. Bus. & Prof. Code § 17500, and the Knox-Keene Act, Cal. Health and Safety Code § 1360. (Pl. Br. at 22:21-26:21.) Aspex claims VSP's advertising suggests that patients will be reimbursed up to a set amount for any eyewear frame without limitation as to the brand. It alleged that these statements were untrue or misleading. (*Id.*; Compl. ¶¶ 103-108.) What Aspex really means is that someday these statements could become actionable if VSP (a) changes its reimbursement for Aspex frames and (b) does not also change its advertising. But that speculation fails to state a claim, as do the current allegations.

In order to state a claim for false advertising, a plaintiff must allege: "(1) statements in the advertising are untrue or misleading, and (2) defendant knew, or by the exercise of reasonable care should have known, that the statements were untrue or

---

[5] The information about the parties' settlement discussions is not offered to prove the validity or amount of any claim, but for the permissible purpose of refuting Aspex's allegations that VSP requested Aspex to drop its lawsuits in exchange for no consideration. *See* Fed. R. Evid. 408 advisory committee notes (permitting compromise evidence if offered for a purpose other than to prove the validity, invalidity, or amount of a claim); *Milton H. Greene Archives, Inc. v. Julien's Auction House LLC*, 2009 WL 2762262, at *1 (9th Cir. Sept. 1, 2009) (evidence of negotiations demonstrating defendant's willingness to pay a license fee for copyrights admissible to show absence of bad faith and refute plaintiff's claim of willful infringement).

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

misleading." *VP Racing Fuels, Inc. v. Gen. Petroleum Corp.*, 673 F. Supp. 2d 1073, 1088 (E.D. Cal. 2009). Likewise, a violation of the Knox-Keene Act is established only if a healthcare plan uses advertisements or solicitations that are untrue or misleading. Cal. Health & Safety Code § 1360.[6]

Aspex's false advertising claims fail because the alleged statements are true. (VSP Mem. Sec. VI.) Aspex offered no evidence that VSP has failed to provide any of its insureds with reimbursement for Aspex frames.

### F.    Aspex's Cannot Show a Likelihood of Success on its Tortious Interference Claim.

Aspex offered no evidence that supports its claim for intentional interference with prospective economic advantage.

Aspex asserts that VSP interfered with its prospective business by telling others about the upcoming change to Aspex's in-network status for reimbursement purposes. (Pl. Mem. at 27:3-14.) Aspex alleges that VSP's conduct was "wrongful" because its actions violated "several statutes." (*Id.* at 27:18-20) But the only "statutes" VSP identified were the antitrust law, the Hobbs Act and the false advertising law. (*Id.*) As discussed above, those claims fail as a matter of law. VSP's election to change the way it does business with Aspex does not constitute "wrongful" interference required to state a claim for tortious interference.

---

[6] Aspex does not mention the Knox-Keene Act in its complaint; its unfair competition claim alleging a violation of the act should fail for this reason alone. *See Commonwealth of Pa. ex rel. Zimmerman v. Pepsico*, 836 F.2d 173, 181 (3d Cir. 1988) (legal theories raised for the first time in a brief are not properly before the court).

- 27 -

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

1074526.1

Aspex's arguments rest on the false premise that a refusal to deal with another business due to litigation is "wrongful." The Ninth Circuit has rejected that premise. *See Marin*, 271 F.3d at 834-835.

VSP has a legitimate interest in not continuing to fund Aspex's litigations. Aspex has no contractual right to continue as an in-network provider, and, as noted in the case relied upon by Aspex, it cannot convert its failed breach of contract claim into a tortious interference claim. *See Arntz Contracting Co. v. St. Paul Fire and Marine Ins.,* 47 Cal. App. 4th 464, 479 (1996)

Aspex may not have wanted eye doctors to know about VSP's decision, but that does not allow Aspex to assert a tortious interference claim against VSP. As in *Arntz*, truthful statements to interested parties about VSP's impending change in coverage are not wrongful conduct actionable as intentional interference with prospective economic relations. *Id.* at 480.

## II.  ASPEX FAILED TO CLEARLY DEMONSTRATE A LIKELIHOOD OF IRREPARABLE HARM.

Aspex also failed to clearly demonstrate a likelihood of irreparable harm. Aspex attempts to demonstrate irreparable harm by arguing that the change in its in-network status could potentially lead to a loss of business revenues, customer relationships, sales representatives and business opportunities. (Mot. at 6:24-8:16.) But none of these claimed injuries are irreparable, since the harm alleged by Aspex can be adequately redressed through an award of damages. *See Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (explaining that irreparable injury connotes "harm which cannot be redressed by a legal or equitable remedy following trial"). Indeed, the fact that compensatory damages are available to Aspex in the ordinary course of litigation weighs

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

1074526.1

heavily against any claim of "irreparable" harm.  *See Sampson v. Murray*, 415 U.S. 61, 90 (1974); *FDIC v. Faulkner*, 991 F.2d 262, 265 (5th Cir. 1993); *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113–14 (2nd Cir. 2003); *Los Angeles Memorial Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1202 (9th Cir. 1980); *Cotter v. Desert Palace, Inc.*, 880 F.2d 1142, 1145 (9th Cir. 1989).

Even the harm Aspex claims is conjectural.  Aspex alleges that some unidentified retailers "are becoming reluctant" to purchase Aspex products.  (Compl. ¶¶ 35, 39.) Aspex speculates that some retailers are "less willing" and "maybe unwilling" to stock Aspex's merchandise based on VSP's change to its reimbursement status.  (Compl. ¶ 40.) However, Aspex provided no information about any actual losses and did not identify any doctors that refused to purchase Aspex's frames because of the decision.

Aspex also exaggerates its "reliance" on VSP reimbursement to Aspex's customers.  Aspex states that 70% of its sales are to independent ECPs.  (Pl. Mem. at 7:12-13.)  But Aspex never mentions what proportion of those sales is reimbursed by VSP insurance and what proportion is paid for by other means.  Nor did Aspex suggest it cannot compete by reducing its price, if necessary.  In the end, Aspex offered nothing but speculation about the nature and extent of any consequence it will suffer due to its litigious behavior.  But whatever that may be – whether lost sales or reduced profits on sales to VSP subscribers – it is readily measureable in dollars in the unlikely event Aspex prevails.

1074526.1

### III. The Balance of Equities and Public Interest Favor Denial of Aspex's Motion for a Preliminary Injunction

Aspex requests an injunction that would permit it to keep suing VSP and its affiliates, and force VSP to effectively underwrite those very lawsuits. Aspex cannot have it both ways. The balance of equities tips in favor of denying injunctive relief.

There is likewise no public interest to support an injunction. Potential financial consequences for Aspex's agents and sales representatives do not constitute a public interest. (*See* Marchon Mem. pp. 17:19-18:9.) The public has no interest in having courts attempt to weld together two companies which have shown a propensity for disagreement, friction and adverse litigation. It is in the public interest to recognize and apply the longstanding rule that parties generally do not have to continue to do business with others who sue them.

Dated:  April 30, 2010.

s/ Scott W. Hansen
Scott W. Hansen (admitted pro hac vice)
Laura A .Brenner (admitted pro hac vice)
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202
Telephone:  414-298-1000
Facsimile:  414-298-8097
E-mail:  shansen@reinhartlaw.com
lbrenner@reinhartlaw.com

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

1074526.1

and

William R. Warne (Bar No. 141280)
Meghan M. Baker (Bar No. 243765)
Downey Brand
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Telephone:  916-520-5510
Facsimile:  916-520-5910
E-mail:  wwarne@downeybrand.com
mbaker@downeybrand.com
Attorneys for Defendant
Vision Service Plan

REINHART\3515927

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION
1074526.1