SCOTT W. HANSEN (admitted pro hac vice)
LAURA A. BRENNER (admitted pro hac vice)
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202
Telephone:  414-298-1000
Facsimile:  414-298-8097
E-mail:  shansen@reinhartlaw.com
lbrenner@reinhartlaw.com

WILLIAM R. WARNE (Bar No. 141280)
MEGHAN M. BAKER (Bar No. 243765)
Downey Brand
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Telephone:  916-520-5510
Facsimile:  916-520-5910
E-mail:  wwarne@downeybrand.com
mbaker@downeybrand.com

Attorneys for Defendant
VISION SERVICE PLAN

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASPEX EYEWEAR, INC. <br><br> Plaintiff, <br><br> v. <br><br> VISION SERVICE PLAN; MARCHON EYEWEAR, INC.; ALTAIR EYEWEAR, INC. <br><br> Defendants. | CASE NO.  2:10 CV 00632 <br><br> **DECLARATION OF BRIAN G. BODINE IN SUPPORT OF VISION SERVICE PLAN'S OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** <br><br> **Date: May 19, 2010** <br> **Time: 9:30 a.m.** <br> **Courtroom:  Courtroom No. 6** <br> **Judge: Hon. John  A. Mendez** |

## DECLARATION OF BRIAN G. BODINE

I, Brian G. Bodine, have personal knowledge of the facts stated in this declaration.

1.      I have represented Altair Eyewear, Inc. in *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, Case No. 02 CIV 6195 (JGK) (WP) (S.D.N.Y), an action filed in 2002 in which Aspex alleged that some of Altair's clip-on eyewear infringed claims of three patents. Those patents are U.S. Patent No. 5, 737,054 ("the '054 patent"), U.S. Patent No. 6,012,811 ("the '811 patent"), and U.S. Patent No. 6,092,896 ("the '896 patent").

2.      On or about July 12, 2005, I prepared a settlement proposal that was sent by facsimile to Aspex's counsel. A true and correct copy of this letter is attached as Exhibit A. This letter proposed settlement terms, and further stated "Unless we can settle the above referenced dispute under terms that are mutually beneficial, however, it is highly likely that VSP will terminate its relationship with Aspex, and Aspex will no longer be a supplier of products to VSP doctors for sale to patients covered by the VSP plan." Attached as Exhibit B is a true and correct copy of the facsimile transmission report showing transmission of the above- identified letter to Aspex's counsel, Mr. Matthew Wagner.

3.      On September 9, 2005, the United States District Court for the Southern District of New York issued its claim construction ruling. This decision was published at 386 F. Supp. 2d 526. A copy of this decision is attached hereto as Exhibit C.

4.      On or about October 7, 2005, I prepared another settlement proposal that was sent by facsimile to Aspex's counsel. Attached as Exhibit D is

DECLARATION OF BRIAN G. BODINE

a true and correct copy of the October 7 letter. This letter proposed settlement terms, and further stated "If we cannot end the litigation through mutually agreeable terms—including a license allowing Altair to continue to produce its magnetic clip-on products without continued litigation and including a royalty payment to Plaintiffs—then VSP intends to terminate its relationship with Aspex." Attached as Exhibit E is a true and correct copy of the facsimile transmission report showing transmission of the above-identified letter to Aspex's counsel, Mr. Matthew Wagner.

5.    On April 2, 2007, the District Court granted Altair's Motion for Summary Judgment of Non-Infringement and dismissed the case. This decision was published at 485 F. Supp. 2d 310. A copy of this decision is attached hereto as Exhibit F.

6.    Following the District Court's dismissal of Aspex's infringement claims, Aspex appealed to the United States Court of Appeals for the Federal Circuit.

7.    On August 1, 2008, the United States Court of Appeals for the Federal Circuit issued its decision, affirming in part and reversing in part. This decision was published at 288 Fed. Appx. 697 (Fed. Cir. 2008). A copy of this decision is attached hereto as Exhibit G.

8.    On March 29, 2010, the United States Patent and Trademark Office issued an Office Action in application Ser. No. 90/009,532, the re-examination

DECLARATION OF BRIAN G. BODINE

application of the '054 patent. The Office Action rejected all claims of the '054

patent for a variety of reasons. A true and correct copy of the Office Action

downloaded from the USPTO website is attached as Exhibit H.

9.    I declare under penalty of perjury that this information is true and

correct.

Dated this _28th_ day of April, 2010.

_____
Brian G. Bodine

4
DECLARATION OF BRIAN G. BODINE

# EXHIBIT A



# Davis Wright Tremaine LLP

ANCHORAGE    BELLEVUE    LOS ANGELES    NEW YORK    PORTLAND    SAN FRANCISCO    SEATTLE    SHANGHAI    WASHINGTON, D.C.

BRIAN G. BODINE                2600 CENTURY SQUARE              TEL (206) 622-3150
DIRECT (206) 628-7623          1501 FOURTH AVENUE               FAX (206) 628-7699
brianbodine@dwt.com            SEATTLE, WA 98101-1688           www.dwt.com

July 12, 2005

## CONFIDENTIAL SETTLEMENT PROPOSAL
## SUBJECT TO FED. R. EVID. 408
## AND ANY OTHER APPLICABLE RULE OR STATUTE

**VIA FACSIMILE** - (914) 941-6091

Matthew C. Wagner, Esq.
COLLEN IP
The Holyoke-Manhattan Building
80 South Highland Avenue
Town of Ossining, NY  10562

Re:    *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*
       U.S. District Court for the Southern District of New York
       CA No. 02 CIV 6195 (JGK) (WP)
       Our Reference No. 59739-1

Dear Mr. Wagner:

As we have discussed in the past, it may make sense for the parties to resolve the above-referenced matter through settlement rather than continued litigation. Accordingly, my client, Altair Eyewear, Inc., has authorized me to make the following settlement offer.

Before outlining the terms, I offer the following background. Since it began selling products using a magnetic clip, Altair Eyewear has sold approximately 250,000 pairs of eyewear using a magnetic clip. Sales of these products has generated approximately $11,000,000 in wholesale net revenue.

We believe that a reasonable settlement offer will allow Altair Eyewear to continue to sell eyewear using a magnetic clip including its Sunlites and Joseph Abboud products while paying Aspex and Contour a royalty for all sales of models that include a magnetic clip. The terms that we propose below are similar to terms that we proposed to your client over a year ago and, having received no response, we added more details to allow your client to evaluate the merits of our proposal. We believe that the following terms are reasonable:

Matthew C. Wagner, Esq.
July 12, 2005
Page 2



1.    Within ten (10) days of the execution of a settlement agreement, Altair Eyewear will pay Plaintiffs $550,000 for royalties on past sales.

2.    Concurrently with the execution of a settlement agreement, the parties will execute a license agreement allowing Altair Eyewear to sell its Sunlites and Joseph Abboud products with a magnetic clip.  In exchange, Altair Eyewear will pay Plaintiffs a royalty of 5% of net wholesale revenue.

3.    In the future, Altair may develop new designs for eyewear having magnetic clip-on lenses at the bridge that will either be manufactured by and purchased from Plaintiffs or purchased by Altair from its existing manufacturers.  If the former, no royalties are due from Altair.  If the latter, Altair will pay Plaintiffs a 5% of net wholesale revenue royalty.

4.    Altair may develop a product that uses temple mounted magnets to attach auxiliary lenses to primary lenses.  Any such product will either be manufactured by and purchased from Plaintiffs or purchased by Altair from its existing manufacturers.  If the former, no royalties are due from Altair.  If the latter, Altair will pay Plaintiffs a 5% of net wholesale revenue royalty.

5.    Altair will give license Plaintiffs a royalty free license to use Altair Eyewear's magnetic clip patents, including without limitation, United States Patent No. 6,053,011 and 6,139,141.

6.    The parties will dismiss all claims with prejudice with each party bearing its own attorneys' fees and costs.

Please do not take this settlement proposal to indicate any perceived weakness in our case.  We believe that we have a strong case and that we will ultimately prevail.  This proposal reflects a business decision that it would be more beneficial to settle the case, thereby saving all of the parties the cost of continuing the litigation and relieving all parties from the uncertainties inherent in continued litigation.  With that said, however, my client is firmly committed to vigorously defending its position should the parties be unable to reach a reasonable settlement.

Settling this case now will also help strengthen the relationship between your clients and my client's parent corporation, VSP.  I understand that a substantial portion of Aspex's current business is supplying products for sale through VSP doctors and that in the past year alone Aspex sold $10 million in product through VSP doctors.  Unless we can settle the above-referenced dispute under terms that are mutually beneficial, however, it is highly likely that VSP will terminate its relationship with Aspex, and Aspex will no longer be a supplier of products to VSP doctors for sale to patients covered by the VSP plan.

This offer expires at the close of business on Friday, July 22, 2005.  Please transmit this offer to your clients as soon as possible.

SEA 1665190v2 59739-1
Seattle

Matthew C. Wagner, Esq.
July 12, 2005
Page 3



Please contact me if you have questions or concerns or if you wish to discuss.

Best regards,

Davis Wright Tremaine LLP

Brian G. Bodine

BGB:mw

EXHIBIT B

```
                           ***  TX REPORT  ***
                           *********************

            TRANSMISSION OK

            TX/RX NO              3143
            CONNECTION TEL                   919149416091
            SUBADDRESS
            CONNECTION ID
            ST. TIME             07/12 14:37
            USAGE T              01'40
            PGS.                    4
            RESULT               OK
```

LAWYERS

# Davis Wright Tremaine LLP



ANCHORAGE  BELLEVUE  HONOLULU  LOS ANGELES  NEW YORK  PORTLAND  SAN FRANCISCO  SEATTLE  SHANGHAI  WASHINGTON, D.C.

2600 CENTURY SQUARE          TEL (206) 622-3150
1501 FOURTH AVENUE           FAX (206) 628-7699
SEATTLE, WA  98101-1688      www.dwt.com

---

## FACSIMILE TRANSMITTAL

Date: July 12, 2005

**SEND TO:**

| NAME | FIRM/COMPANY/CONFIRMATION NO. | FAX NUMBER |
|---|---|---|
| **Matthew C. Wagner, Esq.** | **COLLEN IP** | **(914) 941-6091** |

**FROM:**

Brian G. Bodine          Telephone: (206) 628-7623      Fax: (206) 628-7699

### NUMBER OF PAGES (including cover page): 4

Floor Sent From: _____     Time Sent: _____ AM PM      Operator: _____

RETURN TO SENDER:  VIA INTRAOFFICE MAIL ☐     WILL PICK UP X      EXTENSION: 7583

**COMMENTS:**

THE WRITTEN MESSAGE TRANSMITTED HEREBY IS FOR THE EXCLUSIVE USE OF THE ADDRESSEE AND CONTAINS CONFIDENTIAL, PRIVILEGED AND NONDISCLOSABLE INFORMATION. IF THE RECIPIENT OF THIS MESSAGE IS NOT THE ADDRESSEE, OR A PERSON RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE ADDRESSEE, SUCH RECIPIENT IS PROHIBITED FROM READING OR USING THIS MESSAGE IN ANY WAY. IF YOU HAVE RECEIVED THIS MESSAGE BY MISTAKE, PLEASE NOTIFY THE SENDER IMMEDIATELY AND DESTROY THE FACSIMILE MESSAGE.

# EXHIBIT C

386 F.Supp.2d 526, 2005 Markman 2230453
**(Cite as: 386 F.Supp.2d 526)**

▷

United States District Court,
S.D. New York.
ASPEX EYEWEAR, INC., Contour Optik, Inc.,
Plaintiffs
v.
ALTAIR EYEWEAR, INC., Defendant
**No. 02Civ.6195SCR.**

Sept. 9, 2005.

**Background:** Eyewear distributor and licensor of
patents for secondary eyeglass frames that attached
to primary eyeglass frames via magnetic attraction,
as opposed to mechanical "clips," brought infringe-
ment action against competitor. Parties filed claim
construction briefs and a *Markman* hearing was
held.

**Holdings:** The District Court, Robinson, J., held
that:
(1) term "frame," in patents, meant an eyeglass
device that included, at least, a bridge and rims, and
thus excluded rimless frames;
(2) term "projection" was not limited to single-
component structure described in specification;
(3) term "retaining mechanisms" was a means-
plus-function claim and meant a structure that kept
the lenses in place using rims, and
(4) phrase "not parallel to the frontal plane" meant
substantially perpendicular to the frontal plane,
without any limitation that coupling occur on the
top and bottom of surfaces of the bridge.

Ordered accordingly.

West Headnotes

**[1] Patents 291 ☞226.6**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k226.5 Substantial Identity of Subject
Matter
                291k226.6 k. Comparison with Claims
of Patent. Most Cited Cases

**Patents 291 ☞314(5)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k314 Hearing
                291k314(5) k. Questions of Law or
Fact. Most Cited Cases
Patent infringement analysis involves two steps: in
the first step the court determines the proper con-
struction of the patent claims by establishing, as a
matter of law, the scope and boundaries of the sub-
ject matter that is patented, and in the second step
the trier of fact compares the properly construed
claims to the allegedly infringing device and de-
termines whether there has been an infringement.
35 U.S.C.A. § 271(a).

**[2] Patents 291 ☞101(1)**

291 Patents
    291IV Applications and Proceedings Thereon
        291k101 Claims
            291k101(1) k. In General. Most Cited
Cases

**Patents 291 ☞165(2)**

291 Patents
    291IX Construction and Operation of Letters
Patent
        291IX(B) Limitation of Claims
            291k165 Operation and Effect of Claims
in General
                291k165(2) k. Claims as Measure of
Patentee's Rights. Most Cited Cases

**Patents 291 ☞191**

291 Patents
    291X Title, Conveyances, and Contracts

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.Supp.2d 526, 2005 Markman 2230453
**(Cite as: 386 F.Supp.2d 526)**

291X(A) Rights of Patentees in General
    291k191 k. Rights and Powers of Patentees as to Making, Use, or Sale of Invention. Most Cited Cases

The claims of a patent are the numbered paragraphs at the end of the patent that define the scope of the invention and thus the scope of the patentee's right to exclude others from making, using, or selling the patented invention.

**[3] Patents 291 ☞165(3)**

291 Patents
    291IX Construction and Operation of Letters Patent
        291IX(B) Limitation of Claims
            291k165 Operation and Effect of Claims in General
                291k165(3) k. Construction of Language of Claims in General. Most Cited Cases

Patent claim construction is the judicial statement of what is and is not covered by the technical terms and other words of the claims.

**[4] Patents 291 ☞157(1)**

291 Patents
    291IX Construction and Operation of Letters Patent
        291IX(A) In General
            291k157 General Rules of Construction
                291k157(1) k. In General. Most Cited Cases

**Patents 291 ☞161**

291 Patents
    291IX Construction and Operation of Letters Patent
        291IX(A) In General
            291k161 k. State of the Art. Most Cited Cases

In construing patent claims, the words of a claim are generally given their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the art in ques-

tion at the time of the invention.

**[5] Patents 291 ☞159**

291 Patents
    291IX Construction and Operation of Letters Patent
        291IX(A) In General
            291k159 k. Extrinsic Evidence in General. Most Cited Cases

**Patents 291 ☞161**

291 Patents
    291IX Construction and Operation of Letters Patent
        291IX(A) In General
            291k161 k. State of the Art. Most Cited Cases

**Patents 291 ☞165(3)**

291 Patents
    291IX Construction and Operation of Letters Patent
        291IX(B) Limitation of Claims
            291k165 Operation and Effect of Claims in General
                291k165(3) k. Construction of Language of Claims in General. Most Cited Cases

**Patents 291 ☞167(1)**

291 Patents
    291IX Construction and Operation of Letters Patent
        291IX(B) Limitation of Claims
            291k167 Specifications, Drawings, and Models
                291k167(1) k. In General. Most Cited Cases

**Patents 291 ☞168(2.1)**

291 Patents
    291IX Construction and Operation of Letters Patent

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.Supp.2d 526, 2005 Markman 2230453
**(Cite as: 386 F.Supp.2d 526)**

2911IX(B) Limitation of Claims
2911k168 Proceedings in Patent Office in General
2911k168(2) Rejection and Amendment of Claims
2911k168(2.1) k. In General. Most Cited Cases

Because the meaning of a patent claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, courts construing a patent should look to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean; those sources include various forms of intrinsic evidence, such as the words of the claims themselves, the specification, and the prosecution history, as well as various forms of extrinsic evidence, including expert and inventor testimony, dictionaries, and treatises.

**[6] Patents 291 ☞101(4)**

291 Patents
2911V Applications and Proceedings Thereon
2911k101 Claims
2911k101(4) k. Specifications and Drawings, Construction With. Most Cited Cases

Term "frame," in patents claiming secondary eyeglass frames that attached to primary eyeglass frames via magnetic attraction, meant an eyeglass device that included, at least, a bridge and rims, and thus excluded rimless frames, notwithstanding disclaimers in patents that specifications showing diagrams with rimmed eyeglasses were not intended to limit scope of claims, in view of claims' requirement that frame be capable of supporting lenses in the frame, and absence of any specific statement in patents about possibility of frames with or without rims.

**[7] Patents 291 ☞101(2)**

291 Patents
2911V Applications and Proceedings Thereon
2911k101 Claims
2911k101(2) k. Construction in General. Most Cited Cases

Phrase "Supporting (respectively auxiliary) primary lenses therein," in patent claiming secondary eyeglass frames that attached to primary eyeglass frames via magnetic attraction, meant that lenses were secured to frames that included rims.

**[8] Patents 291 ☞101(2)**

291 Patents
2911V Applications and Proceedings Thereon
2911k101 Claims
2911k101(2) k. Construction in General. Most Cited Cases

Term "projection," in patent claiming secondary eyeglass frames that attached to primary eyeglass frames via magnetic attraction, meant any portion of the auxiliary bridge which extended toward the primary bridge for the purpose of going over and engaging with the primary bridge; "projection" could also be a multi-component, bent, or even U-shaped structure, and was not limited to single-component structure described in specification.

**[9] Patents 291 ☞167(1.1)**

291 Patents
2911X Construction and Operation of Letters Patent
2911X(B) Limitation of Claims
2911k167 Specifications, Drawings, and Models
2911k167(1.1) k. Specification as Limiting or Enlarging Claims. Most Cited Cases

A patentee need not describe in the specification every conceivable and possible future embodiment of his invention.

**[10] Patents 291 ☞101(2)**

291 Patents
2911V Applications and Proceedings Thereon
2911k101 Claims
2911k101(2) k. Construction in General. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.Supp.2d 526, 2005 Markman 2230453
**(Cite as: 386 F.Supp.2d 526)**

Term "attached," in patent claiming secondary eye-glass frames that attached to primary eyeglass frames via magnetic attraction, meant fastened or connected, by way of magnetic engagement, as phrase in which term appeared described securing of second magnetic member of auxiliary frame with first magnetic member of primary frame.

**[11] Patents 291 ☜101(8)**

291 Patents
   291IV Applications and Proceedings Thereon
      291k101 Claims
         291k101(8) k. Functions, Advantages or Results of Invention. Most Cited Cases
Term "retaining mechanisms," in patent claiming secondary eyeglass frames that attached to primary eyeglass frames via magnetic attraction, was a means-plus-function claim, since relevant claim language described only what the retaining mechanisms did, namely supported a pair of lenses and defined a frontal plane, and term thus meant a structure that kept the lenses in place using rims. 35 U.S.C.A. § 112.

**[12] Patents 291 ☜101(8)**

291 Patents
   291IV Applications and Proceedings Thereon
      291k101 Claims
         291k101(8) k. Functions, Advantages or Results of Invention. Most Cited Cases
There is presumption against construing a patent claim as a means-plus-function claim, where the relevant term does not include the word "means," but that presumption is rebuttable. 35 U.S.C.A. § 112.

**[13] Patents 291 ☜101(8)**

291 Patents
   291IV Applications and Proceedings Thereon
      291k101 Claims
         291k101(8) k. Functions, Advantages or Results of Invention. Most Cited Cases
Means-plus-function claiming in a patent applies

only to purely functional limitations that do not provide the structure that performs the recited function. 35 U.S.C.A. § 112.

**[14] Patents 291 ☜101(8)**

291 Patents
   291IV Applications and Proceedings Thereon
      291k101 Claims
         291k101(8) k. Functions, Advantages or Results of Invention. Most Cited Cases
Phrase "supporting a pair of lenses," in patent claiming secondary eyeglass frames that attached to primary eyeglass frames via magnetic attraction, described function of claimed "retaining mechanisms," pursuant to patent statute's means-plus-function provision, and phrase thus meant holding the lenses in place using rims. 35 U.S.C.A. § 112.

**[15] Patents 291 ☜101(8)**

291 Patents
   291IV Applications and Proceedings Thereon
      291k101 Claims
         291k101(8) k. Functions, Advantages or Results of Invention. Most Cited Cases
Phrase "defining a frontal plane," in patent claiming secondary eyeglass frames that attached to primary eyeglass frames via magnetic attraction, described function of claimed "retaining mechanisms," pursuant to patent statute's means-plus-function provision, and phrase thus meant delineating, by rims, the plane of glasses parallel to the lenses. 35 U.S.C.A. § 112.

**[16] Patents 291 ☜101(2)**

291 Patents
   291IV Applications and Proceedings Thereon
      291k101 Claims
         291k101(2) k. Construction in General. Most Cited Cases
Phrase "holding the two retaining mechanisms together," in patent claiming secondary eyeglass frames that attached to primary eyeglass frames via

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.Supp.2d 526, 2005 Markman 2230453
**(Cite as: 386 F.Supp.2d 526)**

magnetic attraction, meant supporting, or keeping from falling, the rims together.

**[17] Patents 291 ☜101(2)**

291 Patents
    291IV Applications and Proceedings Thereon
       291k101 Claims
          291k101(2) k. Construction in General.
Most Cited Cases
Phrase "two frames are attached together," in patent claiming secondary eyeglass frames that attached to primary eyeglass frames via magnetic attraction, meant that two eyeglass devices which included, at least, a bridge and rims were fastened or connected by magnetic attraction.

**[18] Patents 291 ☜101(2)**

291 Patents
    291IV Applications and Proceedings Thereon
       291k101 Claims
          291k101(2) k. Construction in General.
Most Cited Cases
Phrase "not parallel to the frontal plane," in patent claiming secondary eyeglass frames that attached to primary eyeglass frames via magnetic attraction, meant substantially perpendicular to the frontal plane, without any limitation that coupling occur on the top and bottom of surfaces of the bridge.

**[19] Patents 291 ☜101(2)**

291 Patents
    291IV Applications and Proceedings Thereon
       291k101 Claims
          291k101(2) k. Construction in General.
Most Cited Cases
Phrase "U-shaped structure having two arms," in patent claiming secondary eyeglass frames that attached to primary eyeglass frames via magnetic attraction, meant a three-sided structure in the shape of the letter "U," however oriented.

**[20] Patents 291 ☜101(2)**

291 Patents

291IV Applications and Proceedings Thereon
    291k101 Claims
       291k101(2) k. Construction in General.
Most Cited Cases
Phrase "sandwiched between," in patent claiming secondary eyeglass frames that attached to primary eyeglass frames via magnetic attraction, in which bridge of first frame included U-shaped structure and magnetic coupling occurred when bridge of second frame was "sandwiched between" arms of U-shaped structure, meant that the U-shaped structure extended at least partially over (and under) the bridge, notwithstanding drawing indicating that the U-shaped structure extended over only part of the bridge.

**[21] Patents 291 ☜101(2)**

291 Patents
    291IV Applications and Proceedings Thereon
       291k101 Claims
          291k101(2) k. Construction in General.
Most Cited Cases
Phrase "a bridge configured to connect two retaining mechanisms and hold them together," in patent claiming secondary eyeglass frames that attached to primary eyeglass frames via magnetic attraction, meant the middle part of the eyeglasses spanning the nose designed to connect the rims.

**Patents 291 ☜328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
       291k328 Patents Enumerated
          291k328(2) k. Original Utility. Most
Cited Cases
5,737,054, 6,012,811, 6,092,896. Construed.
**\*529** Jess M. Collen, Matthew C. Wagner, Jeffrey A. Lindenbaum, Collen IP, Westchester County, NY, for Plaintiffs.

Brian G. Bodine, Kaustuv M. Das, Davis Wright Tremaine, LLP, Seattle, WA, Edward J. Davis, Peter Karanjia, Davis Wright Tremaine, LLP, New

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.Supp.2d 526, 2005 Markman 2230453
(Cite as: 386 F.Supp.2d 526)

York City, for Defendant.

## MEMORANDUM DECISION AND ORDER

ROBINSON, District Judge.

### I. Background

### A. Factual History

Aspex Eyewear, Inc. ("Aspex") is a Delaware corporation engaged in the distribution of eyewear. Contour Optik, Inc. ("Contour"; Aspex and Contour are collectively referred to herein as the "Plaintiffs") is a Taiwanese corporation owned by the family of Richard and David Chao, who are the named inventors of the patents at issue in this case.

Altair Eyewear, Inc. ("Altair" or "Defendant") is a California corporation also engaged in the distribution of eyewear. Altair is a wholly-owned subsidiary of Vision Services Plan ("VSP"), which is also a California corporation.

Aspex derives all of its rights with respect to the re-sale of bridge mounted magnetic eyewear from its Canadian sister company, Chic Optik ("Chic"). Both Chic and Aspex are owned and operated by the Ifergan family. Nonu Ifergan, a resident of Montreal, Canada, is the President of both companies. Thierry Ifergan, Nonu **\*530** Ifergan's son, is the Executive Vice President of Aspex and a resident of Florida, Aspex's principal place of business.

This case involves eyeglass technology, specifically the way in which secondary sunglass frames attach to primary (i.e. prescription) eyeglass frames. For years, the prevailing technology involved a form of "clip-ons," which essentially used mechanical hooks to attach a second pair of lenses directly to the primary eyeglass lenses. Plaintiffs characterize this approach as problematic in that it is cumbersome and likely to result in scratched lenses. As a result, Plaintiffs patented a new approach that relied on magnetic attraction to attach the secondary lens frame to the primary lens frame.

In particular, Plaintiffs obtained three patents, which they claim have been infringed by Defendants: 1) United States Patent No. 5,737,054, entitled "Auxiliary Lenses for Eyeglasses" (the " '054 Patent"), which was issued by the PTO on April 7, 1998; 2) United States Patent No. 6,012,811, entitled "Eyeglass Frames with Magnets at Bridges for Attachment" (the " '811 Patent"), issued on January 11, 2000; 3) United States Patent Number 6,092,896, entitled "Eye-wear With Magnets" (the " '896 Patent"), issued on July 25, 2000 (the '054 Patent, '811 Patent and the '896 Patent are collectively referred to herein as the "Patents-in-Suit"). Together, the Patents-in Suit describe and claim the use of magnets to connect an auxiliary spectacle frame containing, for example, sunglass lenses, to a primary spectacle frame.

The '054 Patent discloses a pair of primary spectacle frames with a magnet in the bridge of the primary spectacle frame; an auxiliary spectacle frame with a projection extending rearward from the bridge; and a second magnet at the projection. The projection from the bridge of the auxiliary frame extends over the bridge of the primary frame, and the magnets in each couple together, thereby securing the auxiliary frame to the primary frame. In Plaintiff's view, the '054 Patent's specification is only one example of many possible embodiments of the invention, and therefore numerous changes can be made to the construction, combination and arrangement of parts without departing from the spirit and scope of the invention.

The '811 Patent is in part a continuation of the '054 Patent. The '811 Patent includes methods and an apparatus for "easily, firmly and elegantly" attaching auxiliary frames to primary frames, using "magnetic members" at the bridges of frames. The patent includes several methods, or "embodiments," for attaching the frames at the bridge. Again, Plaintiffs contend that those skilled in the art would appreciate that these embodiments are for explanatory purposes, and that the invention extends beyond

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.Supp.2d 526, 2005 Markman 2230453
**(Cite as: 386 F.Supp.2d 526)**

these embodiments.

The '896 Patent, a continuation of the '811 and a continuation-in-part of the '054, describes methods and apparatus to easily, firmly and elegantly attach auxiliary eyeglass frames to primary frames, using magnetic members at the bridge of frames. The bridge of the auxiliary frame contains a magnetic member, which couples to another magnetic member at the bridge of a second frame. The magnetic members at the bridge are much less conspicuous than magnets disposed on the plane of the lenses, thus enhancing aesthetic appeal. Moreover, the present invention is easier to manufacture, more secure in attachment than prior art approaches, and attaches more easily to the primary frame.

The Defendant produces a product that also utilizes magnetic attraction to attach a second pair of lenses to the bridge of a pair of eyeglasses. Although it is not entirely clear from the parties' descriptions **\*531** of the facts of this case, it appears that the Defendant's products are rimless. In Defendant's product, the lenses are apparently held together by pins and/or screws-not rims surrounding the lenses.

Specifically, Plaintiffs claim that the Defendant has infringed claim 1 of the '054 Patent, claims 1-3, 5, 6, 9, 10, 12-14, 22-24, 26-28, and 31-33 of the '811 Patent, claims 13-22 of the '896 Patent. Defendant argues that Plaintiffs' patents do not cover Defendant's product and, moreover, notes that the '054 Patent was not the first patent to disclose the use of magnets to attach auxiliary spectacle frames to primary spectacle frames. Nor, in Defendant's view, was the '054 Patent the first patent to disclose attaching auxiliary spectacle frames to primary spectacle frames using magnets at the bridge.

**B. Procedural History**

The Plaintiffs filed their complaint in this action in August 2002, alleging violations of United States patent laws, 25 U.S.C. §§ 271, 281, 283. They filed an amended complaint later that month, which the

Defendant answered in September 2002. Along with its answer, the Defendant made counterclaims against both Plaintiffs. The case was initially assigned to the docket of Judge Koeltl, but was reassigned to this court in September 2003.

In August 2004, the Defendant moved for partial summary judgment that Plaintiff Aspex does not have standing to sue for infringement of the Patents-in-Suit. Shortly thereafter, the Plaintiffs filed a motion, pursuant to Rule 19 of the Federal Rules of Civil Procedure, to add VSP as a defendant in this matter. In a memorandum decision and order, dated March 7, 2005, this court denied both the Defendant's motion for partial summary judgment and the Plaintiffs' motion to add an additional defendant.

On March 14, 2005, the Plaintiffs filed a motion to exclude the testimony of Ogden H. Webster ("Webster"), one of the Defendant's experts. On March 21, 2005, Plaintiffs filed a motion to exclude the testimony of another expert witness for the Defendant, Allen Leck ("Leck"). The Defendant submitted oppositions to both motions and the Plaintiffs submitted replies.

The parties filed their claim construction briefs at approximately the same time. Defendant filed its opening brief on claim construction on or about February 28, 2005, while the Plaintiffs filed their opening claim construction brief on or about March 2, 2005. The parties submitted their reply claim construction briefs on or about March 18, 2005, and Plaintiffs submitted a sur-reply on or about April 15, 2005. A Markman hearing was held in this matter on July 28, 2005. In response to the court's requests, the parties submitted additional briefing after the hearing. This order follows.

**II. Analysis**

**A. Legal Background**

[1] Patent infringement is the unauthorized making, using, selling, offering to sell, or importing into the United States of any patented invention during the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.Supp.2d 526, 2005 Markman 2230453
(Cite as: 386 F.Supp.2d 526)

term of the patent. 35 U.S.C. § 271(a). Patent infringement analysis involves two steps. In the first step the court determines the proper construction of the patent claims by establishing, as a matter of law, the scope and boundaries of the subject matter that is patented, and in the second step the trier of fact compares the properly construed claims to the allegedly infringing device(s) and determines whether there has been an infringement. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), aff'd, 517 U.S. 370, 384-85, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

**\*532** [2][3] The claims of a patent are the numbered paragraphs at the end of the patent that define the scope of the invention and thus the scope of the patentee's right to exclude others from making, using, or selling the patented invention. *See Astrazeneca AB v. Mutual Pharmaceutical Co.,* 384 F.3d 1333, 1336 (Fed.Cir.2004). The purpose of construing patent claims is to define the scope of the coverage of the claim by interpreting the words and terms of art used as they would be understood at the time the claim was made by one reasonably skilled in the relevant art. Claim construction "is the judicial statement of what is and is not covered by the technical terms and other words of the claims." *Netword, LLC v. Centraal Corp.,* 242 F.3d 1347, 1352 (Fed.Cir.2001). *See also United States Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed.Cir.1997), cert. denied, 522 U.S. 950, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997).

[4][5] In construing claims, the words of a claim "are generally given their ordinary and customary meaning." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. *See Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,* 381 F.3d 1111, 1116 (Fed.Cir.2004). Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because pat-

entees frequently use terms idiosyncratically, courts should look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Innova,* 381 F.3d at 1116. Those sources include various forms of "intrinsic" evidence, such as the words of the claims themselves, the specification, and the prosecution history, as well as various forms of "extrinsic" evidence, including expert and inventor testimony, dictionaries and treatises. *See id.; Markman,* 52 F.3d at 979-80.

In a recent decision, the Federal Circuit clarified the principles by which district courts should approach claim construction analysis, including with respect to the proper use of the various kinds of intrinsic and extrinsic evidence. *See Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed.Cir.2005). In *Phillips,* the court looked first to the language of the claims themselves, considering the meaning of particular claim terms, the context in which terms are used in the asserted claims, and other claims of the patent in question, since claim terms are normally used consistently throughout a patent. *See id.* at 1314-15.

Second, the court emphasized that "claims must be read in view of the specification," which the court described as "highly relevant to the claim construction analysis." *Id.* at 1315 (internal quotations omitted). In fact, the Federal Circuit explained that the specification is " 'usually ... dispositive ... [and] the single best guide to the meaning of a disputed term.' " *Id.* (quoting *Vitronics,* 90 F.3d at 1582). For these reasons, the Federal Circuit confirmed that it is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Phillips,* 415 F.3d at 1317.

Third, the court stated that, in addition to consulting the specification, a district court should also consider the patent's prosecution history, if it is in evidence. *See id.* (internal quotation omitted). The court explained that the prosecution history is potentially useful because, like the specification, it was "created by the patentee in attempting to ex-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

plain and obtain the patent." *Id.* That said, the court cautioned that, "because the prosecution history represents an ongoing negotiation between *533 the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Finally, the Federal Circuit confirmed that district courts are authorized to rely on extrinsic evidence. In particular, the court noted that dictionaries and treatises can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention, and that expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field. *Id.* at 1318.

At the same time, however, the Federal Circuit warned that extrinsic evidence is generally less reliable than the patent and the prosecution history in construing claim terms, for several reasons: extrinsic evidence was not created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning; extrinsic publications may not be written by or for skilled artisans and therefore may not reflect the understanding of a skilled artisan in the field of the patent; expert reports and testimony are generated at the time of and for the purpose of litigation and thus can suffer from bias; there is a virtually unbounded universe of potential extrinsic evidence of some marginal relevance that could be brought to bear on any claim construction question; and undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the indisputable public records consisting of the claims, the specification and the prosecution history, thereby undermining the public notice function of patents. *See id.* at 1318-19 (internal quotations omitted). For these

reasons, the court stressed that extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1318 (internal quotations omitted).

**B. Claim Construction of Disputed Terms** [FN1]

> FN1. This court derived its list of disputed terms primarily from Plaintiffs' Opening Claim Construction Brief, which indicated that its list was derived, at least in part, in consultation with the Defendant. Plaintiffs provided a preferred construction for each of the terms contained in their Opening brief but, for whatever reason, Defendant did not provide an alternative construction for each of these terms in its papers. Nevertheless, in this decision, the court will construe each of the terms listed as in disagreement in Plaintiffs' Opening brief, with the exception of those terms regarding which the parties have come to an agreement since the Markman hearing.

**1. '054 Patent**

**i. Relevant Claim Language And Disputed Terms**

**Claim 1:**

> "An eyeglass device comprising:
>
> a primary (respectively auxiliary) spectacle *frame* for *supporting (respectively auxiliary) primary lenses therein,* said primary (respectively auxiliary) spectacle frame including a *middle bridge portion,*
>
> a first magnetic member secured in said middle bridge portion of said primary spectacle frame,
>
> an auxiliary spectacle frame for supporting auxiliary lenses therein, said auxiliary spec-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.Supp.2d 526, 2005 Markman 2230453
**(Cite as: 386 F.Supp.2d 526)**

tacle frame including a middle bridge portion having a *projection* extended therefrom for extending*534 over and for engaging with said middle bridge portion of said primary spectacle frame, and

a second magnetic member secured to said projection of said auxiliary spectacle frame for engaging with said first magnetic member of said primary spectacle frame and for allowing said auxiliary spectacle frame to be *attached* to said primary spectacle frame with only one hand by a user."

### ii. Frame

[6] The Plaintiffs contend that the term "frame" should be construed as: the entirety of the frame with the exception of the lenses and including the lens rims (if provided), the frame magnetic members, the nose bridge, and the arms. Crucially, Plaintiffs insist that the term "frame" should be read to encompass both rimmed and rimless eyeglasses, such that a frame made up only of pins or screws is as much a "frame" as one taking the form of a rim around the lenses. The Defendant, on the other hand, argues that a "frame" is an eyeglass device that includes, at least, a bridge *and* rims. Defendants insist that the rims have to at least partially surround the lenses and, if the rims do not completely encircle the lenses, the frame must include some sort of rim wire to hold the lenses in place.

Defendant's argument, which focuses on the language of the claim itself, is more faithful to the principles of claim construction outlined in *Phillips,* and is more persuasive to this court. As Defendant points out, the relevant claim describes the frame as supporting lenses "therein" and "including" a middle bridge portion. Because the claim discloses a frame that supports lenses "therein," the frame must be capable of supporting the lenses *in* the frame, and only a frame with rims is capable of supporting lenses *in* the frame. In addition, the claim language requires that the frame

"includ[e]" a middle bridge portion, which indicates that the frame must also have other components, i.e. rims. Therefore, considering the term "frame" in the context in which the term is used in the asserted claims, which the Federal Circuit instructed district courts to do at the outset of their claim construction analysis, *see Phillips, supra,* strongly compels the finding that the term "frame" includes some kind of rim surrounding the lenses.

This conclusion is supported by an analysis of the specification. Specifically, the Patents-in-Suit are devoid of any language disclosing any kind of "frames" other than those containing rims. On the contrary, the specification of the '054 Patent discloses "an eyeglass device in accordance with the present invention comprises a primary spectacle frame 10 for supporting primary lenses therein," col. 1, l. 66-col. 2, l. 2, and explains that "an auxiliary spectacle frame **20** is provided for supporting the auxiliary lenses therein," col. 2, ll. 7-9; crucially, the primary spectacle frame **10** in Figures 1 and 2 and the auxiliary spectacle frame 20 in Figures 1-3 of the '054 Patent all include rims. In fact, each of the over thirty diagrams and figures in the Patents-in-Suit disclose eyeglass devices that clearly include rims.

Plaintiffs respond by pointing to a series of generalized disclaimers explaining that the specifications provided in the Patents-in-Suit are not intended to foreclose other variations that are within the scope of the claims. *See, e.g.,* '054 Patent, col. 2, ll. 56-62 ("Although this invention has been described with a certain degree of particularity, it is to be understood that the present disclosure has been made by way of example only and that numerous changes in the detailed construction and the combination and arrangement of parts may be resorted to without departing from the spirit and scope of the invention hereinafter*535 claimed."). Although this court is mindful of the Federal Circuit's repeated admonition to avoid "reading limitations from the specification into the claim," *Phillips,* 415 F.3d at 1323, FN2 Plaintiffs' generalized statements are neverthe-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

less unpersuasive, for several reasons.

> FN2. That said, this court agrees with the Federal Circuit that the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice. *See Phillips,* 415 F.3d at 1323 (citing *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186-87 (Fed.Cir.1998) ("there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification")).

First, Plaintiffs have pointed to various places in the Patents-in-Suit in which the patentee described specific ways in which the disclosed inventions could be changed. *See* '811 Patent, col. 6, ll. 33-35 (acknowledging that an illustration shows a magnetic member with only one or two parts, but explaining "that a magnetic member can have more than two parts"); '896 Patent, col. 6, ll. 50-53 (same); '811 Patent, col. 8, l. 65-col. 9, l. 1 ("Different embodiments in the present invention can be combined in different ways. For example, the vertical flange can be combined with the lateral flanges. The hinge can be combined with the lateral flanges."); '896 Patent, col., 9, ll. 22-25 (same).[FN3] The absence of any specific statement about the possibility of frames with or without rims argues against construing the term "frames" to include rimless frames. Generalized disclaimers provide no guidance in defining which variations are within the scope of claim language and which are not. *See Les Traitments Des Eaux Poseidon v. KWI, Inc.,* 135 F.Supp.2d 126, 135 (D.Mass.2001) (boilerplate language in the specification asserting that the general description is non-restrictive carries "little weight"). Therefore, the court finds that the specifications in the '054 Patent and the other Patents-in-Suit clearly suggest that "frames" include rims.

> FN3. Admittedly, two of the Patents-in-Suit also contain language explaining

that, "different types of auxiliary frames and different forms of primary frames, individually, is also a different embodiment of the present invention." '811 Patent, col. 9, ll. 7-9; '896 Patent, col. 9, ll. 31-33. But this language simply begs the question of whether "frames" can be rimless. It says nothing about the ways in which frames can differ from each other, and can easily be read as allowing for frames with rims made up of different materials.

In addition, Plaintiffs argue that this court should be persuaded by other district courts that have rejected many, if not all, of Defendant's arguments and adopted Plaintiffs' interpretation of the term "frame" in the '054 Patent and in related patents. *See Aspex Eyewear, Inc. and Contour Optik, Inc. v. E'Lite Optik, Inc.* (Dist. Ct. Nev. CV-S-00-1116-PMP (PAL)) (finding that the term "frame" in both the '054 and '811 Patents refers to both rimmed and rimless spectacles because it is commonly understood to refer to some structures that surround an object and other structures that connect parts but do not surround anything); *Aspex Eyewear, Inc. v. Miracle Optics, Inc.,* (C. Dist. Cal. CV 01-10396 (Order Construing Claims, p. 37-38, February 14, 2003) (refusing to construe the term "primary frame" (in a different patent) as requiring a pair of lens rims of a continuous eye-loop type because the claim language is broader and the specification does not require a particular type of lens rim construction). Although this court has reviewed these decisions, the court is not persuaded by them.

First, these decisions were made before the Federal Circuit clarified the principles of claim construction in *Phillips.* Second, **\*536** the unwillingness of the Federal Circuit to itself give any deference to the claim construction findings of District Courts further dissuades this court from giving significant precedential value to judgments of its colleagues. *See Cybor Corp. v. FAS Techs.,* 138 F.3d 1448, 1455 (Fed.Cir.1998) (the Supreme Court endorsed this court's role in providing national uniformity to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.Supp.2d 526, 2005 Markman 2230453
**(Cite as: 386 F.Supp.2d 526)**

the construction of a patent claim, a role that would be impeded if we were bound to give deference to a trial judge's asserted factual determinations incident to claim construction). Evidently, the Federal Circuit believes that it is its responsibility-not the collective responsibility of federal courts-to ensure uniformity of claim construction, and the Federal Circuit will likely have the opportunity to bring uniformity to the construction of the claim language at issue in this case.[FN4]

> FN4. Plaintiffs and Defendant support their arguments with testimony from outside experts and other sources. For example, Plaintiffs point to the Defendant's marketing materials, which allegedly refer to frames as "frames" even when they are rimless, and to testimony by Richard Chao, one of the inventors. The Defendant supports its argument with expert testimony from Allen Leck, who claims that the ordinary meaning of the term "frame" to a person having skill in the eyeglasses industry is that it should include at least a bridge and rims. Plaintiffs have filed a motion to exclude Mr. Leck's testimony. The court finds none of this evidence to be particularly helpful, particularly in light of the intrinsic evidence, which provides the basis for this court's interpretations. As such, the court declines to reach Plaintiffs' motion to exclude Mr. Leck's testimony at this time.

Therefore, the court finds that a "frame" is an eyeglass device that includes, at least, a bridge and rims.

### iii. Supporting (respectively auxiliary) primary lenses therein

[7] Not surprisingly, both Plaintiffs and Defendant construe the phrase "Supporting (respectively auxiliary) primary lenses therein" in ways that are consistent with their differing interpretations of the term "frame." Plaintiffs interpret the phrase to mean "the lenses are secured to the frames, whether rimmed or rimless," while the Defendant would require lenses secured to frames that include rims.

Consistent with the court's construction of the term "frame," which was based in part on its construction of the word "therein," the court interprets "Supporting (respectively auxiliary) primary lenses therein" to mean that "lenses are secured to frames that include rims."

### iv. Middle bridge portion

Plaintiffs argue that "middle bridge portion" means "the middle part of the eyeglasses spanning the nose." The Defendant has not indicated any disagreement with this interpretation.

The court finds that "middle bridge portion" means "the middle part of the eyeglasses spanning the nose."

### v. Projection

[8] Plaintiffs interpret "projection" to mean "any portion of the auxiliary bridge which extends toward the primary bridge for the purpose of going over and engaging with the primary bridge." The Defendant agrees with this interpretation, but requests that the court specifically note that a "projection" is not limited to a single-component straight piece, but that it can also be a multi-component, bent or even U-shaped structure. Plaintiffs object to Defendant's request that the term be read to include "multi-component structures."[FN5]

> FN5. It is not entirely clear to the court whether Plaintiffs also object to Defendant's request insofar as it requests that the court note that the term also comprises bent and U-shaped structures. The court will presume that Plaintiffs do object.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.Supp.2d 526, 2005 Markman 2230453
**(Cite as: 386 F.Supp.2d 526)**

The court finds that the term "projection" means "any portion of the auxiliary **\*537** bridge which extends toward the primary bridge for the purpose of going over and engaging with the primary bridge" and agrees with Defendant that a "projection" can also be a multi-component, bent or even U-shaped structure.

[9] Nothing about the term "projection" indicates that a "projection" could not be a multi-component, bent or U-shaped structure, nor does the other claim language suggest that the term "projection" should be limited as Plaintiffs request. If an apparatus claim recites a general structure (e.g., a noun) without limiting that structure to a specific subset of structures (e.g., with an adjective), the Federal Circuit generally construes the claim to cover all known types of that structure that are supported by the patent disclosure. *See Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1250 (Fed.Cir.1998). Notably, the patentee need not "describe in the specification every conceivable and possible future embodiment of his invention." *See CCS Fitness v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed.Cir.2002) (internal citations omitted).
FN6

> FN6. This, of course, assumes that the term in question is not a means-plus-function claim limitation. *See infra.* In this case, neither Plaintiffs nor the Defendant, nor the court, would construe the term "projection" as a means-plus-function claim limitation.

Here, the court finds no reason to limit the term projection to the kind of single-component structure described in the specification. *See id.* at 1364-65 (reversing the district court's decision to interpret the term "reciprocating member," in a patent involving fitness equipment, as not comprising a multi-component structure simply because the embodiments did not include such a structure). Therefore, the court construes "projection" to mean "any portion of the auxiliary bridge which extends toward the primary bridge for the purpose of going

over and engaging with the primary bridge." The court adds that, all things being equal,[FN7] the term could comprise a multi-component, bent or U-shaped structure.

> FN7. It, of course, goes without saying that the fact that a "projection" could be a multi-component, bent or U-shaped structure does not imply that every multi-component, bent or U-shaped structure necessarily constitutes a "projection."

### vi. Attached

[10] Plaintiffs construe the term "attached" to mean "fastened or connected, by way of magnetic engagement." Defendant objects to limiting the term's meaning to fastening or connecting by magnetic engagement.

The court agrees with Plaintiffs. In the relevant claim language, the term "attached" is found in the following phrase: "a second *magnetic* member secured to said projection of said auxiliary spectacle frame for engaging with said first *magnetic* member of said primary spectacle frame and for allowing said auxiliary spectacle frame to be *attached* to said primary spectacle frame with only one hand by a user" (emphasis added). The references to "magnetic" members clearly imply that the term "attached," read in context, refers to magnetic attachment.

Therefore, the court construes the term "attached" as "fastened or connected, by way of magnetic engagement."

### 2. '811 Patent

#### i. Relevant Claim Language And Disputed Terms

**Claim 1:**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.Supp.2d 526, 2005 Markman 2230453
**(Cite as: 386 F.Supp.2d 526)**

An eyeglass device comprising:

A first frame including

*two retaining mechanisms* for *supporting a pair of lenses,* and *defining a frontal plane,*

***538** a bridge connecting the two retaining mechanisms and *holding the two retaining mechanisms together,* and

a first magnetic member at the bridge for magnetically coupling to another magnetic member at the bridge of a second frame;

such that when coupled,

the *two frames are attached together,*

due to the locations of the magnetic members, one of the frames is restricted from moving downwards relative to the other frame, and

the two magnetic members are *coupled at a surface* that is *not parallel to the frontal phase [sic, plane].*[FN8]

> FN8. Plaintiffs and Defendant appear to agree that the phrase "frontal phase" was erroneously used instead of "frontal plane," which is mentioned earlier in Claim 1. This mistake is made elsewhere in the Patents-in-Suit. Wherever the parties agree that "phase" was erroneously used instead of "plane," the court simply uses the term "plane."

**Claim 2:**

An eyeglass device as recited in claim 1 wherein the coupling occurs at a coupling surface on the second frame that is substantially perpendicular to the frontal plane.

**Claim 12:**

An eye glass device as recited in claim 1 wherein:

The bridge of the first frame includes a *U-shaped structure having two arms;* and the magnetic member at the first frame is disposed at least on one of the arms; such that magnetic coupling occurs when the bridge of the second frame is *sandwiched between* the arms of the U-shaped structure.

**Claim 22:**

An eye glass device comprising:

a bridge connecting two retaining mechanism[FN9] and holding them together, with the two mechanisms supporting a pair of lenses of a first frame; and

> FN9. The actual claim language erroneously excluded the letter 's.'

a magnetic member at the bridge for magnetically coupling to another magnetic member at the bridge of a second frame;

such that:

the two retaining mechanisms defines a frontal plain;

and

when coupled,

the two frames are attached together,

*due to the location of the magnetic members,* one of the frames is restricted from moving downwards relative to the other frame; and

the two magnetic members are coupled at a surface that is not parallel to the frontal phase [sic, plane]

### ii. Retaining mechanisms

[11] Plaintiffs argue that the term "retaining mechanisms" should be construed as any structure that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.Supp.2d 526, 2005 Markman 2230453
**(Cite as: 386 F.Supp.2d 526)**

keeps the lenses in a fixed place or position, whether rims, pins, screws or other mechanisms securing the lenses. The Defendant contends that the term should be restricted to the structure disclosed in the patent's specification-rims-and their equivalents that perform the identical function of "supporting" and "defining."[FN10]

> FN10. To the extent Plaintiffs dispute that the structure disclosed in the specification includes rims, the court disagrees. The court finds, based on its reading of the specification and every figure or drawing contained therein, that the retaining mechanisms disclosed in the specification clearly includes rims.

**\*539** Under U.S. Patent law, "means-plus-function" claims must be construed in a way that is consistent with the structure disclosed in the patent's specification, *see* 35 U.S.C. § 112, ¶ 6, and, in this case, the specifications for each of the Patents-in-Suit depict the retaining mechanisms in the form of rims.[FN11] Defendant argues that "retaining mechanism" is a means-plus-function claim limitation because there is no common meaning of the phrase in the industry, and because the claim limitation is described only in terms of its function and not its mechanical structure (i.e. supporting lenses and defining a plane). *See Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1215 (Fed.Cir.1998) (construing a term as a "means-plus-function" claim limitation in light of "subsequent functional language"). Plaintiffs disagree that "retaining mechanism" is a means-plus-function claim limitation for the purposes of § 112 ¶ 6.

> FN11. As well as to any equivalents, but the issue of equivalents is not before the court at this time.

[12] As Plaintiffs correctly point out, there is presumption against construing "retaining mechanism" as a means-plus-function claim, because the relevant term at issue here does not include the word "means." *See Phillips*, 415 F.3d at 1311 (citing *Per-*

*sonalized Media Communs., LLC v. ITC*, 161 F.3d 696, 703-04 (Fed.Cir.1998)). That said, the presumption is rebuttable, *see Phillips*, 415 F.3d at 1311, and this court finds that the presumption has been rebutted in this case.

[13] Means-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function. *See Watts v. XL Sys., Inc.*, 232 F.3d 877, 880-81 (Fed.Cir.2000). In this case, the term "retaining mechanism" is a purely functional limitation that provides no indication as to the nature of its structure, if any. Rather, the relevant claim language refers to "two retaining mechanisms for supporting a pair of lenses, and defining a frontal plane"-language which describes only what the retaining mechanisms do, namely supporting a pair of lenses and defining a frontal plane. As such, "retaining mechanism" is a means-plus-function claim within the meaning of § 112 ¶ 6.

Plaintiffs argue that the Federal Circuit's analysis in *Phillips* compels a contrary result but, in fact, *Phillips* is consistent with this court's decision. In *Phillips*, the Federal Circuit considered whether the term "baffles"[FN12] was a means-plus-function claim, and ultimately found that it was "not a purely functional placeholder in which structure is filled in by the specification" and, thus, not within the parameters of § 112 ¶ 6. *See* 415 F.3d at 1311. The court based its conclusion on the fact that the claim characterized the baffles as made up of "steel" and "extending inwardly" from the steel shell walls, "which plainly implie[d] that the baffles are structures." *Id.* In this case, in contrast, the relevant claim language contains no language analogous to "extending inwardly" that in any way describes the retaining mechanism's physical structure. As such, the claim language in this case compels a **\*540** different result than that at issue in *Phillips.*[FN13]

> FN12. The relevant claim language in *Phillips* at issue was as follows:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.Supp.2d 526, 2005 Markman 2230453

**(Cite as: 386 F.Supp.2d 526)**

"Building modules adapted to fit together for construction of fire, sound and impact resistant security barriers and rooms for use in securing records and persons, comprising in combination, an outer shell ..., sealant means ... and further means disposed inside the shell for increasing its load bearing capacity comprising internal steel baffles extending inwardly from the steel shell walls."

FN13. Once again, the parties relied in part on the testimony of outside experts and other sources in support of their interpretations of "retaining mechanism." Plaintiffs cited testimony from Richard Chao and Defendant pointed to the testimony of Mr. Leck. The court finds that this evidence is no more helpful in construing "retaining mechanism" than it is in construing "frame" and, as such, declines to reach any motions to exclude any and all of this evidence.

Therefore, the court finds that "retaining mechanism" means "a structure that keeps the lenses in place using rims."

### iii. Supporting a pair of lenses

[14] Plaintiffs construe the phrase "supporting a pair of lenses" to mean "holding the lenses in place, either by rims or some other retaining mechanism such as screws or pins." Defendant interprets the phrase to mean "holding the lenses in place using rims."

Read in the context of the claim language, it is obvious that the phrase "supporting a pair of lenses" is intended to describe a function of the "retaining mechanisms." Consistent with the above finding that "retaining mechanism" is a means-plus-function claim that is therefore limited to the embodiments in the specification, the court finds that "supporting a pair of lenses" means "holding

the lenses in place using rims."

### iv. Defining a frontal plane

[15] Plaintiffs interpret the phrase "defining a frontal plane" to mean "delineating, by rims or other means, the plane of glasses parallel to the lenses." Defendant disagrees with Plaintiffs' construction, in part because it rejects the notion that pins or screws can define a "plane," because three points all in a common line cannot define a plane, as there are infinitely many planes that contain a straight line in three-dimensional space. Rather, Defendant insists that a plane is a surface with the property that any line joining two points on the surface is contained entirely within the plane.

The phrase "defining a frontal plane" also clearly describes a function of the "retaining mechanisms." As such, the court finds that "defining a frontal plane" means "delineating, by rims, the plane of glasses parallel to the lenses."

### v. Holding the two retaining mechanisms together

[16] Plaintiffs interpret the phrase "holding the two retaining mechanisms together" to mean "supporting, or keeping from falling, the two parts that hold the lenses together, whether rims or other mechanisms such as screws or pins." Defendant, of course, offers its now familiar objections.

Consistent with its means-plus function finding, the court finds that the phrase "holding the two retaining mechanisms together" means "supporting, or keeping from falling, the rims together."

### vi. Two frames are attached together

[17] Plaintiffs interpret the phrase "two frames are attached together" to mean "two eyeglasses, whether rimmed or rimless, and comprising the entirety of the auxiliary frame with the exception of the lenses and including the lens rims (if provided), the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.Supp.2d 526, 2005 Markman 2230453
**(Cite as: 386 F.Supp.2d 526)**

auxiliary frame magnetic members, the nose bridge, and the arms connected together as by way of a magnetic device."

Consistent with its above constructions, the court finds that the phrase "two frames are attached together" means "two eyeglass devices, which include, at least, a bridge and rims, are fastened or connected by magnetic attraction."

**\*541 vii. Not parallel to the frontal plane**

[18] Plaintiffs construe the phrase "not parallel to the frontal plane" to mean "not on the front portion of the bridge, but on the top and bottom of surfaces of the bridge, in some cases perpendicular to the frontal plane." Defendant interprets the phrase "not parallel" to mean, simply, that the planes do intersect and objects to limiting the phrase to encompass coupling only at "the top and bottom ... surfaces of the bridge."

First, the court finds (and the parties appear not to contest) that "not parallel" means "substantially perpendicular." The language of Claim 2 states that "[a]n eyeglass device as recited in claim 1 wherein the coupling occurs at a coupling surface on the second frame that is substantially perpendicular to the frontal plane." Therefore, "not parallel," read in the context of other relevant claim language, means "substantially perpendicular."

With respect to Plaintiffs' interpretation that coupling must be done "on the top and bottom of surfaces of the bridge," Defendant argues that, even if one of the non-parallel planes, such as the frontal plane, is vertically aligned, the other plane need not be horizontally aligned, and could in fact also be vertically aligned and still be substantially perpendicular. Defendant cites, as an example, a typical six-sided die; as Defendant points out, for any given side of a die, there are four sides that are perpendicular to it, two of which are horizontally aligned and two of which are vertically aligned. Therefore, Defendant contends, there is no basis for restricting

the phrase "not parallel to the frontal plane" only to "the top and bottom surfaces of the bridge."

The court agrees with Defendant. Plaintiffs cite prosecution history from the related '054 Patent as support for its interpretation, but the language Plaintiffs cite do not preclude Defendant's interpretation. Therefore, the court construes "not parallel to the frontal plane" to mean "substantially perpendicular to the frontal plane" without any limitation that coupling occur on the top and bottom of surfaces of the bridge.

**viii. U-shaped structure having two arms**

[19] Plaintiffs construe "U-shaped structure having two arms" as "a type of bridge, in the shape of the letter 'U', that receives the bridge of the frames to which it is attaching." Defendant interprets the same phrase to mean "a three-sided structure with two of the sides being generally parallel to one another." Defendant insists that the opening of the U-shaped structure need not be at the top and Plaintiffs do not voice any disagreement.

Consistent with these interpretations, the court construes the term to mean "a three-sided structure in the shape of the letter 'U', however oriented."

**ix. Sandwiched between**

[20] Plaintiffs interpret the phrase "sandwiched between" to mean "placed snugly in between the arms of the u-shaped bridge." Defendant, referring to a figure in the specification of the '811 Patent, insists that the bridge of the first frame need not be completely enclosed by the bridge. Rather, the arms of the U-shaped structure must simply extend over (and under) part of the bridge. Plaintiffs do not disagree that the U-shaped structure *may* extend over only part of the bridge, but disagrees to the extent Defendant is claiming that the U-shaped structure *must* extend over only part of the bridge.

The court agrees with Plaintiffs. Although the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

386 F.Supp.2d 526, 2005 Markman 2230453
**(Cite as: 386 F.Supp.2d 526)**

drawing Defendant cites does indicate that the U-shaped structure extends over only part of the bridge, the court finds no reason to limit the claim *542 language to the specific embodiment discussed by Defendant. As such, the court construes "sandwiched between" to mean that the U-shaped structure "extends at least partially 'over' (and 'under') the bridge."

**3. '896 Patent**

**i. Relevant Claim Language and Disputed Terms**

**Claim 13:**

An eyeglass device comprising: *a bridge configured to connect two retaining mechanisms and hold them together,* with the two FN14

FN14. The actual claim language erroneously excluded the letter 's.' Here, the court will refer to retaining mechanisms in the plural form.

mechanisms for supporting a pair of lenses of a first frame and defining a frontal plane; and

a magnetic member at the bridge for magnetically coupling to at least a part of the bridge of a second frame, so as to attach the two frames together;

wherein;

the magnetic member at the bridge of the first frame is enclosed by the bridge at least from the front to prevent the magnetic member from being visible from the front when the frame is being worn; and

when the two frames are secured together, the magnetic member is coupled to the bridge of the second frame at a surface not parallel to the frontal plane.

**ii. a bridge configured to connect two retaining mechanisms and hold them together**

[21] Plaintiffs construe the phrase "a bridge configured to connect two retaining mechanisms and hold them together" as "the middle section of eyeglasses, designed to connect the rims, pins, screws or other mechanisms for supporting the lenses." Defendant interprets the same phrase to mean "middle section of eyeglasses, designed to connect rims."

In light of the court's constructions of the terms "bridge" and "retaining mechanism," the court construes the above phrase as "the middle part of the eyeglasses spanning the nose designed to connect the rims."

**III. Conclusion**

The court interprets the disputed terms in the Patents-in-Suit as described above.

It is so ordered.

S.D.N.Y.,2005.
Aspex Eyewear, Inc. v. Altair Eyewear, Inc.
386 F.Supp.2d 526, 2005 Markman 2230453

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT D



# Davis Wright Tremaine LLP

ANCHORAGE    BELLEVUE    LOS ANGELES    NEW YORK    PORTLAND    SAN FRANCISCO    SEATTLE    SHANGHAI    WASHINGTON, D.C.

| | | |
|---|---|---|
| BRIAN G. BODINE | 2600 CENTURY SQUARE | TEL (206) 622-3150 |
| DIRECT (206) 628-7623 | 1501 FOURTH AVENUE | FAX (206) 628-7699 |
| brianbodine@dwt.com | SEATTLE, WA 98101-1688 | www.dwt.com |

October 7, 2005

## CONFIDENTIAL SETTLEMENT PROPOSAL
## SUBJECT TO FED. R. EVID. 408
## AND ANY OTHER APPLICABLE RULE OR STATUTE

**<u>VIA FACSIMILE</u> - (914) 941-6091**

Matthew C. Wagner, Esq.
COLLEN IP
The Holyoke-Manhattan Building
80 South Highland Avenue
Town of Ossining, NY  10562

Re:    *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*
       U.S. District Court for the Southern District of New York
       CA No. 02 CIV 6195 (JGK) (WP)
       <u>Our Reference No. 59739-1</u>

Dear Mr. Wagner:

We have received no response to my July 12, 2005 letter proposing settlement of the above-referenced matter.  While it still might make sense to resolve the matter through settlement rather than continued litigation, the district court's recently issued claim construction order changes the legal landscape considerably.  *See Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 2005 U.S. Dist. LEXIS 20153 (S.D.N.Y. 2005).

We not only believe that the district court was correct in its claim construction, but also that the district court's order, if appealed, will be affirmed by the Court of Appeals for the Federal Circuit.  As an expression of our confidence in the correctness of the district court's opinion and in an attempt to have this matter expeditiously resolved, my client has authorized me to extend to your client the proposal that you and I have informally discussed.  Specifically, Altair is willing to enter a stipulation of noninfringement and dismiss its invalidity counterclaim without prejudice so that your clients can immediately appeal the district court's ruling.  Absent such stipulation, Altair will be filing a motion for summary judgment of noninfringement, both literally and under the doctrine of equivalents.

Matthew C. Wagner, Esq.
October 7, 2005
Page 2



While Altair expects to prevail both on summary judgment and on any subsequent appeal, the possibility of settlement still exists, albeit under terms that are not as favorable to your clients had settlement been reached before September 12, 2005. Given the favorable nature of the district court's claim construction order and the likelihood of succeeding on appeal, my client views the continuation of this litigation as harassment.

If we cannot end the litigation through mutually agreeable terms—including a license allowing Altair to continue to produce its magnetic clip-on products without continued litigation and including a royalty payment to Plaintiffs—then VSP intends to terminate its relationship with Aspex. I understand that if the *Aspex v. Altair* matter has not been resolved to my client's satisfaction by November 3, 2005, VSP will be sending a letter to its member doctors notifying those doctors that Aspex will no longer be an approved vendor under the VSP plan. I also understand that Aspex products will be phased out as an option under the VSP plan by March 1, 2006. I attach a copy of the letter that VSP intends to send to VSP plan doctors.

As I indicated in earlier correspondence to you, settling this case now will help strengthen the relationship between your clients and VSP. If this matter is not settled, however, VSP will terminate all relationships with Aspex, which could cause your clients to lose sales of $10 million annually through VSP doctors.

Please let me know before the close of business Friday, October 28, 2005, whether your client wishes to discuss settlement of the above-referenced lawsuit.

As always, please contact me if you have questions or concerns or if you wish to discuss this matter further.

Best regards,

Davis Wright Tremaine LLP

Brian G. Bodine

Attachments: As noted

BGB:mw

November 3, 2005

TO:    VSP Member Doctors

RE:    Aspex Eyewear, Inc.

Dear Dr. _____:

This letter is intended to inform you of VSP's decision to discontinue recognizing Aspex Eyewear, Inc. as a supplier under VSP's plans. Effective March 1, 2006, Aspex products will no longer be eligible for reimbursement under VSP's plans.

We are providing you notice of VSP's decision to assist you in your planning and inventory decisions. Claims made for Aspex products with dates of service before March 1, 2006, will be covered at current fee levels. Claims for Aspex products with dates of service March 1, 2006 and later will not be reimbursed.

We trust that our decision to discontinue our relationship with Aspex Eyewear, Inc. as a supplier will not have a negative impact on your business. We look forward to working together with you to provide the best possible care at the lowest possible cost for your patients covered under a VSP plan.

Sincerely,

Roger J. Valine
President, VSP

EXHIBIT E

```
***      TX REPORT      ***
*********************

TRANSMISSION OK

TX/RX NO                3392
CONNECTION TEL                    919149416091
SUBADDRESS
CONNECTION ID
ST. TIME               10/07 12:52
USAGE T                01'39
PGS.                        4
RESULT                 OK
```

LAWYERS

# Davis Wright Tremaine LLP



ANCHORAGE   BELLEVUE   HONOLULU   LOS ANGELES   NEW YORK   PORTLAND   SAN FRANCISCO   SEATTLE   SHANGHAI   WASHINGTON, D.C.

2600 CENTURY SQUARE
1501 FOURTH AVENUE
SEATTLE, WA 98101-1688

TEL (206) 622-3150
FAX (206) 628-7699
www.dwt.com

---

## FACSIMILE TRANSMITTAL

Date: October 7, 2005

**SEND TO:**

| **NAME** | **FIRM/COMPANY/CONFIRMATION NO.** | **FAX NUMBER** |
|---|---|---|
| **Matthew C. Wagner, Esq.** | **COLLEN IP** | **(914) 941-6091** |

**FROM:**

Brian G. Bodine

Telephone:  (206) 628-7623     Fax:  (206) 628-7699

## NUMBER OF PAGES (including cover page):  4

Floor Sent From: _____     Time Sent:_____  AM  PM     Operator:_____

RETURN TO SENDER:   VIA INTRAOFFICE MAIL ☐     WILL PICK UP **X**     EXTENSION:7583

**COMMENTS:**

THE WRITTEN MESSAGE TRANSMITTED HEREBY IS FOR THE EXCLUSIVE USE OF THE ADDRESSEE AND CONTAINS CONFIDENTIAL, PRIVILEGED AND NONDISCLOSABLE INFORMATION. IF THE RECIPIENT OF THIS MESSAGE IS NOT THE ADDRESSEE, OR A PERSON RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE ADDRESSEE, SUCH RECIPIENT IS PROHIBITED FROM READING OR USING THIS MESSAGE IN ANY WAY. IF YOU HAVE RECEIVED THIS MESSAGE BY MISTAKE, PLEASE NOTIFY THE SENDER IMMEDIATELY AND DESTROY THE FACSIMILE MESSAGE.

# EXHIBIT F

485 F.Supp.2d 310
**(Cite as: 485 F.Supp.2d 310)**

▷

United States District Court,
S.D. New York.
ASPEX EYEWEAR, INC. and Contour Optik, Inc.,
Plaintiffs
v.
ALTAIR EYEWEAR, INC., Defendant
**No. 02 Civ. 6195 SCR.**

April 2, 2007.

**Background:** Eyewear distributor and licensor of
patents for secondary eyeglass frames that attached
to primary eyeglass frames via magnetic attraction,
as opposed to mechanical "clips," brought infringe-
ment action against competitor. Following a *Mark-
man* hearing, parties cross-moved for summary
judgment.

**Holdings:** The District Court, Robinson, J., held
that:
(1) competitor did not literally infringe patent for
eyeglass device which included a primary and an
auxiliary spectacle frames for supporting lenses;
(2) pins in competitor's rimless eyeglasses were not
substantially similar to frames as defined in the pat-
ents, and, thus, competitor's device did not infringe
patents under the doctrine of equivalents; and
(3) competitor's device did not infringe means-
plus-function limitation claim in patents.

Summary judgment for competitor.

West Headnotes

**[1] Patents 291 ⚖═226.6**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k226.5 Substantial Identity of Subject
Matter
                291k226.6 k. Comparison with Claims
of Patent. Most Cited Cases

The first step in determining if a patent has been in-
fringed is to determine its scope and meaning.

**[2] Patents 291 ⚖═167(1.1)**

291 Patents
    291IX Construction and Operation of Letters
Patent
        291IX(B) Limitation of Claims
            291k167 Specifications, Drawings, and
Models
                291k167(1.1) k. Specification as Lim-
iting or Enlarging Claims. Most Cited Cases
In interpreting patent claim, courts should not read
limitations from the specification into the claim.

**[3] Patents 291 ⚖═226.6**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k226.5 Substantial Identity of Subject
Matter
                291k226.6 k. Comparison with Claims
of Patent. Most Cited Cases
In the second step for determining if a patent has
been infringed, the court must decide if the accused
device is within the scope of the properly construed
claim.

**[4] Patents 291 ⚖═226.6**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k226.5 Substantial Identity of Subject
Matter
                291k226.6 k. Comparison with Claims
of Patent. Most Cited Cases

**Patents 291 ⚖═237**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
**(Cite as: 485 F.Supp.2d 310)**

291k233 Patents for Machines or Manufactures

291k237 k. Substitution of Equivalents. Most Cited Cases

To show infringement, the plaintiff must establish that the accused device includes every limitation of the claim or an equivalent of each limitation.

**[5] Patents 291 ⟶323.2(2)**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k323 Final Judgment or Decree
        291k323.2 Summary Judgment
          291k323.2(2) k. Presence or Absence of Fact Issues. Most Cited Cases

While the second step of patent infringement analysis is a question of fact, a court may grant summary judgment of non-infringement if no reasonable jury could find that every limitation of all of the asserted claims of the patents-in-suit is found in the accused products.

**[6] Federal Civil Procedure 170A ⟶2544**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2542 Evidence
          170Ak2544 k. Burden of Proof. Most Cited Cases

The party opposing summary judgment must show either that the movant has not established its entitlement to judgment on the undisputed facts or that material issues of fact require resolution by trial.

**[7] Patents 291 ⟶312(1.1)**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k312 Evidence
        291k312(1) Presumptions and Burden of Proof

291k312(1.1) k. In General. Most Cited Cases

In a patent infringement case, the plaintiff has the burden of proving that each and every element of the asserted patent claims is found in the accused device, either literally or by an equivalent.

**[8] Federal Civil Procedure 170A ⟶2466**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)1 In General
        170Ak2465 Matters Affecting Right to Judgment
          170Ak2466 k. Lack of Cause of Action or Defense. Most Cited Cases

A court must grant a motion for summary judgment against a party who has failed to introduce evidence sufficient to establish the existence of an essential element of that party's case, on which the party will bear the burden of proof at trial.

**[9] Federal Civil Procedure 170A ⟶2543**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2542 Evidence
          170Ak2543 k. Presumptions. Most Cited Cases

On a motion for summary judgment, in deciding whether a genuine issue of material fact exists, the court must believe the evidence of the nonmovant and draw all justifiable inferences in the nonmovant's favor.

**[10] Federal Civil Procedure 170A ⟶2546**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2542 Evidence
          170Ak2546 k. Weight and Suffi-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
(Cite as: 485 F.Supp.2d 310)

ciency. Most Cited Cases

To defeat a motion for summary judgment, the opposing party must offer more than conclusory statements.

**[11] Patents 291 ☞323.2(2)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k323 Final Judgment or Decree
            291k323.2 Summary Judgment
               291k323.2(2) k. Presence or Absence of Fact Issues. Most Cited Cases

Contention that the accused device performs the same function, in the same way, to achieve the same result, without more, does not create a genuine issue of material fact as to whether an accused device infringes by equivalents.

**[12] Patents 291 ☞323.2(4)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k323 Final Judgment or Decree
            291k323.2 Summary Judgment
               291k323.2(4) k. Affidavits or Other Evidence. Most Cited Cases

Allegations that a defendant infringed a patent which are entirely lacking in factual support are insufficient to withstand a defendant's motion for summary judgment of non-infringement.

**[13] Patents 291 ☞226.6**

291 Patents
   291XII Infringement
      291XII(A) What Constitutes Infringement
         291k226.5 Substantial Identity of Subject Matter
            291k226.6 k. Comparison with Claims of Patent. Most Cited Cases

The accused device must contain each limitation of the claim exactly to literally infringe a patent; any deviation from the claim prevents the court from finding literal infringement.

**[14] Patents 291 ☞314(5)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k314 Hearing
            291k314(5) k. Questions of Law or Fact. Most Cited Cases

Whether an accused device literally infringes a claim is a question of fact.

**[15] Patents 291 ☞235(2)**

291 Patents
   291XII Infringement
      291XII(A) What Constitutes Infringement
         291k233 Patents for Machines or Manufactures
            291k235 Identity of Principle or Mode of Operation
               291k235(2) k. Particular Patents or Devices. Most Cited Cases

Competitor did not literally infringe patent for eyeglass device which included a primary and an auxiliary spectacle frames for supporting lenses, where, in each of competitor's devices, either the auxiliary or primary frame or both did not contain rims, which were a required element of the patented device.

**[16] Patents 291 ☞237**

291 Patents
   291XII Infringement
      291XII(A) What Constitutes Infringement
         291k233 Patents for Machines or Manufactures
            291k237 k. Substitution of Equivalents. Most Cited Cases

To infringe under the doctrine of equivalents, the differences between the patented device and the accused device must be insubstantial.

**[17] Patents 291 ☞314(5)**

485 F.Supp.2d 310
**(Cite as: 485 F.Supp.2d 310)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k314 Hearing
            291k314(5) k. Questions of Law or
Fact. Most Cited Cases
Whether an accused device or method infringes a
claim under the doctrine of equivalents is a question of fact.

**[18] Patents 291 ☞237**

291 Patents
   291XII Infringement
      291XII(A) What Constitutes Infringement
         291k233 Patents for Machines or Manufactures
            291k237 k. Substitution of Equivalents. Most Cited Cases
For purposes of the doctrine of equivalents, equivalence must be evaluated from the perspective of one of ordinary skill in the art.

**[19] Evidence 157 ☞555.2**

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
            157k555.2 k. Necessity and Sufficiency. Most Cited Cases
The objective of the gatekeeping requirement of
*Daubert* and rule governing admissibility of expert
testimony is to make certain that an expert, whether
basing testimony upon professional studies or personal experience, employs in the courtroom the
same level of intellectual rigor that characterizes
the practice of an expert in the relevant field.
Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[20] Evidence 157 ☞555.2**

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion

            157k555.2 k. Necessity and Sufficiency. Most Cited Cases
The trial judge's gatekeeping obligation under rule
governing admissibility of expert testimony applies
not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" or
"other specialized" knowledge. Fed.Rules
Evid.Rule 702, 28 U.S.C.A.

**[21] Evidence 157 ☞555.2**

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
            157k555.2 k. Necessity and Sufficiency. Most Cited Cases
Under rule governing admissibility of expert testimony, the district court should consider the
*Daubert* factors where they are reasonable measures of the reliability of expert testimony.
Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[22] Evidence 157 ☞555.2**

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
            157k555.2 k. Necessity and Sufficiency. Most Cited Cases
The *Daubert* factors for reliability of expert testimony neither necessarily nor exclusively applies to
all experts or in every case.

**[23] Evidence 157 ☞535**

157 Evidence
   157XII Opinion Evidence
      157XII(C) Competency of Experts
         157k535 k. Necessity of Qualification.
Most Cited Cases
The first step in determining the admissibility of
expert testimony is to examine whether the proposed witness qualifies as an expert, and in doing
so, the court is required to decide whether the par-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
**(Cite as: 485 F.Supp.2d 310)**

ticular expert has specialized knowledge to assist in deciding the particular issue in the case. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[24] Evidence 157 ☞508**

157 Evidence
    157XII Opinion Evidence
        157XII(B) Subjects of Expert Testimony
            157k508 k. Matters Involving Scientific or Other Special Knowledge in General. Most Cited Cases

**Evidence 157 ☞555.2**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.2 k. Necessity and Sufficiency. Most Cited Cases
In determining the admissibility of expert testimony, the court must determine whether the scientific, technical, or other specialized testimony provided by the expert is both relevant and reliable. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[25] Evidence 157 ☞508**

157 Evidence
    157XII Opinion Evidence
        157XII(B) Subjects of Expert Testimony
            157k508 k. Matters Involving Scientific or Other Special Knowledge in General. Most Cited Cases
Expert testimony is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed.Rules Evid.Rule 401, 28 U.S.C.A
.

**[26] Patents 291 ☞323.2(4)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity

            291k323 Final Judgment or Decree
                291k323.2 Summary Judgment
                    291k323.2(4) k. Affidavits or Other Evidence. Most Cited Cases
An expert's unsupported conclusion on the ultimate issue of patent infringement is insufficient to raise a genuine issue of material fact; instead, the expert must include the facts upon which his conclusions were reached.

**[27] Patents 291 ☞323.2(4)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k323 Final Judgment or Decree
                291k323.2 Summary Judgment
                    291k323.2(4) k. Affidavits or Other Evidence. Most Cited Cases
An expert's statements that the critical claim limitation is found in the accused device will not preclude summary judgment unless the expert sets forth these specific facts showing that there is a genuine need for trial. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[28] Evidence 157 ☞506**

157 Evidence
    157XII Opinion Evidence
        157XII(B) Subjects of Expert Testimony
            157k506 k. Matters Directly in Issue. Most Cited Cases

**Evidence 157 ☞535.5**

157 Evidence
    157XII Opinion Evidence
        157XII(C) Competency of Experts
            157k535.5 k. Disqualification; Bias or Conflict of Interest. Most Cited Cases
    (Formerly 157k535)
Testimony of proposed expert, who had been president of eyewear company that focused on developing technologies in design and manufacture of ophthalmic frames and lenses, was not unreliable be-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
(Cite as: 485 F.Supp.2d 310)

cause proposed expert had historic ties with competitor and competitor's counsel "coached" him in preparing his report, and, thus, the testimony was admissible in patent infringement action, where there was no evidence that the advance discussion and preparation of proposed expert went beyond what was normally expected and practiced in federal courts, and proposed expert's testimony did not go to ultimate issue in the case, i.e. whether patents for secondary eyeglass frames that attached to primary eyeglass frames via magnetic attraction were infringed. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

[29] Patents 291 ⚏323.2(4)

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k323 Final Judgment or Decree
                291k323.2 Summary Judgment
                    291k323.2(4) k. Affidavits or Other
Evidence. Most Cited Cases
Fact that proposed expert's testimony in his deposition may contradict his declaration went to the weight such testimony would be accorded, not to whether it was admissible or should be considered by the District Court on a motion for summary judgment of non-infringement in patent infringement action.

[30] Patents 291 ⚏323.2(4)

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k323 Final Judgment or Decree
                291k323.2 Summary Judgment
                    291k323.2(4) k. Affidavits or Other
Evidence. Most Cited Cases
District Court would not consider expert report of patent attorney on competitor's motion for summary judgment of non-infringement in patent infringement action, in determining whether competitor infringed patents for secondary eyeglass frames that attached to primary eyeglass frames via magnetic

attraction under the doctrine of equivalents, where patent attorney, prior to his involvement in the action, did not possess any particular expertise with respect to the eyeglass industry, and he admitted that he did not consider himself to be a person of ordinary skill in the design of eyeglass frames.

[31] Patents 291 ⚏237

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k233 Patents for Machines or Manufactures
                291k237 k. Substitution of Equivalents. Most Cited Cases
To determine if the differences between the patented and allegedly infringing product are substantial, the court examines each element as the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole.

[32] Patents 291 ⚏237

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k233 Patents for Machines or Manufactures
                291k237 k. Substitution of Equivalents. Most Cited Cases
Each element in the patent claim is deemed material to defining the scope of the patented invention; this "all elements rule" means that the doctrine of equivalents will not apply to a claim of patent infringement if applying the doctrine would vitiate an entire claim limitation.

[33] Patents 291 ⚏237

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k233 Patents for Machines or Manufactures
                291k237 k. Substitution of Equival-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
**(Cite as: 485 F.Supp.2d 310)**

ents. Most Cited Cases

Given that the purpose of patent claims is to provide public notice of what the patentee claims as his invention, a court must not make a finding of equivalence if that finding would conflict with the primacy of claims in defining the scope of the patentee's rights.

**[34] Patents 291 €══323.2(2)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k323 Final Judgment or Decree
            291k323.2 Summary Judgment
               291k323.2(2) k. Presence or Absence of Fact Issues. Most Cited Cases

If no reasonable jury could determine that two elements are equivalent, district courts are obliged to grant partial or complete summary judgment of noninfringement.

**[35] Patents 291 €══237**

291 Patents
   291XII Infringement
      291XII(A) What Constitutes Infringement
         291k233 Patents for Machines or Manufactures
            291k237 k. Substitution of Equivalents. Most Cited Cases

Pins in competitor's rimless eyeglasses were not substantially similar to frames as defined in patents for secondary eyeglass frames that attached to primary eyeglass frames via magnetic attraction, as opposed to mechanical "clips," and, thus, competitor's device did not infringe patents under the doctrine of equivalents, although function of pins in allegedly infringing device was arguably similar to function of frames in patented devices, where the way in which the devices performed that function differed; frames encircled the lenses, holding them "therein," as specified in the patent, while pins did not hold the lenses "therein," but, instead, pierced the lenses in several locations to attach them to the bridge and the earpieces.

**[36] Patents 291 €══101(8)**

291 Patents
   291IV Applications and Proceedings Thereon
      291k101 Claims
         291k101(8) k. Functions, Advantages or Results of Invention. Most Cited Cases

Means-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function.

**[37] Patents 291 €══314(5)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k314 Hearing
            291k314(5) k. Questions of Law or Fact. Most Cited Cases

Whether the device or method at issue performs the identical function with the same structure, materials, or acts described in the specification or an equivalent thereof, thus infringing a claim with a means-plus-function limitation, is a question of fact. 35 U.S.C.A. § 112.

**[38] Patents 291 €══226.7**

291 Patents
   291XII Infringement
      291XII(A) What Constitutes Infringement
         291k226.5 Substantial Identity of Subject Matter
            291k226.7 k. Function, Means, Operation, and Result. Most Cited Cases

As in other tests for infringement, a claim limitation in a means-plus-function limitation analysis must be met, literally or equivalently, for infringement to lie. 35 U.S.C.A. § 112.

**[39] Patents 291 €══226.7**

291 Patents
   291XII Infringement
      291XII(A) What Constitutes Infringement
         291k226.5 Substantial Identity of Subject Matter

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
**(Cite as: 485 F.Supp.2d 310)**

291k226.7 k. Function, Means, Operation, and Result. Most Cited Cases

Unlike the component-by-component comparison in the doctrine of equivalents context, a court need not compare individual components of the overall structure in conducting a means-plus-function limitation analysis; instead, the claim limitation is the overall structure corresponding to the claimed function. 35 U.S.C.A. § 112.

**[40] Patents 291 ☞226.7**

291 Patents
   291XII Infringement
      291XII(A) What Constitutes Infringement
         291k226.5 Substantial Identity of Subject Matter
         291k226.7 k. Function, Means, Operation, and Result. Most Cited Cases

Even if pins in competitor's one-piece bridge and three-piece mount performed identical function as "retaining mechanisms" in patents for secondary eyeglass frames that attached to primary eyeglass frames via magnetic attraction, as opposed to mechanical "clips," structure of pins differed substantially from structure of retaining mechanism, and, thus, competitor's device did not infringe means-plus-function limitation claim in patents. 35 U.S.C.A. § 112.

**[41] Patents 291 ☞234**

291 Patents
   291XII Infringement
      291XII(A) What Constitutes Infringement
         291k233 Patents for Machines or Manufactures
         291k234 k. Identity in General. Most Cited Cases

If there is indisputable mechanical incompatibility between the patented device and the allegedly infringing device, there is no infringement.

**Patents 291 ☞328(2)**

291 Patents

291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
   291k328 Patents Enumerated
      291k328(2) k. Original Utility. Most Cited Cases

5,737,054, 6,012,811, 6,092,896. Not Infringed.

**Patents 291 ☞328(2)**

291 Patents

291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
   291k328 Patents Enumerated
      291k328(2) k. Original Utility. Most Cited Cases

6,139,141. Cited as Prior Art.

**\*314** Brian G. Bodine, Kaustuv M. Das, Merchant & Gould, Seattle, WA and Edward J. Davis, Peter Karanjia, Davis Wright Tremaine LLP, New York City, for Defendant Altair Eyewear, Inc.

Jess M. Collen, Matthew C. Wagner, Jeffrey A. Lindenbaum, Collen IP, Town of Ossining, Westchester County, New York City, for Plaintiffs Aspex Eyewear, Inc. and Contour Optik, Inc.

## MEMORANDUM DECISION AND ORDER

ROBINSON, District Judge.

### I. Background

Aspex Eyewear, Inc. and Contour Optik, Inc. ("Aspex" or "Plaintiffs") are suing Altair Eyewear, Inc. ("Altair" or "Defendant") for infringing several patents for detachable sunglass lenses. The sunglass lenses are attached to prescription glasses via magnets at the bridges of the glasses and the sunglass.

Defendant has three different product lines that use magnets to attach sunglass lenses to corrective eyewear: Diamontite Magnetics, Joseph Abboud, and Sunlites. While some of Defendant's Sunlite products contain a rim around the corrective lens portion of the glasses, none of Defendant's products

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
**(Cite as: 485 F.Supp.2d 310)**

contain a rim around the sunglass lenses. Instead, Defendant's lenses are set in what Defendant refers to as a "one-piece bridge" or a "three-piece mount." While Plaintiffs dispute this terminology, choosing, instead, to call all of the mounts "frames," this Court will use Defendant's terminology for the sake of clarity. The "three-piece mount" is comprised of lenses that are mounted, with pins, to a bridge and the earpieces. A "one-piece bridge" is simply the sunglass lenses mounted to the bridge with pins. **\*315** In either the one-piece bridge or the three-piece mount, holes are drilled through the lenses and pins extending from the components of the eyewear are inserted through those holes to mount the components to the lenses.

This Court has written two other opinions in this case. In March 2005, this Court denied Defendant's motion to dismiss the distributor as Plaintiff for lack of standing, and denied Plaintiffs' motion for leave to add Altair's parent corporation as a defendant. *See Aspex Eyewear, Inc. and Contour Optik, Inc. v. Altair Eyewear, Inc.,* 361 F.Supp.2d 210, 216, 217-18 (S.D.N.Y.2005). After holding a *Markman* claim construction hearing, *see Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), *aff'd* 517 U.S. 370, 384-85, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), this Court decided the proper construction of the patent claims. *Aspex Eyewear, Inc. and Contour Optik, Inc. v. Altair Eyewear, Inc.,* 386 F.Supp.2d 526, 534 (S.D.N.Y.2005). Familiarity with those previous opinions is assumed here.

This opinion addresses the parties' cross-motions for summary judgment. Plaintiffs seek summary judgment on the issue of infringement of their three patents; Defendant seeks summary judgment on the issue of noninfringement of the same patents. Additionally, Plaintiffs have submitted two separate motions to exclude the testimony of two of Defendant's experts, Allen Leck and Ogden Webster. Defendant relied on Leck's opinion in its motion for summary judgment on the issue of noninfringement, and accordingly, this Court thus addresses

Plaintiffs' motion to exclude Leck here. Because Defendant does not rely on Webster's opinion in the instant motion, however, it is not necessary for this Court to specifically address Plaintiffs' motion with respect to Webster. This Court does address the admissibility of the deposition testimony and affidavits the parties ask the Court to consider as the opinions of persons of ordinary skill in the relevant art.

For the reasons explained below, this Court grants Defendant's motions for summary judgment on the issue of noninfringement of the three patents and denies Plaintiffs' motions for summary judgment on the issue of infringement.

## II. Analysis

[1][2] Courts use a two-step process to determine if a patent has been infringed. The court first interprets the claim to determine its scope and meaning. *See, e.g., Dolly, Inc. v. Spalding & Evenflo Companies, Inc.,* 16 F.3d 394, 397 (Fed.Cir.1994); *Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 796, 17 U.S.P.Q.2d 1097, 1099 (Fed.Cir.1990) This Court has already interpreted the claims here.[FN1] *Aspex Eyewear, Inc.,* 386 F.Supp.2d at 534.

> FN1. This Court determined, *inter alia,* that "the term 'frame' includes some kind of rim surrounding the lenses.' " *Aspex Eyewear, Inc. and Contour Optik, Inc. v. Altair Eyewear, Inc.,* 386 F.Supp.2d 526, 534 (S.D.N.Y.2005). The diagrams and figures in the Patents-in-Suit contained "eyeglass devices that clearly include rims." *Id.* While courts "should not read limitations from the specification into the claim," *Phillips v. AWH Corp.,* 415 F.3d 1303, 1323 (Fed.Cir.2005), the generalized disclaimers contained in the Patents-in-Suit did not require that "frames" be construed to include rimless varieties of glasses. *See Aspex Eyewear,* 386 F.Supp.2d at 535; (citing *Les Traitments*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
(Cite as: 485 F.Supp.2d 310)

*Des Eaux Poseidon v. KWI, Inc.,* 135 F.Supp.2d 126, 135 (D.Mass.2001)); *see also Phillips,* 415 F.3d at 1315 (holding that the claim specifications are "highly relevant to the claim construction analysis"). This is because, in part, the claim stated that the function of the frames was to "support lenses *therein." See Aspex Eyewear,* 386 F.Supp.2d at 533, 534 (citing Claim 1 of the '054 patent, which described the "eyeglass device" as comprising "a primary (respectively auxiliary) spectacle       frame        for        supporting (respectively auxiliary) primary lenses therein".) After making the determination that "frames" required rims, this Court construed other terms consistently as requiring rimmed frames.

The claim construction determinations this Court made included the following:

### 1. '054 Patent

a. *frame* means an eyeglass device that included, at least, a bridge and rims, and thus excluded rimless frames;

b. *projection* means "any portion of the auxiliary bridge which extends toward the primary bridge for the purpose of going over and engaging with the primary bridge" and can also be a multi-component, bent or even U-shaped structure

### 2. '811 Patent

a. *retaining mechanisms* is a means-plus-function claim within the meaning of § 112 ¶ 6 and means a structure that kept the lenses in place using rims, and

b. *supporting a pair of lenses* means "holding the lenses in place using rims."

c. *defining a frontal plane* means

"delineating, by rims, the plane of glasses parallel to the lenses."

d. *holding the two retaining mechanisms together* means "supporting, or keeping from falling, the rims together."

e. *two frames are attached together* means "two eyeglass devices, which include, at least, a bridge and rims, are fastened or connected by magnetic attraction."

f. *not parallel to the frontal plane* means "substantially perpendicular to the frontal plane" without any limitation that coupling occur on the top and bottom of surfaces of the bridge.

### 3. '896 Patent

a. *a bridge configured to connect two retaining mechanisms and hold them together* means "the middle part of the eyeglasses spanning the nose designed to connect the rims."

**\*316** [3][4] In the second step to determine if a patent has been infringed, the court must decide if the accused device is within the scope of the properly construed claim. *See, e.g., Dolly, Inc.,* 16 F.3d at 397; *Becton Dickinson & Co.,* 922 F.2d at 796. To show infringement, the plaintiff must establish that the accused device includes every limitation of the claim or an equivalent of each limitation. *See, e.g., Dolly, Inc.,* 16 F.3d at 397; *Becton Dickinson & Co.,* 922 F.2d at 796.

### a. Summary Judgment Standard

[5][6][7][8] While the second step of patent infringement analysis is a question of fact, a court may grant summary judgment on non-infringement if no reasonable jury could find that every limitation of all of the asserted claims of the patents-in-suit is found in the accused products. *See Tech-*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
**(Cite as: 485 F.Supp.2d 310)**

*Search, L.L.C. v. Intel Corp.,* 286 F.3d 1360, 1371-72 (Fed.Cir.2002). The party opposing the summary judgment must show either that the movant has not established its entitlement to judgment on the undisputed facts or that material issues of fact require resolution by trial. *Vivid Techs., Inc. v. American Science & Eng'g, Inc.,* 200 F.3d 795, 806-07 (Fed.Cir.1999). The plaintiff has the burden of proving that each and every element of the asserted patent claims is found in the accused device, either literally or by an equivalent. *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1535 (Fed.Cir.1991). A court must grant a motion for summary judgment "against a party who has failed to introduce evidence sufficient to establish the existence of an essential element of that party's case, on which the party will bear the burden of proof at trial." *Novartis Corp. v. Ben Venue Labs., Inc.,* 271 F.3d 1043, 1046 (Fed.Cir.2001).

[9][10][11][12] In deciding whether a genuine issue of material fact exists, the court must believe the evidence of the nonmovant and draw all justifiable inferences in the nonmovant's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To defeat a motion for summary judgment, however, *317 the opposing party must offer more than "conclusory statements." *Moore U.S.A., Inc. v. Standard Register Co.,* 229 F.3d 1091, 1112, 56 USPQ2d 1225, 1240 (Fed.Cir.2000). "The mere recital of the *Graver Tank* mantra that the accused device performs 'the same function, in the same way, to achieve the same result,' without more, does not create a genuine issue of material fact as to whether an accused device infringes by equivalents." *Id.* at 1113 (quoting *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)). Thus, allegations that a defendant infringed a patent which are "entirely lacking in factual support" are insufficient to withstand a defendant's motion for summary judgment on non-infringement. *Id.* at 1112.

Here, the Court must apply three different tests to determine if Defendants have infringed Plaintiffs' patents. The first two tests are relevant for the '054 patent. First, a defendant can commit literal patent infringement if "the accused device or method performs an identical function to the one recited in the claim." *IMS Tech. v. Haas Automation, Inc.,* 206 F.3d 1422, 1429 (Fed.Cir.), *cert. dismissed* 530 U.S. 1299, 121 S.Ct. 24, 147 L.Ed.2d 1047 (2000) (citations omitted). Second, a defendant can infringe a patent under the doctrine of equivalents, explained below. *See id.* The third analysis, often referred to as the means-plus-function (or structure-plus-function) test, is used to determine if the '811 and '896 patents were infringed under 35 U.S.C. § 112 ¶ 6. *See id.* at 1430.

### b. Literal Infringement of '054 Patent

[13][14] The accused device must "contain each limitation of the claim exactly" to literally infringe a patent. *Litton Sys., Inc. v. Honeywell Inc.,* 140 F.3d 1449, 1454 (Fed.Cir.1998). Any deviation from the claim prevents the court from finding literal infringement. *See id.* Whether an accused device literally infringes a claim is a question of fact. *See IMS Tech.,* 206 F.3d at 1429.

[15] Defendant argues that, given the claim construction requirement that both primary and sunglasses frames contain rims, Defendant has not literally infringed Plaintiffs' patent. At oral argument, Plaintiffs conceded that in each of Defendant's devices, either the auxiliary or primary frame or both did not contain rims. As rims are a required element of each of the allegedly infringing devices, Defendant has not literally infringed Plaintiffs' '054 patent. *Litton Sys., Inc.,* 140 F.3d at 1454.

### c. Doctrine of Equivalents: '054 Patent

[16][17][18] To infringe under the doctrine of equivalents, the differences between the patented device and the accused device must be "insubstantial." *Oak Tech., Inc. v. Int'l Trade Comm'n,* 248 F.3d 1316, 1331 (Fed.Cir.2001). Whether an accused

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
**(Cite as: 485 F.Supp.2d 310)**

device or method infringes a claim under the doctrine of equivalents is a question of fact. *Seachange Int'l, Inc. v. C-Cor Inc.,* 413 F.3d 1361, 1429 (Fed.Cir.2005). As "equivalence [must] be evaluated from the perspective of one of ordinary skill in the art." *Lighting World, Inc. v. Birchwood Lighting, Inc.,* 382 F.3d 1354, 1357 (Fed.Cir.2004), this Court must first determine the admissibility of the parties' experts' testimony.

**i. Admissibility of Expert Testimony**

The Federal Circuit has stated that where an evidentiary ruling raises a procedural issue that is not unique to patent law, the law of the regional circuit applies. *See Odetics, Inc. v. Storage Tech. Corp.,* 185 F.3d 1259, 1276 (Fed.Cir.1999); *318WMS Gaming, Inc. v. International Game Technology,* 184 F.3d 1339, 1361 (Fed.Cir.1999). Because the admissibility of expert testimony is a procedural issue that arises in an array of substantive areas, Second Circuit law governs the admissibility of the experts' testimony in this case.

[19] Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert testimony, provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's

testimony both rests on a reliable foundation and is relevant to the task at hand." The objective of the "gatekeeping" requirement of *Daubert* and Rule 702 is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

[20][21][22] The trial judge's gatekeeping obligation applies not only to testimony based on "scientific" knowledge, as in *Daubert,* but also to testimony based on "technical" or "other specialized" knowledge. *Id.* at 141, 119 S.Ct. 1167. The Court emphasized that the test for reliability is "flexible," *id.,* and stated that a trial judge may, but need not, consider the specific factors identified in *Daubert:*

> (1) whether a theory or technique can be and has been tested;
>
> (2) whether it has been subjected to peer review and publication;
>
> (3) whether it has a high known or potential rate of error; and
>
> (4) whether it is generally accepted in the relevant scientific community.

*Id.* at 149-50, 119 S.Ct. 1167 (citing *Daubert,* 509 U.S. at 592-94, 113 S.Ct. 2786). A district court should consider the Daubert factors "where they are reasonable measures of the reliability of expert testimony," *Kumho,* 526 U.S. at 152, 119 S.Ct. 1167. The list of factors "neither necessarily nor exclusively applies to all experts or in every case," *id.* at 141, 119 S.Ct. 1167. Notably, the trial judge has "the same kind of latitude in deciding how to test an expert's reliability ... as it enjoys when it decides whether that expert's relevant testimony is reliable." *Id.* at 152, 119 S.Ct. 1167.

[23][24] Pursuant to this framework, the first step

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310

**(Cite as: 485 F.Supp.2d 310)**

in determining the admissibility of expert testimony is to examine "whether the proposed witness qualifies as an expert." *Baker v. Urban Outfitters, Inc.*, 254 F.Supp.2d 346, 352 (S.D.N.Y.2003). The court is required to "decide whether the particular expert has specialized knowledge to assist ... 'in deciding the particular issue in the case.' " *Kumho,* 526 U.S. at 157, 119 S.Ct. 1167 (internal citation omitted). Next, the Court must determine "whether the scientific, technical or other specialized testimony provided by the expert is both relevant and reliable." *Baker,* 254 F.Supp.2d at 353.

**\*319** [25] Expert testimony is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401; *see also Campbell ex rel. Campbell v. Metropolitan Property and Cas. Ins. Co.,* 239 F.3d 179, 184 (2d Cir.2001). With respect to the issue of reliability, "[t]he district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.' " *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir.2002) (quoting FED.R.EVID. 702).

[26][27] An expert's "unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact." *Arthur A. Collins v. Northern Telecom Limited,* 216 F.3d 1042, 1046 (Fed.Cir.2000). Instead, the expert must include the facts upon which his conclusions were reached. *See id.; Zelinski v. Brunswick Corp.,* 185 F.3d 1311, 1317 (Fed.Cir.1999). An expert's statements that the critical claim limitation is found in the accused device will not preclude summary judgment unless the expert sets forth these "specific facts showing that there is a genuine need for trial." Fed.R.Civ.P. 56(e); *Arthur A. Collins,* 216 F.3d at 1047.

**1. Allen Leck**

[28] Defendant seeks to admit the expert report of Allen Leck, who until recently was the President of Avantek Eyewear company.[FN2] Avantek focuses on developing technologies in the design and manufacture of ophthalmic frames and lenses. Leck thus claims that he is "skilled in the art" in the eyeglass and eyewear industry.

> FN2. In addition to being the President of Avantek, Inc. from 2001 until 2005, Leck was the President of Primary Eyecare Network from 1989-2001. Primary Eyecare Network, whose membership included over one thousand doctors and seven hundred practitioners, was a management/buying group for independent optometrists that offered management/financial training, purchasing, staff training, and support services. From 1983-1989, Lent was the Vice President of Marketing and Sales/ Vice President of Sales for Coopervision, Inc.; before that, he was the Director of Marketing and Sales for Aquaflex Contact Lens Co. for two years. He began his career at Bausch and Lomb, Inc., where he worked in a variety of sales and product manager positions.

Plaintiffs do not contest that Leck has specialized knowledge. Plaintiffs instead contend that Leck is unreliable because he has historic ties with Defendant and Defendant's counsel "coached" him in preparing his report. Plaintiffs also argued that Leck did not review the patent file histories and should not have been permitted as an expert in the *Markman* hearing.

It is not unusual for counsel to discuss testimony and reports of a witness, even an expert witness, prior to their testimony. In fact, such consultation sharpens the witness's testimony and saves the court considerable time. Here, there is no evidence that the advance discussion and preparation of Leck went beyond what is normally expected and prac-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
**(Cite as: 485 F.Supp.2d 310)**

ticed in the federal courts. Since Leck's testimony did not go to the ultimate issue in this case (i.e. whether the patents were infringed), but instead regarded how various terms are used and interpreted in the industry, his failure to review the patent file history is not fatal to a determination of his viability and value as an expert witness in this case.

**\*320** Plaintiffs have not alleged that Leck's opinion regarding the pins is not grounded on sufficient facts or data, or not the product of reliable principles and methods, or that Leck erred in applying otherwise reliable principles and methods. *Amorgianos*, 303 F.3d at 265. While Leck may have some attenuated ties to Defendant, such connections do not automatically disqualify his testimony. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (Fed.Cir.1985) (holding that "[w]hile the opinion testimony of a party having a direct interest in the pending litigation is less persuasive than opinion testimony by a disinterested party, it cannot be disregarded for that reason alone and may be relied upon when sufficiently convincing"). Finally, it should be noted that the *Markman* hearing was completed in this case, and this Court did not consider Leck's testimony in that hearing. *Aspex Eyewear, Inc.*, 386 F.Supp.2d at 536 n. 4. In light of the above, this Court finds that Leck's opinion as "one of ordinary skill in the art" is admissible. *Lighting World, Inc.*, 382 F.3d at 1357.

**2. Stephen Wright**

[29] Defendants submit the declaration of Stephen Wright, the President of Altair.[FN3] While Plaintiffs cite to Wright's deposition testimony in their motion for summary judgment, they discount Wright's declaration as that of a person who was "not disclosed as an expert or as one skilled in the art of eyewear."[FN4] Plaintiffs also argue that Wright's declaration contradicts his deposition testimony and, "lacks credibility." They do not, however, argue that he does not have specialized knowledge.

FN3. Wright has been involved in many

aspects of the eyewear industry during his thirty-two year career, and is responsible for all aspects of Altair's business.

FN4. Plaintiff states that Wright is "unqualified to speak of characteristics pertaining to equivalence of the accused product because he was not disclosed as an expert."

Defendant states that Wright is not testifying as an expert, but instead he is testifying as to facts or opinions that are rationally based on his perception and that such perceptions are helpful to the determination of the facts at issue. *See* Fed.R.Evid. 701; *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 296 n. 21 (Fed.Cir.1985). This Court will consider Wright's declaration as opinions. *See, e.g., Montefiore Medical Center v. American Protection Ins. Co.*, 226 F.Supp.2d 470, 473-474 (S.D.N.Y.2002). The fact that Wright's testimony in his deposition may contradict his declaration goes to the weight such testimony should be accorded, not to whether it is admissible or should be considered by this Court. Plaintiff may be correct that such contradictions lessen Wright's credibility, but that is a determination for the Court to make after reviewing his declaration. This Court finds that Wright has the requisite specialized knowledge, and his declaration is relevant. This Court holds that Wright's opinion is admissible as one of ordinary skill in the art.

**3. David Chao**

Plaintiffs seek to admit the declaration of David Chao, the co-inventor of the '811 and '896 patents and the Director of International Sales at Contour Optik.[FN5] Contour **\*321** Optik designs, manufactures, and markets eyewear, including primary eyeglass frames with magnetic clip-on sunglasses, throughout the world. Like Wright, Chao was not disclosed as an expert witness. *Montefiore Medical Center*, 226 F.Supp.2d at 473-474. Nevertheless, Chao has the requisite specialized knowledge, and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
**(Cite as: 485 F.Supp.2d 310)**

his declaration is both relevant and reliable.[FN6] This Court holds that Chao's opinion is admissible as one of ordinary skill in the art.

> FN5. Chao has been employed by Contour since 1989 and became the Director of International Sales in 1996. He is also a shareholder and corporate officer of Contour. He graduated from the University of Maryland with a BA in 1988, and has designed eyewear since 1990. He is the sole or joint inventor on multiple patents in the magnetic eyewear field, including at least eight patents in Canada, and twenty-five patents in the United States and other countries.

> FN6. This Court received, and considered, additional briefing from Defendant regarding the admissibility of the Chao Declaration.

**4. Harry F. Manbeck**

[30] Plaintiffs seek to admit the expert report of Harry F. Manbeck, a patent attorney who, prior to his involvement in this case, did not possess any particular expertise with respect to the eyeglass industry. Indeed, Manbeck admits that he "do[es] not consider [himself] to be a person of ordinary skill in the design of eyeglass frames." Manbeck Expert Report ¶ 5; Manbeck Dep. at 38:19-39:1. Thus, this Court declines to use Manbeck's opinion to determine if Altair infringes Aspex's patents under the doctrine of equivalents. *See, e.g., Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.,* No. 03 Civ. 8253(DLC), 2006 WL 44053, at *3-4, 2006 U.S. Dist. LEXIS 278, at *10-11 (S.D.N.Y. Jan. 9, 2006)

**ii. Analysis**

[31][32][33][34] To determine if the differences between the patented and allegedly infringing product are substantial, the court examines each element as "the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 29, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146 (1997). Each element in the patent claim is "deemed material to defining the scope of the patented invention." *Id.* This "all elements rule" means that the doctrine of equivalents will not apply to a claim of patent infringement if applying the doctrine would "vitiate an entire claim limitation." *Seachange Int'l, Inc. v. C-COR Inc.,* 413 F.3d 1361, 1378 (Fed.Cir.2005). Given that the purpose of claims is to provide public notice of what the patentee claims as his invention, a court must not make a finding of equivalence if that finding "would conflict with the primacy of claims in defining the scope of the patentee's rights." *Sage Products v. Devon Indus.,* 126 F.3d 1420, 1424 (Fed.Cir.1997). If no reasonable jury could determine that two elements are equivalent, "district courts are obliged to grant partial or complete summary judgment" of noninfringement. *Sage Products,* 126 F.3d at 1423.

Courts have applied two different analyses to determine if the differences between the two devices are "insubstantial." One is a three-part "function-way-result test" that focuses "on the *function* served by a particular claim element, the *way* that element serves that function, and the *result* thus obtained by that element." *Warner-Jenkinson Co., Inc.,* 520 U.S. at 39, 117 S.Ct. 1040 (emphasis in original). The other is referred to as the "insubstantial differences test" and is a looser inquiry in which the court compares the two devices. *See id.*[FN7] This Court will apply the function-way-result test.

> FN7. Plaintiffs argue for a more loosely-applied test, citing *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.,* 62 F.3d 1512, 1518 (Fed.Cir.1995). This case was reversed by *Warner-Jenkinson.* 520 U.S. at 29, 117 S.Ct. 1040.

**\*322** The fact-finder must evaluate equivalence

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
**(Cite as: 485 F.Supp.2d 310)**

from the perspective of one of ordinary skill in the art. *Lighting World, Inc.,* 382 F.3d at 1357. Here, then, the parties put on dueling experts. Defendant argues, via Stephen Wright [FN8] and Allen Leck, [FN9] that the one-piece bridge and the three-piece mount are substantially different from "frames" because they lack the rims that surround lenses mounted in a frame. Plaintiff, via its expert and owner David Chao, [FN10] argues that the interchangeability of pins and rims is common in the eyewear industry. [FN11]

FN8. Wright states that there are significant difference between frames and either a one-piece bridge or a three-piece mount. First, the structure is different: in a frame, lenses are inserted into and contained within the rims of the frame. In a one-piece bridge or three-piece mount, holes are drilled through the lenses and pins are inserted through those hold to mount the one-piece bridge or the three-piece mount components to the lenses. This results in a weaker and less-durable mount than what would be provided if a frame was used. Also, the pins used to mount the lenses can be in the wearer's line of sight. Mounting lenses in a one-piece bridge and three-piece mount is more difficult and expensive than installing lenses in rims, as specialized machinery is required to drill holes in the lenses. If the holes are not drilled properly, the lenses can become cracked or loose. Finally, very thick lenses cannot be mounted using a three-piece mount. Wright claims one-piece bridges and/or three-piece mounts have several advantages, however. They are lighter than frames, and thus more comfortable for the wearer, and "more stylish and aesthetically pleasing" than frames as they are less conspicuous.

FN9. Leck states that while persons in the eyeglasses industry might refer to a three-

piece mount or a one-piece bridge as a "rimless frame," the way that the term frame is defined in claim 1 of the '054 patent-as "a primary spectacle frame for supporting primary lenses therein" and "an auxiliary frame for supporting auxiliary lenses therein"-limits the definition of frame here. For eyeglasses frames to support lenses therein, they would necessarily have to include rims that surround the lenses, either entirely or partially along with the use of some form of lens-retaining wire.

FN10. Chao states that a spectacle "frame," in the eyewear industry, can include rimless frames, semi-rimless frames, and full frames. He states that rims are "interchangeable" with studs, pins, or screws, and that the lens mounting for rimless and rimmed eyewear is "essentially the same."

FN11. Plaintiffs also argue that Defendant's marketing of its patented product should be considered when deciding this case. This was a point Plaintiffs brought up during the claim construction hearing, and one that this Court again does not find relevant. *Aspex Eyewear, Inc.,* 386 F.Supp.2d at 536 n. 4. Plaintiffs state that the patent Defendant uses as a basis for the projects that Defendant seeks to differentiate as frameless describes eyewear that "magnetically attaches auxiliary eyeglasses to an eyeglasses frame." U.S. Patent No. 6,139, 141 (" '141 Patent"). Plaintiffs claim that by marking its packaging for both rimmed and rimless eyewear with the '141 Patent, Defendant should be somehow estopped from claiming that "frames" require rims.

The claim construction in the case before this Court related only to Plaintiffs' patents. Claim 1 of Plaintiffs' '054 patent,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
**(Cite as: 485 F.Supp.2d 310)**

described the "eyeglass device" as comprising "a primary (respectively auxiliary) spectacle frame for supporting (respectively auxiliary) primary lenses *therein*". It does not appear that Defendant's '141 Patent requires that the frames contain "lenses therein." Thus, the scope of "frames" in Plaintiffs' '054 Patent appears to be simply narrower than the scope of "frames" in Defendant's '141 Patent.

The hotly contested issue in this Court's *Markman* hearing was whether frames required rims. This Court held that frames do require rims. Whether "frames" are construed in the eyeglass industry to include "rimless frames" is not particularly relevant in this case. Here, the Court is called upon to determine if the pins in Defendant's rimless eyeglasses are substantially similar to the frames *as defined *323 in Plaintiffs' patents* and as construed by this Court in the *Markman* hearing.

[35] This Court will apply the function-way-results test. In the *Markman* hearing, this Court determined that, in Plaintiffs' '054 patent, frame means "an eyeglass device that included, at least, a bridge and rims." Plaintiffs' claim stated that the function of the frames was to "support lenses *therein.*" See *Aspex Eyewear*, 386 F.Supp.2d at 533, 534 (citing Claim 1 of the '054 patent, which described the "eyeglass device" as comprising "a primary (respectively auxiliary) spectacle frame for supporting (respectively auxiliary) primary lenses therein".) Pins do not support lenses "therein."

The function of the pins in Defendant's product is arguably similar to the function of the rims in Plaintiffs' product. However, the way in which these two devices perform that function differs. The frames encircle the lenses, holding them "therein," as specified in Plaintiffs' patent. Pins do not hold the lenses "therein." Instead, the pins pierce the lenses in several locations to attach them to the bridge and the earpieces. While, again, the results are arguable the same-the lenses are suspended be-

fore the wearer's eyes-the way these results are reached is different. As a result, pins are not substantially similar to rims. Applying the doctrine of equivalents would vitiate this claim limitation. *Seachange Int'l, Inc.,* 413 F.3d at 1378. Thus, the doctrine of equivalents does not apply, and Defendant's motion for summary judgment on the '054 patent is GRANTED.

**d. Means-Plus-Function Equivalency under § 112 ¶ 6: '811 and '896 Patents**

[36][37] As this Court explained in the claim construction order, "[m]eans-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function." *See Aspex Eyewear, Inc.,* 386 F.Supp.2d at 539 (citing *Watts v. XL Sys., Inc.,* 232 F.3d 877, 880-81 (Fed.Cir.2000)). A means-plus-function term covers, under 35 U.S.C. § 112, the "corresponding structure, material, or acts described in the specification and equivalents thereof." Section 112, ¶ 6 "protect[s] the substance of a patentee's right to exclude by preventing mere colorable differences or slight improvements from escaping infringement ... by holding as infringements equivalents that are beyond the literal scope of the claim." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.,* 145 F.3d 1303, 1310 (Fed.Cir.1998). The Federal Circuit explained that "[c]laim construction of a § 112 ¶ 6 limitation includes identifying the claimed function and determining the corresponding structure or act disclosed in the specification, both of which are questions of law." *IMS Tech.,* 206 F.3d at 1430. Whether the device or method at issue performs the identical function with the same structure, materials, or acts described in the specification or an equivalent thereof, thus infringing a claim with a § 112 ¶ 6 limitations, is a question of fact. *See id.*

[38][39] As in other tests for infringement, a claim limitation in a § 112, ¶ 6 analysis "must be met, literally or equivalently, for infringement to lie." *Odetics, Inc. v. Storage Technology Corp.,* 185

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
**(Cite as: 485 F.Supp.2d 310)**

F.3d 1259, 1268 (Fed.Cir.1999). Unlike the component-by-component comparison in the doctrine of equivalents context, however, a court need not compare individual components of the overall structure. *Id.* Instead "the claim limitation is the overall structure corresponding to the claimed function." *Id.*

The Federal Circuit has applied two different approaches in the means-plus-function comparison. Plaintiffs argue the *324 *IMS Technology* approach. In *IMS Technology*, the court compared the allegedly infringing device to the patented device by considering "the substantiality of their differences in the context of the claimed invention." *See IMS Tech.*, 206 F.3d at 1436-37. The court considered if the differences in the physical characteristics of the two devices were "important to the invention" by asking if the structures performed "the same function in substantially the same way to achieve substantially the same result." *Id.* at 1437. FN12 If the "disclosed physical structure is of little or no importance to the claimed invention, there may be a broader range of equivalent structures than if the physical characteristics are critical in performing the claimed function in the context of the claimed invention." *Id.* at 1435.

> FN12. The invention in *IMS Technology* was an apparatus that permitted interactive programming of a machine tool. *See id.* The element in question was the "interface means" used to store the programs created using that programming apparatus. *See id.* The patented product used a tape cassette transport; the accused product used a floppy disc drive. *See id.* The Federal Circuit vacated the grant of summary judgment of noninfringement because the plaintiff "provided some evidence of structural similarity" between the two devices and determined that the substantiality of those differences was an issue of fact "in light of the role played by the 'interface means' in the claimed invention." *See id.*

Defendant argues the Court should apply the test used in *Kemco Sales*. In *Kemco Sales*, the Federal Circuit required the allegedly infringing device to either be identical to the patented device or to be "equivalent" under § 112 ¶ 6: "(1) perform the identical function and (2) be otherwise insubstantially different with respect to structure." *Kemco Sales, Inc. v. Control Papers Co., Inc.*, 208 F.3d 1352, 1364 (Fed.Cir.2000).

[40] Defendants prevail under either *Kemco* or *IMS Technology* because the structure they use to attach lenses to their glasses differs substantially from structure of the Plaintiffs' retaining mechanisms.

The parties agree that comparison should be made between (a) the retaining mechanism in the patents-in-suit, (b) rims, and (c) the pins in the accused device. This Court construed "retaining mechanisms" in Plaintiffs' '811 and '896 Patents to be a means-plus-function term meaning "a structure that keeps the lens in place using rims." *Aspex Eyewear, Inc.*, 386 F.Supp.2d at 540. In the claim construction, this Court explained that the function of the "retaining mechanism" is to "support[ ] a pair of lenses and defin[e] a frontal plane." *Id.* at 539. Also relevant to this analysis is the phrase "defining a frontal plane," which was construed to mean "delineating, by rims, the plane of glasses parallel to the lenses." *Id.* (noting that " 'defining a frontal plane' also clearly describes a function of the 'retaining mechanisms' "). The claim construction also continued to define "frames" as requiring at least a bridge and rims. FN13

> FN13. Other terms defined in the claim construction need not be considered here as this Court finds dispositive the lack of means-plus-function equivalency under § 112 ¶ 6 for the retaining mechanism.

Defendant points out that each claim that requires "retaining mechanisms" also requires frames. In terms of the retaining mechanism itself, Defendant states that one of the functions of the retaining mechanism was to define the plane, and that was a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
(Cite as: 485 F.Supp.2d 310)

crucial feature that allowed Plaintiffs to distinguish their '811 and '896 Patents from the prior art. Defendants argue that the frontal plane defined by Plaintiffs' retaining mechanisms was important because the magnetic coupling in the '811 *325 and '896 Patents differed from the magnetic coupling in a prior third-party patent in that it occurred at a surface *not* in the frontal plane. Defendant argues that given the importance of the "retaining mechanism" in defining the frontal plane and, thus, the plane in which the magnetic members are coupled, the pins do not meet the means-plus-function equivalency test in § 1 12 ¶ 6.

Defendant also argues that the way in which the pins fulfill the function of retaining the lenses is different: rims perform their "retaining mechanism" function by supporting the lenses in the frame. Pins pass through holes drilled in the lenses. Thus, even if the supporting-and-defining-the-frontal-plane functions of the "retaining mechanism" were performed the same way with pins and frames, there is no infringement under § 112 ¶ 6 because the way in which those functions are performed is different.

Plaintiffs argue that even under frames-include-rims claim construction, the pins are equivalent to the rims disclosed in its '811 and '896 patents since they perform the same function, and they "are clearly of little or no importance to the claimed invention." Plaintiffs argue that the retaining mechanism merely provides a means for securing the lenses to the bridges. In the context of the invention, Plaintiffs state that the retaining mechanism is less important to the novel feature-a bridge-mounted magnetic system that is capable of being secured with one hand by the wearer. Even under *Kemco*, Plaintiffs argue, the patents are infringed as the pins perform the identical function as rims: they keep the lens in place and secure the lenses to the bridge. The Plaintiffs argue that the structure of the pins is equivalent to that of rims.

In *Chiuminatta*, the Federal Circuit held that the accused device did not have a structure that was equivalent to the structure in the means-plus-function clause, which provided for a "means connected to the saw for supporting the surface of the concrete." 145 F.3d at 1306. The function of the means clause was to "support[ ] the surface of the concrete adjacent to the leading edge of the cutting blade to inhibit chipping, spalling, or cracking of the concrete surface during cutting." *Id.* at 1308. The structure was a skid plate, "a generally flat hard plate that straddles the leading edge of the cutting blade." *Id.* at 1309. The allegedly infringing product used wheels that rotated rather than a flat plate that skidded. *Id.* Finding that "the differences between the wheels and the skid plate [were] not insubstantial," the Federal Circuit upheld a district court's grant of Defendant's motion for summary judgment. *Id.*

[41] If there is "indisputable mechanical incompatibility" between the patented device and the allegedly infringing device, there is no infringement. *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1375 (Fed.Cir.2004). In *Frank's Casing*, there was a substantial difference between the raising and lowering mechanisms in the patented and the raising and lowering mechanisms in the accused devices. *Id.* While the two hydraulic cylinders at issue "perform[ed] essentially the same function," they "represent[ed] two distinct structural approaches" to performing that function. *Id.* As a result, there was no infringement.

In *Odetics*, in contrast, pins in the infringing structure were the equivalent of the gear in the patented structure as they "perform[ed] the identical function in the same way" by "receiv[ing] the force necessary to accomplish the 'rotary' function." *326 185 F.3d at 1271.[FN14] The patented structure rotated because force was exerted against the teeth of the gear, which then turned the bin about the rod, and the accused device rotated because force was exerted against the cam followers, which also turned the bin about the rod. *Id.* at 1269-70. Thus, the *way* that structures accomplish the claimed rotary function, and the *result* of that function were substantially equivalent. *Id.* at 1270. Finally, the gear and pins

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
**(Cite as: 485 F.Supp.2d 310)**

were actually interchangeable. *Id.* As a result, the device containing the "bin array" infringed the patented device containing "rotary means." *Id.*

> FN14. In *Odetics,* the structure corresponding to the means-plus-function "rotary means" element was "the components that receive the force and rotate as a result of that force (*i.e.,* the rod, gear, and rotary loading and loading mechanisms)." *Odetics, Inc.,* 185 F.3d at 1264. Thus, the patented "rotary means" element was a set of tape holders or bins, a rod that provided the axis of rotation, and a gear that received the force necessary to accomplish the rotation function. *Id.* at 1265. The allegedly infringing element was a "bin array" composed of a set of tape holders or bins, a rod that formed the axis of the bin array, and pins that were affixed to the bottom of the bin array that received the force necessary to rotate the structure. *Id.* at 1265.

This Court finds that even if the pins in Defendant's one-piece bridge and three-piece mount perform the identical function as the "retaining mechanisms" in the Plaintiffs' patent, their structure differs substantially from the structure of Plaintiffs' retaining mechanism. Plaintiffs' retaining mechanisms keep the rims in place using rims that encircle the lenses. Defendant's one-piece bridge and three-piece mounts, instead, have pins inserted through the lenses. Under either *Kemco* or *IMS* test, Defendants prevail because the structure they use to attach lenses to their glasses differs substantially from the structure of the Plaintiffs' retaining mechanisms.

Here, the patented retaining mechanism is a "structure that keeps the lenses in place using rims." The function is to keep the lenses in place. The structure supports lenses holding them in place using rims. The rims encircle the lenses to keep them in place. Pins in the allegedly infringing structure keep the lenses in place, but do so by piercing the lenses and attaching them to the bridge and the

earpieces. Like the skid plate and the rotating wheel in *Chiuminatta,* the structure of the rims and the pins differs substantially. 145 F.3d at 1309. While the rims and the pins "perform essentially the same function," they "represent two distinct structural approaches" to performing that function. *Frank's Casing Crew & Rental Tools,* 389 F.3d at 1375. No reasonable factfinder could find that the rims in the '811 and '896 patents and the pins in Defendant's one-piece mounts and three-piece bridges are substantially equivalent because the way these structures accomplish the claimed function is different. *Odetics,* 185 F.3d at 1270. Thus, there is no infringement under § 112 ¶ 6. *Id.*

Furthermore, this Court determined that pins were not insubstantially different from rims and, thus, granted Defendants motion for summary judgment on the '054 patent for both literal infringement and infringement under the doctrine of equivalents. The '811 and '896 patents also require "frames," which are defined in the same way as they were in the '054 patent. For the reasons explained in the '054 patent, pins and rims are not "insubstantially different with respect to structure," *Kemco Sales, Inc.,* 208 F.3d at 1364, and, thus, there is no literal infringement under § 112 ¶ 6 even if they have the same function. No reasonable factfinder could find **\*327** that the Defendant's products are equivalent to Plaintiffs' because of these limitations. *Chiuminatta,* 145 F.3d at 1309 (holding that summary judgment is appropriate if "no reasonable jury could have found that the accused device has an equivalent to the disclosed structure").

Having found that there is no infringement under § 112 ¶ 6, there is no need to determine if there is infringement of the '811 and '896 patents under the doctrine of equivalents. *Chiuminatta,* 145 F.3d at 1311 (holding that where the issue of equivalence involves "technology that predates the invention ... a finding of non-equivalence for § 112, ¶ 6, purposes should preclude a contrary finding under the doctrine of equivalents"). Finally, because several claim limitations are missing from the accused

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

485 F.Supp.2d 310
**(Cite as: 485 F.Supp.2d 310)**

products, there can be no infringement of any of the dependant claims. *See, e.g., Jeneric/Pentron, Inc. v. Dillon Company, Inc.,* 205 F.3d 1377, 1383 (Fed.Cir.2000). Thus, this Court grants Defendant's motion for summary judgment on the issue of non-infringement of the '811 and '896 patents.

**III. Conclusion**

Plaintiffs' motions for summary judgment on the issue of infringement of the '054, '811, and '896 patents are DENIED, as is Plaintiffs' motion to exclude the testimony Allen Leck. Defendant's motions for summary judgment on the issue of noninfringement of the '054, '811, and '896 patents are GRANTED.

All outstanding motions on the docket for this case are hereby terminated, and the Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

S.D.N.Y.,2007.
Aspex Eyewear, Inc. v. Altair Eyewear, Inc.
485 F.Supp.2d 310

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT G

288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.)))**

▷
This case was not selected for publication in the
Federal Reporter.

Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Federal Circuit Rule
32.1 and Federal Circuit Local Rule 32.1. (Find
CTAF Rule 32.1)

United States Court of Appeals,
Federal Circuit.
ASPEX EYEWEAR, INC., and Contour Optik,
Inc., Plaintiffs-Appellants,
v.
ALTAIR EYEWEAR, INC., Defendant-Cross Ap-
pellant.
**Nos. 2007-1380, 2007-1407.**

Aug. 1, 2008.
Rehearing En Banc Denied Sept. 26, 2008.

**Background:** Eyewear distributor and licensor of
patents for secondary eyeglass frames that attached
to primary eyeglass frames via magnetic attraction,
as opposed to mechanical "clips," brought infringe-
ment action against competitor. The United States
District Court for the Southern District of New
York, Stephen C. Robinson, J., 485 F.Supp.2d 310,
entered summary judgment in competitor's favor,
and plaintiffs appealed.

**Holdings:** The Court of Appeals, Michel, Chief
Judge, held that:
(1) term "frame" did not necessarily require pres-
ence of rims;
(2) term "retaining mechanisms" was means-
plus-function limitation; and
(3) pins in competitor's rimless eyeglasses were not
substantially similar to frames as defined in patents.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Patents 291 ☞101(2)**

291 Patents
  291IV Applications and Proceedings Thereon
    291k101 Claims
      291k101(2) k. Construction in General.
Most Cited Cases
Term "frame," as used in patents claiming second-
ary eyeglass frames that attached to primary eye-
glass frames via magnetic attraction, did not neces-
sarily require presence of rims, or anything more
than part of middle bridge in which first magnetic
member was secured in primary frame and from
which projection extended in auxiliary frame.

**[2] Patents 291 ☞101(8)**

291 Patents
  291IV Applications and Proceedings Thereon
    291k101 Claims
      291k101(8) k. Functions, Advantages or
Results of Invention. Most Cited Cases
Term "retaining mechanisms," as used in patent
claiming secondary eyeglass frames that attached to
primary eyeglass frames via magnetic attraction,
was means-plus-function limitation; term had no
common meaning in eyeglass industry, and there
were multiple types of retaining mechanisms that
could retain lenses.

**[3] Patents 291 ☞237**

291 Patents
  291XII Infringement
    291XII(A) What Constitutes Infringement
      291k233 Patents for Machines or Manu-
factures
        291k237 k. Substitution of Equival-
ents. Most Cited Cases
Pins in competitor's rimless eyeglasses were not
substantially similar to frames as defined in patents
for secondary eyeglass frames that attached to
primary eyeglass frames via magnetic attraction, as
opposed to mechanical "clips," and thus competit-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.)))**

or's device did not infringe patents under doctrine of equivalents.

**[4] Patents 291 ⟨⟩286**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k286 k. Persons Entitled to Sue. Most Cited Cases
It was not necessary that exclusive license be in writing for licensee to have standing to bring patent infringement action, where patentee's assignee was also joined. 35 U.S.C.A. § 261.

**[5] Patents 291 ⟨⟩323.2(3)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k323 Final Judgment or Decree
            291k323.2 Summary Judgment
               291k323.2(3) k. Particular Cases. Most Cited Cases
Genuine issue of material fact as to whether eyeglass distributor had oral or implied exclusive license to distribute patented items precluded summary judgment in its patent infringement suit for lack of standing. 35 U.S.C.A. § 261.

**Patents 291 ⟨⟩328(2)**

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most Cited Cases
5,737,054. Construed.

**Patents 291 ⟨⟩328(2)**

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most

Cited Cases
6,012,811, 6,092,896. Not Infringed.

**\*698** Appeal from United States District Court for the Southern District of New York, No. 02-CV-6195, Stephen C. Robinson, Judge.Michael A. Nicodema, Greenberg Traurig, LLP, of New York, NY, argued for plaintiffs-appellants. Of counsel on the brief were Matthew C. Wagner and Jeffrey A. Lindenbaum, Collen IP Intellectual Property Law, P.C., of Ossining, New York.

Brian G. Bodine, Merchant & Gould P.C., of Seattle, WA, argued for defendant-cross appellant. With him on the brief was Kaustuv M. Das.

Richard M. Saccocio, Richard M. Saccocio, P.A., of Plantation, FL, amicus curiae Designer's Eyewear Studio, Inc., et al.

Before MICHEL, Chief Judge, LINN, Circuit Judge, and ZAGEL,[FN*] District Judge.

> FN* Honorable James B. Zagel, United States District Court for the Northern District of Illinois, sitting by designation.

MICHEL, Chief Judge.

**\*\*1** Aspex Eyewear, Inc. ("Aspex") and Contour Optik, Inc. ("Contour") appeal from the district court's summary judgment of non-infringement. *Aspex Eyewear Inc. v. Altair Eyewear, Inc.,* 485 F.Supp.2d 310 (S.D.N.Y.2007). We heard oral argument on June 4, 2008. We reverse the district **\*699** court's construction of "frame" and thus its summary judgment of non-infringement as to U.S. Patent No. 5,737,054 ("the '054 patent"), but we affirm the district court's summary judgment of non-infringement as to U.S. Patent Nos. 6,012,811 ("the '811 patent") and 6,092,896 ("the '896 patent") and its determination that material issues of fact remain as to whether Aspex has standing to sue as an exclusive licensee. We remand for additional proceed-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.)))**

ings on infringement of the '054 patent in light of the corrected claim construction and on standing to sue on that patent.

## I.

Contour, a Taiwanese company, is the assignee of the patents-in-suit:, the ' 054 patent entitled "Auxiliary Lenses for Eyeglasses," with Richard Chao as the named inventor; the '811 patent entitled "Eyeglass Frames with Magnets at Bridges for Attachment," a continuation-in-part of the application that issued as the '054 patent, with named inventors David and Richard Chao; and the '896 patent entitled "Eye-Wear with Magnets," a continuation of the application that issued as the '811 patent with named inventors David and Richard Chao. The patents-in-suit claim eyeglasses with auxiliary lenses (e.g., sunglasses) that attach to the primary glasses using magnets. Before the assignment to Contour, Richard Chao granted an exclusive license to Chic Optic, Inc. ("Chic"), a Canadian company. Aspex, a Delaware corporation, alleges that it received an exclusive license to the patents-in-suit from Chic under an oral or implied agreement. Both Chic and Aspex are owned by the Ifergan Trust.

Altair Eyewear, Inc. ("Altair") is a California company that distributes eyewear; some of the eyeglasses that Altair distributes include auxiliary sunglasses that attach to the primary glasses with magnets. In Altair's accused products (Diamontite Magnetics, Joseph Abboud, and Sunlites), some of the glasses have rims around the primary lenses, but all of the sunglasses (which attach to the primary glasses) are rimless. In rimless glasses, holes are drilled in the lenses, and the bridge and earpieces are attached to the lenses with pins.

In August 2002, Aspex and Contour [FN1] sued Altair in the Southern District of New York alleging that Altair infringed certain claims of the patents-in-suit by selling glasses with auxiliary sunglasses that attach to the primary glasses with magnets.[FN2] In August 2004, Altair moved for

partial summary judgment that Aspex lacked standing, and in March 2005, the district court denied that motion. At the district court, Aspex argued that it had standing based on two sources of patent rights: (1) a written agreement between Chic and Aspex and (2) oral and implied agreements between Contour, Chic, and Aspex. The district court held that the Chic-Aspex agreement was insufficient to confer standing because it was executed before the patents-in-suit issued, and the agreement referred only to patents already in existence. But the district court concluded that there was "without doubt, more than enough evidence on which a reasonable jury could believe that there was an oral and/or implied exclusive license between Chic and Aspex." Thus, the district court denied Altair's motion for partial summary judgment.

> FN1. Aspex and Contour are referred to collectively as Aspex, except in the discussion of standing in which references to Aspex are to Aspex alone.

> FN2. Aspex also alleged that Altair infringed another. patent, but those allegations were dropped when Aspex filed an amended complaint.

**\*700 \*\*2** Following briefing on claim construction by the parties, the district court held a *Markman* hearing on July 28, 2005. In September 2005, the district court issued an opinion construing various claim terms in the patents-in-suit.

Claim 1 of the '054 patent recites:

> 1. An eyeglass device comprising:

> a primary spectacle *frame* for supporting primary lenses therein, said primary spectacle *frame* including a middle bridge portion,

> a first magnetic member secured in said middle bridge portion of said primary spectacle *frame,*

> an auxiliary spectacle *frame* for supporting auxiliary lenses therein, said auxiliary spectacle

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.)))

*frame* including a middle bridge portion having a projection extended therefrom for extending over and for engaging with said middle bridge portion of said primary spectacle *frame,* and

a second magnetic member secured to said projection of said auxiliary spectacle *frame* for engaging with said first magnetic member of said primary spectacle *frame* and for allowing said auxiliary spectacle frame to be attached to said primary spectacle *frame* with only one hand by a user.

'054 patent, col.2 l.64-col.3 l.14 (emphases added). The district court determined that "frame" in the claims of the '054 patent "is an eyeglass device that includes, at least, a frame, a bridge and rims." The court reached this construction based primarily on the language of the claims and specification. The court stated:

Because the claim discloses a frame that supports lenses 'therein,' the frame must be capable of supporting the lenses *in* the frame. In addition, the claim language requires that the frame 'includ[e]' a middle bridge portion, which indicates that the frame must also have other components, i.e. rims.

The court specifically noted that it relied solely on the intrinsic evidence and did not rely on inventor testimony, expert testimony, and defendant's marketing materials which the parties had submitted in support of their claim constructions.

Claim 1 of the '811 patent recites:

1. An eyeglass device comprising:

a first frame including

*two retaining mechanisms for supporting a pair of lenses, and defining a frontal plane,*

a bridge connecting the two retaining mechanisms and holding the two retaining mechanisms together, and

a first magnetic member at the bridge for magnetically coupling to another magnetic member at the bridge of a second frame;

such that when coupled,

the two frames are attached together,

due to the locations of the magnetic members, one of the frames is restricted from moving downwards relative to the other frame, and

the two magnetic members are coupled at a surface that is not parallel to the frontal phase.

'811 patent, col.9 ll.16-31 (emphasis added).

The district court concluded that the claim limitation "two retaining mechanisms for supporting a pair of lenses, and defining a frontal plane" was a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6. Because rims were the only structure disclosed in the specification, the district court limited the scope of the limitation to "a structure that keeps the lenses in place using rims."

**3 Following claim construction, the parties cross-moved for summary judgment on infringement, *701 Altair arguing that it did not infringe and Aspex arguing that Altair infringed under the doctrine of equivalents. In April 2007, the district court granted summary judgment of non-infringement. It was undisputed that while some of the accused glasses had rims around the primary lenses, none of the accused products had rims around the sunglass lenses. Thus, the district court concluded that none of the accused products literally infringed the '054 patent. The district court also concluded that the accused products could not infringe the '054 patent under the doctrine of equivalents because the rimless glasses supported the lenses in a different way (rims encircle the lenses, whereas according to the district court, the pins in rimless glasses do not hold the lenses "therein"). Next, the district court examined infringement as to the asserted claims of the '811 and '896 patents. Since the district court had determined that the "retaining mechanism" limita-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.)))**

tion was a means-plus-function limitation and that the only structure disclosed in the specification was rims, the court evaluated whether the rimless glasses of the accused product used a retaining mechanism equivalent to rims. The court concluded that the pins used in a rimless configuration were not equivalent to rims because the structure differed substantially. Thus, the court granted summary judgment of non-infringement as to the '811 and '896 patents.

On April 13, 2007, the district court entered judgment and closed the case. On May 11, 2007, the district court amended its judgment to dismiss Altair's counterclaims without prejudice. On May 15, 2007, Aspex and Contour filed their notice of appeal, and on June 8, 2007, Altair filed its notice of cross-appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II.

We review a district court's grant of summary judgment de novo. *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.,* 149 F.3d 1309, 1315 (Fed.Cir.1998). At summary judgment, all ambiguous facts and inferences must be construed in the light most favorable to the non-movant. *Id.* Summary judgment is only appropriate if no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law. *Id.*

### A. *Claim Construction*

Claim construction is a question of law reviewed de novo. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454-56 (Fed.Cir.1998) (en banc). We determine the ordinary and customary meaning of undefined claim terms as understood by a person of ordinary skill in the art at the time of the invention, using the methodology in *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-19 (Fed.Cir.2005) (en banc).

1. *'054 Patent: "frame"* [FN3]

FN3. In its infringement analysis, the district court concluded that the accused products did not infringe the '054 patent because none of the accused sunglasses have rims, and that none of the patents-in-suit infringed under the doctrine of equivalents because rims were not equivalent to glasses that use only pins to hold the lenses in place. On appeal, Aspex argues that the district court erred in construing the claim limitations "not parallel to the frontal plane" and "u-shaped structure having two arms." The district court did not rely on its construction of these terms in evaluating infringement, and thus we decline to reach them in this appeal.

Claim 1 of the '054 patent recites "a primary spectacle *frame* for supporting primary lenses *therein,* said primary spectacle frame *including* a middle bridge portion" and "an auxiliary spectacle *frame* for supporting auxiliary lenses *therein,* said *702 auxiliary spectacle frame *including* a middle bridge portion ..." '054 patent, col.2 ll.65-67, col.3 ll.3-7 (emphases added). The district court concluded that a "frame" in the claims of the '054 patent "is an eyeglass device that includes, at least, a bridge and rims." On appeal, Aspex argues that the district court erred in limiting a "frame" to one with rims.

**4 [1] In reaching its construction, the district court relied on a linguistic analysis of the claim language, finding that since the frames must support the lenses "therein," the lenses must be supported "in" the frame and finding that since claim 1 requires that the frame "include[ ]" a middle bridge portion, it must include other components. We disagree. First, "therein" does not limit the "frame" to one that has rims. As noted in the many dictionaries in the record, "therein" means "in that place." Altair argues that the frame in claim 1 must support the lenses "in" the frame, but that structures without rims "are capable, at most, of supporting lenses *at* that place or securing lenses *to* various components." Appellee's Br. at 40 (emphasis in ori-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.)))**

ginal). But such a hyper-technical analysis of pre-positions is unnecessary. For a glasses frame to support the lenses "therein," the frames must hold the lenses in place. Such a view is supported by other dictionaries in the record which include as definitions of frames: "the framework for a pair of glasses" and "the constituent of a pair of glasses other than the lenses." J.A. at 1281, 1292.

Further, the use of "including" in claim 1 does not support limiting "frame" to one with rims. "Including" is generally an open-ended term that does not preclude additional elements, but "including" does not require additional, unspecified elements as the district court found.

Moreover, the fact that the claim recites a middle bridge *portion* does not necessarily require the presence of rims. The "portion" recited in claim 1 need be no more than that part of the middle bridge in which a first magnetic member is secured in the primary frame and from which the projection extends in the auxiliary frame. The use of the term "portion" does not itself require that the frame contain structure in addition to the middle bridge. Thus, nothing in the claim language limits a "frame" to only one with rims.

Turning to the specification, the disclosure of the '054 patent is decidedly short and merely repeats the same language on which the district court relied ("therein" and "including"). The written description never mentions or describes rims, although rims are illustrated in the figures. And it makes clear that the precise configuration of the components of the glasses could be modified and still be within the scope of the claims. '054 patent, col.2 ll.56-62. Additionally, the stated objective of the invention is "to provide auxiliary lenses which may be easily engaged on the primary spectacle frame." *Id.* at col.1 ll.28-30. This objective is accomplished by the mode of attachment (magnetic members in the bridge portion of the glasses) and has nothing to do with whether or not the frames include rims. Thus, the specification does not support the narrow interpretation requiring that a "frame" be limited to one

with rims.

The district court concluded that the accused products could not infringe either literally or under the doctrine of equivalents because the accused sunglasses are rimless. Because we conclude that the claims of the '054 patent do not require rims, we reverse the district court's summary judgment of non-infringement as to the '054 patent and remand for further proceedings consistent with our revised claim construction.

***703** 2. *'811 and '896 patents:* "*retaining mechanisms*"

****5** Claim 1 of the '811 patent recites "two retaining mechanisms for supporting a pair of lenses, and defining a frontal plane." The district court held that this limitation was a means-plus-function limitation under Section 112 ¶ 6. On appeal, Aspex challenges this conclusion.

When a claim limitation does not recite a "means," there is a rebuttable presumption that it is not a means-plus-function limitation. *E.g., DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 469 F.3d 1005, 1023 (Fed.Cir.2006). The presumption can be overcome, however, if "the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1369 (Fed.Cir.2002). "To help determine whether a claim term recites sufficient structure, we examine whether it has an understood meaning in the art." *Id.* We have also held that a claim term need not recite specific structure; instead, "it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." *Lighting World, Inc. v. Birchwood Lighting, Inc.,* 382 F.3d 1354, 1359-60 (Fed.Cir.2004).

On appeal, Aspex argues that the claim limitations

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.)))

that require the "retaining mechanisms" to "define a frontal plane" and recite "a bridge connecting the two retaining mechanisms and holding the two retaining mechanisms together" establish that the "retaining mechanisms" are "physical structures." Appellant's Br. at 27. But the question is not whether "retaining mechanisms" are physical structures but whether they are sufficiently definite structures.

In *Massachusetts Institute of Technology & Electronics for Imaging, Inc. v. Abacus Software,* 462 F.3d 1344 (Fed.Cir.2006), this court affirmed the district court's determination that "colorant selection mechanism" was a means-plus-function limitation. We stated that "[t]he generic terms 'mechanism,' 'means,' 'element,' and 'device' typically do not connote sufficiently definite structure." *Id.* at 1354. Thus, we noted that "[t]he term 'mechanism' standing alone connotes no more structure than the term 'means.' " *Id.* We concluded that "colorant selection" had no generally understood meaning in the art that would connote sufficiently definite structure. *Id.*

On the other hand, in *Greenberg v. Ethicon Endo-Surgery, Inc.,* 91 F.3d 1580 (Fed.Cir.1996), this court reversed the district court's holding that the claim limitation "detent mechanism" was a means-plus-function limitation. We stated that " 'detent' denotes a type of device with a generally understood meaning in the mechanical arts, even though the definitions are expressed in functional terms." *Id.* at 1583 (noting that dictionaries defined "detent," among other ways, as a part of a mechanism that locks or unlocks a movement).

**6 [2] This case is more analogous to *MIT* than *Greenberg.* Here, "mechanism" is a generic term, and its modifier, "retaining," is also quite broad, meaning "to hold back, keep, restrain." *E.g., Webster's Ninth New Collegiate Dictionary* 1006 (1990) (defining "retain"). Altair's expert Dr. Leck stated in his expert report that " 'retaining mechanism' has no common meaning in the eyeglass industry," and that he had no "mental picture of a specific structure when [he heard] the term." *704 When

David Chao, one of the inventors, was asked whether there was "a commonly recognized structure in the industry for a retaining mechanism," he testified only that there were multiple types of retaining mechanisms that could retain lenses. Thus, there is no indication in the record that "retaining mechanism" connotes definite structure to a person of ordinary skill in the art. We affirm the district court's holding that "retaining mechanism" is a means-plus-function limitation. Because it is undisputed that the only structure disclosed in the specification for performing the recited functions (i.e., supporting the lenses and defining a frontal plane) are rims, the district court correctly construed this claim limitation as "a structure that keeps the lenses in place using rims."

Aspex argues that even if the district court correctly construed "retaining mechanism," it erred in concluding that Altair's rimless configuration was not equivalent to rims. It is undisputed that the sunglasses in the accused products are rimless; instead of rims, holes are drilled in the lenses and pins attach the lenses to the bridge.

The district court stated that the function of the "retaining mechanisms" in the claims was to support the lenses and define a frontal plane, but held that even if the pins in the accused products perform this function, the structure of the accused products "differs substantially." In particular, rims hold the lenses in place by encircling them whereas the pins in a rimless configuration are drilled through the lenses. Based on this, the district court concluded that the way in which the pins in the accused products accomplish the function is different.

Aspex argues that it presented sufficient evidence to establish a disputed issue of material fact as to equivalency. It points to the declaration of David Chao, one of the inventors, who declared that "rims are interchangeable with studs, pins, or screws" and that both pins and rims retain the lenses and attach them to the bridge and/or "end piece." J.A. at 2939. Aspex also points to Altair's marketing materials that refer to rimless products as having frames.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.)))**

[3] We conclude that the evidence presented by Aspex was insufficient to create a disputed issue of material fact as to equivalency. We agree with the district court that pins retain the lenses in a substantially different way than rims. Moreover, David Chao's testimony on which Aspex relies is conclusory. Thus, we affirm the district court's conclusion that the accused products do not infringe the asserted claims of the '811 and '896 patents because they do not use "retaining mechanisms" (i.e., rims or their equivalents).

### B. Standing

**\*\*7** Altair cross-appeals solely on the issue of whether Aspex has standing. Whether a party has standing to sue is a question of law that we review de novo. Additionally, standing is jurisdictional and cannot be waived. *See Mentor H/S, Inc. v. Med. Device Alliance, Inc.,* 240 F.3d 1016, 1018-19 (Fed.Cir.2001) (per curiam). Because the district court denied summary judgment as to standing, however, we review that determination for abuse of discretion. *See, e.g., Perricone v. Medicis Pharm. Corp.,* 432 F.3d 1368, 1372 (Fed.Cir.2005).

This court has held that plaintiffs in patent suits fall into three categories for standing purposes: "those that can sue in their own name alone; those that can sue as long as the patent owner is joined in the suit; and those that cannot even participate as a party to an infringement suit." *Morrow v. Microsoft Corp.,* 499 F.3d 1332, 1339 (Fed.Cir.2007). In the first category **\*705** (i.e., those who can sue in their own name alone) are those plaintiffs that hold all legal rights to the patent, including assignees and those to whom "all substantial rights to the patent" have been transferred. *Id.* at 1340. Exclusive licensees who do not receive all substantial rights fall into the second category and must join the patent owner as co-plaintiff to satisfy prudential concerns (i.e., to avoid the possibility that the accused infringer could later be sued by the patentee also). *Id.* Finally, the third category (those who cannot be parties at all) includes those who lack exclusionary

rights, i.e., those licensees who are authorized to make, use, and sell the patented product but who have no right to prevent others from also doing so. *Id.* at 1341.

In this case, Aspex argues that it is in the second category, as an exclusive licensee, whereas Altair argues that Aspex is in the third category as a "bare" licensee. The district court concluded that there was sufficient evidence of an oral or implied exclusive license to preclude summary judgment on the issue of standing.[FN4]

> FN4. In the district court, Aspex argued that a 1998 written license agreement between Chic and Aspex granted Aspex an exclusive license. The district court rejected this argument. Shortly thereafter, in *Aspex Eyewear, Inc. v. E'Lite Optik, Inc.,* 127 Fed.Appx. 493, 494 (Fed.Cir.2005), this court reached the same conclusion affirming a different district court's summary judgment for lack of standing because the written license agreement did not grant Aspex an exclusive license as to the '054 and '811 patents. In that case, we declined to reach Aspex's argument that it received an exclusive license through an implied or oral license because Aspex had not properly raised that argument below. *Id.* at 497. In this appeal, Aspex no longer argues that the written license agreement granted it an exclusive license. Thus, we focus only on whether Aspex has standing based on an oral or implied license.

In its cross-appeal, Altair argues: (1) exclusive licenses sufficient to grant standing to the licensee must be in writing; and (2) even if an oral exclusive license can confer standing, the evidence here was insufficient to show that Aspex is an exclusive licensee.[FN5]

> FN5. Altair also argues that Chic never received an exclusive license to the '811 patent from Contour and thus could not have

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.)))**

granted Aspex an exclusive license. Because we affirm the district court's summary judgment of non-infringement as to the '811 and '896 patents, we need not determine whether the district court was correct in denying Altair's motion for summary judgment that Aspex lacked standing to pursue infringement claims as to those patents.

1. *Writing Requirement for Exclusive Licenses*

[4] 35 U.S.C. § 261 states in relevant part:

Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing. The applicant, patentee, or his assigns or legal representatives may *in like manner* grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States.

(emphasis added). We have concluded that both assignments and "virtual assignments" (i.e., exclusive license agreements that convey all substantial rights) must be in writing for a party to have standing to sue in its own name. *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed.Cir.1998). This court has also concluded that an exclusive license need not be in writing for the exclusive licensee to have standing to sue with the patentee as a co-plaintiff. *Waymark Corp. v. Porta Sys. Corp.*, 334 F.3d 1358, 1364 (Fed.Cir.2003); *see also Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1552 (Fed.Cir.1995) *706 (en banc) ("To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's *express or implied promise* that others shall be excluded from practicing the invention within that territory as well.") (emphasis added); *Weinar v. Rollform, Inc.*, 744 F.2d 797, 806-07 (Fed.Cir.1984). While Altair is correct that none of these cases expressly analyzes the "in like manner" language in

Section 261, we are bound to follow our precedent, and thus we hold that an exclusive license need not be in writing for the licensee to have standing if the patentee or assignee is also joined, as Contour was here.

2. *Aspex's Evidence of an Oral or Implied Exclusive License*

**8 The district court denied summary judgment finding that Aspex had raised at least a genuinely disputed issue of material fact that it had an implied or oral exclusive license. The court based its conclusion on the following findings:

• Chic and Aspex are both owned by members of the same family and have a close business relationship.

• Aspex has operated as an exclusive licensee, distributing products made pursuant to the patents-in-suit and seeking to enforce its rights under the patents.

• Thierry Ifergan, a member of the family that owns both Chic and Aspex, testified that oral and implied agreements exist that grant Aspex an exclusive license to the patents-in-suit.

[5] We agree that this evidence, along with other evidence in the record, is sufficient to establish a genuinely disputed issue of material fact as to whether Aspex had an oral or implied exclusive license. In addition to the above, Nonu Ifergan, another member of the family that owned both Chic and Aspex, testified that both companies believed the written license agreement conferred an exclusive license to the patents-in-suit and operated consistent with that understanding. Altair's arguments that the evidence was insufficient simply call into question the credibility of the Ifergans' testimony; since the district court simply denied summary judgment, however, credibility is not before us, only whether there was a disputed issue of material fact. Therefore, we hold that the district court did not abuse its discretion in denying summary judg-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.)))**

ment for lack of standing.

### III.

For the foregoing reasons, we affirm the district court's summary judgment of non-infringement as to the '811 and '896 patents. We also affirm the district court's denial of summary judgment for lack of standing. But we reverse the district court's summary judgment of non-infringement as to the '054 patent because we conclude that a "frame" as that term is used in the '054 patent is not limited to one with rims. We remand for further proceedings as to infringement of the claims of that patent consistent with our revised claim construction as well as regarding standing to enforce that patent.

C.A.Fed. (N.Y.),2008.
Aspex Eyewear, Inc. v. Altair Eyewear, Inc.
288 Fed.Appx. 697, 2008 WL 2950997 (C.A.Fed. (N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/009,532 | 07/17/2009 | 5,737,054 | | 8149 |

| | | |
|---|---|---|
| 32361 | 7590 | 03/29/2010 |

GREENBERG TRAURIG, LLP
MET LIFE BUILDING
200 PARK AVENUE
NEW YORK, NY 10166

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| | |

DATE MAILED: 03/29/2010

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

EXHIBIT H

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

REED SMITH LLP

SUITE 2500 ONE LIBERTY PLACE

1650 MARKET STREET

PHILADELPHIA, PA 19103

MAILED

MAR 2 9 2010

CENTRAL REEXAMINATION UNIT

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/009,532*.

PATENT NO. *5,737,054*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| *Office Action in Ex Parte Reexamination* | Control No. 90/009,532 | Patent Under Reexamination 5,737,054 |
|---|---|---|
| | Examiner MY-TRANG N. TON | Art Unit 3992 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a☐ Responsive to the communication(s) filed on _____ .    b☐ This action is made FINAL.
c☒ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.    3. ☐ Interview Summary, PTO-474.
2. ☐ Information Disclosure Statement, PTO/SB/08.    4. ☐ _____ .

Part II    SUMMARY OF ACTION

1a. ☒ Claims *1-4* are subject to reexamination.
1b. ☐ Claims _____ are not subject to reexamination.
2. ☐ Claims _____ have been canceled in the present reexamination proceeding.
3. ☐ Claims _____ are patentable and/or confirmed.
4. ☒ Claims *1-4* are rejected.
5. ☐ Claims _____ are objected to.
6. ☐ The drawings, filed on _____ are acceptable.
7. ☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved (7b)☐ disapproved.
8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).
   a)☐ All  b)☐ Some*  c)☐ None    of the certified copies have
   1☐ been received.
   2☐ not been received.
   3☐ been filed in Application No. _____ .
   4☐ been filed in reexamination Control No. _____ .
   5☐ been received by the International Bureau in PCT application No. _____ .
   * See the attached detailed Office action for a list of the certified copies not received.
9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.
10. ☐ Other: _____

cc: Requester (if third party requester)

| *Application  Number* | Application/Control No. | Applicant(s)/Patent under Reexamination | |
|---|---|---|---|
| | 90/009,532 | 5,737,054 | |
| | **Examiner** | **Art Unit** | |
| | MY-TRANG N. TON | 3992 | |

Part of Paper No.  20100317

Application/Control Number: 90/009,532                                    Page 2
Art Unit: 3992

## BACKGROUND

This is a reexamination of U.S Patent No. 5,737,054 (hereinafter "the '054 patent").

This Office action is a first Office action on the merits for the reexamination proceeding control number 90/009,532.

The '054 patent issued on April 7, 1998 based on US Patent Application No. 08/766,327 (the base application) filed on December 13, 1996.

## SUMMARY OF PROCEEDINGS

A Request pursuant to 37 CFR 1.510 for ex parte reexamination of the '054 patent" was filed 7/17/2009 by Third Party Requester.  An Order granting ex parte reexamination of '054 patent was mailed 10/14/2009.  The Order stated that there was a substantial new question of patentability affecting claims 1-4 of the '796 patent.

## STATUS OF CLAIM

The following is the status of the claims with respect to the request:

Claims 1-4 are reexamined in view of the following prior art submitted by the third party requesters.

Application/Control Number: 90/009,532                                    Page 3
Art Unit: 3992

## REFERENCES APPLIED OR DISCUSSED

In the request for reexamination, the third party requester alleges that

the patent base claims are questionable in light of the following references:

1. Japanese Utility Model Registration No. 3031881 (hereinafter "Miki")

2. German Patent No. 39 33 310 (hereinafter "Stemme")

3. U.S. Patent No. 5,568,207 to Chao, et al. (hereinafter "Chao '207")

4. China Patent Disclosure 107096 (hereinafter "Chen")

5. German Patent No. 88 06 989.6 (hereinafter "Zen")

6. U.S. Patent No. 5,416,317 to Sadler (hereinafter "Sadler")

None of these references were considered during prosecution of the base

application.

Application/Control Number: 90/009,532                              Page 4
Art Unit: 3992

## *GROUNDS OF REJECTIONS*

Pages 2 and 11-12 of the request identifies the statement of substantial

new question of patentability relevant to claims 1-4 of the '054 patent.

**Issue A:** The request indicates that Requester considers that claims 1-2

are rejected under 35 USC 102 (b) as being anticipated by Miki.

**Issue B:** The request indicates that Requester considers that claims 3

and 4 are unpatentable pursuant to 35 U.S.C. § 103 as being obvious

over Miki in view of Zen.

**Issue C:** The request indicates that Requester considers that claims 1-4

are unpatentable pursuant to 35 U.S.C. § 102(a) and 35 U.S.C. § 102(b) as

being anticipated by Stemme.

**Issue D:** The request indicates that Requester considers that claims 1

and 2 are unpatentable pursuant to 35 U.S.C. § 103 as being obvious over

Chen in view of Chao '207.

**Issue E:** The request indicates that Requester considers that claims 3

and 4 are unpatentable pursuant to 35 U.S.C. § 103 as being obvious over

Chen in view of Chao '207, and further in view of Zen.

Application/Control Number: 90/009,532                                    Page 5
Art Unit: 3992

**Issue F:**  The request indicates that Requester considers that claims 1-4 are unpatentable pursuant to 35 U.S.C. § 103 as being obvious over Zen in view of Chao '207.

**Issue G:**  The request indicates that Requester considers that claim 1-4 are unpatentable pursuant to 35 U.S.C. § 103 as being obvious over Stemme in view of Chen and/or Zen.

**Issue H:**  The request indicates that Requester considers that claims 1 and 2 are unpatentable pursuant to 35 U.S.C. § 103 as being obvious over Miki in view of Stemme and/or Chao '207.

**Issue I:**  The request indicates that Requester considers that claims 3 and 4 are unpatentable pursuant to 35 U.S.C. § 103 as being obvious over Miki in view of Stemme and/or Zen.

Application/Control Number: 90/009,532                                    Page 6
Art Unit: 3992

## CLAIM REJECTIONS – RELEVANT STATUTE

### *Claim Rejections - 35 USC § 102*

The following is a quotation of the appropriate paragraphs of 35

U.S.C. 102 that form the basis for the rejections under this section made in

this Office action:

A person shall be entitled to a patent unless –

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for a patent.

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for

all obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Application/Control Number: 90/009,532                                    Page 7
Art Unit: 3992

## STATUS OF REJECTIONS PROPOSED BY REQUESTER

The following alleged substantial new questions of patentability are taken from pages 19-91 of the Request.

**Issue A:**  Claims 1-2 are rejected under 35 U.S.C. 102(b) as being anticipated by Miki.

The rejection of claims 1-2 were proposed by the third party requester in the request for reexamination, are **ACCEPTED** essentially as proposed in the Request pp. 19-28.

The discussion and explanation in view of the item matching in the claim chart at pages 19-28 offered by the Requester is hereby incorporated by reference for the requester's explanation of the proposed rejection.

Regarding claim 1:  **An eyeglass device comprising:**



**a primary spectacle frame for supporting primary lenses therein,**

Fig. 7 of Miki demonstrates the primary spectacle frame for supporting primary lenses.

Application/Control Number: 90/009,532                                      Page 8
Art Unit: 3992



Fig. 9 as shown above presents auxiliary spectacles 11 engaged to the primary

spectacles, including a frame connecting two lenses.

**said primary spectacle frame including a middle bridge portion,**

Fig. 7 of Miki illustrates the primary spectacle frame  including a

middle bridge portion (A-A').

Figure 8 of Miki illustrates a cross-sectional view of the bridge of the eyeglasses

used in the example of the clip-on eyeglasses and shows the A-A' cross-section

in Fig. 7. [0014]

Figure 10 of Miki illustrates a cross sectional view of the bridge section of the

clip-on eyeglasses and shows the A-A' cross section in Figure 9. [0017]

**a first magnetic member** (22) **secured in said middle bridge portion of said**

**primary spectacle frame,**

Miki discloses in [0017]:

Application/Control Number: 90/009,532                                    Page 9
Art Unit: 3992

> Since a margin is required in the attaching and detaching operations of the clip-on lenses,
> a gap formed by the support plate 13 provided on the bridge of the clip-on lenses and the
> magnet 15 fixed to the inside of the support plate 13 is larger than the thickness formed
> by the bridge 22 of the eyeglasses and the magnet 22 fixed to the bridge and is larger than
> the hooks provided on the top rim edges of the clip-on lenses … and the magnet 22 of the
> eyeglasses are magnetically bonded, and the lenses are in a stable state of firm latching
> by the hooks to the eyeglasses.

**an auxiliary spectacle frame** (see Figs. 5 and 9) **for supporting auxiliary**

**lenses** (11) **therein, said auxiliary spectacle frame including a middle**

**bridge portion** (14) **having a projection** (13) **extended therefrom for**

**extending over and for engaging with said middle bridge portion of said**

**primary spectacle frame** (when the primary and auxiliary frame are coupled

together, the projection 13 from the auxiliary frame extends over the primary

spectacle frame and is engaged with the primary frame), **and**

Miki discloses in [0017]:

> Since a margin is required in the attaching and detaching operations of the clip-on lenses,
> a gap formed by the support plate 13 provided on the bridge of the clip-on lenses and the
> magnet 15 fixed to the inside of the support plate 13 is larger than the thickness formed
> by the bridge 22 of the eyeglasses and the magnet 22 fixed to the bridge and is larger than
> the hooks provided on the top rim edges of the clip-on lenses … and the magnet 22 of the
> eyeglasses are magnetically bonded, and the lenses are in a stable state of firm latching
> by the hooks to the eyeglasses.

**a second magnetic member** (15) **secured to said projection** (13) **of said**

**auxiliary spectacle frame for engaging with said first magnetic member**

(22) **of said primary spectacle frame** (15 and 22 are connectable to each other

magnetically)

Miki discloses in [0017]:

> Since a margin is required in the attaching and detaching operations of the clip-on lenses, a gap formed by the support plate 13 provided on the bridge of the clip-on lenses and the magnet 15 fixed to the inside of the support plate 13 is larger than the thickness formed by the bridge 22 of the eyeglasses and the magnet 22 fixed to the bridge and is larger than the hooks provided on the top rim edges of the clip-on lenses. When clip-on lenses are mounted to tightly bond the bridge 14 of these clip-on lenses to the bridge of the eyeglasses, the magnet 15 of the clip-on lenses and the magnet 22 of the eyeglasses are magnetically bonded, and the lenses are in a stable state of firm latching by the hooks to the eyeglasses.

**and for allowing said auxiliary spectacle frame to be attached to said primary spectacle frame with only one hand by a user** (even though Miki does not specifically disclose "with only one hand by a user", however, this limitation is seen to define intended use (i.e., setting forth the way to handle the eyeglasses "with only one hand by the user" is not a sufficient way of distinguishing over the prior art). The object of Miki device is "to offer clip-on eyeglasses that are easy to attach and detach, have an attractive appearance, and achieve a stable fixed state even for heavy clip-on lenses" [0009]. Thus, the Miki's device is capable of allowing the auxiliary spectacle frame to be attached to the primary spectacle frame with only one hand by a user. Accordingly, the absence of a disclosure relating to a function does not defeat anticipation. In re Schreiber, 128 F.3d 1473, 1477 (Fed. Cir. 1997) (finding anticipation because, although the prior art did not address the use of the disclosed structure to dispense popcorn, the use was inherent in the prior art reference). It is sufficient to show that the prior art apparatus "is capable" of being used as claimed. See Ex parte Masham, 2 USPQ2d at 1648; see also Manual of Patent Examining Procedure

Application/Control Number: 90/009,532                    Page 11
Art Unit: 3992

707.07(f), form paragraph 7.37.09 ("If the prior art structure is capable of

performing the intended use, then it meets the claim.")


Regarding claim 2:  **An eyeglass device comprising:**



**a primary spectacle frame for supporting primary lenses therein,**

Fig. 7 of Miki demonstrates the primary spectacle frame for supporting primary

lenses.



Fig. 9 as shown above presents auxiliary spectacles 11 engaged to the primary

spectacles, including a frame joining two lenses.

**said primary spectacle flame including a middle bridge portion,**

Application/Control Number: 90/009,532                                         Page 12
Art Unit: 3992

Fig. 7 of Miki illustrates the primary spectacle frame including a middle bridge

portion (A-A').

Figure 8 of Miki illustrates a cross-sectional view of the bridge of the eyeglasses

used in the example of the clip-on eyeglasses and shows the A-A' cross-section

in Fig. 7. [0014]

Figure 10 of Miki illustrates a cross sectional view of the bridge section of the

clip-on eyeglasses and shows the A-A' cross section in Figure 9. [0017]


**a first connector member** (22, labeled 23 in Fig. 8) **secured in said middle**

**bridge portion** (A-A') **of said primary spectacle frame,**

Miki discloses in [0017]:

> Since a margin is required in the attaching and detaching operations of the clip-on lenses,
> a gap formed by the support plate 13 provided on the bridge of the clip-on lenses and the
> magnet 15 fixed to the inside of the support plate 13 is larger than the thickness formed
> by the bridge 22 of the eyeglasses and the magnet 22 fixed to the bridge and is larger than
> the hooks provided on the top rim edges of the clip-on lenses.  When clip-on lenses are
> mounted to tightly bond the bridge 14 of these clip-on lenses to the bridge of the
> eyeglasses, the magnet 15 of the clip-on lenses and the magnet 22 of the eyeglasses are
> magnetically bonded, and the lenses are in a stable state of firm latching by the hooks to
> the eyeglasses.


**an auxiliary spectacle frame** (see Figs. 5 and 9) **for supporting auxiliary**

**lenses** (11) **therein, said auxiliary spectacle frame including a middle**

**bridge portion** (A-A') **having a projection** (13)  **extended therefrom for**

Application/Control Number: 90/009,532                                      Page 13
Art Unit: 3992

**extending over and for engaging with said middle bridge portion** (A-A') **of**

**said primary spectacle frame,**

**a second connector member** (15) **secured to said projection** (13) **of said**

**auxiliary spectacle frame for engaging with said first connector member**

(23 (labeled as 22 in Fig. 8)) **of said primary spectacle frame, and**

Miki discloses in [0017]:

> Since a margin is required in the attaching and detaching operations of the clip-on lenses, a gap formed by the support plate 13 provided on the bridge of the clip-on lenses and the magnet 15 fixed to the inside of the support plate 13 is larger than the thickness formed by the bridge 22 of the eyeglasses and the magnet 22 fixed to the bridge and is larger than the hooks provided on the top rim edges of the clip-on lenses. When clip-on lenses are mounted to tightly bond the bridge 14 of these clip-on lenses to the bridge of the eyeglasses, the magnet 15 of the clip-on lenses and the magnet 22 of the eyeglasses are magnetically bonded, and the lenses are in a stable state of firm latching by the hooks to the eyeglasses.

**magnetic means** (magnets engage between 23 and 15, Fig. 10) **operatively**

**associated with the first** (23 (labeled as 22 in Fig. 8)) **and second connector**

**members** (5) **whereby they are connectable to each other magnetically** (15

and 22 are connectable to each other magnetically)

Miki discloses in [0017]:

> Since a margin is required in the attaching and detaching operations of the clip-on lenses, a gap formed by the support plate 13 provided on the bridge of the clip-on lenses and the magnet 15 fixed to the inside of the support plate 13 is larger than the thickness formed by the bridge 22 of the eyeglasses and the magnet 22 fixed to the bridge and is larger than the hooks provided on the top rim edges of the clip-on lenses. When clip-on lenses are mounted to tightly bond the bridge 14 of these clip-on lenses to the bridge of the eyeglasses, the magnet 15 of the clip-on lenses and the magnet 22 of the eyeglasses are

Application/Control Number: 90/009,532                                    Page 14
Art Unit: 3992

magnetically bonded, and the lenses are in a stable state of firm latching by the hooks to
the eyeglasses.


**for allowing said auxiliary spectacle frame to be attached to said primary**

**spectacle flame with only one hand by a user** (even though Miki does not

specifically disclose "with only one hand by a user", however, this limitation is

seen to define intended use (i.e., setting forth the way to handle the eyeglasses

"with only one hand by the user" is not a sufficient way of distinguishing over

the prior art). The object of Miki device is "to offer clip-on eyeglasses that are easy to

attach and detach, have an attractive appearance, and achieve a stable fixed state even for

heavy clip-on lenses" [0009]. Thus, the Miki's device is capable of allowing the

auxiliary spectacle frame to be attached to the primary spectacle frame with

only one hand by a user. Accordingly, the absence of a disclosure relating to a

function does not defeat anticipation. In re Schreiber, 128 F.3d 1473, 1477

(Fed. Cir. 1997) (finding anticipation because, although the prior art did not

address the use of the disclosed structure to dispense popcorn, the use was

inherent in the prior art reference). It is sufficient to show that the prior art

apparatus "is capable" of being used as claimed. See Ex parte Masham, 2

USPQ2d at 1648; see also Manual of Patent Examining Procedure 707.07(f),

form paragraph 7.37.09 ("If the prior art structure is capable of performing the

intended use, then it meets the claim.")

Application/Control Number: 90/009,532                                  Page 15
Art Unit: 3992

**Issue B:**  Claims 3-4 are rejected under 35 U.S.C. 103(a) as being

obvious over Miki in view of Zen.


The rejection of claims 3-4 were proposed by the third party requester in

the request for reexamination, are **ACCEPTED** as proposed in the Request pp.

29-30.


The discussion and explanation in view of the item matching in the claim

chart at pages 29-30 offered by the Requester is hereby incorporated by

reference for the requester's explanation of the proposed rejection.

Application/Control Number: 90/009,532                               Page 16
Art Unit: 3992

Regarding claim 3: The eyeglass device as claimed in claim 2,

| with the first connector member being a magnet, | Zen<br>Zen discloses "a soft, magnetic material (22, 22') are non-removeably affixed to the primary frame front side (15) at one or more places and wherein a permanently magnetic material (30, 30', 42, 42') non-removeably affixed to one or more places on the attachment eyeglass part ...." (Zen Translation, Claim 1.)<br>Zen further discloses "Magnetic material used on front side 15 is preferably a soft material having high permeability and low coercive force. An appropriate soft magnetic material for use in the invention is Nakano Permalloy PB, which can be obtained from Nakano Permalloy Co., Ltd." (Zen Translation at 9.)<br>Zen further discloses "Magnetic material used for attachment eyeglasses 24 is preferably a permanent magnetic material; for example Plastiform brand magnetic material ...." (Zen Translation at 10.)<br>Accordingly, Zen teaches the use of a magnetic material on the front surface of the primary spectacles, and a permanent magnet on the rear surface of the auxiliary spectacles. It would be obvious to a person of ordinary skill in the art to reverse the location of the magnetic material and the permanent magnet, as no change in functionality is accomplished by the reversal. |
| the second connector member being a magnetizable substance, | Zen<br>See discussion above. |

Claim 3 of the '054 patent locates a magnet on the bridge of the primary spectacle frame, and a magnetic material on the projection. Zen teaches the use of a magnetic material on one side of the connection, with a permanent magnet on the opposite side of the connection. While the magnet and magnetic material of Zen are located in the reverse locations of claim 3, Zen teaches substituting a magnet and a magnetic material for the paired magnets of Miki, and it would be obvious for a person of ordinary skill in the art to reverse the placements of the magnet and the magnetic material, such is done in claim 4 of the '054 patent.

Application/Control Number: 90/009,532                                      Page 17
Art Unit: 3992

Regarding claim 4: The eyeglass device as claimed in claim 2,

| with the second connector member being a magnet, | Zen<br>Zen discloses "a soft, magnetic material (22, 22') are non-removeably affixed to the primary frame front side (15) at one or more places and wherein a permanently magnetic material (30, 30', 42, 42') non-removeably affixed to one or more places on the attachment eyeglass part ...." (Zen Translation, Claim 1.)<br>Zen further discloses "Magnetic material used on front side 15 is preferably a soft material having high permeability and low coercive force. An appropriate soft magnetic material for use in the invention is Nakano Permalloy PB, which can be obtained from Nakano Permalloy Co., Ltd." (Zen Translation at 9.) |
| --- | --- |
| the first connector member being a magnetizable substance. | Zen<br>Zen further discloses "Magnetic material used for attachment eyeglasses 24 is preferably a permanent magnetic material; for example Plastiform brand magnetic material ...." (Zen Translation at 10.) |

Claim 4 of the '054 patent locates a magnetic material on the bridge of the primary spectacle frame, and a permanent magnet on the projection. Zen teaches the use of a magnetic material on the primary spectacle side of the connection, with a permanent magnet on the auxiliary spectacle side of the connection. Accordingly, Zen teaches substituting a magnet and a magnetic material for the paired magnets of Miki.

Application/Control Number: 90/009,532                                    Page 18
Art Unit: 3992

**Issue C:**  Claims 1-4 are rejected under 35 U.S.C. 102(a) as being

anticipated by Stemme.

The rejection of claims 1-4 were proposed by the third party requester in

the request for reexamination, are **ACCEPTED** essentially as proposed in the

Request pp.30-42.

The discussion and explanation in view of the item matching in the claim

chart at pages 30-42 offered by the Requester is hereby incorporated by

reference for the requester's explanation of the proposed rejection.

Regarding claim 1: **An eyeglass device comprising:**



Application/Control Number: 90/009,532                                    Page 19
Art Unit: 3992

**a primary spectacle frame** (406) **for supporting primary lenses** (418, 420)
**therein, said primary spectacle frame** (406) **including a middle bridge
portion** (416),

**a first magnetic member** (434) **secured in said middle bridge portion** (416)
**of said primary spectacle frame** (406),

**an auxiliary spectacle frame** (428) **for supporting auxiliary lenses** (430,
432) **therein, said auxiliary spectacle frame** (428) **including a middle bridge
portion** (a bridge portion between lenses 430 and 432) **having a projection
extended therefrom for extending over and for engaging with said middle
bridge portion of said primary spectacle frame** (Stemme states "The inclined
surfaces 442 and 444 and sections 443 and 445, which may, of course, also be designed as
corresponding recesses in the bridge 416 and/or as elevations in the intermediate part 428 as
special means for a form fitting connection ... if necessary and removed from them again when
not needed [translation at 4, column 2]. The projection of Stemme is explicitly
described as an elevation from the bridge portion of the auxiliary glasses which
extends into a recess in the bridge of the primary spectacle frame, and as a
result extends over at least a portion of the middle bridge portion when the
elevation is inserted into the recess), **and**

**a second magnetic member** (435) **secured to said projection of said
auxiliary spectacle frame** (430 and 432) **for engaging with said first
magnetic member** (434) **of said primary spectacle frame** (406) **and for**

**allowing said auxiliary spectacle frame to be attached to said primary spectacle frame with only one hand by a user** (even though Stemme does not specifically disclose "with only one hand by a user", however, this limitation is seen to define intended use (i.e., setting forth the way to handle the eyeglasses "with only one hand by the user" is not a sufficient way of distinguishing over the prior art). .The object of Stemme device is "To this end, light attenuation is to be promptly increased and decreased in a simple manner in keeping with quickly changing light conditions, and/or it is to be enabled in a simple manner to promptly introduce refractive power into the eyes' optical path and remove it from the eyes' optical path - positive refractive power particularly if the eyeglass user is far-sighted, and negative refractive power if the eyeglass user is near-sighted. In the case of far sightedness, this refractive power, for example, is intended as a close-vision aid that can easily be quickly attached (for example for reading) and can be quickly removed again in a simple manner, for example when entering a staircase and leaving a house, and in the case of short sightedness, this refractive power, for example, is intended to be used as an aid for far vision that can easily be quickly attached and removed." [under Description section, first page, first column, last paragraph – second column, first line]. Thus, the Stemme's device is capable of allowing the auxiliary spectacle frame to be attached to the primary spectacle frame with only one hand by a user. Accordingly, the absence of a disclosure relating to a function does not defeat anticipation. In re Schreiber, 128 F.3d 1473, 1477 (Fed. Cir. 1997) (finding anticipation because, although the prior art did not address the use of the disclosed structure to dispense popcorn, the use was inherent in the prior art reference). It is sufficient to show that the prior art

Application/Control Number: 90/009,532                                    Page 21
Art Unit: 3992

apparatus "is capable" of being used as claimed. See Ex parte Masham, 2

USPQ2d at 1648; see also Manual of Patent Examining Procedure 707.07(f),

form paragraph 7.37.09 ("If the prior art structure is capable of performing the

intended use, then it meets the claim.")

<u>Regarding claim 2</u>:  **An eyeglass device comprising:**



Fig.1

**a primary spectacle frame** (406) **for supporting primary lenses** (418, 420)

**therein, said primary spectacle flame** (406) **including a middle bridge**

**portion** (416),

**a first connector member** (434) **secured in said middle bridge portion** (416)

**of said primary spectacle frame** (406),

Application/Control Number: 90/009,532                                                Page 22
Art Unit: 3992

**an auxiliary spectacle frame** (428) **for supporting auxiliary lenses** (430,

432) **therein, said auxiliary spectacle frame (428) including a middle**

**bridge portion** (bridge portion between lenses 430, 432) **having a projection**

**extended therefrom for extending over and for engaging with said middle**

**bridge portion of said primary spectacle frame** (Stemme states "The inclined

surfaces 442 and 444 and sections 443 and 445, which may, of course, also be designed as

corresponding recesses in the bridge 416 and/or as elevations in the intermediate part 428 as

special means for a form fitting connection ... if necessary and removed from them again when

not needed [translation at 4, column 2]. Thus, Stemme teaches a projection

extending from the bridge portion of the auxiliary spectacles into a recess in

the bridge of the primary spectacle frames, and as a result Stemme teaches a

projection extended from the middle bridge portion of the auxiliary lenses),

**a second connector member** (435) **secured to said projection of said**

**auxiliary spectacle frame** (428) **for engaging with said first connector**

**member** (434) **of said primary spectacle frame** (406. Fig. 1 clearly illustrates

the first and second connector members engaging each other), **and magnetic**

**means** (magnetic between 434 and 435) **operatively associated with the first**

**(434) and second (435) connector members whereby they are connectable**

**to each other magnetically** (434 and 435 are connectable to each other

magnetically) **for allowing said auxiliary spectacle frame to be attached to**

**said primary spectacle flame with only one hand by a user** (even though

Stemme does not specifically disclose "with only one hand by a user", however,

Application/Control Number: 90/009,532                                   Page 23
Art Unit: 3992

this limitation is seen to define intended use (i.e., setting forth the way to

handle the eyeglasses "with only one hand by the user" is not a sufficient way

of distinguishing over the prior art).  The object of Stemme device is "To this end,

light attenuation is to be promptly increased and decreased in a simple manner in keeping with

quickly changing light conditions, and/or <u>it is to be enabled in a simple manner to promptly</u>

<u>introduce refractive power into the eyes' optical path and remove it from the eyes' optical path</u> -

positive refractive power particularly if the eyeglass user is far-sighted, and negative refractive

power if the eyeglass user is near-sighted. In the case of far sightedness, this refractive power,

for example, is intended as a close-vision aid that <u>can easily be quickly attached</u> (for example

for reading) and <u>can be quickly removed again in a simple manner</u>, for example when entering

a staircase and leaving a house, and in the case of short sightedness, this refractive power, for

example, is intended to be used as an aid for far vision <u>that can easily be quickly attached and</u>

<u>removed." [under Description section, first page, first column, last paragraph –</u>

<u>second column, first line].</u>  Thus, the Stemme's device is capable of allowing the

auxiliary spectacle frame to be attached to the primary spectacle frame with

only one hand by a user.  Accordingly, the absence of a disclosure relating to a

function does not defeat anticipation. In re Schreiber, 128 F.3d 1473, 1477

(Fed. Cir. 1997) (finding anticipation because, although the prior art did not

address the use of the disclosed structure to dispense popcorn, the use was

inherent in the prior art reference). It is sufficient to show that the prior art

apparatus "is capable" of being used as claimed. See Ex parte Masham, 2

USPQ2d at 1648; see also Manual of Patent Examining Procedure 707.07(f),

Application/Control Number: 90/009,532                                                    Page 24
Art Unit: 3992

form paragraph 7.37.09 ("If the prior art structure is capable of performing the

intended use, then it meets the claim.")


Regarding claim 3: **The eyeglass device as claimed in claim 2 with the
first connector member being a magnet, the second connector member
being a magnetizable substance.**

Stemme states in the abstract:  "For a fastening arrangement for fastening an

accessory to at least one eye aid, in particular eyeglasses, wherein the pair of spectacles and

accessory have permanent magnets or magnetic return path parts for the magnetic flux of the

permanent magnets". Thus, one side of Stemme may be a magnet, and the other

side being a "magnetic return part for the magnetic flux if the permanent

magnets". For that reason, Stemme teaches both the use of a pair of magnets,

as well as the use of a magnet and a magnetizeable material.


Regarding claim 4: **The eyeglass device as claimed in claim 2, with
the second connector member being a magnet, the first connector
member being a magnetizable substance.**

Claim 4 is similarly rejected as claim 3, Stemme states in the abstract:

"For a fastening arrangement for fastening an accessory to at least one eye aid, in particular

eyeglasses, wherein the pair of spectacles and accessory have permanent magnets or magnetic

return path parts for the magnetic flux of the permanent magnets". Thus, one side of

Application/Control Number: 90/009,532                                    Page 25
Art Unit: 3992

Stemme may be a magnet, and the other side being a "magnetic return part for

the magnetic flux if the permanent magnets". For that reason, Stemme teaches

both the use of a pair of magnets, as well as the use of a magnet and a

magnetizeable material.


    *** It is noted that in the request, pages 41-42, reference Zen proposed

by Requester as secondary references. However, since Stemme does disclose

the teaching for claims 3-4, thus, list separate rejection based on Stemme in

view of Zen would be redundant and unnecessary at this time.


    **Issue D:** Claims 1-2 are rejected under 35 U.S.C. 103(a) as being

obvious over Chen in view of Chao '207.

    The rejection of claims 1-2 were proposed by the third party requester in

the request for reexamination, are **ACCEPTED** as proposed in the Request, pp.

43-56.

    The discussion and explanation in view of the item matching in the claim

chart at pages 43-56 offered by the Requester is hereby incorporated by

reference for the requester's explanation of the proposed rejection.


    **Issue E:** Claims 3-4 are rejected under 35 U.S.C. 103(a) as being

obvious over Chen in view of Chao '207 and further in view of Zen.

Application/Control Number: 90/009,532                                Page 26
Art Unit: 3992

The rejection of claims 3-4 were proposed by the third party requester in

the request for reexamination, are **ACCEPTED** as proposed in the Request

pp.56-58.

The discussion and explanation in view of the item matching in the claim

chart at pages 56-58 offered by the Requester is hereby incorporated by

reference for the requester's explanation of the proposed rejection.


**Issue F:**  Claims 1-4 are rejected under 35 U.S.C. 103(a) as being

obvious over Zen in view of Chao '207.

The rejection of claims 1-4 were proposed by the third party requester in

the request for reexamination, are **ACCEPTED** as proposed in the Request

pp.59-74.

The discussion and explanation in view of the item matching in the claim

chart at pages 59-74 offered by the Requester is hereby incorporated by

reference for the requester's explanation of the proposed rejection.


** It is noted that Issues D-F proposed by Requester are relevant and

similar teaching; Thus, list separate rejections based on them would be

redundant and unnecessary at this time.

Application/Control Number: 90/009,532                                    Page 27
Art Unit: 3992

**Issue G:**  Claims 1-4 are rejected under 35 U.S.C. 103(a) as being obvious over Stemme in view of Chen and/or Zen.

The rejection of claims 1-4 were proposed by the third party requester in the request for reexamination, are **ACCEPTED** as proposed in the Request pp. 74-84.

Issue C has already found claims 1-4 to have been anticipated, so the obviousness question in Issue G is moot. Alternatively, claims 1-4 would have been obvious.


**Issue H:**  Claims 1-2 are rejected under 35 U.S.C. 103(a) as being obvious over Miki in view of Stemme and/or Chao.

The rejection of claims 1-2 were proposed by the third party requester in the request for reexamination, are **ACCEPTED** as proposed in the Request pp. 84-88.

Issue A has already found claims 1-2 to have been anticipated, so the obviousness question in Issue H is moot. Alternatively, claims 1-2 would have been obvious.


**Issue I:**  Claims 3-4 are rejected under 35 U.S.C. 103(a) as being obvious over Miki in view of Stemme and Zen.

Application/Control Number: 90/009,532                                Page 28
Art Unit: 3992

The rejection of claims 3-4 were proposed by the third party requester in the request for reexamination, are **ACCEPTED** as proposed in the Request pp. 89-91.

Issue B has already found claims 3-4 to have been obvious, so the obviousness question in Issue I is moot.

## Reexamination Procedures

Extensions of time under 37 C.F.R. 1.136(a) will not be permitted in these *proceedings* because the provisions of 37 C.F.R. 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. § 305 requires that reexamination proceedings "will be conducted with special dispatch" (37 C.F.R. 1.550(a)). Extension of time in ex *parte* reexamination proceedings are provided for in 37 C.F.R. 1.550(c).

The patent owner is reminded of the continuing responsibility under 37 C.F.R. 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving the patent throughout the course of this reexamination proceeding. The third party requester is also reminded of the ability of similarly apprise the Office any such activity or proceeding throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.

Application/Control Number: 90/009,532                                          Page 29
Art Unit: 3992

Patent owner is notified that any proposed amendment to the specification and/or claims in this reexamination proceeding must comply with 37 C.F.R. 1.530(d)-(j), must be formally presented pursuant to 37 C.F.R. 1.52(a) and (b), and must contain any fees required by 37 C.F.R. 1.20(c). See MPEP § 2250(IV) for examples to assist in the preparation of proper proposed amendments in reexamination proceedings.

After the filing of a request for reexamination by a third party requester, any document filed by either the patent owner or the third party requester must be served on the other party (or parties where two or more third party requested proceedings are merged) in the reexamination proceeding in the manner provided in 37 CFR 1.248. See 37 CFR 1.550(f).

In order to insure full consideration of any amendments, affidavits or declarations or other documents as evidence of patentability, such documents must be submitted in response to the first Office action on the merits (which does not result in a close of prosecution). Submissions after the second Office action on the merits, which is intended to be a final action, will be governed by the requirements of 37 CFR 1.116, after final rejection and by 37 CFR 41.33 after appeal, which will be strictly enforced.

Application/Control Number: 90/009,532                                    Page 30
Art Unit: 3992

## *Conclusion*

All correspondence relating to this *ex parte* reexamination proceeding should

be directed:

By Mail to:   Mail Stop *Ex Parte* Reexam
              Central Reexamination Unit
              Commissioner for Patents
              United States Patent & Trademark Office
              P.O. Box 1450
              Alexandria, VA 22313-1450

By FAX to:   (571) 273-9900
             Central Reexamination Unit

By hand:    Customer Service Window
            Randolph Building
            401 Dulany Street
            Alexandria, VA 22314

Registered users of EFS-Web may alternatively submit such correspondence
via the electronic filing system EFS-Web, at
https://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html. EFS-
Web offers the benefit of quick submission to the particular area of the Office
that needs to act on the correspondence. Also, EFS-Web submissions are "soft
scanned" (i.e., electronically uploaded) directly into the official file for the
reexamination proceeding, which offers parties the opportunity to review the
content of their submissions after the "soft scanning" process is complete.

Any inquiry concerning this communication should be directed to the

Central Reexamination Unit at telephone number (571) 272-7705.


/My-Trang N. Ton/

Primary Examiner, CRU 3992

Conferees:

/Margaret Rubin/                    /Sue Lao/
Primary Examiner, CRU 3992          OPQA