SCOTT W. HANSEN (admitted pro hac vice)
LAURA A. BRENNER (admitted pro hac vice)
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202
Telephone: 414-298-1000
Facsimile: 414-298-8097
E-mail: shansen@reinhartlaw.com
lbrenner@reinhartlaw.com

WILLIAM R. WARNE (Bar No. 141280)
MEGHAN M. BAKER (Bar No. 243765)
Downey Brand
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Telephone: 916-520-5510
Facsimile: 916-520-5910
E-mail: wwarne@downeybrand.com
mbaker@downeybrand.com

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASPEX EYEWEAR, INC. | ) CASE NO. 2:10 CV 00632 _ |
| Plaintiff, | ) **DECLARATION OF JAMES** |
| | ) **LANGENGELD IN SUPPORT OF** |
| v. | ) **VISION SERVICE PLAN'S** |
| | ) **OPPOSITION TO PLAINTIFF'S** |
| | ) **MOTION FOR A PRELIMINARY** |
| VISION SERVICE PLAN; MARCHON | ) **INJUNCTION** |
| EYEWEAR, INC.; ALTAIR EYEWEAR, INC. ) | |
| | ) **Date: May 19, 2010** |
| Defendants. | ) **Time: 9:30 a.m.** |
| | ) **Courtroom: Courtroom No. 6** |
| | ) **Judge: Hon. John A. Mendez** |

# DECLARATION OF JAMES LANGENFELD

My name is JAMES LANGENFELD. This declaration contains my opinion to a reasonable degree of economic certainty and the bases on which they rest, and I offer it in opposition to plaintiff's motion for preliminary injunctive relief:

1.    I, Dr. James Langenfeld, am an economist and Director of LECG, an economic consulting firm that specializes in applied microeconomic, intellectual property, and financial analyses. I am also an Adjunct Professor at Loyola Law School in Chicago. I have held a number of positions involving the analysis of economic issues in antitrust, intellectual property, and damages estimation. These positions include Director for Antitrust (1988-1993) in the Federal Trade Commission's Bureau of Economics, where I supervised 45 Ph.D. economists and made policy recommendations on every antitrust matter considered by the Commission. While in that position, I helped draft policy statements, including the 1992 Department of Justice and FTC *Horizontal Merger Guidelines* and the 1993 *Statements on Antitrust Enforcement Policy in Health Care*. Other positions include Deputy Director for Economic Policy Analysis, and Economic Advisor to an FTC Commissioner and to the FTC's Director of Consumer Protection. As part of my work in these positions, I analyzed and supervised analyses of the sale and business practices of retail eye care.

2.    As a consulting economist, I have testified as an expert economist many times in federal court on a variety of economic issues, including market definition in the health care industries. As part of this work, I have performed economic analysis of retail eye care and contact lenses. I have published many

2

scholarly writings on economic issues in journals and books, which include the economic analysis of health care issues, antitrust, intellectual property, and relevant market definition.

3.      I received a Ph.D. in economics from Washington University in St. Louis and a B.A. from Georgetown University.  I am affiliated with the American Economic Association, the American Society of Health Economists, the American Bar Association, and the Western Economic Association, among other professional societies.

4.      VSP retained me as an expert to perform economic analyses that will help it respond to Aspex, Inc.'s motion for a preliminary injunction and to respond to an expert report submitted by Mr. John Raycraft.  In performing my analysis, I reviewed a number of documents provided to me by VSP and its subsidiaries, including both VSP information and information from third party sources.  In addition, my staff and I interviewed several employees of VSP, including one from VSP's Marchon subsidiary. These sources are those typically used by economists in performing their analyses, and I have used this type of information in performing economic analysis of antitrust matters since my employment at the Federal Trade Commission.  My findings and opinions are based upon these source materials, in addition to my training and experience as an economist.

5.      For the court's convenience, most of my conclusions are contained in this declaration; however, many of my citations to standard economic treatises and explanations of how to apply the lessons of those treatises are contained in my expert report, which is attached as Exhibit A.

# I. Background

6.      My conclusions are based on my research and analyses of this matter that reflect many aspects of the vision care industry, including a number of observations related to VSP's business.  VSP's primary line of business is providing insurance for vision care. As such, VSP sells insurance coverage to corporations, groups, and government entities for their employees either as part of a total benefits package or as a plan that employees can accept or refuse.  I understand that ████████ employees eligible to join a voluntary VSP plan through their employer did not do so.

7.      As part of its insurance provision, VSP maintains a network of optometrists ("ODs") and ophthalmologists ("MDs" or "DOs") as approved eye care providers for use by VSP's subscribers.  As is true with other medical practices, ODs, MDs, and DOs accept numerous insurance plans, such as Humana's CompBenefits, UnitedHealth Group's Spectera, Highmark's DavisVision, Luxottica Group's EyeMed Vision Care, and VSP.  According to the American Optometric Association, 2005 data suggested that optometrists, on average, belonged to 5.4 HMO vision plans, 5.2 PPO vision plans, and 10.5 other plans. This is consistent with internal documents provided by VSP that suggest that ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ in its network.

4

8.    VSP faces significant competition when selling its insurance products to companies and individuals, including other insurance plans, self-pay, and/or discount options.

9.    Recent data suggests that VSP actively competes with other insurance companies. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████    ████████████

████████████████████████████████████████████████

████████████████████████████ for to a variety of insurance plans.

10.    VSP's data showing significant competition are consistent with the American Optometric Association's 2007 Third Party/Managed Care Survey relied upon by Mr. Raycraft. Those data show that VSP represented only about 18 percent of the total optometric practice revenue (and 22 percent of patients).

11.    I have also learned that vision insurance coverage is only one of several ways that individuals may purchase eye care and eyewear. In fact, according to the 2008 and 2009 Jobson Consumer Perceptions of Managed Vision Care reports (based upon 2007 and 2008 data, respectively), only 49 percent of survey respondents indicated that they had a vision plan (either through stand-alone vision insurance or as part of an overall health benefits package).

12.    An alternative option to an insurance plan is the use of a discount plan. Discount plans can be purchased individually through an annual membership

fee through numerous plans, including AARP, FACTXtra Discount Vision Care Program, Alliance Health Card, EyeBenefits, Ameriplan Discount Dental & Health Plans, Coast to Coast Vision, Careington Dental & Vision Discount, or Aetna VisionSM Discount program.

13.     Some Employers offer discount plans.  Employer discount plans typically allow participants access to a network of eye care providers at fixed discount prices. Benefits usually include eye exams and either eyeglasses or a set of contact lenses.

14.     Another substitute for purchasing private insurance is the use of a flexible spending account or flexible spending arrangement (FSA). These accounts are typically facilitated by employers and offer an easy method for employees to save money pre-taxes for use in covering medical expenses.

## II.     Overall Economic Assessment of Plaintiff's Allegations

15.     To assess whether there is any viable claim that VSP has market power in a relevant market, I undertook typical economic analyses.  An economic evaluation of alleged monopolization or attempted monopolization typically focuses on several key analyses. Economists analyze each of these steps because each step is economically necessary to determine how the alleged monopolization affects competition and consumers, not just one competitor.

16.     First, economists typically undertake a study to define the relevant antitrust markets.  As in any monopolization or attempted monopolization case, it is important to determine what is allegedly being monopolized.  Second,

antitrust purposes, such as "industry recognition" and "provider or subscriber lock-in," it too fails to present any of the economic analysis typically presented in antitrust matters as necessary to establish a relevant antitrust market.

20.    Mr. Raycraft ignores the basic methodology that economists typically use to determine relevant markets.  In particular, when defining antitrust markets, multiple demand and supply factors must be considered, as is well established in U.S. antitrust agencies' publications. For instance, the economics of the *Merger Guidelines'* approach to market definition focuses initially on buyers' demand and the products over which a "hypothetical monopolist" could profitably raise prices to customers. Evidence for evaluating tests of this sort and for assessing demand factors can come from a variety of sources, including business documents, third party analysis of the industry, and industry experts, as well as quantitative economic analysis. The evidence on the degree of substitution can be based on evidence on the functional substitutability of the products, evidence of shifts in purchases in response to changes in the relative prices of different products, and evidence of the overall sensitivity of purchases of products in a hypothetical market to price increases on those products.

21.    Mr. Raycraft does not perform any market definition analysis similar to the economic analyses in the *Merger Guidelines*, nor does he attempt to measure substitution among alternative products such as estimating cross elasticities of demand.

22.    Indeed, the closest that Plaintiff comes to even acknowledging the importance of demand-side substitution is in the *Memorandum of Points*, which

8

again relies on assertions rather than any analysis of data or consumer behavior. Specifically, the *Memorandum* states that "while vision-related 'discount plans' may apply to similar products and services, such plans are not a *substitute*, or *functionally interchangeable*, for vision insurance because they do not provide insurance." This sort of tautological reasoning completely ignores consumer behavior and preferences. The question is not whether discount plans provide insurance, but rather whether consumers view discount plans and other ways to pay for eye care as substitute means for paying for their eye care in place or in conjunction with insurance.

23.    In relation to eye care, Mr. Raycraft offers no support for his assertion of separate Insurance and Discount Markets. No discussion of consumer preferences is offered and no analysis of consumer substitution is provided. In fact, nothing beyond Mr. Raycraft's industry experience is supplied in support of the proposed eye care market definitions. Accordingly, there is no economic analysis that supports the market Mr. Raycraft uses to estimate his 50.5 percent share of the Eye Care Insurance Market for VSP.

24.    Mr. Raycraft does not explain why the variety of other entities he lists do not compete with VSP. Namely, he claims that "Medicare HMOs, Medicare fee-for service, Medicaid, other government plans and those that have no third-party coverage"[1] should be excluded from the calculation. The purpose in estimating market share, however, is to obtain an indication of a firm's market

---

[1] *Raycraft Declaration*, Exhibit 1 at page 4.

9

power. In this case, the question is whether VSP has sufficient market power over end-user customers or ECPs in the provision of eye care such that VSP could be in a position to "monopolize the Eye Care Insurance and Prescription Eyewear Frames Market."

25.    The groups that Mr. Raycraft excludes without any apparent analysis are relevant to this question. For example, to the extent that employees opt out of purchasing VSP's coverage and choose to have no third-party coverage, VSP's influence over ECPs is greatly reduced and it is not an "essential facility." ECPs still serve customers with private insurance, government aid, and no coverage at all, and the ECPs would be able to continue to sell Aspex frames to these customers even if they did not sell frames to VSP members.

26.    Mr. Raycraft does not offer any analysis justifying his submarkets for Retail and ECP eye care/eyewear. The only justification aside from his industry experience that Mr. Raycraft offers in support of his submarket divisions is the suggestion that entities operating in the various proposed submarkets are driven by different motivators. For example, Mr. Raycraft asserts retailers offering vision care services are motivated by their desire to increase the sale of eyewear in a retail environment, while ECP doctors are reported to be driven by "the primary purpose of providing eye health."[2] However, Mr. Raycraft does not offer any explanation for why these particular supply motivations, even assuming they are

---

[2] *Raycraft Declaration*, Exhibit 1 at page 2.

true, would lead to sufficient differentiation as to qualify for the purpose of defining a distinct antitrust market or submarkets.

27.    Particularly important, missing from Mr. Raycraft's discussion of the eye care markets and submarkets is any assessment of customer demand preferences or patterns of substitution among the various eye care options. No explanation is given as to why consumers could not or would not shift between ECP and Retail vision care in the face of a significant and non-transitory increase in prices for frames sold by ECPs.

28.    Although Mr. Raycraft asserts a Frames Market that includes all types of eyewear with no submarkets specified, the Complaint alleges two narrow sub-markets. Specifically, the Complaint asserts two relevant submarkets of the overall Frames Market to be "Frames sold to VSP's network of participating providers" and "VSP's insured subscribers and their dependents."

29.    In an attempt to support these two submarkets, the Complaint asserts several "facts." First, it argues that subscribers and providers are "locked in," meaning VSP has monopoly power over these subscribers and providers. Second, it argues that VSP has power over subscribers, because if subscribers do not choose "approved frames" they will lose the value of the insurance they have purchased from VSP. Third, the Complaint alleges that because VSP has minimum stocking requirements of "approved frames" for ECP offices in its network, independent ECPs with limited space will stock only those frames covered by VSP insurance. Fourth, the Complaint points to "financial incentives"

11

economists evaluate the potential impact of the allegedly anticompetitive actions of the monopolist or potential monopolist on competition and competitors in that market. That is, whether the alleged monopolist actually has monopoly power or sufficient market power to be in a position to credibly monopolize the relevant markets. In addition to establishing whether the firm allegedly monopolizing or attempting to monopolize the market has sufficient market power, economists evaluate the probable effect of the specific allegedly anticompetitive conduct on competitors and competition.

17.    Economic analysis of the relevant antitrust markets indicates that VSP is not dominant in any properly defined eye care market, nor in a Frames Market; it does not possess sufficient market power to exclude or foreclose Aspex from a Frames Market; and even if (contrary to the economic evidence) Aspex were excluded from any relevant market, VSP would not be able to monopolize the Frames Market.

## III.    Economic Analysis of Relevant Markets

18.    As part of my work I analyzed the relevant markets defined by Aspex and its expert, Mr. John Raycraft.

19.    I conclude that neither Aspex nor its expert properly analyze the relevant markets. Mr. Raycraft does not present any of the economic analysis typically presented in antitrust matters necessary to establish a relevant antitrust market. Likewise, while the Complaint lists some factors that are purported to establish the various proposed markets as well-defined relevant markets for

7

that VSP provides for its own frames subsidiary, Altair. These assertions are not supported by the available economic evidence or economic analysis.

30.    As the evidence discussed above in the previous paragraphs makes clear, neither end consumers nor independent ECPs are "locked in" to VSP. Consumers have a range of choices, from other vision care insurance providers to discount plans to FSAs to out-of-pocket purchases. Many employers make vision insurance plans, such as VSP's, voluntary, offer more than one vision insurance plan, and do not compel their employees to chose VSP coverage plans instead of buying services offered by low cost retailers such as Walmart. Accordingly, employees can substitute other plans or forms of payment for VSP's insurance. Indeed, since ECPs typically accept 5.4 HMO vision plans, 5.2 PPO vision plans, and 10.5 other plans in addition to out-of-pocket payments, many consumers would not even need to switch doctors when changing payment options.

31.    Similarly, ECPs are not locked into VSP because they accept multiple insurance plans, along with many other forms of payment. Only about 18 percent of the typical optometrist's revenues come from VSP subscribers. Furthermore, 44 percent of ECPs within VSP's network report that fewer than 25 percent of their patients are VSP members. Second, Plaintiff assumes that if VSP were to change the coverage status of Aspex frames, VSP subscribers would no longer purchase any Aspex frames. It is my understanding from VSP, however, that while coverage amounts for Aspex would decline should VSP move it out-of-network, coverage would continue. Thus, it is erroneous to assume that even VSP subscribers would cease to purchase Aspex frames.

32.     There are several reasons why moving Aspex out of its network would not eliminate demand for Aspex frames. For example, Plaintiff has argued that it has a differentiated product that is covered by two patents. If true, then presumably individuals that desire the differentiated features may continue to demand the Aspex products. It appears that many VSP members are already paying out-of-pocket for Aspex frames because in-network coverage does not fully cover the retail cost of many Aspex frames.

33.     Furthermore, if VSP were to substantially reduce its frame allowance to an out-of-network reimbursement for Aspex frames, then VSP's coverage would worsen for those customers that prefer Aspex frames. Because VSP faces considerable competition from other vision care insurance providers, such as EyeMed, DavisVision, and Spectera, as well as from discount plans and discount retailers, in the face of reduced coverage and/or higher out-of-pocket expenses, some subscribers would likely switch away from VSP toward one of their many other options. Competition would therefore constrain VSP.

34.     In alleging VSP-specific submarkets, Plaintiff is attempting to craft a market definition that suits its goals in establishing that VSP has monopoly power and has violated the Sherman Act. The available evidence suggests much broader markets with considerable competition.

## IV.     Economic Analysis of VSP's Alleged Monopoly Power

35.     Plaintiff's evidence of market power is wholly insufficient, and an analysis of the economic evidence shows VSP does not have monopoly or

substantial market power in any relevant antitrust market. While Mr. Raycraft and the Complaint list some market shares, some of these shares are "adjusted" using methods not explained or justified and other shares are not supported with the source of the data. For example, the Complaint alleges that VSP has 65 percent of the Insurance Market and "in excess" of 20 percent in the Frames market. The Complaint further asserts that VSP subscribers account for "more than seventy-five percent (75%) of the total amount of [VSP providers'] patient/customer [sic]." Mr. Raycraft reports different totals, suggesting a "conservative" 50.5 percent in an alleged Insurance Market and provides no opinion on the Frames market. Mr. Raycraft suggests that shares within some VSP ECPs are much higher, stating "some ECP's report VSP members comprise 80% or more of their practice." Mr. Raycraft appears to have misunderstood the document he cites for this last piece of data, which merely supports the fact that the author found over 80 percent of his patients were covered by managed care, which can include a wide array of plans.

36.      More importantly, Plaintiff's market definitions are overly narrow. If I instead rely on industry third party data, I find much broader markets and lower VSP shares. In particular, these data indicate that VSP has no more than a 22 percent share of the patient base for optometrists and the unit share of frame sales was only 13 percent for Marchon and less than 2 percent for Altair in 2009. ▬

▬▬▬▬▬▬

▬▬▬▬▬▬

▬.

14

37.   Such low shares offer no support for a finding of monopoly, dominance, or meaningful market power, either in eye care or in frame supply. Without reliable evidence of substantial market power or monopoly power, VSP is not credibly in a position to monopolize or attempt to monopolize the eyewear market.

## V.   Economic Analysis of VSP's Alleged Monopolistic Conduct

38.   I also analyzed Aspex's claim of exclusionary conduct, and the potential impact of that conduct on competition. Aspex offers no reason to believe that VSP's market share in an alleged eye care vision market is sufficient to foreclose Aspex from competing in the Frames market. ███████████████ ███████████████████████████████████████████████████ ███████████████. ECPs commonly accept numerous private insurance plans, public insurance, discount plans, and out-of-pocket payments. Even if it were true that VSP commanded 65 percent of private insurance (the evidence indicates it does not) VSP is in no position to foreclose Aspex because VSP is not dominant among ECPs in vision care funding.

39.   Patients subscribing to other private or public insurance, discount plans, or personal funding that demand Aspex frames will ensure that ECPs carry them. For example, Jobson Research surveyed retailers on how important certain factors were in determining whether its location would carry a new frame brand.

Over 80 percent responded that it was extremely or somewhat important that the brand is well known by customers/patients.

40.    Competition for frames appears vigorous. The AOA reports that the "typical optometrist had an average of 740 frames on display during 2006." One study estimates that these are typically comprised of approximately 29 different frame manufacturers.  There is no reason to presume many ECPs would drop Aspex if these frames are valued by their customers.  Moreover, Plaintiff has argued that it sells a differentiated product covered by two patents.  This would also act to increase demand for Aspex frames, and thus make it more likely that VSP subscribers who value the patented features would continue to demand Aspex frames, and thus providers would continue to carry those frames.

41.    Apparently to provide evidence of foreclosure, Bernard Pedoussaut, management consultant for Aspex Eyewear, indicated that he asked sales managers to determine which customers had reduced or eliminated orders as a result of VSP's plans.[3]  The resulting information suggests that 99 accounts have reduced orders of Aspex frames, are waiting to reorder, or apparently stated that they would "likely" no longer carry the product if the VSP issue was not resolved.[4]

42.    Reviewing the limited and incomplete materials provided to support what Mr. Pedoussaut presents, I find that it is not adequately documented for it to

---

[3] Declaration of Bernard Pedoussaut, April 8, 2010, at ¶27.

[4] Declaration of Bernard Pedoussaut, April 8, 2010, at Exhibits C and D.

be considered reliable in any way. Moreover, the information presented is insufficient to support any claim of VSP's ability to foreclose Aspex's access to ECPs, or even to VSP providers. The total number of accounts Aspex contacted to perform this analysis is far short of the approximately ███████████ in VSPs network. Moreover, a careful reading of the responses makes clear that the customer communications fall short of foreclosure. In sum, reductions in order volumes or indications that the account is waiting until the situation (however defined by Aspex sales persons) is resolved for a small fraction of total providers does not suggest that VSP could successfully foreclose access to all providers choosing to accept VSP.

43.    Equally important, Plaintiff's foreclosure argument focuses narrowly on independent ECPs. However, as Mr. Pedoussaut reports, Aspex obtains 30 percent of its revenues from retailers, not ECPs.[5] Thus, even if it were possible for VSP to foreclose Aspex from part of ECP distribution – and the evidence contradicts this conclusion – Aspex would not be foreclosed from the Frames Market because VSP's alleged de-listing behavior has no effect at all on retail distribution of eyeglass frames.

---

[5] Declaration of Bernard Pedoussaut, April 8, 2010, at ¶13.

## VI.   Economic Implausibility of VSP Monopolizing the Frames Market Based on VSP's Alleged Conduct Against Aspex

44.    I determined that (1) it is economically implausible that VSP would be able to exclude Aspex from the Frames market, and (2) even if Apex were to leave the Frames Market, VSP would not be in a position to monopolize or attempt to monopolize the Frames Market.

45.    Plaintiff purports that VSP's incentive to foreclose Aspex from the Frames Market is to provide a competitive advantage to its own lines of frames, Marchon and Altair.

46.    This allegation does not withstand scrutiny. According to a survey from The Vision Council, an independent third party, as of 2009 Marchon had only 13 percent of the Frames Market, on a unit basis.  Altair, at most, had less than 1.7 percent of the Frames Market.

47.    Nor are Marchon and Altair dominant in comparison to the shares of competing frames manufacturers.  In fact, as of December 2009, Safilo and Luxottica are reported to have 14.4 and 12.9 percent shares (unit basis) of the Frames Market, respectively. Like Altair, Aspex had, at most, less than 1.7 percent of the Frames Market. Therefore, under the most Plaintiff-friendly assumptions consistent with these data, VSP's unit share of the Frames Market would increase at most from 14.7 to 16.4 percent as a result of the alleged attempted monopolization, leading to a VSP frame share only slightly higher than its largest

18

competitor (Safilo) with 14.4 percent of the Frames Market. An increase of less than 2 percent is not sufficient for VSP to monopolize the Frames Market.

48.    To illustrate how little the alleged monopolistic behavior would be likely to result in a monopoly, I assume (contrary to the available evidence) that Aspex would exit the Frames Market as a result of VSP's actions and VSP eyeglass frames brands would take over all of Aspex's sales.

49.    Even under these extreme assumptions, the competitive structure of the Frames Market would be essentially unchanged. Attached as Exhibit B is a summary of the current frames market concentration using the Herfindahl-Hirschman Index ("HHI") based upon VisionWatch survey data. The *Merger Guidelines* currently provide general rules that assist in determining whether changes in market concentration are likely to have anticompetitive effects. The proposed revisions of the *Guidelines* specify that markets with an HHI below 1500 after the change in market concentration are not concentrated, and the change in market concentration is unlikely to have adverse competitive consequences.

50.    As shown in Exhibit B, the HHI for the Frames Market based on unit shares, has an HHI of only 774, with a change in the HHI of only 50. Clearly, the HHI here falls well below the cutoff, indicating an unconcentrated market. The Exhibit also shows that when shares are measured by revenues, even under my aggressive share change assumptions, the change in concentration as measured by the HHI is only 61 and again falls below the cutoff for a concentrated market.

51.    The above analysis, however, makes some aggressive and unrealistic assumptions (such as all of Aspex share going to Marchon/Altair). Regardless, all

evidence suggests that the Frames Market is not concentrated and experiences vigorous competition.  Corroborating this point, data from a 2009 Jobson Research study suggests that while 80 percent of all independent optical retail locations currently stock and dispense Marchon frames (and 41 percent stock Altair frames), they also stock 27 other frame manufacturers (including Aspex), and at least 40 percent of the independent retail locations carry frames from 10 non-VSP frame manufacturers.  ████████████████████████████████████████

████████████████████████████████[6]

---

[6] Declaration of Bernard Pedoussaut, April 8, 2010, at Exhibit B, pages 27-30.

52.    Therefore, these shares and changes in shares fall far below the level where it could be argued that VSP has a likelihood of successful monopolization. Thus, even if VSP desired to and was successful in completely eliminating Aspex in the foreseeable future, and assuming that no other frame maker benefited from Aspex's removal, VSP would not be able to monopolize the Frames Market, nor would it even substantially increase its market power and reduce competition in any meaningful fashion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30ᵗʰ day of April, 2010.

Dr. James Langenfeld

21

# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ASPEX EYEWEAR, INC., | ) | CASE NO. 2:10-CV-00632-MCE-GGH |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| VISION SERVICE PLAN; | ) | |
| MARCHON EYEWEAR, INC., | ) | |
| ALTAIR EYEWEAR, INC., | ) | |
| | ) | |
| Defendants. | ) | |

# Economic Expert Report of James Langenfeld

## April 30, 2010

TABLE OF CONTENTS

I.    Qualifications, Assignment, and Preparation................................................ 1
    A.    Qualifications............................................................................. 1
    B.    Assignment and Preparation ........................................................ 2
    C.    Summary of Opinions/Conclusions ............................................... 3
II.   Background ......................................................................................... 4
    A.    Eye Care ................................................................................. 4
    B.    Eyewear.................................................................................. 9
III.  Plaintiff's Antitrust Claims ................................................................... 9
    A.    Proposed Antitrust Markets ........................................................ 10
    B.    Alleged Antitrust Violations ...................................................... 11
IV.   Economics of Monopolization and Attempted Monopolization......................... 13
V.    Economic Assessment of Plaintiff's Allegations........................................ 15
    A.    Economic Assessment of the Proposed Antitrust Markets ..................... 15
        Eye Care Financing Markets................................................... 18
        Eye Care/Eyewear Submarkets................................................ 21
        Eyewear Market ................................................................ 23
    B.    Economic Assessment of the Alleged Antitrust Violations .................... 25
        Foreclosure....................................................................... 27
        Essential Facilities .............................................................. 31
        Unlawful Leveraging ........................................................... 32
        Harm to Competition ........................................................... 33
VI.   Conclusions........................................................................................ 33

# I.    Qualifications, Assignment, and Preparation

## A.    *Qualifications*

I, Dr. James Langenfeld, am an economist and Director of LECG, an economic consulting firm that specializes in applied microeconomic, intellectual property, and financial analyses. I am also an Adjunct Professor at Loyola Law School in Chicago.

I have held a number of positions involving the analysis of economic issues in antitrust, intellectual property, and damages estimation. These positions include Director for Antitrust (1988-1993) in the Federal Trade Commission's Bureau of Economics, where I supervised 45 Ph.D. economists and made policy recommendations on every antitrust matter considered by the Commission. While in that position, I helped draft policy statements, including the 1992 Department of Justice and FTC *Horizontal Merger Guidelines* and the 1993 *Statements on Antitrust Enforcement Policy in Health Care*. Other positions include Deputy Director for Economic Policy Analysis, and Economic Advisor to an FTC Commissioner and to the FTC's Director of Consumer Protection. As part of my work in these positions, I analyzed and supervised analyses of the sale and business practices of retail eye care. I was also a Senior Economist (1985-1987) at the General Motors Corporation and taught economics at Washington University and the University of Missouri, St. Louis.

As a consulting economist, I have testified as an expert economist many times in federal court on a variety of economic issues, including market definition in the health care industries. As part of this work, I have performed economic analysis of retail eye care and eyewear.

I have published many scholarly writings on economic issues in journals and books, which include the economic analysis of health care issues, antitrust, intellectual property, and relevant market definition. I am also a contributor to the *ABA's Proving Antitrust Damages*.

I received a Ph.D. in economics from Washington University in St. Louis and a B.A. from Georgetown University. I am affiliated with the American Economics Association, the American Society of Health Economists, the American Bar Association,

1

and the Western Economic Association, among other professional societies.  A copy of my curriculum vitae is attached as Appendix 1, which summarizes my experience.

LECG is being compensated at my customary rate of $625 per hour.

## B.   *Assignment and Preparation*

I have been retained on behalf of Vision Service Plan ("VSP") to perform certain economics analyses. In particular, counsel for VSP has requested that I review and analyze the expert Declaration and Report of Mr. John Raycraft and the related antitrust allegations made by Aspex in its motion for preliminary and permanent injunction. The key antitrust claim appears to be that VSP has violated Section 2 of the Sherman Act, alleging "…defendants have monopolized or have attempted to monopolize the Eye Care Insurance Market and Prescription Eyewear Frames Market, and have abused and sought to extend their dominant market position in the Eye Care Insurance Market."[1]  In the context of this claim, Plaintiff claims VSP has engaged in these allegedly monopolistic acts by attempting to exclude and foreclose Aspex from the putative "Eye Wear Frames Market" and submarkets through threatening to "de-list" Aspex from VSP's list of frame providers eligible for full insurance coverage.[2]  Mr. Raycraft has offered opinions related to these allegations, including offering definitions about relevant markets, the share of VSP in the claimed vision insurance market, and that VSP "can effectively bar frame manufacturers such as Aspex from doing business with independent ECPs [eye care professionals]." [3]

In performing my analysis, I have reviewed a number of documents that have been provided by VSP and its subsidiaries, including both VSP information and information from third party sources.  In addition, my staff and I have interviewed several employees of VSP, including one from VSP's Marchon subsidiary.

These sources are those typically used by economists in performing their analyses, and I have used this type of information in performing economic analysis of

---

[1] *Aspex Eyewear, Inc. v. Vision Service Plan, et al.*, Complaint for Injunctive Relief and Damages for: Breach of Contract; Promissory Estoppel; Antitrust Violations; Tortious Interference with Prospective Economic Advantage; False Advertising; and Unfair Business Practices, at ¶92 (Hereafter *Complaint*).
[2] *Complaint*, at ¶83.
[3] Declaration of John A. Raycraft, April 9, 2010, at page 2 (Hereafter *Raycraft Declaration*).

antitrust matters since my employment at the Federal Trade Commission. My findings and opinions are based upon these source materials, in addition to my training and experience as an economist. A list of the materials that I have reviewed to date and the employees that I have interviewed is attached as Appendix 2.

## C.    *Summary of Opinions/Conclusions*

The remainder of this report is organized as follows. Section II presents background material relevant for the discussion of the antitrust allegations. Section III summarizes the allegations, starting with the Plaintiff's proposed antitrust markets and closing with the claims regarding VSP's violation of Section 2 of the Sherman Act. In Section IV, I explain the necessary steps for successfully establishing monopolization claims. Section V presents my detailed rebuttal to the Plaintiff's antitrust allegations, while Section VI concludes my opinions in more detail.

My key findings are summarized below:

- o    The Plaintiff ignores pivotal economic factors that render the proposed market definitions overly narrow. The resulting overly narrow markets could misleadingly suggest VSP and its subsidiaries have monopoly power or sufficient market power to be able to monopolize or attempt to monopolize any relevant market. However, it is clear that VSP does not monopolize any relevant antitrust market.

- o    Even accepting Mr. Raycraft's all Eyeglass Frames Market, VSP's share of this market (on a unit basis) is currently well under 20 percent (combining Marchon and Altair) and Aspex's share is less than 2 percent. Thus, even if (again contrary to my analysis) VSP fully foreclosed Aspex from an Eyeglass Frames Market and all of Aspex's share accrued to a VSP subsidiary, VSP would not obtain a monopoly and the structure of that market would remain essentially unchanged.

- o    It is incorrect for the Plaintiff to assume that should VSP "de-list" Aspex's frames, no consumers would purchase any Aspex frames. While "de-listing" would reduce VSP subscribers' reimbursement amounts for Aspex frames, that coverage would not fall to zero.

3

o  VSP is in no position to foreclose Aspex from the sale of frames. VSP is one of many private insurance companies accepted by the typical ECP; ECPs accept many other forms of payment aside from private insurance, including public insurance, discount plans, and direct consumer payments out-of-pocket.  Moreover, Aspex receives 30 percent of revenues outside of ECPs, from retail chains.

I have reached a number of other conclusions regarding Mr. Raycraft's opinions and Plaintiff's monopolization and attempted monopolization claims, which are described in various sections of this report. In short, neither the Plaintiff's market definitions nor its antitrust allegations survive economic scrutiny.

I retain the right to supplement and/or refine my opinions based on any additional information that I may receive.

## II.    Background

### A.    *Eye Care*

VSP is a national provider of eye care insurance based in Rancho Cordova, California,[4] selling insurance coverage to corporations, groups, and government entities to offer to their employees or members. Vision insurance coverage is only one of several ways that individuals may pay for part of their eye care and eyewear.  In fact, according to the 2008 and 2009 Jobson Consumer Perceptions of Managed Vision Care reports (based upon 2007 and 2008 data, respectively), only 49 percent of survey respondents indicated that they had a vision plan (either through stand-alone vision insurance or as part of an overall health benefits package).[5]

I understand VSP sells insurance for vision care most commonly in one of two ways. The first is for VSP to contract with a company that pays for its employees' coverage as part of the firm's overall package of benefits. The second is for VSP to

---

[4] "VSP Facts," https://www.vsp.com/cms/about/facts.html, accessed April 29, 2010.
[5] 2008 Consumer Perceptions of Managed Vision Care, Jobson Optical Research, at slides 5-6 (Hereafter *Jobson Consumer Perceptions 2008*) and 2009 Consumer Perceptions of Managed Vision Care, Jobson Optical Research, at slides 5-6 (Hereafter *Jobson Consumer Perceptions 2009*).  The surveys were conducted on sample sizes of 9,333 and 7,211 in November-December 2007 and December 2008, respectively.  Survey respondents were derived from the U.S. population, ages 18 and older.

contract with a company that offers the plan to its employees, who can then elect (or not) to join the plan and pay premiums to VSP in exchange for eye care insurance.[6] With this second "voluntary plan," VSP may be one of several eye care plans offered to a given entity's employees.[7] For example, the federal government facilitates the provision of eye care insurance for its employees, giving them a choice of opting into one of three insurance plans.[8] ███████████

████████████████████████████████████████████████

██████████████████████[9] █████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████.[10]

As part of its insurance provision, VSP maintains a network of optometrists ("ODs") and ophthalmologists ("MDs" or "DOs") as approved eye care providers for use by VSP's subscribers. These "in-network" doctors have negotiated contracts with VSP that include the terms of reimbursement for services. VSP's in-network doctors run individual offices or small local/regional chains, and do not work out of vision centers located in large retailers, such as LensCrafters or Walmart.[11] VSP subscribers can also choose to visit doctors that are out-of-network and receive coverage benefits, although the covered amounts are typically less than if the consumer had used an in-network doctor.

████████████████████████████████████████████████

███████████████████████████████████████.[12] According to a survey conducted in 2007 by the American Optometric Association ("AOA"), there were 37,083 full time equivalent optometrists during 2007, and approximately 75 percent of these

---

[6] Employers may or may not subsidize the cost of this insurance.

[7] Interview with Kelly Freitas, Manager of Product Development, VSP.

[8] Interview with Kelly Freitas, Manager of Product Development, VSP.

[9] VSP Federal Plan Enrollment Comparison – Highly Confidential.

[10] VSP Federal Plan Enrollment Comparison – Highly Confidential.

[11] Book1.xls – Highly Confidential.

[12] See VSP & Spectera Plans – Benefit Comparison – Highly Confidential, for provider and office counts. It appears those data may be dated, and as of April 2010, the total provider count (including ODs, DOs, MDs and providers via schools) was 26,680. See VSP Doctor Count by State, April 2010 – Highly Confidential. Plaintiff focuses on the number of doctors within VSP's network. The Complaint claims that VSP is accepted by "nearly 20,000 offices across the country." *Complaint*, at ¶13. The office count, as opposed to the higher individual doctor count, is the more appropriate statistic for this case given the allegations of attempted exclusion from OD offices of Aspex eyewear, as explained below.

5

were in private practice.[13]  Private practice doctors accounted for about 51 percent of total ophthalmic revenues.[14]

As is true with other medical practices, vision care practices typically accept patients participating in numerous competing insurance plans, such as Humana's CompBenefits, UnitedHealth Group's Spectera, Highmark's Davis Vision, and VSP.[15] According to the American Optometric Association, 2005 data suggested that optometrists, on average, belonged to 5.4 HMO vision plans, 5.2 PPO vision plans, and 10.5 other plans.[16] ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████.[17]

VSP benefits cover eye exams for subscribers that visit doctors within the VSP network and offer reduced coverage for subscribers visiting doctors outside of that network. ████████████████████████████████

██████.[18]

VSP faces significant competition when selling its insurance products to companies and individuals from other insurance plans, self-pay, and or discount options. Recent data suggests that VSP actively competes with other insurance companies.



---

[13] Caring for the Eyes of America, a Profile of the Optometric Profession, American Optometric Association, 2008, at page 7 (Hereafter *AOA 2008*). These appear to be the data referenced in Mr. Raycraft's declaration.  See *Raycraft Declaration*, Exhibit 1, at page 5.
[14] *AOA 2008*, at pages 23-24.
[15] Book1.xls – Highly Confidential.
[16] *AOA 2008*, at page 10.
[17] VSP & Spectera Plans – Benefit Comparison – Highly Confidential, VSP & EyeMed Plans – Benefit Comparison - Highly Confidential, and VSP & Davis Plans – Benefit Comparison - Highly Confidential.
[18] See, generally, Plan Reference Chart – Highly Confidential.
[19] VSP 2009 Loss by Competitor, December 31, 2009 – Highly Confidential.
[20] VSP 2009 Loss by Competitor, December 31, 2009 – Highly Confidential.

████████████████████████████████████████████████████████████

██████ The American Optometric Association's 2005 survey shows significant competition among eye care insurers (or other funding providers). These data are consistent with the Third Party/Managed Care Survey relied upon by Mr. Raycraft, which shows that VSP represented only about 18 percent of total optometric revenue (and 22 percent of optometric patients) in 2007.[21]

Many corporations or other entities provide voluntary vision insurance, where individuals can and do choose not to participate in the plan. ██████████████████



███████████████████████ This is not surprising as consumers have several alternatives to purchasing a vision insurance plan through their employer.

One option is the use of discount plans. Discount plans can be purchased individually through an annual membership fee through numerous plans, including AARP, FACTXtra Discount Vision Care Program, Alliance Health Card, EyeBenefits, AmeriPlan Discount Dental & Health Plans, Coast to Coast Vision, Careington Dental & Vision Discount, or Aetna VisionSM Discount program, to name just a few.[24] Some plans are also offered through employers.[25] Discount plans typically allow participants access to a network of eye care providers at fixed, discounted prices. Benefits usually include

---

[21] VSP 2009 Loss by Competitor, December 31, 2009 – Highly Confidential.

[22] *Raycraft Declaration*, Exhibit B and *AOA 2008*, at page 9. Note that the revenue amounts exclude copay amounts, which come from the patients themselves.

[23] Interviews with Kelly Freitas, Manager of Product Development, VSP and Kate Renwick-Espinosa, Vice President of Marketing, VSP.

[24] See "AARP Vision Discount Plan," http://www.aarphealthcare.com/products/vision/, accessed April 22, 2010; "FACTXtra Discount Vision Care Program," http://usafact.org/discountvisioncareplan.html, accessed April 22, 2010; "Alliance Health Card," http://www.alliancehealthcard.com/vision-plan/, accessed April 22, 2010; "EyeBenefits," http://www.eyebenefits.com/Public3/Home/index.cfm, accessed April 22, 2010; "AmeriPlan Discount Dental & Health Plans," http://www.familydentalhealthplans.com/, accessed April 22, 2010; "Coast to Coast Vision," http://www.dentalplans.com/visionplans/coasttocoasthome.asp?plan=816, accessed April 22, 2010; "Careington Dental & Vision Discount," http://www.mydentalandvision.com/, accessed April 22, 2010; "Aetna VisionSM discount program," http://www.aetna.com/plans-services-health-insurance/overview/vision-plans/vision-insurance.html , accessed April 22, 2010.

[25] "SVS Vision Optical Centers," http://www.svsvision.com/corporate-vision/discount.aspx, accessed April 29, 2010.

eye exams and either eyeglasses or a set of contact lenses.[26] While discount plans may not defray as much of the cost of each service as insurance plans, members in general can access them as often as necessary and do not face the annual use restrictions imposed by most insurers.[27]

Another substitute for purchasing private insurance is the use of a flexible spending account or flexible spending arrangement (FSA). These accounts are typically facilitated by employers and offer an easy method for employees to save money pre-taxes for use in covering medical expenses.[28]  In particular, if an employee elects to participate in a medical FSA, she first chooses the annual amount to set aside from her salary.[29] That amount may be spread over the pay periods throughout the year, with equal allotments deducted from the employee's paycheck before taxes are calculated and withdrawn, or may be set up with a single payment.[30]  After an employee incurs a medical expense, such as obtaining a vision exam or purchasing eyeglasses or contact lenses,[31] she fills out a reimbursement form and attaches the appropriate documentation.[32] Thus, FSAs offer consumers a way to set aside funds for medical care expenses – a method which also lowers the consumer's taxes. According to the 2007 and 2008 Jobson Consumer Perceptions survey, 10 and 11 percent of consumers had an FSA, respectively.[33]

Finally, many consumers may elect to pay for vision care on an as-needed basis, with or without making any special arrangements in advance. According to Jobson

---

[26] Madeleine Vessel, with updates by Gary Heiting, "Understanding Provider Networks and Vision Insurance Plans," December 2009, http://www.allaboutvision.com/vision-insurance/provider-networks.htm, accessed April 29, 2010.

[27] "Vision Insurance Information: What It Is and How to Use It," http://www.docshop.com/education/vision/general-eye/vision-insurance/, accessed April 29, 2010.

[28] Publication 969, Health Savings Accounts and Other Tax-Favored Health Plans, Internal Revenue Service, November 25, 2009, at page 15.

[29] Although there are no legal limits on contributions, plan sponsors can set a maximum contribution amount.  See "FACTS from EBRI: Flexible Spending Accounts," Employee Benefit Research Institute, May 2007; Publication 969, Health Savings Accounts and Other Tax-Favored Health Plans, Internal Revenue Service, November 25, 2009, at page 16.

[30] Publication 969, Health Savings Accounts and Other Tax-Favored Health Plans, Internal Revenue Service, November 25, 2009, at pages 15-16.

[31] Publication 969. Health Savings Accounts and Other Tax-Favored Health Plans. Internal Revenue Service, November 25, 2009, at page 16; Publication 502, Medical and Dental Expenses, Internal Revenue Service, November 10, 2009, at pages 5, 8.

[32] Publication 969, Health Savings Accounts and Other Tax-Favored Health Plans, Internal Revenue Service, November 25, 2009, at page 16.

[33] *Jobson Consumer Perceptions 2008 and 2009*, at slide 11.

Consumer Perceptions of Managed Vision Care in 2007 and 2008, just over half of consumers surveyed had no vision coverage.[34] Many of these consumers pay out of pocket for eye care, since a 2009 VisionWatch survey estimates approximately 64 percent of the U.S. adult population uses corrective prescription eyeglasses.[35]

There are many other firms that sell eyewear in competition with VSP and Aspex, as discussed below.

## B.     Eyewear

Aspex is a specialty frame manufacturer specializing in frames that involve technological features, such as magnetic clip-on sunglasses and the accompanying frames that work with those clip-ons, flexible metal frames, and frames whose temple colors can be switched out.[36] I understand Aspex claims to hold an interest in two patents on magnetic clip-on eyeglasses and has sued VSP for infringement of those patents.[37]

In addition to its primary business line of eyecare insurance, VSP owns two subsidiaries, Marchon and Altair, both of which manufacture and distribute eyeglass frames.[38] Both Marchon and Altair distribute frames through independent eye care professionals ("ECPs").[39] In addition, Marchon distributes some optical and numerous sunglass frames through retail outlets and offers a low-priced line through Wal-Mart.[40]

# III.     Plaintiff's Antitrust Claims

Aspex asserts several claims in its Complaint, including the claims of monopolization and attempted monopolization. As noted earlier, I address only the antitrust claims in this rebuttal report. Plaintiff lists several markets it denotes as relevant antitrust markets, and then describes VSP's alleged anticompetitive behaviors in those

---

[34] *Jobson Consumer Perceptions 2008 and 2009*, at slide 6.

[35] VisionWatch Eyeglass Frames, December 2009 at page 2 (Hereafter *VisionWatch*).

[36] See, e.g., "Research and Development," www.aspexeyewear.com, accessed April 20, 2010 and *Complaint*, at ¶¶24-31.

[37] *Complaint*, at ¶¶24-31.  It is my understanding that Aspex has not yet stated which of Marchon's frames it believes infringes.

[38] VSP launched Altair in 1992 and acquired Marchon in 2008; See "VSP History," https://www.vsp.com/cms/about/vsp-history.html, accessed April 29, 2010.

[39] "VSP History," https://www.vsp.com/cms/about/vsp-history.html, accessed April 29, 2010. See also, Declaration of Nancy J. Doig, Exhibit F, at pages 5-6.

[40] Interview with Alex Hartounian, Associate General Counsel, Marchon. See also, Declaration of Nancy J. Doig, Exhibit F, at page 6.

markets. In this section, I summarize both the proposed antitrust markets and the alleged anticompetitive conduct.

## A. Proposed Antitrust Markets

Aspex's Complaint asserts two relevant antitrust markets and two "submarkets." First is the "Eye Care Insurance Market," or simply the "Insurance Market" that consists of "insurance products that cover eye examinations, eye care, eye care medical procedures such as laser and Lasik surgery, and eye wear products such as prescription contact lenses, prescription lenses for glasses, and prescription eyewear frames and related or ancillary products."[41] Aspex's Complaint appears to rely primarily on the Declaration of John Raycraft to support this antitrust market definition.[42]

Aspex's second declared relevant market is the "Prescription Eyewear Frames Market," or simply the "Frames Market." This market consists of "prescription eyewear frames and related or ancillary products."[43] The Complaint also alleges two other Eyewear Frames "submarkets." The "VSP Subscriber Eyewear Frames Submarket" consists of VSP subscribers and their dependents.[44] The "VSP Participating Providers Eyewear Frames Submarket" consists of frames sold to ECPs in VSP's network of participating providers.[45]

Mr. Raycraft discusses an overall eyeglass frames market, but does not offer any division of the proposed eyeglass frames market into submarkets.[46] The Complaint instead relies upon the declaration of Nancy Doig, who does not discuss relevant antitrust markets nor present any market definition analysis, in proposing the two VSP specific submarkets for the overall Frames Market ("VSP Participating Providers Eyewear Frames Submarket" and the "VSP Subscriber Eyewear Frames Submarket").[47] In

---

[41] *Complaint*, at ¶73.  In its Memorandum of Points and Authorities in Support of Plaintiff's Motion for a Preliminary Injunction, at pages 3-4, Aspex also argues that this market excludes other forms of insurance and "discount plans." (Hereafter *Memorandum of Points and Authorities*).

[42] *Raycraft Declaration*, Exhibit 1, at pages 2-4.

[43] *Complaint*, at ¶75.

[44] *Complaint*, at ¶77.

[45] *Complaint*, at ¶77.

[46] Mr. Raycraft posits that while some frame manufacturers "sell extensively to both the retail and independent ECP sub-markets...", "...a large number focus their efforts on one sub-market or the other."*Raycraft Declaration*, Exhibit 1, at page 4.

[47] *Memorandum of Points and Authorities*, at page 20.

addition to proposing an Insurance Market and Eyeglass Frames Market, Mr. Raycraft discusses two submarkets not covered in the Complaint. The first of these is the "Retail Market" for "eyecare/eyewear", which according to Mr. Raycraft is "comprised primarily of large specialty retail chains (e.g., LensCrafters, Pearl Vision, Eye Masters, Sterling Optical, Eye Care Centers of America (ECCA) as well as Big box stores (e.g., Wal-Mart, Costco, Target, etc.)".[48] While no source is offered, Mr. Raycraft states that retail accounts for 40-50 percent of "fully funded eyecare/eyewear benefits".[49]

The second of Mr. Raycraft's submarkets is the "Independent Private Practice (ECP) Market" for "eyecare/eyewear", which is comprised of independent, self-employed optometrists and ophthalmologists. Representing the remainder of his proposed Insurance Market, Mr. Raycraft estimates that the ECP market accounts for 50-60 percent of "fully funded eyecare/eyewear benefits," and he claims VSP has 94 percent of ECPs within its network.[50]

Mr. Raycraft also asserts an additional market, the Discount Market.[51] According to Mr. Raycraft, the Discount Market is "based on selling discount access that will presumably be accepted at various locations with the retail sub-market and the independent ECP sub-market."[52] Mr. Raycraft reports that discounts can range from 15 percent to as high as 60 percent and notes that "[t]his is a hi-growth sub-market due to the relative absence of any barriers to entry."[53]

## B. Alleged Antitrust Violations

After defining the antitrust markets, Plaintiff then alleges that VSP is dominant in these markets and has monopoly power in the named submarkets. In particular, Plaintiff asserts that VSP has "market and monopoly power in such market [the Eye Care

---

[48] *Raycraft Declaration*, Exhibit 1, at page 2.
[49] *Raycraft Declaration*, Exhibit 1, at page 2.
[50] *Raycraft Declaration*, Exhibit 1, at pages 2-3, 5.
[51] As noted above, the *Memorandum of Points and Authorities* argues that the discount plans are not part of the insurance market although it does not explicitly identify this as a separate relevant antitrust market. See page 3.
[52] *Raycraft Declaration*, Exhibit 1, at page 3.
[53] *Raycraft Declaration*, Exhibit 1, at pages 3-4. Mr. Raycraft's source actually states, "[t]he vision benefit offers 10% to 60% discounts on eyewear and eye care at more than 12,000 optical locations throughout the United States." See "Vision," http://www.newbenefits.com/BenefitMoreInfo.aspx?bid=577, accessed April 29, 2010.

Insurance Market] in that it has the power to control prices or exclude competitors…"[54] and that "[d]efendant VSP is the dominant supplier of eye care insurance in the Eye Care Insurance Market… accounting for more than 65 % of all insurance policies written…"[55] This 65 percent is not supported by Mr. Raycraft's calculations. Mr. Raycraft reports that VSP's share of the vision care market is only 22 percent.[56] Mr. Raycraft argues that this figure must be "adjusted" because it "includes those that do not compete with VSP…"[57] but he does not explain why the other entities he lists do not compete with VSP. After making his exclusions, Mr. Raycraft arrives at an adjusted share of 50.5 percent for VSP in vision insurance. While Mr. Raycraft claims that 50.5 percent is "conservative"[58], nowhere in his report or affidavit does he indicate that the share might be as high as 65 percent. Thus, there is no reviewable basis for the 65 percent reported in the Complaint.

The Complaint alleges that VSP is using its market/monopoly power in threatening to "de-list" ("boycott") Aspex from VSP's list of covered frame providers.[59] Mr. Raycraft states that "[i]n order for frame manufacturers to have the ability to sell to VSP providers through VSP they must be on the VSP approved provider list."[60] In support of this assertion, Mr. Raycraft argues that ECPs have limited capacity to display frames in comparison to the big box stores like Wal-Mart. As a result, Mr. Raycraft argues that ECPs "…will fill their frame boards with frames they can get at no cost or frames that are approved for coverage for VSP members, a significant percentage if not the majority of their patient base."[61]

Translating the alleged conduct into antitrust law claims, Plaintiff alleges the following violations of the Sherman Act, Section 2.  The first Section 2 claim is the foreclosure of Aspex from the Frames Market and Submarkets. Namely, the Complaint alleges that "[b]y de-listing Aspex, and/or by threatening to do so, VSP has unnecessarily excluded Aspex from the Submarkets and/or has handicapped Aspex's ability to compete

---

[54] *Complaint* at ¶78.
[55] *Complaint* at ¶78.
[56] *Raycraft Declaration*, Exhibit 1, at page 4.
[57] *Raycraft Declaration*, Exhibit 1, at page 4.
[58] *Raycraft Declaration*, Exhibit 1, at pages 4-5.
[59] *Complaint* at ¶¶80-81.
[60] *Raycraft Declaration*, Exhibit 1, at page 6.
[61] *Raycraft Declaration*, Exhibit 1, at page 6.

in the Submarkets."[62] As a part of this claim, the Complaint also asserts that VSP's delisting "boycott," if successful, "…will use and extend defendant VSP's market and monopoly or near-monopoly position, as an essential facility, into the Prescription Eyewear Frames Market and Submarkets, thereby unlawfully affecting and reducing competition in that market…"[63]

The second Section 2 claim asserted in the Complaint is that "…VSP's conduct also constitutes unlawful monopoly leveraging in that VSP used its monopoly in the Eye Care Insurance market to unnecessarily exclude or handicap Aspex in the related Prescription Eyewear Frames Market and Submarkets."[64]

## IV.    Economics of Monopolization and Attempted Monopolization

An economic evaluation of alleged monopolization or attempted monopolization typically focuses on several key analyses.[65] Economists analyze each of these steps because each step is economically necessary in determining whether an alleged monopolization is likely to harm competition and consumers, and not just reflect one competitor being disadvantaged (as happens in competitive markets).

First, economists typically undertake a study to define the relevant antitrust market(s).[66] As in any monopolization or attempted monopolization case, it is important to determine what is allegedly being monopolized.

Second, economists evaluate the likely impact of the allegedly anticompetitive actions of the monopolist or potential monopolist on competition and competitors in that market.    As a threshold matter, a firm monopolizing or attempting to monopolize a market would in general only be likely to succeed in harming competitors and competition if that firm possesses a significant degree of market power.    Economists

---

[62] *Complaint* at ¶87.
[63] *Complaint* at ¶89.
[64] *Complaint* at ¶91.
[65] See generally W. Kip Viscusi, John M. Vernon, & Joseph E. Harrington, Jr., "Economics of Regulation and Antitrust" (MIT Press, 2001), at pages 257-292 (Hereafter *Viscusi et al. 2001*).
[66] Phillip E. Areeda, John L. Solow, & Herbert Hovenkamp, "Antitrust Law: An Analysis of Antitrust Principles and Their Application, Vol II A 2nd ed." (Aspen Law & Business, 2002), at pages 179-187 (Hereafter *Areeda et al. 2002*).

usually perform a structural analysis of the market to assist in determining market power, and in particular calculate the market share of the firm allegedly attempting to monopolize the relevant markets to see if the share is large enough to be consistent with it possessing sufficient market power.[67]

In addition to establishing whether the firm allegedly monopolizing or attempting to monopolize the market has sufficient market power, economists evaluate the probable effect of the specific allegedly anticompetitive conduct on competitors and competition.[68] For example, economists analyze whether the acts would likely eliminate enough competitors in the foreseeable future so that the firm attempting monopolization would substantially increase its market power and reduce competition.[69] If there is an allegation that the plaintiff competitor of the defendant firm requires access to an "essential facility" controlled by the defendant, then the defendant would need both monopoly power in the alleged essential facility and noticeable market power in the market where the two firms compete.[70] Otherwise it would be unlikely for the defendant to be able to monopolize the market where it competes with the plaintiff, since there would still be many other competitors in that market that would prevent the alleged monopolization or attempt to monopolize.

Third, economists analyze whether there are other market forces (such as barriers to entry or expansion) that would prevent firms not subject to the conduct at issue from becoming more substantial competitors.[71] If so, and the other analyses indicate the conduct would create significantly more market power for the would-be monopolist and reduce competition, then economic analysis would conclude there is a dangerous probability that the allegedly anticompetitive acts would result in or maintain a monopoly.

---

[67] *Areeda et al. 2002*, at pages 187-198.
[68] *Areeda et al. 2002*, at pages 237-240.
[69] *Viscusi et al. 2001*, at page 264.
[70] Robert Pitofsky, "The Essential Facilities Doctrine under United States Antitrust Law," Federal Trade Commission, http://www.ftc.gov/os/comments/intelpropertycomments/pitofskyrobert.pdf.
[71] Dennis W. Carlton & Jeffrey M. Perloff, "Modern Industrial Organization" (Addison Wesley 2005), 351-378.

In the subsequent sections, I examine the economic evidence related to the economic analysis discussed above in order to assess the opinions provided by Mr. Raycraft and the antitrust claims by the Plaintiff.

# V.  Economic Assessment of Plaintiff's Allegations

In this section, I assess whether and to what extent the Plaintiff's proposed market definitions and antitrust claims withstand economic scrutiny. Employing standard economic analyses based on the principles for market definition described in the Department of Justice and Federal Trade Commission *Horizontal Merger Guidelines*, I find that the Plaintiff has ignored pivotal economic factors that render the proposed market definitions overly narrow and thus misleadingly suggesting dominance. Economic analysis of the relevant antitrust markets indicates that VSP is not dominant in any properly defined eye care market or in a Frames Market; it does not possess sufficient market power to exclude or foreclose Aspex from a Frames Market; nor is access to its network of ECPs an essential facility for any frame supplier. Even if we accept Aspex's assertions that it would be entirely excluded from the Frames Market, VSP would still not be able to monopolize that market. Excluding just one firm (Aspex) with very small shares of its own would have no impact on the overall competitive structure of the Frames Market. Finally, again assuming that VSP were successful in completely foreclosing Aspex, VSP still would not be able to monopolize the Frames Market by leveraging any purported market power in an eye care market into the Frames Market.

In short, neither Plaintiff's market definitions nor their antitrust allegations are supported by economic evidence. I begin with an assessment of the markets and then turn to the Sherman Act allegations.

## A. Economic Assessment of the Proposed Antitrust Markets

In this section, I evaluate whether the economic evidence justifies splitting the provision of eye care into four distinct markets, as asserted by Mr. Raycraft: insurance and discount markets, in terms of eye care funding, and independent ECP and retail markets, in terms of eye care providers. I also assess the economic support for separating

15

the eyeglass frames market into VSP subscriber and VSP provider submarkets, as asserted in the Complaint.

As explained above, Mr. Raycraft asserts his market definitions; he does not present any analysis or data to support them. A "market" for antitrust purposes is typically based on standard economic analyses related to the nature of competition, which can often differ from market definitions that are used for different purposes in business and marketing.

In particular, when defining antitrust markets multiple demand and supply factors must be considered, as is well established in U.S. antitrust agencies' publications. For instance, the economics of the *Merger Guidelines'* approach for market definition focuses initially on buyers' demand and the products over which a "hypothetical monopolist" could profitably raise prices to customers.[72] This approach asks whether a small but significant (usually five to ten percent) and non-transitory price increase over existing levels by all firms in the proposed market would be profitable. One key element of this approach is determining the degree customers would switch to other products if prices of the products in a proposed market were raised. That is, for a given set of customers, what are the products they buy and would customers substitute a substantial amount of other products if prices on the products they purchase were increased? If enough customers would switch to other products or locations in response to such a price increase so that the price increase would be unprofitable, then the proposed market being tested could not be profitably monopolized. The relevant market would then need to be expanded to include the products to which the switch was made. If such a price increase would be profitable, then the proposed market is a relevant antitrust market. In essence, this procedure identifies a group of products and geographic areas that could be profitably monopolized. To implement this market definition test, economists and the *Merger Guidelines* begin with the smallest plausible product market, and then tests what would

---

[72] The *Merger Guidelines* define a relevant market as "a product or group of products and a geographic area in which it is produced or sold such that a hypothetical profit-maximizing firm … that was the only present and future producer or seller of those products in that area likely would impose at least a 'small but significant and nontransitory' increase in price." U.S. Department of Justice and the Federal Trade Commission, Horizontal Merger Guidelines, revised April, 8, 1997 at § 1.0 (Hereafter, *Merger Guidelines*). The Merger Guidelines are currently being considered for revision. However, the focus of the economic analyses in the proposed revision is very similar to that in the existing Merger Guidelines, and would not substantively affect my opinions in this case.

16

happen in the event of a small but significant and nontransitory price increase, and expands the market as necessary until reaching the point where such a price increase would be profitable. [73]

Evidence for evaluating tests of this sort and for assessing demand factors can come from a variety of sources, including business documents, third party analyses of the industry, and industry experts, as well as quantitative economic analysis. For example, the evidence on the degree of substitution can be based on evidence on the functional substitutability of the products, evidence of shifts in purchases in response to changes in the relative prices of different products, and evidence of the overall sensitivity of purchases of products in a hypothetical market to price increases on those products. [74]

Mr. Raycraft does not present any of the economic analyses typically presented in antitrust matters necessary to establish a relevant antitrust market. Likewise, while the Complaint lists some factors that are purported to establish the various proposed markets as well-defined relevant markets for antitrust purposes, such as "industry recognition" and "provider or subscriber lock-in," [75] it too fails to present any of the economic analyses typically presented in antitrust matters as necessary to establish a relevant antitrust market. For example, Mr. Raycraft does not perform any market definition analysis similar to the economic analyses in the *Merger Guidelines*, nor does he attempt to measure substitution among alternative products such as estimating cross elasticities of demand. Indeed, the closest that Plaintiff comes to even acknowledging the importance of demand-side substitution is in the *Memorandum of Points*, which again relies on assertions rather than any analysis of data or consumer behavior. Specifically, the

---

[73] The Guidelines indicate that the analysis

> "will begin with each product (narrowly defined) produced or sold by each merging firm and ask what would happen if a hypothetical monopolist of that product imposed at least a 'small but significant and nontransitory' increase in price . . . If, in response to the price increase, the reduction in sales of the product would be large enough that a hypothetical monopolist would not find it profitable to impose such an increase in price, then the Agency will add to the product group the product that is the best substitute for the merging firm's product." § 1.11

[74] See, generally James A. Keyte, "Market Definition and Differentiated Products: The Need for a Workable Standard," *Antitrust Law Journal*, Spring 1995; and Gregory Werden, "Demand Elasticities in Antitrust Analysis" *Antitrust Law Journal*, Vol. 66, 1998, 363-414.

[75] See, e.g., *Complaint* at ¶¶76-77.

*Memorandum* states that "...while vision-related 'discount plans' may apply to similar products and services, such plans are not a *substitute*, or *functionally interchangeable*, for vision insurance because they do not provide any actual insurance."[76] This sort of tautological reasoning completely ignores consumer behavior and preferences. Defining a "vision insurance" market by pointing out other substitutes may not technically be "insurance" is not economic analysis, it is rhetoric. The question is not whether discount plans provide insurance, but rather whether consumers view discount plans and other ways to pay for eye care as substitute means for paying for their eye care in place or in conjunction with insurance.

<u>Eye Care Financing Markets</u>

In relation to eye care, Mr. Raycraft offers no support for his assertion of separate Insurance and Discount Markets. No discussion of consumer preferences is offered and no analysis of consumer substitution is provided. In fact, nothing beyond Mr. Raycraft's industry experience is supplied in support of the proposed eye care market definitions. Interestingly, the Complaint appears to acknowledge the analyses that are typically conducted to establish antitrust markets when discussing the Insurance and Frames Market. For Insurance, the Complaint asserts "...a small, but non-transitory price increase for eye care insurance products and services will not cause a significant number of purchasers of eye care insurance to switch to other forms of insurance or health insurance..."[77] For the Frames Market, the Complaint asserts that "...a small, but non-transitory price increase for prescription eye wear products will not cause a significant number of purchasers of such products to switch to other products that could be substituted for prescription eye wear products..."[78] However, no analysis to show that this is true for Insurance and Frames was conducted in any of the Plaintiff's filings. Nor did the Complaint address the question of whether an increase in the cost of vision insurance would lead consumers to switch to discount plans, FSA accounts, or other forms of payment.

---

[76] *Memorandum of Points*, at page 11.
[77] *Complaint*, at ¶73(f).
[78] *Complaint*, at ¶75(g).

Accordingly, there is no economic analysis that supports the market Mr. Raycraft assumes to estimate his 50.5 percent share of the Eye Care Insurance Market for VSP. First, Mr. Raycraft does not explain why the variety of other entities he lists do not compete with VSP. Namely, he claims that "Medicare HMOs, Medicare fee-for service, Medicaid, other government plans and those that have no third-party coverage" should be excluded from the calculation.[79] The purpose in estimating market share, however, is to obtain an indication of a firm's market power. In this case, the question is whether VSP has sufficient market power over end-user customers or ECPs in the provision of eye care such that VSP could be in a position to "monopolize the Eye Care Insurance and Prescription Eyewear Frames Market."[80] The groups that Mr. Raycraft excludes without any apparent analysis are relevant for this question. For example, to the extent that employees opt out of purchasing VSP's coverage and choose to have no third-party coverage, VSP's influence over ECPs is greatly reduced and it is not an "essential facility". ECPs still serve customers with private insurance, government aid, and no coverage at all, and the ECPs would be able to continue to sell Aspex frames to these customers even if they did not sell frames to VSP members.

According to the American Optometric Association, "[t]he 'typical' OD patient profile consisted of 50.5 percent of patients covered by private plans and 29.1 percent covered by public health plans (e.g., Medicare, Medicaid, other government programs). …One-fifth (20.4 percent) of patients had no third party coverage for OD services."[81] VSP is but one supplier of "private plans," so its share of the average ECP office's patients should be strictly less than 50.5 percent based on American Optometric Association data. Indeed, the smaller the population of eye care patients that VSP serves, the lower its share of ECP revenues will be, and the lower its market power in any eye care financing market will be. Wrongly excluding these other parties from the relevant market definition artificially increases VSP's "market share" and suggests dominance when none exists in practice.

---

[79] *Raycraft Declaration*, Exhibit 1, at page 4.
[80] *Complaint*, at ¶92.
[81] *Raycraft Declaration*, Exhibit B.

A survey of federal employees suggests that they are sensitive to price when considering the enrollment option. ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████ While this study does not indicate whether non-enrollees substituted the offered insurance for another form of insurance, a discount plan, payments through an FSA, or chose to pay out of pocket, another VSP study provides further insight.



████████████████████████████████.[84]  Comments provided to the survey included statements such as the following:

Mr. Raycraft also attempts to use public statements regarding the number of companies covered as evidence of VSP's high market share of eye care (and corroboration for his market definition).   However, the fact that "VSP claims it has

---

[82] Federal Non-Enrollees Vision Study Survey Results, June 6, 2008 – Highly Confidential, at slide 8.
[83] Potential Voluntary Enrollment Study, May 2009 – Highly Confidential, at slide 6.
[84] Potential Voluntary Enrollment Study, May 2009 – Highly Confidential, at slide 7.
[85] Potential Voluntary Enrollment Study, May 2009 – Highly Confidential, at slide 8.
[86] Potential Voluntary Enrollment Study, May 2009 – Highly Confidential, at slide 7.
[87] Potential Voluntary Enrollment Study Final Transcript – Highly Confidential, at pages 22-23.

contracted with over 50% of the companies on the 2007 Fortune 500 list" does not corroborate Mr. Raycraft's market definition, nor his eye care market share estimation.[88]

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████[89] In addition, it is my understanding that companies are free to cancel their contract with VSP at any time – all that is required is that the company pay any outstanding amounts that exceed payments made for coverage provided to date.

Furthermore, even if VSP were the only plan offered through a company or group purchaser, when the plan is voluntary, individual can and do decide not to join an eye care provider's plan. In fact, as reported above, nearly half of all employees eligible for VSP insurance under a voluntary employer plan chose not to subscribe to VSP. Contrary to Mr. Raycraft's and the Complaint's assertions, available evidence indicates that consumers consider a number of options in relation to vision care, including insurance, discount plans, and cash payments. Thus, having a contract in place does not indicate that the employees will necessarily select VSP. The above factors imply that the number of contracts that VSP enters into with companies is not equivalent to VSP's share of eye care patients.

Eye Care/Eyewear Submarkets

Mr. Raycraft does not offer any analysis justifying his submarkets for Retail and ECP eye care/eyewear. The only justification, aside from his industry experience, offered by Mr. Raycraft in support of his submarket divisions is the suggestion that entities operating in the various proposed submarkets are driven by different motivators. For example, Mr. Raycraft asserts retailers offering vision care services are reported to be motivated by their desire to increase the sale of eyewear in a retail environment, while ECP doctors are reported to be driven for "the primary purpose of providing eye health."[90] Mr. Raycraft does not provide any analysis showing the differences in motivation. Moreover, Mr. Raycraft does not offer any explanation for why these particular supply motivations, even if true, would lead to sufficient differentiation as to

---

[88] *Raycraft Declaration*, Exhibit 1, at page 5.
[89] VSP Federal Plan Enrollment Comparison – Highly Confidential.
[90] *Raycraft Declaration*, Exhibit 1 at page 2.

qualify for the purpose of defining a distinct antitrust market or submarkets, especially as he states that, in his experience, "independent ECPs view the retail market as their major competition…"[91]

Particularly important, missing from Mr. Raycraft's discussion of the eye care markets and submarkets is any assessment of customer demand preferences or patterns of substitution among the various eye care options. No explanation is given as to why consumers could not or would not shift between ECP and Retail vision care in the face of a significant and non-transitory increase in prices for frames sold by ECPs. Moreover, as acknowledged by Mr. Raycraft "[v]arious forms of discount plans are marketed and available in both the retail and independent ECP sub-markets."[92] Thus, Mr. Raycraft has not demonstrated that retail centers and ECPs are substitutes in the eyes of consumers and employers, and why they are not part of the same antitrust market.

As VSP has experienced, consumers do consider both retail and independent ECP providers when considering their eye care options. ████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████."[94] According to the VisionWatch 2009 eyeglass frames survey, approximately 50 percent of consumers purchased frames at independent optical retailers, while 42 percent purchased frames from conventional chains, mass merchandisers, or department stores.[95]    Again, Mr. Raycraft presents no analysis or evidence indicating retailers and ECPs do not compete with each other, whereas there is evidence that retailers and ECPs do compete with one another and should be included in the same antitrust market.

---

[91] *Raycraft Declaration*, Exhibit 1 at pages 2-3.
[92] *Raycraft Declaration*, Exhibit 1 at page 3.
[93] Potential Voluntary Enrollment Study, May 2009 – Highly Confidential, at slide 5.
[94] Potential Voluntary Enrollment Study Final Transcript – Highly Confidential, at page 20.
[95] *VisionWatch*, at pages 69-70. The remaining 8 percent indicated "Other/Don't Know."

Eyewear Market

Although Mr. Raycraft asserts a Frames Market that includes all types of eyewear with no submarkets specified, the Complaint alleges two narrow sub-markets. Specifically, the Complaint asserts two relevant submarkets of the overall Frames Market to be "Frames sold to VSP's network of participating providers" and "VSP's insured subscribers and their dependents."[96]

In an attempt to support these two submarkets, the Complaint asserts several "facts".[97] First, it argues that subscribers and providers are "locked in", meaning VSP has monopoly power over these subscriber and providers. Second, it argues that VSP has power over subscribers, because if subscribers do not choose "approved frames" they will lose the value of the insurance they have purchased from VSP. Third, the Complaint alleges that because VSP has minimum stocking requirements of "approved frames" for ECP offices in its network, independent ECPs with limited space will stock only those frames covered by VSP insurance. Fourth, the Complaint points to "financial incentives" that VSP provides for its own frame subsidiary, Altair. These assertions are not supported by the available economic evidence or economic analysis.

As the evidence discussed above in the previous sections, neither end consumers nor independent ECPs are "locked in" to VSP. Consumers have a range of choices, from other vision care insurance providers to discount plans to FSA out of pocket purchases. Indeed, since ECPs typically accept 5.4 HMO vision plans, 5.2 PPO vision plans, and 10.5 other plans[98] in addition to out-of-pocket payments, many consumers would not even need to switch doctors when changing payment options.[99] Similarly, ECPs are not

---

[96] *Complaint*, at ¶77, (a) through (d).
[97] *Complaint*, at ¶77.
[98] *AOA 2008*, at page 10.
[99] In fact, a document relied upon by Mr. Raycraft highlights this fact. An article he cites discusses scripts that could be used for patient recall. "Telephone recall allows you to educate patients about their coverage and update them on which plan the doctor participates in:
  'The doctor recommended we see you this month to check for glaucoma. It has been one year since he or she last examined you. Do you still have Aetna Senior Choice insurance?'

  'No, I'm sorry I can't go to you anymore. I now have Secure Horizons.'

  'The doctor also accepts Secure Horizons patients. I will be happy to arrange an appointment that will be covered by your new insurance plan. Usually, when you have switched plans, you are immediately eligible for an eye examination and a new pair of glasses.'"

locked into VSP because they accept multiple insurance plans, along with many other forms of payment. ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████.[100]

Regarding potentially limited frame board space,[101] ECPs make decisions regarding what to stock based on their expectations of customer preferences.[102] If an OD expects its customers will want to purchase Aspex frames, then he will stock them. The Plaintiff is attempting to argue that once Aspex is de-listed, customers will no longer purchase *any* Aspex frames since they will "lose the value of their insurance", and hence the reduced demand will lead ECPs to stop stocking Aspex frames.[103] This chain of reasoning is based on some extreme assumptions that are not supported by the economic evidence.

First, Plaintiff assumes that VSP subscribers comprise all of an ECP's customer base, however, most ECP's are not exclusive to any particular vision insurer. The typical ECP accepts several insurance plans along with other forms of payment that account for over 80 percent of their customers according to the information provided by Mr. Raycraft.[104] To the extent that Aspex frames are covered by other insurance plans or purchased by customers using discount plans or paying out of pocket, then Aspex frames will still be demanded and hence ECPs will still choose to carry them.

Second, Plaintiff assumes that if VSP were to change the coverage status of Aspex frames, VSP subscribers would no longer purchase any Aspex frames. It is my understanding from VSP, however, that while coverage amounts for Aspex would fall should VSP "de-list" it, the coverage would not drop to zero. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

---

See Peter G. Shaw-McMinn, O.D., "So Many Plans, So Little Time: Coping with Multiple Managed Care Plans," American Optometric Association, at page 7.
[100] *Raycraft Declaration*, Exhibit B; Doctor Satisfaction Survey Data – Highly Confidential.
[101] The AOA reports that the typical ECP offered over 700 frames in 2006. *AOA 2008*, at page 30.
[102] *AOA 2008*, at page 30.
[103] *Complaint*, at ¶77(b).
[104] See *Raycraft Declaration*, Exhibit 1, at page 5.
[105] VSP 2010 Out-of-Network Schedules – Highly Confidential.

There are several reasons why an increase in the out of pocket cost of the frames would not lead to a complete elimination of demand for Aspex frames. For example, Plaintiff has argued that it has a differentiated product that is covered by two patents.[106] If true, then presumably individuals that desire the differentiated features may continue to demand the Aspex products even at the higher cost. It appears that many VSP members are already paying out-of-pocket for frames because in-network coverage does not fully cover the retail cost of many Aspex frames. According to the VisionWatch 2009 survey, 26 percent of frames sold had retail prices over $150, and approximately 65 percent had a retail price between $100 and $149.[107] Thus, many VSP subscribers are already paying money out-of-pocket for frames. A VSP subscriber choosing an Aspex frame in the future would still obtain significant coverage for frame expenses from VSP, and presumably many will continue purchase Aspex frames. Assuming all VSP subscribers would no longer purchase Aspex frames is an unsupported and incorrect assumption, which appears to be the one of the critical unsupported assumptions that form the bases for Aspex's claim of being excluded from the sales of frames.

████████████████████████████████████████████
████████████████████████████████████████████,[108] as well as from discount plans and discount retailer. In the face of substantial reduced coverage and/or higher out-of-pocket expenses, some subscribers would likely switch away from VSP toward one of their many other options. Competition therefore constrains VSP.

The available evidence does not offer support for such narrowly defined submarkets. Neither Mr. Raycraft's Declaration nor the Complaint properly establishes relevant antitrust markets. The markets that are asserted, and not supported with economic evidence, are overly narrow and misleading. The available evidence suggests much broader markets with considerable competition.

## B. Economic Assessment of the Alleged Antitrust Violations

As a threshold matter, a firm monopolizing or attempting to monopolize a market or foreclose a competitor would in general only be likely to succeed in harming

---

[106] *Complaint*, at ¶¶24-31.
[107] See VisionWatch – The Vision Council Member Benefit Reports, December 2009, at page 81.
[108] See, e.g., 2009 VSP Loss by Competitor, December 31, 2009 – Highly Confidential.

competitors and competition if that firm possesses a noticeable degree of market power. Economists usually perform a structural analysis of the market to assist in determining market power. This usually involves calculating the market share of the firm allegedly attempting to monopolize the market (within the appropriately defined relevant market), and then testing whether the share is large enough to be consistent with substantial market power.

Plaintiff's evidence on market power is no better than its evidence on market definition. While Mr. Raycraft and the Complaint list some market shares, some of these shares are "adjusted" using methods not explained or justified and other shares are not supported with the source of the data. For example, the Complaint alleges that VSP has 65 percent of the Insurance Market and "in excess" of 20 percent in the Frames market.[109] The Complaint further asserts that VSP subscribers account for "more than seventy-five percent (75%) of the total amount of [VSP providers'] patient/customer [sic]."[110] Mr. Raycraft reports different totals, suggesting a "conservative" 50.5 percent in the Insurance Market and provides no opinion on the Frames market.[111] Mr. Raycraft suggests that shares within some VSP ECPs are much higher, stating "some ECP's report VSP members comprise 80% or more of their practice."[112] Mr. Raycraft appears to have misunderstood the document he cites for this last piece of data, which merely supports the fact that the author found over 80 percent of his patients were covered by managed care, which can include a wide array of plans.[113] VSP is only one of many competing managed care options.

More importantly, Plaintiff's market definitions are overly narrow. If I instead rely on industry third party data, I find much broader markets and lower VSP shares. In particular, these data indicate that VSP has no more than a 22 percent share of the patient base for optometrists[114] and it appears to have had at most a 15 percent unit share of

---

[109] See *Complaint*, at ¶¶78 and 82.
[110] See *Complaint*, at ¶80.
[111] See *Raycraft Declaration*, Exhibit 1, at pages 4-5.
[112] *Raycraft Declaration*, Exhibit 1, at page 5.
[113] See Peter G. Shaw-McMinn, O.D., "So Many Plans, So Little Time: Coping with Multiple Managed Care Plans," The article makes clear that managed care includes Medicaid, Medicare and HMOs.
[114] *Raycraft Declaration,* at Exhibit B.

frame sales in December 2009.[115] ████████████████████████

████████████████████████████████████████████████████

██████████████████████████████[116] Such low shares offer no support at all for a finding of monopoly, dominance or meaningful market power, either in eye care or in frame supply. Without reliable evidence of substantial market power or monopoly power, VSP is not credibly in a position to monopolize or attempt to monopolize the eyewear market. Nevertheless, I address each of the claimed antitrust violations in turn.

Foreclosure

Plaintiff alleges that VSP is attempting to foreclose Aspex from the Frames Market. Plaintiff alleges:

> "[the threat to de-list], if put into practice, will foreclose a very substantial portion of the Prescription Eyewear Frames Market, and will foreclose virtually all of the Frames Submarkets, for Aspex as a result of defendant VSP's market power and monopoly or near-monopoly position in the Eye Care Insurance Market, and the power that VSP, as an essential resource or facility, can and does exert over its network of approved providers who constitute more than half (and more than ninety percent in some areas) of the channels of distribution for the sale and distribution of Prescription Eyewear Frames products, including plaintiff Aspex's products."[117]

Even if we take the Plaintiff's antitrust markets as given, however, the Complaint offers no explanation for why an alleged 65 percent of the "Insurance Market" is sufficient to enable VSP to foreclose Aspex from the Frames Market.[118] As explained in Section IIA above, VSP does not command the largest fraction of the typical ECP's

---

[115] See *VisionWatch* at slide 58 reporting year end December 2009 shares. I have assumed a maximum share for Altair of 1.7 percent for this calculation, the lowest share reported on the table. It is likely Altair's share is below 1 percent, however, since the table notes that unit shares less than 1 percent are not reported. On a revenue basis, combined shares would appear to be no greater than 19 percent, assuming a 1.6 percent maximum share for Altair. *VisionWatch* at slide 56. The Complaint alleges that VSP (through Altair and Marchon) has "in excess" of 20 percent of the frames market. However, no backup or source is given. See *Complaint*, at ¶82.
[116] Doctor Satisfaction Survey data – Highly Confidential. The survey also reports that 82 percent indicated that VSP accounted for less than 50 percent.
[117] *Complaint*, at ¶83.
[118] *Complaint*, at ¶78.

revenues (accounting for only 18 percent of the typical optometrist's revenues). ECPs commonly accept numerous private insurance plans, public insurance, discount plans, and out of pocket payments. Even if it were true that VSP commanded 65 percent of private vision insurance (the evidence does not support this), VSP is in no position to foreclose Aspex. Patients subscribing to other private or public insurance plans, discount plans, or personal funding, that demand Aspex frames will ensure that ECPs carry them. For example, Jobson Research surveyed retailers on how important certain factors were in determining whether its location would carry a new frame brand. Over 80 percent responded that it was extremely or somewhat important that the brand be well known by customers/patients.[119]

Competition amongst frames manufacturers appears vigorous. The AOA reports that the "typical optometrist had an average of 740 frames on display during 2006"[120] and that these displays are typically comprised of approximately 29 different frame manufacturers.[121] There is reason to presume many ECPs would not drop Aspex if these frames are valued by their customers. In addition, Plaintiff has argued that it sells a differentiated product covered by two patents. Assuming some degree of differentiation in Aspex's frames, at least some VSP subscribers who value Aspex's features would presumably continue to demand Aspex frames, and thus providers would continue to carry those frames.

Apparently to provide evidence of foreclosure, Bernard Pedoussaut, management consultant for Aspex Eyewear, indicated that he asked sales managers to determine which customers had reduced or eliminated orders as a result of VSP's plans.[122] The resulting information suggests that 99 accounts have reduced orders of Aspex frames, are waiting to reorder, or apparently stated that they would "likely" no longer carry the product if the VSP issue was not resolved.[123] As reported by Mr. Pedoussaut, this survey must be considered unreliable since critical underlying information on the survey has not been

---

[119] Viewpoint Frames, Winter 2009 Frames Performance Perception Ratings, at slide 92 (Hereafter *Viewpoint*).
[120] *AOA 2008*, at page 30.
[121] *Viewpoint*, at slide 3.
[122] Declaration of Bernard Pedoussaut, April 8, 2010, at ¶27.
[123] Declaration of Bernard Pedoussaut, April 8, 2010, Exhibits C and D.

produced.[124] Moreover, the information presented is insufficient to support any claim of VSP's ability to foreclose Aspex's access to ECPs, or even to VSP providers. While Aspex has not provided any information as to the total number of accounts they contacted in this analysis, 99 accounts is far short ███████████████████████████████

████████[125] Moreover, a careful reading of the responses makes clear that the customer communications fall short of foreclosure. In sum, reductions in order volumes or indications that the account is waiting until the situation (however defined by Aspex sales persons) is resolved for a small fraction of total providers does not suggest that VSP could successfully foreclose access to all providers choosing to accept VSP insurance.

Equally important, Plaintiff's foreclosure argument focuses narrowly on independent ECPs. However, as Mr. Pedoussaut reports, Aspex obtains 30 percent of its revenues from retailers, not ECPs.[126] Thus, even if it were possible for VSP to foreclose Aspex from a portion of ECP distribution – and the evidence clearly contradicts this conclusion – Aspex would not be foreclosed from the Frames Market because VSP's alleged de-listing behavior should have no effect at all on retail distribution of eyeglass frames.

Plaintiff purports that VSP's incentive to foreclose Aspex from the Frames Market is to provide a competitive advantage to its own lines of frames, Marchon and Altair. This allegation, however, does not withstand scrutiny. According to a survey from the Vision Council, an independent third party, as of 2009 Marchon had only 13 percent of the Frames Market, on a unit basis.[127] Altair, at most, had less than 1.7 percent of the

---

[124] Plaintiff reports a "customer survey." In particular, the Declaration of Mr. Pedoussaut presents Exhibits C and D to establish that VSP's actions in changing the coverage status of Aspex would result in considerable anticompetitive harm to Aspex. It is my understanding that Plaintiff has refused to provide any detail on this survey. Mr. Pedoussaut's declaration provides none of the information required to determine the validity of Aspex's customer survey. For instance, only customer numbers are given; I have no information on which clients were polled and how Aspex chose them. I, therefore, do not know whether the reported clients are representative of all of Aspex's clients in Ohio and Colorado or whether each of the reported customers was indeed called by a VSP representative. Nor do I know whether or not Mr. Pedoussaut chose to report only those customers with negative responses. I do not know what, specifically, the Aspex sales people asked of these clients and whether their inquiries were biased or inflammatory, crafted to elicit responses of the sort reported by Mr. Pedoussaut.

[125] Declaration of Bernard Pedoussaut, April 8, 2010, at ¶17.

[126] Declaration of Bernard Pedoussaut, April 8, 2010, at ¶13.

[127] *VisionWatch*, at page 58. According to information on the Vision Council's website, this survey "is an on-going study of a statistically balanced sample of 100,000 US residents designed to be representative of the U.S. population 18 years of age and older. The structure of the sample is controlled to produce an un-weighted composition that is as close as possible to the desired final mix. Both demographic weights and

Frames Market.[128] Nor are Marchon and Altair dominant in comparison to the shares of competing frame manufacturers. In fact, as of December 2009, Safilo and Luxottica are reported to have had 14.4 and 12.9 percent shares of the Frames Market, respectively. Like Altair, Aspex had, at most, less than 1.7 percent of the Frames Market.[129] Therefore, under the most Plaintiff-friendly assumptions consistent with these data, VSP's share of the Frames Market would increase at most from 14.7 to 16.4 percent as a result of the alleged attempted monopolization, leading to a VSP frame share only slightly higher than its next largest competitor (Safilo) with 14.4 percent of the Frames Market.[130] An increase of less than 2 percent is not sufficient for VSP to monopolize the Frames Market.

To illustrate how unlikely the alleged monopolistic behavior would be to result in a monopoly, assume (contrary to the available evidence) that Aspex would exit the Frames market as a result of VSP's actions and VSP eyeglass frame brands would take over all of Aspex's sales. Even under these extreme assumptions, the competitive structure of the Frames Market would be essentially unchanged. Exhibit B summarizes the current market concentration using the Herfindahl-Hirschman Index ("HHI") based upon the VisionWatch survey information. The *Merger Guidelines* currently provide general rules that assist in determining whether changes in market concentration are likely to have anticompetitive effects. The *Merger Guidelines* currently specify that markets with an HHI below 1000 after the change in market concentration are not concentrated, and the change in market concentration is unlikely to have adverse competitive consequences.[131] As shown in Exhibit B, the HHI change in the Frames

---

psychographic weights are applied to assure that the final sample is statistically stable and representative." See The Vision Council, "The Market Measurement for the Optical Products and Services Markets," http://www.thevisioncouncil.org/members/content_1408.cfm, accessed April 29, 2010.

[128] *VisionWatch*, at page 23. The table indicates that unit shares below 1 percent are not reported, so it is likely that Altair actually has below 1 percent. However, I have conservatively used the lowest share reported in the table for the purposes of this calculation.

[129] *VisionWatch*, at page 58.

[130] *VisionWatch*, at page 58.

[131] *Merger Guidelines*, at §1.51. On April 20, 2010, the Department of Justice ("DOJ") and Federal Trade Commission ("FTC") released proposed revisions to the *Merger Guidelines*. One key proposal is an upward revision of the HHI thresholds. The proposed revised Guidelines state that the agencies will consider markets "unconcentrated" if, after the merger, they have an HHI below 1,500 (an increase from a threshold of 1,000). A market will be considered "highly concentrated" at an HHI of 2,500 or greater (an increase from 1,800). A merger producing (i) an increase of more than 200 HHI points and (ii) a post-

Market is only 50, and the Frames Market based on unit shares has an HHI of only 774. For HHI's above 1000 but below 1800 (after the increase in concentration), when the change in concentration is below 100 the *Merger Guidelines* again find that the change is unlikely to have adverse competitive consequences.[132] The Exhibit also shows that when shares are measured by revenues, even under my aggressive share change assumptions, the change in concentration as measured by the HHI is only 61.

The above analysis makes some aggressive and unrealistic assumptions (such as all of Aspex share going to Marchon/Altair). Regardless, all evidence suggests that the Frames Market is not concentrated and experiences vigorous competition. Corroborating this point, data from Jobson Research from a winter 2009 study suggest that while 80 percent of all independent optical retail locations currently stock and dispense Marchon frames (and 41 percent stock Altair frames), they also stock 27 other frame manufacturers (including Aspex), and at least 40 percent of the independent retail locations carry frames from 10 non-VSP frame manufacturers.[133] ████████████████████████ ████████████████████████████████████████.[134]

Therefore, these shares and changes in shares fall far below the level where it could be argued that VSP has a likelihood of successful monopolization. Thus, even if VSP desired to and was successful in completely eliminating Aspex in the foreseeable future, and assuming that no other frame maker benefited from Aspex's removal, VSP would not be able to monopolize the Frames Market, nor would it even substantially increase its market power and reduce competition in any meaningful fashion.

Essential Facilities

Just as VSP has no ability to exclude Aspex from the Frames Market, neither does its network of ECPs constitute an essential facility capable of preventing Aspex from competing in the marketplace. As is clear from the above discussions, Aspex has access to the Frames Market through multiple channels in addition to VSP subscribers. First, Aspex receives a substantial portion of its revenues, a reported 30 percent, from retail

---

merger HHI exceeding 2,500 will be presumed anticompetitive. See Horizontal Merger Guidelines for Public Comment: Released on April 20, 2010 at http://www.ftc.gov/os/2010/04/100420hmg.pdf.
[132] *Merger Guidelines*, at §1.51.
[133] *Viewpoint*, at slides 3, 6-8.
[134] Declaration of Bernard Pedoussaut, April 8, 2010, Exhibit B, at pages 27-30.

distributors, which are entirely outside of VSP's network of providers, including Big Box retailers like Wal-Mart and Costco.[135]   I understand Aspex achieves this significant revenue generation through the use of only two internal sales people.[136]

Second, within ECP offices, Aspex has many avenues outside of VSP subscribers to reach consumers. As I have already indicated, VSP represents only one of several private insurers accepted by the typical OD. ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████[137]

Third, ECP customers who are subscribers to public insurance plans, discount plans, or consumers who self-insure (through FSA accounts or out-of-pocket payments) represent additional significant channels of access for Aspex's frames sales.

Finally, even if Aspex were removed from VSP's list of in-network covered frame providers, VSP subscribers wanting to purchase Aspex would still receive some reimbursement coverage, as explained above. As such, VSP financing cannot be an essential facility to competing in the frames market and cannot prevent Aspex from successfully selling its eyewear.

Unlawful Leveraging

The final Sherman Act allegation put forward by Plaintiff is that VSP is attempting unlawful leveraging of its monopoly power in the Insurance Market into the Frames Market.  Plaintiff alleges "VSP's conduct also constitutes unlawful monopoly leveraging in that VSP used its monopoly in the Eye Care Insurance market to unnecessarily exclude or handicap Aspex in the related Prescription Eyewear Frames Market and Submarkets... As a result of the foregoing... defendants have monopolized or have attempted to monopolize the Eye Care Insurance Market and Prescription Eyewear Frames Market."[138] As already shown above, insurance cannot be viewed as a separate antitrust market and VSP has no monopoly or market power in the provision of eye care funding. Without market power in a relevant market, VSP has nothing to

---

[135] Declaration of Bernard Pedoussaut, April 8, 2010, at ¶13.
[136] Declaration of Bernard Pedoussaut, April 8, 2010, at ¶13.
[137] 2009 VSP Loss by Competitor, December 31, 2009 – Highly Confidential.
[138] *Complaint*, at ¶¶91-92.

"leverage." Nor would VSP be able to monopolize the Frames Market simply by pushing Aspex out. For all of the reasons explained above related to the other allegations, this allegation fails as well.

Harm to Competition

Antitrust laws are designed to protect competition across a market, not particular competitors, regardless of the particular anticompetitive theory.[139] As the discussion above makes clear, harm to Aspex does not constitute harm to competition in the Frames Market. At a fundamental level, the Plaintiff has not presented any arguments explaining why harm to Aspex, as an individual (and very small) frame provider, would harm competition in the market. Even if Aspex were entirely foreclosed, the competitive landscape would appear to remain largely unchanged in the Frames Market.

# VI.   Conclusions

- o   Plaintiff has alleged monopolization and attempted monopolization by VSP. As a threshold economic matter, the issue is not whether Aspex has been excluded from any particular market, but whether VSP is taking anticompetitive actions that would allow it to monopolize a relevant market. The Plaintiff and its expert Mr. Raycraft present no analysis that suggests excluding Aspex from the Eyewear Frames Market would allow VSP to monopolize the Eye Care Insurance Market, assuming these markets constitute relevant markets. There is also no evidence that, even if Aspex were entirely excluded, VSP's Marchon and Altair would be in a position to monopolize a Prescription Eyewear Frames Market.

- o   Even assuming the specific facts that Plaintiff asserts show Aspex is put at a competitive disadvantage does not result in damage to competition, as opposed to harm to a single (small) competitor. Based on the available information, there is no likelihood that competition in frames would be damaged by just disadvantaging Aspex by reimbursing these frames less.

---

[139] See, e.g., *Viscusi et al. 2001*, at page 67 and Robert Pitofsky, "The Political Content of Antitrust," *University of Pennsylvania Law Review,* 127 (4), 1051-1075, (April 1979), at page 1059.

Altair and Marchon are not dominant and do not have significant market power in the Frames Market. Nor would Aspex be completely excluded from that market because even VSP subscribers would still be able to obtain some reimbursement for Aspex's differentiated frames. Moreover, Aspex still makes substantial sales in what Mr. Raycraft calls the "Retail Market" that includes Pearl, LensCrafters, Wal-mart, and other chains.

o   Plaintiff has not established appropriate antitrust markets. The markets it asserts, without support or evidence, are overly narrow and thus misleadingly imply that VSP is dominant.

o   Mr. Raycraft (nor anyone else working with the Plaintiff) has not conducted the typical economic analyses necessary to determine market share, entry barriers, or a showing that the actions against Aspex would damage market-wide competition.   VSP competes against other vision care insurers, FSAs, discount plans, and even no insurance.   It is true that there is competition at the employer level over vision insurance plans, but employers can choose to include vision insurance or not.   And even in those instances where employers contract with VSP for voluntary vision insurance, employees actively choose whether or not to subscribe to those plans.

o   More reliable third party data indicate VSP is not dominant and does not have meaningful market power on any relevant vision care market or Frames Market.

o   Without significant market power, there can be no abuse of market power. That is, VSP is not capable of monopolizing the Frames Market (through Marchon and Altair). Nor is VSP capable of foreclosing or excluding Aspex from the Frames Market. Nor is access to VSP financing in any way an essential facility. Nor can VSP leverage any position it might have in vision care insurance into market power in the Frames Market simply by eliminating Aspex as a competitor.

o   Even if VSP were to delist Aspex, there is no likelihood of substantial foreclosure in the Frames Market.

_____
James Langenfeld

35

# Appendix 1



# JAMES A. LANGENFELD

LECG, LLC
1603 Orrington Ave, Suite 1500
Evanston, IL 60201

Tel. (847) 424-4108
Fax. (847) 475-1031
Email: JLangenfeld@lecg.com

## EDUCATION

Ph.D., WASHINGTON UNIVERSITY, Economics, 1983

A.B., GEORGETOWN UNIVERSITY, English & Economics, 1971

## PRESENT POSITIONS

LECG, LLC, August 1995 – present
Director

Loyola University Chicago, School of Law, August 2002 – present
Adjunct Professor

## PROFESSIONAL EXPERIENCE

LEXECON INC., January 1994 - August 1995
Vice President

BUREAU OF ECONOMICS, FEDERAL TRADE COMMISSION, 1988-1993
Director for Antitrust

BUREAU OF ECONOMICS, FEDERAL TRADE COMMISSION, 1987-1988
Deputy Director of Economic Policy Analysis, Associate Director for Special Projects

ECONOMICS STAFF, GENERAL MOTORS CORPORATION, 1985-1987
Senior Economist

COMMISSIONER, FEDERAL TRADE COMMISSION, 1984-1985
Economic Advisor

BUREAUS OF COMPETITION AND CONSUMER PROTECTION,
FEDERAL TRADE COMMISSION, 1982-1984
Assistant to the Director

BUREAU OF ECONOMICS, FEDERAL TRADE COMMISSION, 1979-1982
Economist

UNIVERSITY OF MISSOURI, St. Louis, MO, 1978-1979
Instructor

CONFERENCE ON EDUCATION, 1977
Consultant

CENTER FOR THE STUDY OF AMERICAN BUSINESS, ECONOMICS DEPT.,
WASHINGTON UNIVERSITY, 1973-1977
Researcher



UNIVERSITY COLLEGE, WASHINGTON UNIVERSITY, 1974-1976
<u>Instructor</u>

SECTION OF MARKET DEVELOPMENT, AMTRAK, 1972-1973
<u>Statistical Analyst</u>

BUREAU OF ECONOMICS, INTERSTATE COMMERCE COMMISSION, 1971-1972
<u>Economist</u>

**REFEREE**

*Journal of Industrial Economics*

*Economic Inquiry*

*Antitrust Law Journal*

*Global Competition Review*

*Antitrust Bulletin*

*International Journal of the Economics of Business*

**PROFESSIONAL ACTIVITIES**

Advisory Board, American Antitrust Institute

U.S. Advisory Board for the Institute for Consumer Antitrust Studies

Special Correspondent, Economics, *Global Competition Review*

Editorial Board, *International Journal of the Economics of Business*

Sedona Conference Working Group on the Intersection of Patent and Antitrust Laws

American Bar Association, Antitrust, Healthcare and Intellectual Property Sections

American Economic Association

American Health Lawyers Association, Antitrust Practice Group

American Society of Health Economists

Licensing Executives Society

National Association for Business Economics

Southern Economic Association

Western Economic Association International

LECG

## RECENT AWARDS

Adolph G. Abramson Scroll for an outstanding article in *Business Economics*, 2005.

Listed in the Global Competition Review's *The Handbook of Competition Economists* (2005-2007) and the economist section of *An International Who's Who of Competition Lawyers* (1999-2004)

Honoree, Celebration of the Twentieth Anniversary of the 1982 Merger Guidelines, Department of Justice, June 10, 2002

FTC Distinguished Service Award (1993)

SES Meritorious Service Award (1992)

## DISSERTATION

Federal Automobile Regulations, 1983

## PAPERS AND PUBLICATIONS

1) "The Impact of FTC Regulation on the Cigarette Industry and on Cigarette Litigations," *Research in Law and Economics*, (with Brad Noffsker), (Forthcoming)

2) "Chapter 5: Econometrics and Regression Analysis," *Proving Antitrust Damages*, Section of Antitrust Law, American Bar Association, (with Wenqing Li, Greg Leonard and John Morris), (Forthcoming)

3) "Daubert and Other Gatekeeping Challenges of Antitrust Economists," AAI Working Paper #08-06, (with Chris Alexander), March 10, 2010. Available at http://ssrn.com/abstract=1337081

4) "Is GM the New Amtrak?" *The Daily Beast*, June 5, 2009. Available at http://www.thedailybeast.com/blogs-and-stories/2009-06-05/is-gm-the-new-amtrak/

5) "Non-Horizontal Merger Guidelines in the United States and the European Commission: Time for The United States to Catch Up?," *George Mason Law Review*, Vol. 16, No. 4, Summer 2009, 851-884

6) "Needed Revisions of the Non-Horizontal Merger Guidelines," *The Threshold*, Vol. 9, No. 2, Spring 2009, 30-39

7) "Supplemental LECG Report Regarding Proposed Highmark/IBC Consolidation," (with Rob Kneuper), January 30, 2009. Available at http://www.ins.state.pa.us/ins/lib/ins/highmark-ibc/1768.pdf

8) "LECG Report to the Pennsylvania Insurance Department Regarding Proposed Highmark/IBC Consolidation" (with Robert Kneuper), September 10, 2008. Available at http://www.ins.state.pa.us/ins/lib/ins/highmark-ibc/1355.pdf

9) "The Potential Impact of *Twombly* on Antitrust Class Actions," (with Wendy Bloom) *GCP*, Release 2, June 2008

LECG

10) "Natural Experiments," (with Mary Coleman), *Issues in Competition Law and Policy* ABA Section of Antitrust Law, Vol. 1, 2008, 743-772

11) "Price Discrimination and the Cruise Line Industry: Implications for Market Definition, Competition, and Consumer Welfare," (with Wenqing Li), *International Journal of the Economics of Business*, Vol. 15, Issue 1, February 2008, 1-25

12) "Q&A: James Langenfeld on Using Econometrics to Estimate Damages," *LECG Library*, January 2008

13) "The Future of US Federal Antitrust Enforcement: Learning From Past and Current Influences," (with Daniel R. Shulman), *The Sedona Conference Journal*, Vol. 8, Fall 2007, 1-15

14) "Refining the Matsushita Standard and The Role Economics Can Play", (with James Morsch), *Loyola University Chicago Law Journal*, Vol. 38, No. 3, Spring 2007, 507-512

15) "The Economics of High Tech Antitrust," (with Anne Layne-Farrar and Jorge Padilla), *Global Competition Review* Vol. 10, Issue 4, April 2007, 35-38

16) "Book review of Michael Whinston's *Lectures on Antitrust Economics*," *World Competition Law and Economics Review*, Vol. 30, March 2007, 174-175

17) "The FTC's Study of Pharmacy Benefits Managers," (with Robert Maness), *Antitrust Health Care Chronicle*, Vol. 19, No. 4, January 2006, 23-29

18) "The Benefits of Free Trade to U.S. Consumers," (with James Nieberding), *Business Economics*, Vol. 40, July 2005, 41-51

19) "Economic Analyses of Patent Settlement Agreements: The Implementation of Specific Economic Tests, the Evaluation of Dynamic Efficiency, and the Scope of Patent Rights," (with Wenqing Li), *University of San Francisco Law Review*, Vol. 39, Issue 1, Fall 2004, 57-80

20) "Federal Trade Commission Horizontal Restraint Cases: An Update," (with Louis Silvia), *The Antitrust Bulletin*, Vol. XLIX, No.3, Fall 2004, 521-591

21) "How the 'Other Half' Lives: FTC Non-Merger Antitrust Enforcement," *The Antitrust Bulletin*, Vol. XLIX No. 3, Fall 2004, 457-469

22) "Competition, Consumer Awareness, and Distribution in the Contact Lens Industry," (with Robert Maness), June 24, 2004

23) "Elzinga-Hogarty Tests and Alternative Approaches for Market Share Calculations in Hospital Markets," (with H.E. Frech III and R. Forrest McCluer), *Antitrust Law Journal* Vol. 71, No.3, 2004, 921-947

24) "The Cost of PBM "Self-Dealing" Under a Medicare Prescription Drug Benefit," (with Robert Maness), September 2003

LECG

25) "Economic Literature on Price Discrimination and its Application to the Uniform Pricing of Gasoline," (with Wenqing Li and George Schink), *International Journal of the Economics of Business*, Vol. 10, No.2, July 2003, 179-193

26) "Intellectual Property and Agreements to Settle Patent Disputes: The Case of Partial Settlement Agreement with Payments from Branded to Generic Drug Manufacturers," (with Wenqing Li), *Antitrust Law Journal*, Vol. 70, Issue 3, Spring 2003, 777-818

27) "The Impact of Increases in Health Costs on Employment-Based Health Spending, the Number of Uninsured, Employment, and Wages for the United States and Each State 20003 – 2007," (with Richard Shin), prepared for the American Association of Health Plans, January 13, 2003

28) "Oregon's Measure 23 Could Increase State Health Care Expenditures by 30% in 2005," (with Richard Shin), Prepared for the American Association of Health Plans, October 9, 2002

29) "Estimates of Private Employment-Based Insurance Spending In the United States and by State (and the District of Columbia) 2003-2007," (with Richard Shin), Prepared for the American Association of Health Plans, September 24, 2002

30) "Intellectual Property and Antitrust: Steps Toward Striking a Balance," *Case Western Reserve Law Review*, Vol. 52, No. 1, Fall 2001, 91-110

31) "The Perfect Caper? Private Damages and The Microsoft Case," *The George Washington Law Review*, Vol. 69, No. 5/6, October/December 2001, 902-914

32) "Oil Pipelines' Effects on Refined Products Prices," (with Mary Coleman and George Schink), presented Federal Trade Commission conference, Factors that Affect Prices of Refined Petroleum Products, August 2, 2001

33) "The Use and Misuse of Critical Loss Analysis," (with Wenqing Li), *LECG Perspectives*, Vol. 2, No. 3, July 2001

34) "Critical Loss Analysis in Evaluating Mergers," (with Wenqing Li), *Antitrust Bulletin*, Summer 2001, 299-337

35) "Has Microsoft Committed the Perfect Caper?" (with Robert H. Lande), *FTC Watch*, No. 564, April 16, 2001, 11-13

36) "Skepticism Overdone: Managed Care and Costs," (with H.E. Frech III), *Health Affairs*, November/December 2000, Vol. 19, No. 6, 305

37) "Challenges to Managed Care Practices in Healthcare And Their Potential Effects," (with Michaelyn Corbett), *LECG Perspectives*, Vol. 1, No.4, October, 2000

38) "The Economics of Geographic Market Definition in the Sutter Health/Summit Merger," (with Wenqing Li), *Antitrust Health Care Chronicle*, Vol. 14, No.3, Fall 2000, 11-12

39) "Competition in U.S. Healthcare and Its Future," (with Michaelyn Corbett), *Global Competition Review*, August-September, 2000, 29-30

LeCG

40) "Lost Profits from Patent Infringement: The Simulation Approach," (with Gregory J. Werden, and Luke M. Froeb), *International Journal of the Economics of Business*, Vol. 7, No.2, 2000, 213-227

41) "The Impact of Antitrust Exemptions for Health Care Professionals on Health Care Costs," (with H.E. Frech III), Monograph, Prepared for the American Association of Health Plans, June, 2000

42) "Quantitative Techniques in Competition Analysis," (with Tom Hoehn, Melori Meschi and Len Waverman), *Global Competition Review*, October-November, 1999, 27-28

43) "Quantitative Techniques in Competition Analysis," (with Tom Hoehn, Melori Meschi and Len Waverman) Prepared for the U.K. Office of Fair Trading , October, 1999

44) "Recent Trends in Merger Enforcement in the United States: The Increasing Impact of Economic Analysis," (with Robert H. Lande), *Comparative Law*, Vol. 15, 1998, 73-96

45) "The Use of Customer Complaints in Antitrust Analysis," *Government Antitrust Litigation Advisory*, July 1998, 1-5

46) "Antitrust Analysis and Remedies in High-Tech Industries," (with Mary Coleman), *Global Competition Review*, June/July 1998, 42-43

47) ABA Antitrust Section, 1997 Annual Review of Antitrust Law Developments (1998) (Contributor)

48) "Programming Concerns in German Pay-TV," (with Steve Wildman and William Wagener), *The Global Competition Review*, April/May 1998, 47

49) "The Triumph and Failure of the U.S. Merger Guidelines in Litigation," *The Global Competition Review*, December 1997/January 1998, 36-37

50) "Cash Machines: Fee Disclosure and Competition v. Regulation," (with Alan Frankel), *The Global Competition Review*, August/September 1997, 31-32

51) "Sea-Change or Submarkets? Federal Trade Commission v. Staples, Inc. and Office Depot, Inc.," (with Alan Frankel), *The Global Competition Review*, June/July 1997, 29-30

52) "Antitrust and Intellectual Property: Landing on Patent Avenue in the Game of Monopoly," (with James Gould), *IDEA - The Journal of Law and Technology*, Vol. 37, No. 3, 1997, 449-89

53) "From Surrogates to Stories: The Evolution of Federal Merger Policy," (with Robert Lande), *Antitrust*, Spring 1997, 5-9

54) "The Merger Guidelines As Applied," in Malcolm Coate and Andrew Kleit (eds.), The Economics of the Antitrust Process, 1996

55) Proving Antitrust Damages, Section of Antitrust Law, American Bar Association, William Page (ed.), (co-author), 1996, 41-64

LECG

56) "Antitrust and Agreements Among Health Care Providers: 'The Messenger Model,' Efficiencies, and Non-Exclusive Contracts," (with Richard Higgins), Southern Economic Association Meetings, New Orleans, LA, November 19, 1995

57) "Competition Policy and Privatization During the Transition of Central and Eastern Europe to a Market Economy: An Organizational Perspective," (with Dennis Yao), in H. Thomas, D. O'Neal and J. Kelly (eds.), Strategic Renaissance and Business Transformation, 1995, 33-55

58) "Competition Policy and Privatization in a Transition Economy: An Organizational Perspective," (with Dennis Yao), in H.J. Blommestein and B. Steunenberg (eds.) Government and Markets, 1994, 195-218

59) "Economic Theories of the Potential Anticompetitive Impact of Physician Owned Joint Ventures," (with Michael Black), *Antitrust Bulletin*, Summer 1994, 385-414

60) "Entry Under the Merger Guidelines, 1982-1992," (with Malcolm Coate), *Antitrust Bulletin*, Fall 1993, 557-592

61) "The Federal Trade Commission's Horizontal Restraint Cases: An Economic Perspective," (with Louis Silvia), *Antitrust Law Journal*, Spring 1993, 653-697

62) "Frontiers in Monopolization," (with Michael Black), in John Clark and Mary Lou Steptoe (eds.), The Antitrust Division and the FTC Speak on Current Developments in Federal Antitrust Enforcement, 1992 (New York: Practicing Law Institute), Chapter 26, 647-662

63) "Efficiencies in U.S. Merger Analysis," (with Timothy Deyak), *International Merger Law*, September 1992

64) "Analysis of Nonprice Horizontal Restraints," (with Louis Silvia and Terry Winslow), in Von Kalinowski (ed.), Antitrust Counseling and Litigation Techniques (New York: Matthew Bender, 1992), Chapter 19

65) "Liberal Trade and Antitrust Developing Nations," (with Roger Boner), *Regulation*, Spring 1992, 5-6

66) "Hospital Mergers: Do U.S. Antitrust Agencies Follow the Government Guidelines?" (with Paul Pautler), *International Merger Law*, February 1992

67) "Analyzing Agreements Among Competitors: What Does the Future Hold?" (with John Morris), *Antitrust Bulletin*, Fall 1991, 654-679

68) "Is Competition Policy the Last Thing Central and Eastern Europe Need?" (with Marsha Blitzer), *American University Journal of International Law and Policy*, Spring 1991, 347-398

69) "In Defense of Antitrust" (with John Morris), *Regulation*, Spring 1991, 2-4

70) "Antitrust Enforcement: The Gray Area of Agreements Among Competitors," *ATRS Report*, Spring 1991, 3-20

LECG

71) "Economic Analysis in Health Care Antitrust," (with M. Vita, P. Pautler, and L. Miller), *The Journal of Contemporary Health Law and Policy*, Spring 1991, 73-116

72) "The FTC in the 1980's," (with David Scheffman), *Industrial Organization Review*, Summer, 1990, 79-98

73) "Comment on 'Identifying Cartel Policing Under Short-Term Uncertainty'," *Journal of Law and Economics*, October 1989, 77-82

74) "Innovation and U.S. Competition Policy," (with David Scheffman), *Antitrust Bulletin*, Spring 1989, 1-63. Also published in *Aussenwirtschaft* 43 Jahrang (1988), 45-95

75) "The Use of Customer Complaints in Antitrust Analysis," (with Steve Stockum), *ATRS Report*, Spring 1989, 3-13

76) "Regulatory Reform: the Right Way and the Wrong Way," (with Thomas Walton), in Roger Meiners and Bruce Yandle (eds.), Regulation and the Reagan Era: Politics, Bureaucracy and the Public Interest, 1989, 41-71

77) "Attorney Advertising and Competition at the Bar," (with Terry Calvani and Gordon Shuford), *Vanderbilt Law Review*, May 1988, 761-788

78) "How Can Guidelines Reduce the Uncertainties of Antitrust Enforcement?" *Antitrust Bulletin*, Fall 1987, 643-659

79) "Settlement vs. Litigation in Antitrust Enforcement," (with Robert Rogowsky), in Mackay, Miller, and Yandle (eds.), The Federal Trade Commission: The Political Economy of Regulation, 1987, 205-219

80) "Evolution or Revolution--What is the Future of Antitrust?" (with David Scheffman), *Antitrust Bulletin*, Summer 1986, 287-300

81) "The Impact of Antitrust Guidelines on Business," *Contemporary Policy Issues*, July 1986, 22-29

82) "The Effect of Warranties: A Comment," in Ippolito and Scheffman (eds.), Empirical Approaches to Consumer Protection Economics (Washington, D.C.: F.T.C., 1986), 105-108

83) "CAFE Estimation Errors and Their Causes," (with Richard Schneider), presented at the Western Economic Association Meetings, San Francisco, July 1986

84) "Financial Deregulation and Geographic Market Delineation: An Application of the Justice Guidelines to Banking," (with Joseph McKenzie), *Antitrust Bulletin*, Fall 1985, 695-712

85) "An Overview of the Current Debate on Resale Price Maintenance," (with Terry Calvani), *Contemporary Policy Issues*, Spring 1985, 1-8

86) "The Failing Industry Merger Defense: A Market Alternative to MITI," presented at the Southern Economic Association Meetings in Atlanta, Georgia, November 1984

LeCG

87) "Antitrust Enforcement and the Oil Industry: Mergers in an Industry of Giants," presented at the National Association of Attorneys General Oil Merger Seminar, Denver, Colorado, April 24-25, 1984

88) "An Economic Analysis of the Law of Evidence Applied to the Subjective and Objective tests in an Entrapment Defense," (with Richard Higgins), presented at the International Atlantic Economic Conference in San Juan, Puerto Rico, March 1984

89) "The Costs and Benefits of Automobile Emissions Controls and Safety Regulations," Working Paper of the Center for the Study of American Business, Washington University in St. Louis, October 1983, Revised January 1984

90) "Federal Automobile Regulations," presented at the Industrial Organization Society Meetings in San Francisco, California, December 1983

91) "Comment of the Staff of the F.T.C. on Certain Motor Vehicle and Certain Chassis and Bodies Therefore, before the U.S. International Trade Commission, TA-201-44," (co-authored), October 1980

92) "Demand Effects of Automobile Regulations," presented at the Econometric Society Meetings in Atlanta, Georgia, December 1979

93) "The New Wave of Regulation: An Appraisal," *The Alternative: An American Spectator*, March 1976

94) "Motor Carriers of Passengers," ICC Annual Report to Congress, 1972

95) "Empirical Findings on Self Esteem: A Selected Survey," Appendix to P.S.L. Office of Education contract, 1971

96) Assisted Murray L. Weidenbaum on Government Mandated Price Increases (AEI: 1975), "Private Advisors and Government Policymaking," *Policy Analysis*, Winter 1975, "The Advantages of Credit on the Personal Income Tax," *George Washington Law Review*, March 1974

While at the FTC, contributed to the U.S. Department of Justice and Federal Trade Commission 1992 Horizontal Merger Guidelines and the 1993 Statements of Enforcement Policy Relating to Health Care and Antitrust.

## RECENT EXPERT TESTIMONIAL AND RELATED EXPERIENCE

Dr. Langenfeld has made many presentations and submitted reports to the Federal Trade Commission, the Department of Justice, the Department of Defense, the Canadian Bureau of Competition Policy, and the European Commission since leaving the FTC. These presentations involved the petroleum industry, various chemical industries, construction equipment, various consumer products industries, health care markets, medical products and drugs, insurance, computers, communications, defense, aerospace, food processing, baking, chemicals, cigarettes, automobiles and trucks, and various industrial products. They covered economic analyses of mergers, monopolistic practices, collusion, consumer protection, and government regulation. Numerous other presentations at conferences and seminars cover a wide variety of economic, policy, damages, and strategic planning topics.

LeCG

In addition to these presentations, Dr. Langenfeld has extensive experience testifying in federal and state courts, as well as before the European Commission. This formal testimonial and related experience covers antitrust, damages, intellectual property litigation, taxation issues, and economic policy, including:

Testimony of James A. Langenfeld before the Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines Review Project, Chicago, IL, December 10, 2009.

Deposition of James A. Langenfeld in Linda Adams, et al., v. Philip Morris Incorporated, et al., in the Circuit Court of Ohio County, West Virginia, Case No. 00-C-5000, November 23, 2009.

Deposition of James A. Langenfeld in Public Consulting Group, Inc., v. Unisys Corp., before the American Arbitration Association, Case No. 16181Y0000509, October 13, 2009.

Deposition of James A. Langenfeld in All Star Carts and Vehicles, Inc., H.B. Millwork, Inc., and Kussmaul Electronics Company, Inc. v. BFI Canada Income Fund, IESI, Corp., IESI NY, Corp., Winters Bros. Recycling, Corp., Winters Bros. Waste Systems, Inc., Waste Management, Inc., Waste Management of New York, LLC., Allied Waste Industries, Inc., Allied Waste of Long Island, Inc., and Island Waste Services, LTD, in the United States District Court Eastern District of New York, Civil Action Mo. CV 08-1816 (LDW)(AKT), September 18, 2009.

Trial Testimony of James A. Langenfeld in re: Universal Service Fund Telephone Billing Practices, in the United States District Court for the District of Kansas, Case No. 02-1468, November 13, 2008.

Deposition of James A. Langenfeld in City of St. Louis et al., v. American Tobacco Co., et al. in the Circuit Court of the City of St. Louis State of Missouri, No. 982-09652A, May 29, 2008 and July 23, 2008.

Testimony of James A. Langenfeld in Public Informational Hearings of the Pennsylvania Insurance Department in Form A Filings for Highmark, Inc. and Independence Blue Cross, Pittsburgh, July 8, 2008, Harrisburg, July 10, 2008, and Philadelphia, July 15, 2008.

Testimony of James A. Langenfeld before the European Commission in the Hearing in the Airfreight case, Comp39.258, Brussels, Belgium, July 2, 2008.

Testimony of James A. Langenfeld before PA Senate Banking and Insurance Committee in Form A Filings for Highmark, Inc. and Independence Blue Cross, Harrisburg, Pennsylvania, June 11, 2008.

Deposition of James A. Langenfeld in United States Gypsum Company v. Lafarge North America, Inc., Lafarge S.A., et al., in the United States Court for the Northern District of Illinois, Civil Action No. 03-CV-6027, December 7, 2007.

Trial Testimony of James A. Langenfeld in Gray v. Ford Motor Co., Tompkins v. Ford Motor Co., Katz v. Ford Motor Co., Montoya and McLachlan v. Ford Motor Co., in the Superior Court of the State of California County of Sacramento, JCCP Nos. 4266 & 4270, July 10-12, 2007 & September 24, 2007.

Deposition of James A. Langenfeld in <u>The Regents of the University of California, et al., v. Micro Therapeutics, Inc., et al.,</u> in the United States District Court Northern District of California San Jose Division, No. C 03 05669 JW (RS), June 7, 2007.

Deposition of James A. Langenfeld in <u>Gray v. Ford Motor Co., Tompkins v. Ford Motor Co., Katz v. Ford Motor Co., Montoya and McLachlan v. Ford Motor Co.,</u> in the Superior Court of the State of California County of Sacramento, JCCP Nos. 4266 & 4270, August 10 & 11, 2006.

Trial testimony of James A. Langenfeld in <u>PostX Corporation v. Secure Data in Motion, Inc. d/b/a Sigaba, Clearswift Corporation and James Reid and Secure Data in Motion, Inc. d/b/a Sigaba v. PostX Corporation, Mayfield Associates Fund VI, Mayfield Associates Fund IV, L.P., Mayfield IX, L.P., Mayfield XI, Mayfield XI Qualified and Mayfield Principals Fund II,</u> United States District Court Northern District of California, Case No. C02-04483 SI, March 14, 2006.

Deposition of James A. Langenfeld in <u>Thales Avionics, Inc., v. Matsushita Avionics Systems Corporation, Matsushita Electric Industrial Co. Ltd., and DOES 2-100,</u> in the United States District Court Central District of California Southern Division, Case No. SACV 04-454-JVS, January 10, 2006.

Deposition of James A. Langenfeld in <u>Federal Trade Commission v. Aloha Petroleum, Ltd., and Truststreet Properties, Inc.</u> in the United States District Court District of Hawaii, August 19, 2005.

Trial testimony of James A. Langenfeld in <u>Government Employees Medical Plan a/k/a GemPlan, an Idaho legal entity; Board of Trustees of GemPlan, in their capacity as Trustees of the Trust Fund of GemPlan's Self-funded health care plan, and Mutual Insurance Assurance Associates, Inc., an Idaho Corporation v. Regence Blue Shield of Idaho, Inc., and Blue Cross of Idaho Health Services Inc., an Idaho Corporation,</u> in the United States District Court for the District of Idaho, Case No. CIV 04-284-E-BLX, August 5, 2005.

Deposition of James A. Langenfeld in <u>Qualitest Pharmaceuticals, Inc.; v. Usher-Smith Laboratories, Inc.,</u> Case No. 03 C 4734, in the United States District Court for the Northern District of Illinois Eastern Division, May 25, 2005.

Deposition of James A. Langenfeld in <u>PostX Corporation v. Secure Data in Motion, Inc. d/b/a Sigaba, Clearwsift Corporation and James Reid; Counterclaimant Secure Data in Motion, Inc. d/b/a Sigaba v. Post X Corporation, Mayfield Associates Fund VI, Mayfield Associates Fund IV, L.P., Mayfield IX, L.P., Mayfield XI, Mayfield XI Qualified and Mayfield Principals Fund II, Counterdefendants,</u> in the United States District Court Northern District of California, May 19, 2005.

Deposition of James A. Langenfeld in <u>Government Employees Medical Plan a/k/a GemPlan, an Idaho legal entity; Board of Trustees of GemPlan, in their capacity as Trustees of the Trust Fund of GemPlan's Self-funded health care plan, and Mutual Insurance Assurance Associates, Inc., an Idaho Corporation v. Regence Blue Shield of Idaho, Inc., and Blue Cross of Idaho Health Services Inc., an Idaho Corporation,</u> in the United States District Court for the District of Idaho, Case No. CIV 04-284-E-BLX, May 5, 2005.

LECG

Trial Testimony of James A. Langenfeld in United Healthcare of Illinois Inc., and UnitedHealth Networks, Inc., v. Advocate Health Care Network, Advocate Health Partners, Advocate Health and Hospitals Corporation, and Advocate Northside Health Network, in arbitration before the American Arbitration Association, Chicago, IL, April, 25-26, May 9, 2005.

Trial Testimony of James A. Langenfeld in Bernard Walker, individually, and on behalf of those similarly situated, 122 Reef Drive, Ocean City, NJ 08226 v. TAP Pharmaceutical Products, Inc., Abbott Laboratories and Takeda Chemical Industries, Ltd., Docket No. CPML-682-01, in the Superior Court of New Jersey, Law Division, Cape May County, April 21, 2005.

Trial Testimony of James A. Langenfeld in Norma Rose and Leonard Rose v. Brown & Williams, as successor in interest to American Tobacco, Philip Morris, USA, Inc., and R.J. Reynolds Tobacco Company, Index No. 101996/02, Supreme Court of the State of New York, County of New York, March 23, 2005.

Trial Testimony of James A. Langenfeld in United States of America v. Philip Morris Incorporated, et al., Civil Action No. 99-2496 (GK) in the United States District Court for the District of Columbia, March 10, 14, 2005.

Deposition of James A. Langenfeld in United Healthcare of Illinois Inc., and UnitedHealth Networks, Inc., v. Advocate Health Care Network, Advocate Health Partners, Advocate Health and Hospitals Corporation, and Advocate Northside Health Network, in arbitration before the American Arbitration Association, Chicago, IL, February 23, 2005.

Deposition of James A. Langenfeld in Qualitest Pharmaceuticals, Inc. v. Upsher-Smith Laboratories Inc., Case No. 03 C 4734, in the United States District Court for the Northern District of Illinois Eastern Division, February 17, 2005.

Deposition of James A. Langenfeld in Marsh USA Inc.; Marsh & McLennan Companies, Inc. v. James S. Wylie; Palmer & Cay, Inc., Case No. 03-C-3597, in the United States District Court for the Northern District of Illinois, January 27, 2005.

March 2010

# Appendix 2

# Appendix 2
# Materials Cited

| Material Description |
|---|

## Court Documents

*Aspex Eyewear, Inc. v. Vision Service Plan; Marchon Eyewear, Inc.; Altair Eyewear, Inc.,* Complaint for Injunctive Relief and Damages for: Breach of Contract; Promissory Estoppel; Antitrust Violations; Tortious Interference with Prospective Economic Advantage; False Advertising; and Unfair Business Practices, March 17, 2010

*Aspex Eyewear, Inc. v. Vision Service Plan; Marchon Eyewear, Inc.; Altair Eyewear, Inc.,* Memorandum of Points and Authorities in Support of Plaintiff's Motion for a Preliminary Injunction, April 9, 2010

## Declarations

Declaration of John A. Raycraft, April 9, 2010

Raycraft Exhibit I

Raycraft Exhibit B: 2008 Third Party/Managed Care Survey National Highlights

Declaration of Nancy J. Doig in Support of Aspex Eyewear, Inc.'s Motion for Preliminary Injunction, April 9, 2010

Doig Exhibit F: Vision Service Plan, Notice of Material Modification to Plan License Application

Declaration of Bernard Pedoussaut, April 8, 2010

Pedoussaut Exhibit B: VSP Provider Reference Manual

Pedoussaut Exhibit C: VSP Affected Accounts in Territory M09

Pedoussaut Exhibit D: VSP Affected Accounts in Territory G08

## Interviews

Alex Hartounian, Associate General Counsel, Marchon

Dave Plevyak, Corporate Development, VSP

Kate Renwick-Espinosa, Vice President, Marketing, VSP

Kelly Freitas, Manager of Product Development, VSP

Lindsay McCarthy, Corporate Development Analyst, VSP

Lisa Fields, Deputy General Counsel, VSP

## Literature, Articles, & Government Documents

Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization, (Addison Wesley, 2005)

Gregory Werden, "Demand Elasticities in Antitrust Analysis" Antitrust Law Journal, Vol. 66, 1998

James A. Keyte, "Market Definition and Differentiated Products: The Need for a Workable Standard," Antitrust Law Journal, Spring 1995

## Materials Cited

| Material Description |
| --- |
| Peter G. Shaw-McMinn, O.D., "So Many Plans, So Little Time: Coping with Multiple Managed Care Plans." American Optometric Association |
| Phillip E. Areeda, John L. Solow, & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, Vol II A 2nd ed., (Aspen Law & Business, 2002) |
| Publication 502, Medical and Dental Expenses, Internal Revenue Service, November 10, 2009 |
| Publication 969, Health Savings Accounts and Other Tax-Favored Health Plans, Internal Revenue Service, November 25, 2009 |
| Robert Pitofsky, "The Essential Facilities Doctrine Under United States Antitrust Law," Federal Trade Commission, http://www.ftc.gov/os/comments/intelpropertycomments/pitofskyrobert.pdf |
| Robert Pitofsky, "The Political Content of Antitrust," University of Pennsylvania Law Review, 127(4), April 1979 |
| U.S. Department of Justice and the Federal Trade Commision, Horizontal Merger Guidelines For Public Comment, released April 20, 2010 |
| U.S. Department of Justice and the Federal Trade Commission, Horizontal Merger Guidelines, revised April, 8, 1997 |
| W. Kip Viscusi, John M. Vernon, & Joseph E. Harrington, Jr., Economics of Regulation and Antitrust, 3rd. ed. (MIT Press, 2001) |

### Third Party Data

| |
| --- |
| "AARP Vision Discount Plan," http://www.aarphealthcare.com/products/vision/, accessed April 22, 2010 |
| "Aetna VisionSM discount program," http://www.aetna.com/plans-services-health-insurance/overview/vision-plans/vision-insurance.html , accessed April 22, 2010 |
| "Alliance Health Card," http://www.alliancehealthcard.com/vision-plan/, accessed April 22, 2010 |
| "AmeriPlan Discount Dental & Health Plans," http://www.familydentalhealthplans.com/, accessed April 22, 2010 |
| "Careington Dental & Vision Discount," http://www.mydentalandvision.com/, accessed April 22, 2010 |
| "Coast to Coast Vision," http://www.dentalplans.com/visionplans/coasttocoasthome.asp?plan=816, accessed April 22, 2010 |
| "EyeBenefits," http://www.eyebenefits.com/Public3/Home/index.cfm, accessed April 22, 2010 |
| "FACTS from EBRI: Flexible Spending Accounts," Employee Benefit Research Institute, May 2007 |
| "FACTXtra Discount Vision Care Program," http://usafact.org/discountvisioncareplan.html, accessed April 22, 2010 |
| "Research and Development," www.aspexeyewear.com, accessed April 20, 2010. |
| "SVS Vision Optical Centers," http://www.svsvision.com/corporate-vision/discount.aspx, accessed April 29, 2010 |

# Materials Cited

| Material Description |
| --- |
| "Vision Insurance Information: What It Is and How to Use It." http://www.docshop.com/education/vision/general-eye/vision-insurance/, accessed April 29, 2010. |
| "Vision." http://www.newbenefits.com/BenefitMoreInfo.aspx?bid=577, accessed April 29, 2010 |
| "VSP Facts." https://www.vsp.com/cms/about/facts.html, accessed April 28, 2010 |
| "VSP History." https://www.vsp.com/cms/about/vsp-history.html, accessed April 29, 2010. |
| 2008 Consumer Perceptions of Managed Vision Care, Jobson Optical Research |
| 2009 Consumer Perceptions of Managed Vision Care, Jobson Optical Research |
| Caring for the Eyes of America, a Profile of the Optometric Profession, American Optometric Association, 2008 |
| Madeleine Vessel, with updates by Gary Heiting, "Understanding Provider Networks and Vision Insurance Plans," December 2009, http://www.allaboutvision.com/vision-insurance/provider-networks.htm, accessed April 29, 2010. |
| The Vision Council, "The Market Mesaurement for the Optical Products and Services Markets," http://www.thevisioncouncil.org/members/content_1408.cfm, accessed April 29, 2010 |
| ViewPoint Frames, Winter 2009, Frames Performance Perception Rankings |
| VisionWatch - The Vision Council Member Benefits Report, December 2009 |
| VisionWatch Eyeglass Frames, The Vision Council, December 2009 |

*VSP Documents*

| |
| --- |
| Book1.xls - Highly Confidential |
| Doctor Satisfaction Survey data - Highly Confidential |
| Federal Non-Enrollees Vision Study Survey Results, June 6, 2008 - Highly Confidential |
| Plan Reference Chart - Highly Confidential |
| Potential Voluntary Enrollment Study Final Transcript - Highly Confidential |
| Potential Voluntary Enrollment Study: Market Insights, May 2009 - Highly Confidential |
| VSP & Davis Plans - Benefit Comparison - Highly Confidential |
| VSP & EyeMed Plans - Benefit Comparison - Highly Confidential |

## Materials Cited

| Material Description |
| --- |
| VSP & Spectera Plans - Benefit Comparison - Highly Confidential |
| VSP 2009 Loss by Competitor, December 31, 2009 - Highly Confidential |
| VSP 2010 Out of Network Schedules - Highly Confidential |
| VSP Doctor Count by State, April 2010 - Highly Confidential |
| VSP Federal Plan Enrollment Comparison - Highly Confidential |

# Exhibit B

## Exhibit B
## Frames Market HHI - With and Without Aspex in the Market
## 2009

| Company | 2009 Actual | | | | 2009 Hypothetical | | | |
|---|---|---|---|---|---|---|---|---|
| | 2009 Share (Units) [A] | 2009 Share (Revenue) [B] | Sq Share (Units) [C] = (100 x [A])^2 | Sq Share (Rev) [D] = (100 x [B])^2 | 2009 Share (Units) [E] | 2009 Share (Revenue) [F] | Sq Share (Units) [G] = (100 x [E])^2 | Sq Share (Rev) [H] = (100 x [F])^2 |
| Safilo | 14.4% | 19.6% | 207.4 | 384.2 | 14.4% | 19.6% | 207.4 | 384.2 |
| Marchon & Altair combined | 14.7% | 18.9% | 216.1 | 357.2 | 16.4% | 20.5% | 269.0 | 420.3 |
| Luxottica | 12.9% | 16.4% | 166.4 | 269.0 | 12.9% | 16.4% | 166.4 | 269.0 |
| Viva | 5.0% | 4.7% | 25.0 | 22.1 | 5.0% | 4.7% | 25.0 | 22.1 |
| Marcolin/Creative | 3.3% | 4.6% | 10.9 | 21.2 | 3.3% | 4.6% | 10.9 | 21.2 |
| Silhouette | 2.2% | 4.0% | 4.8 | 16.0 | 2.2% | 4.0% | 4.8 | 16.0 |
| Zyloware | 2.8% | 2.5% | 7.8 | 6.3 | 2.8% | 2.5% | 7.8 | 6.3 |
| Charmant | 2.5% | 2.5% | 6.3 | 6.3 | 2.5% | 2.5% | 6.3 | 6.3 |
| Kenmark | 2.5% | 2.4% | 6.3 | 5.8 | 2.5% | 2.4% | 6.3 | 5.8 |
| REM | 2.4% | 2.2% | 5.8 | 4.8 | 2.4% | 2.2% | 5.8 | 4.8 |
| ClearVision | 1.7% | 1.9% | 2.9 | 3.6 | 1.7% | 1.9% | 2.9 | 3.6 |
| Nouveau | 2.0% | 1.6% | 4.0 | 2.6 | 2.0% | 1.6% | 4.0 | 2.6 |
| Eyewear Designs | 1.7% | 1.6% | 2.9 | 2.6 | 1.7% | 1.6% | 2.9 | 2.6 |
| Subtotal | 68.1% | 82.9% | 666.5 | 1,101.4 | 69.8% | 84.5% | 719.3 | 1,164.5 |
| Estimated Aspex share | 1.7% | 1.6% | 2.9 | 2.6 | 0.0% | 0.0% | | |
| Assumed Aspex share | | | | | 0.0% | 0.0% | | |
| Remaining firms' combined share | 30.2% | 15.5% | | | 30.2% | 15.5% | | |
| Assumed shares held by each remaining firm | 1.7% | 1.6% | | | 1.7% | 1.6% | | |
| Estimated minimum number of remaining firms | 18 | 10 | 54.2 | 27.4 | 18 | 10 | 54.2 | 27.4 |
| HHI | | | 723.6 | 1,131.3 | | | 773.6 | 1,191.8 |
| Change in HHI | | | | | | | 50.0 | 60.5 |

### Notes:

Marchon and Altair are combined since they are both subsidiaries of VSP. Because Aspex, Altair and others' market shares are too small to be reported, these shares are conservatively estimated to be equal to the smallest market share listed. The hypothetical computations assume that Aspex's entire share is distributed to Marchon and Altair.

HHI is a commonly accepted measure of market concentration and is calculated as the sum of the squared market shares of all participants. Economists often consider a market with an HHI of less than 1,000 to be a competitive marketplace; 1,000-1,800 to be a moderately concentrated marketplace; and 1,800 or greater to be highly concentrated. As a general rule, mergers that increase the HHI by more than 100 points in concentrated markets typically raise antitrust concerns. Recently, the FTC and DOJ have proposed upward revisions to the threshold HHI measures whereby the agencies will consider markets "unconcentrated" if, after the merger, they have a HHI below 1,500.

### Sources:

VisionWatch Eyeglass Frames, The Vision Council, December 2009, at pages 56 and 58; U.S. Department of Justice and the Federal Trade Commission, Horizontal Merger Guidelines, revised April, 8, 1997, at §1.51, at http://www.usdoj.gov/atr/public/guidelines/hmg.pdf; U.S. Department of Justice and the Federal Trade Commission, Horizontal Merger Guidelines For Public Comment, released April 20, 2010, at page 19 at http://www.ftc.gov/os/2010/04/100420hmg.pdf