KATHLEEN E. FINNERTY - (SBN 157638) (Counsel for Service)
NANCY J. DOIG - (SBN 226593)
GREENBERG TRAURIG, LLP
1201 K Street, Suite 1100
Sacramento, CA  95814-3938
Telephone:  (916) 442-1111
Facsimile:  (916) 448-1709
finnertyk@gtlaw.com, doign@gtlaw.com

Attorneys for Plaintiff
ASPEX EYEWEAR, INC.

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASPEX EYEWEAR, INC. | CASE NO.  2:10-CV-00632-JAM-GGH |
| Plaintiff, | **ASPEX'S REPLY MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| VISION SERVICE PLAN; MARCHON EYEWEAR, INC.; ALTAIR EYEWEAR, INC. | **DATE:**  May 19, 2010 |
| | **TIME:**     9:30 a.m. |
| Defendants. | **CTRM:**  6 |
| | **JUDGE:**  Hon. John A. Mendez |

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................................. 1

**I.    ASPEX HAS SATISFIED THE TRADITIONAL STANDARD FOR A  PRELIMINARY INJUNCTION** ...................................... 2

    **A.    Absent An Injunction, Aspex Will Be Irreparably Harmed** ........................................................................... 2

    **B.    The Balance Of Hardships And Public Interest Both Favor Aspex** ......................................................... 4

    **C.    Aspex Is Likely To Succeed On The Merits** .................................... 4

**II.    VSP DOES NOT HAVE THE "RIGHT" TO USE ITS MASSIVE  NETWORK TO DESTROY ASPEX** ...................... 5

**III.    ASPEX WILL PREVAIL ON ITS UCL CLAIM** ................................. 7

    **A.    VSP's Conduct Is Unlawful Under The Hobbs Act** .................. 7

    **B.    VSP's Conduct Is Unfair Pursuant To *Cel-Tech* Because VSP's Conduct Violates The "Spirit" of the Antitrust Laws, or Represents an "Incipient" Antitrust Violation** ............... 8

    **C.    VSP's Conduct Is Unlawful Because it Violates California's  False Advertising Law, § 17500 and the Knox-Keene Act** ...................................................................... 11

**IV.    ASPEX WILL PREVAIL ON ITS TORTIOUS INTERFERENCE CLAIM** ........................................................ 12

**V.    ASPEX WILL PREVAIL ON ITS CONTRACT OR PROMISSORY ESTOPPEL CLAIMS** ...................................... 12

**VI.    THE "SUBSTANTIAL QUESTIONS GOING TO THE MERITS" STANDARD SURVIVES *WINTER V. NRDC* -- THUS, ASPEX WOULD BE ENTITLED TO RELIEF EVEN IF IT HAD NOT SHOWN A LIKELIHOOD OF SUCCESS** .................. 14

**CONCLUSION** ................................................................................................ 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ASPEX'S REPLY MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*All World Prof'l Travel Servs., Inc. v. American Airlines, Inc.*,
   282 F. Supp. 2d 1161 (C.D. Cal. 2003) ............................................................... 8

*Am. Trucking Assoc., Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009) ............................................................................ 15

*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*,
   47 Cal. App. 4th 464 (1996) ............................................................................... 12

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985) ............................................................................................. 9

*Bezverkhov v. Cal-Western Conveyance Corp.*,
   2009 WL 4895581 (E.D. Cal. Dec. 11, 2009) .................................................... 14

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
   140 F.3d 494 (3d Cir. 1998) ................................................................................. 7

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) ......................................................................................... 8

*Chavez v. Whirlpool Corp.*,
   93 Cal. App. 4th 363 (2001) ............................................................................... 10

*Dhillan v. City of Stockton*,
   2009 WL 1617779 (E.D. Cal. June 9, 2009) ...................................................... 14

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ............................................................................................. 9

*Intergraph Corp. v. Intel Corp.*,
   195 F.3d 1346 (Fed. Cir. 1999) ........................................................................... 6

*Managed Care Litigation*,
   135 F. Supp. 2d 1253 (S.D. Fla. 2001) ............................................................... 7

*Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*,
   271 F.3d 825 (9th Cir. 2001) .......................................................................... 6, 12

*Monsanto Co. v. Spray Rite Serv. Corp.*,
   465 U.S. 752 (1984) ........................................................................................... 10

*Okwuosa v. City of Elk Grove*,
   2009 WL 1658110 (E.D. Cal. June 12, 2009) .................................................... 14

*Peoples Choice Wireless, Inc. v. Verizon Wireless*,
   131 Cal. App. 4th 656 (2d Dist. 2005) ................................................................ 9

*Pinkser v. Pacific Coast Society of Orthodontists*,
   12 Cal. 3d 541 (1974) ......................................................................................... 14

*Potvin v. Metro. Life Ins. Co.*,
   22 Cal. 4th 1060 (2000) ...................................................................................... 13

*Protectmarriage.com v. Bowen*,
   599 F. Supp. 2d 1197 (E.D. Cal. 2009) .............................................................. 14

*Rent-A-Center Inc. v. Canyon Television & Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991) ............................................................................... 3

*Samura v. Kaiser Foundation Health Plan*,
    17 Cal. App. 4th 1284 (1993) ..................................................................... 12

*Sterr v. Baptista*,
    2010 WL 500464 (E.D. Cal. Feb. 8, 2010) ................................................. 14

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ..................................................................... 15

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*,
    240 F.3d 832 (9th Cir. 2001) ................................................................... 3, 4

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919) ..................................................................................... 10

*United States v. Culbert*,
    435 U.S. 371 (1978) ....................................................................................... 7

*People v. Lynam*,
    253 Cal. App. 2d 959 (1967) ....................................................................... 11

*Winter. Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund*,
    598 F.3d 30 (2d Cir. 2010) ......................................................................... 14

**California Statutes**

California Bus. & Prof. Code § 17500 ................................................................ 11

California Health & Safety Code § 1360 ........................................................... 12

ASPEX'S REPLY MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF ITS MOTION FOR A
PRELIMINARY INJUNCTION

**PRELIMINARY STATEMENT**

VSP is the largest vision insurer in the United States, insuring 55 million people and contracting with 26,000 eye doctors.  Through its Altair and Marchon subsidiaries, VSP is also the number one eyewear frames manufacturer on a unit basis.  Thus, VSP has the market position and incentive to alter both consumers' and providers' eyewear purchasing decisions.

This action seeks to prevent VSP from *using* that market position and economic power to appropriate the intellectual property and/or market share of Aspex, its small, yet innovative rival.  Specifically, VSP made clear to Aspex -- and *admits* in its opposing papers -- that if Aspex insisted upon enforcing its patent rights, VSP would destroy it.

VSP's defense rests on the notion that it has the unfettered right to stop doing business with Aspex.  However, that is not what this case is about.  Rather, this case is about VSP using its economic power and market position *to cause other persons and entities* (its 55 million subscribers and 26,000 providers) not to do business with Aspex by making it more costly and administratively burdensome for these *other parties* to purchase Aspex's eyewear.  Unlike the cases it relies upon, VSP does not and has never purchased Aspex's products.  Rather, it is the gatekeeper for eyewear purchases made by its subscribers and providers.  Thus, VSP is not refusing to deal with Aspex -- it is changing the terms of vision coverage for one in six Americans and one in two eye doctors to cause *them* not to buy Aspex products.  VSP's *admitted* goal is to destroy Aspex's revenue stream.  In sum, given that the keystone of its defense in this case is inapposite, none of the cases VSP cites authorizes such unfair and illegal conduct.  As shown below, such conduct *is* illegal and unfair under the established authority relied on by VSP.

Aspex has also shown that it would be irreparably harmed in the absence of an injunction, a fact confirmed by VSP's admitted motive to harm Aspex, and the significant harm Aspex has suffered by the *mere threat* of de-listing VSP projected into the marketplace.  Conversely, VSP would not be harmed or burdened in the slightest degree by an injunction.

VSP's conduct is illegal and should be enjoined pending trial on the merits.

ASPEX'S REPLY MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF ITS MOTION FOR A
PRELIMINARY INJUNCTION

# I.    ASPEX HAS SATISFIED THE TRADITIONAL STANDARD FOR A PRELIMINARY INJUNCTION

Contrary to what VSP argues, Aspex has satisfied the traditional, four-factor test for injunctive relief.  *See Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 374 (2008) (summarizing the four-factor test)[1]. While, as shown below, the alternate standard for the first prong ("substantial questions going to the merits") is still viable, in its opening Memorandum Aspex set forth and supported the following elements:

- Aspex is likely to succeed on the merits of its claims (Points III.A.3 through III.E);

- Absent an injunction, Aspex is likely to suffer immediate and irreparable harm (Point III.A.1);

- The balance of hardships tips in Aspex's favor (Point III.A.2); and

- An injunction would further the public interest (*id.*).

## A.    Absent An Injunction, Aspex Will Be Irreparably Harmed

Aspex demonstrated in its moving papers that irreparable harm is imminent and likely. VSP's papers confirm, rather than refute, this showing.[2]

As Aspex demonstrated in its opening Memorandum, the threatened loss of a substantial portion of its revenue constitutes irreparable harm, particularly where, as here, it is likely to be severe enough to put it out of business.  (Aspex Mem. 6:24-7:11.)  An injunction in such circumstances is justified because the resulting economic losses cannot be readily

---

[1]    Contrary to VSP's suggestion, Aspex does not seek an affirmative injunction that is subject to heightened scrutiny.  Instead, the injunction sought by Aspex falls within the scope of a prohibitory injunction.  The Ninth Circuit's distinction between a "mandatory injunction" that seeks to compel the defendant to perform an affirmative act and a "prohibitory injunction" that seeks to preserve the status quo pending trial supports this interpretation. *Stanley v. Univ. of S. Cal.,* 13 F.3d 1313, 1320 (9th Cir. 1994) (holding that an injunction compelling a university to employ a basketball coach at a higher salary than she received under her expired contract does not preserve the status quo).  A prohibitory injunction preserves the *status quo*, which is precisely what Aspex seeks from the court, by seeking a court order that permits the parties to continue to do business the way they have for the past 15-plus years.

[2]    Contrary to what defendant Marchon suggests, Aspex is not seeking relief based on a mere "possibility" of irreparable harm.  (Marchon Opp'n 3:22-4:21.)  It has argued – and shown – that such harm is *likely* to occur in the absence of an injunction.

ASPEX'S REPLY MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

1   calculated, and because the loss of goodwill, customers, staff, and advertising value cannot be

2   redressed by either a legal or equitable ruling after trial.  *See Stuhlbarg Int'l Sales Co., Inc. v.*

3   *John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) (loss of goodwill cannot be

4   readily calculated); *Rent-A-Center Inc. v. Canyon Television & Appliance Rental, Inc.*, 944

5   F.2d 597, 603 (9th Cir. 1991) (loss of goodwill and value of advertising expenditures cannot be

6   redressed by a legal or equitable ruling after trial).  VSP's words and deeds show that Aspex

7   does, indeed, face such a likelihood.  First, VSP admits that the sole purpose of de-listing

8   Aspex is to render Aspex financially unable to continue litigating against Altair and Marchon.

9   (Brooks Decl. ¶ 10 (Aspex uses revenue from frame sales to finance underlying patent

10  litigations); VSP Mem. 1 (same); VSP Mem. 8 (purpose of de-listing Aspex is for VSP to

11  "avoid[] the steep burden of defending itself").)  Second, although VSP speculates that the

12  harm *might* be mitigated by its members' use of "out-of-network" benefits, VSP is well aware

13  that over 95% of its members stay *in network.*  (Doig Decl. Ex. H.)  VSP knows that "out-of-

14  network" status is a powerful deterrent (*i.e.*, over 95% effective) for its 55 million members to

15  purchase anything "out of network."

16      VSP also knows that its 26,000 eye doctor providers necessarily carry *limited*

17  inventories and that most will not carry eyewear that is "out of network" for VSP even though

18  such eyewear may be "in network" for other insurance companies -- because VSP subscribers

19  represent such a large fraction of the customers for such providers.  Indeed, VSP's campaign

20  against Aspex has been aimed at VSP's *providers* (not its subscribers) precisely because VSP

21  knows that those providers will stop -- and in many cases, on VSP's *mere threat*, have already

22  stopped -- carrying Aspex's eyewear in response.  VSP knows that inducing VSP's providers to

23  cease carrying Aspex products will entirely eliminate *any* possibility of the providers'

24  customers having the option of buying Aspex's eyewear, whether "in network" or not under

25  VSP's insurance plan, or under any other insurance company's plan.  VSP's documents also

26  show that the decision to de-list Aspex was made by VSP's *most senior executives*.  They

27  would not have made the decision unless they believed it would have the intended result --

28

ASPEX'S REPLY MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF ITS MOTION FOR A
PRELIMINARY INJUNCTION

1  namely, to deny Aspex the revenue it needs to stay in business and to continue enforcing its

2  patent rights.

3        Aspex also identified other forms of irreparable harm, such as the loss of established

4  customers and its network of sales representatives.  (Pedoussaut Decl. ¶¶ 33-37.)  VSP fails to

5  show that these effects would not be felt.  Indeed, VSP essentially concedes the point by

6  implying that Aspex should adapt to this devastation by modifying its business model to sell to

7  large chains (currently just 30% of Aspex's business), which would render Aspex's established

8  customer relationships and network of sales representatives *useless*.  (VSP Mem. 19;

9  Langenfeld Decl. ¶¶ 24, 43.)    Aspex's loss of its customer relationships and goodwill, and

10 sales representatives, constitutes irreparable harm.  *See, e.g., Stuhlbarg Int'l Sales Co. v. John

11 D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001); *see also* Aspex Mem. 6-8, and cases cited

12 therein, supporting injunctive relief.

13        **B.    The Balance Of Hardships And Public Interest Both Favor Aspex**

14        The balance of hardships tips so sharply in Aspex's favor that VSP has not even

15 suggested that it would be harmed by the issuance of an injunction.  It argues only that an

16 injunction would "permit [Aspex] to keep suing VSP" -- in other words, Aspex would remain

17 solvent and thus be able to enforce its patent rights.  (VSP Mem. 30.)  Merely stating VSP's

18 position refutes it -- indeed, it demonstrates that VSP's *stated goal* is to inflict so much harm on

19 Aspex that Aspex will not be able to continue its patent litigations against Altair and Marchon.

20        VSP's argument as to the public interest is equally frivolous, as it has not even

21 attempted to show that an injunction would "weld together" Aspex and VSP.  (VSP Mem. 30.)

22 Meanwhile, without an injunction, the public (*i.e.*, the one in six Americans covered by VSP)

23 will have their benefits reduced without their consent -- plus, non-VSP members of the public

24 will be prejudiced when treated by VSP doctors who stop carrying Aspex's products.

25        **C.    Aspex Is Likely To Succeed On The Merits**

26        As explained in Aspex's opening memorandum and below, Aspex is likely to succeed

27 on the merits of its claims.

28

ASPEX'S REPLY MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF ITS MOTION FOR A
PRELIMINARY INJUNCTION

## II.    VSP DOES NOT HAVE THE "RIGHT" TO USE ITS MASSIVE NETWORK TO DESTROY ASPEX

The thrust of VSP's opposition is that it has an unqualified "right to stop doing business with a company that sues it."[3]  (VSP Mem. 6.)  VSP considers this right to be an all-purpose defense to Aspex's claims.  (VSP Mem. at Point I.A (discussing alleged "right" without reference to any particular claim).)  In making this argument, VSP mischaracterizes both the facts and the law.

As to the facts, VSP is wrong for two main reasons.  First, VSP has not merely refused to do business with a litigation adversary.  Rather, VSP is exploiting its unique position to *induce others* (26,000 doctors and 55 million members) to stop purchasing Aspex's products.  Moreover, if, as VSP states, it had simply wanted to cut ties with Aspex, then it would have simply made a clean break.  Instead, VSP has acted like a classic extortionist.  Initially, it wielded its power using *threats* and *demonstrations* of the harm it could cause.  Then, after Aspex held its ground, VSP increased the pressure.  In late 2009 and early 2010, VSP started calling *key* Aspex customers advising of its intent to "discontinue [its] business relationship with Aspex and … no longer provide standard frame coverage for frames manufactured or distributed by Aspex."  (Brooks Decl. Exs. A and B.)  VSP's manifest intent was to *threaten* Aspex by *demonstrating* to Aspex that VSP could ruin its business.  This is confirmed by the fact that VSP readily agreed to stop calling Aspex's customers when it believed that it was about to get what it wanted from Aspex during the parties' "settlement negotiations."  VSP has cited no case holding that such extortionate conduct is lawful.

Second, while VSP contends it is merely altering its relationship with Aspex, in reality VSP is changing its relationships with its 26,000 doctors and 55 million members.  (VSP Mem. 28:13-14 (admitting its conduct would constitute a "change in coverage"); Brooks Decl. Exs. A and B (entitled "Frame Coverage Changes").)  VSP does not purchase products from Aspex.

---

[3]    VSP also contends throughout its papers that Aspex's patent claims are not well-founded.  This is utterly false.  As shown in the accompanying Supplemental Declaration of José Peña, Esq., Aspex has had tremendous success enforcing its patent rights in both the District Courts and the Federal Circuit.

1    Instead, VSP reimburses members and/or doctors for *their* purchases of such products.  While

2    VSP argues that these purchases might continue, it will be done in a way that, as "out of

3    network," is administratively *inconvenient* and economically *less valuable* to VSP's 55 million

4    members -- all for the purpose of starving Aspex of revenue it needs to pay its legal fees in the

5    patent litigation.  Once again, VSP has cited no case authorizing such deliberate destruction of

6    another business.

7         The cases VSP relies upon are inapposite on these and other grounds.  For example,

8    VSP relies mainly upon *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir. 1999), in

9    which Intel severed its close-knit business relationship with Intergraph following Intergraph's

10   filing of a patent infringement suit against Intel.  Prior to the lawsuit, Intergraph had obtained

11   extensive *special* treatment from Intel, including technical assistance, sharing of trade secrets,

12   pre-release access to new products, and other special benefits.  *Id.* at 1354-56.  Intel withdrew

13   the *special* treatment, but "did not refuse to deal with Intergraph as with any regular

14   customer[.]"  The Ninth Circuit reversed the preliminary injunction which had required Intel to

15   restore these benefits.  *Id.* at 1367.  By contrast, VSP seeks to alter the purchasing decisions of

16   *others* (its 55 million subscribers and 26,000 providers), and the injunction would merely

17   require VSP to treat Aspex like every other frames manufacturer, as it has for the past 15 years.

18   Aspex does not seek any *special* treatment comparable to the close-knit relationship at issue in

19   *Intergraph.*

20        VSP also relies heavily on *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271

21   F.3d 825 (9th Cir. 2001), a case that does not support its position because *Marin Tug* only

22   addressed intentional interference with economic advantage -- it says nothing about antitrust or

23   any of the other claims at issue here.  *Id.* at 830.  The Court merely held that, to establish the

24   "wrongfulness" element of that tort, a plaintiff must show a violation of another law.  *Id.* at

25   831.  Aspex complied by expressly pleading independent wrongfulness in its complaint.

26   (Compl., Count IV, ¶ 100(d)-(g).)  Aspex also has shown a likelihood of success as to that

27   element because it will show that VSP violated the Hobbs Act, the Knox-Keene Act, etc.

28

ASPEX'S REPLY MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF ITS MOTION FOR A
PRELIMINARY INJUNCTION

1   Thus, *Marin Tug* does not assist VSP in any way, much less provide it with an all-purpose

2   defense to Aspex's claims.

3   **III.     ASPEX WILL PREVAIL ON ITS UCL CLAIM**

4          **A.     VSP's Conduct Is Unlawful Under The Hobbs Act**

5          VSP's arguments concerning the Hobbs Act are meritless.  VSP's memorandum ignores

6   the text of the Hobbs Act, implicitly conceding that its conduct violates the statutory language,

7   focusing instead on what VSP erroneously says was the original purpose of the Act.  This is

8   fatal.  While VSP tries to suggest that only racketeers and mobsters can violate the statute (VSP

9   Mem. 24-25), the Supreme Court has expressly rejected that argument.  *See United States v.*

10  *Culbert*, 435 U.S. 371 (1978).  In *Culbert*, the Court held that the statute is to be applied

11  literally, and explained that "Congress intended to make criminal all conduct within the reach

12  of the statutory language." *Id.* at 380.  VSP's conduct is illegal regardless of the fact that it is a

13  corporation and not a classic mobster.

14         VSP's effort to distinguish between extorting Aspex's intellectual property rights and

15  "illegal kickbacks" (*i.e.*, cash payments) is equally futile.  (VSP Mem. 24-25 (asserting various

16  cases are not on point because they involved illegal kickbacks).)  Under the Hobbs Act it makes

17  no difference whether the extortionist seeks cash, personal property, or *intangible property*

18  such as Aspex's patent rights.  Courts have consistently rejected attempts to distinguish

19  between extortionate demands for "kickbacks" and demands for other types of property.[4]  (*See*

20  Aspex Mem. 21, and cases cited therein.)

21         Finally, VSP's reliance on *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d

22  494 (3d Cir. 1998), is also misplaced.  In that case, "the Third Circuit joined two other circuits

23  in expanding the 'claim of right' defense[5] to extortion[.]" *In re Managed Care Litigation*, 135

24

25  ───────────────────

    [4]       VSP also provides a Declaration from its General Counsel, Thomas Fessler, the apparent goal of which is
26  to create an irrelevant dispute regarding the *terms* of VSP's extortionate "settlement" offers.  In any event, Mr.
    Fessler's recitation is factually incorrect.  (See the accompanying Supplemental Declaration of José Peña, Esq.)

27  [5]       Notably, VSP does not even discuss the "claim of right" defense in its Memorandum, nor does it provide
28  evidence sufficient to invoke it.

───────────────────
7
ASPEX'S REPLY MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF ITS MOTION FOR A
PRELIMINARY INJUNCTION

1   F. Supp. 2d 1253, 1264 (S.D. Fla. 2001) (discussing *Brokerage Concepts*).  Although it does

2   not appear the Ninth Circuit has adopted this rule, the case is distinguishable on several

3   grounds.  For example, it does not apply where the defendant has "power akin to a monopoly,

4   something more than mere hard bargaining on a level playing field."  *Id.* at 1264; *see also All*

5   *World Prof'l Travel Servs., Inc. v. American Airlines, Inc.*, 282 F. Supp. 2d 1161, 1175 (C.D.

6   Cal. 2003) (distinguishing *Brokerage Concepts* on several grounds including plaintiff's

7   allegation that defendant inflicted severe economic harm and interfered with plaintiff's right to

8   make decisions free of coercion, which "is a protectable property right").    Thus,

9   notwithstanding the Third Circuit's decision in *Brokerage Concepts*, "threats by one business

10  entity to cause economic harm to another if the latter does not agree to a change in a contract or

11  a kickback is enough to establish the predicate offense of extortion or attempted extortion."  *All*

12  *World, supra,* 282 F. Supp. 2d at 1176 (internal citations omitted).

13          In short, VSP has violated the Hobbs Act.  This establishes "unlawful" conduct under

14  the UCL, and alone is sufficient to establish a likelihood of success on the merits, justifying

15  issuance of a preliminary injunction.

16          **B.    VSP's Conduct Is Unfair Pursuant To *Cel-Tech* Because VSP's Conduct
                    Violates The "Spirit" of the Antitrust Laws, or Represents an "Incipient"
17                  Antitrust Violation**

18          Aspex also is likely to prevail on its UCL claim based on its antitrust allegations even if

19  it cannot, at this juncture of the case -- *i.e.*, without discovery of defendants' market shares --

20  prove a full-blown antitrust violation.  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel.*

21  *Co.*, 20 Cal. 4th 163, 181 (1999).  In *Cel-Tech*, the court defined the boundary of acceptable

22  marketplace conduct by holding that conduct is "unfair" if it "threatens an incipient violation of

23  an antitrust law, or violates the policy or spirit of one of those laws because its effects are

24  comparable to or the same as a violation of the law, or otherwise significantly threatens or

25  harms competition."  *Id.* at 187.

26          Nevertheless, in opposing the motion, VSP focuses on whether Aspex has established

27  every detail needed to support a full-blown violation of the Sherman Act (*e.g.*, sufficient

28  market share, or a dangerous probability of acquiring such share, and *quantifiable* harm to

8

ASPEX'S REPLY MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF ITS MOTION FOR A
PRELIMINARY INJUNCTION

1    consumers).  (VSP Mem. 15-22.)   Not surprisingly, without discovery, Aspex might not yet be

2    in a position to establish all of the elements of a § 2 claim, which typically require detailed

3    analysis by economists after the underlying data is obtained in fact discovery.  However, Aspex

4    *has* shown that VSP's conduct falls within the framework and spirit of Sherman Act § 2 claims

5    under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), *Eastman Kodak*

6    *Co. v. Image Tech. Servs., Inc*., 504 U.S. 451 (1992), and the Ninth Circuit's leveraging and

7    essential facilities cases law.

8         VSP is engaging in precisely the type of conduct that the Supreme Court condemned in

9    *Aspen Skiing*.  The Court's language fits VSP's conduct like a glove.  VSP is using its market

10   position in the eye care insurance market in a "deliberate effort to discourage its customers

11   from doing business with its smaller rival."  472 U.S. at 601-609.  As in *Aspen Skiing* and

12   *Kodak*, VSP's decision is an *abrupt change* in a long-standing arrangement and the change is

13   "motivated entirely by a decision to avoid providing any benefit to [Aspex]."  *Id.*  VSP

14   concedes that, like the defendant in *Aspen Skiing*, it is "not motivated by efficiency concerns."

15   *Id.*; *see also* VSP Mem. 3 (admitting de-listing "would not be in VSP's interest if Aspex were

16   not so litigious").  Thus, VSP's conduct falls within the spirit of *Aspen Skiing*, *Kodak*, and the

17   Ninth Circuit leveraging and essential facilities cases.  (Aspex. Mem. 11-19.)

18        VSP's conduct also represents an incipient violation -- meaning conduct that, if allowed

19   to continue on a larger scale, would be a full-blown antitrust violation.  In this regard, VSP's

20   actions here are likely to affect competitors' future behavior, in that competitors in the frames

21   market will be deterred from competing aggressively with VSP's subsidiaries because they

22   know that VSP can and will strike back by de-listing them.  Further, consumers suffer injury

23   because they are unable to purchase the eyewear of their choice on an equal basis.

24        In *Peoples Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656 (2d Dist.

25   2005), the Court held that, in assessing whether conduct falls within the "spirit" of the antitrust

26   laws under *Cel-Tech*, a court should "look at the alleged impact of the conduct," "consider any

27   countervailing policies," and consider whether the conduct is, "too far removed from

28   cognizable antitrust evils to warrant intervention by a California court."  *Id.* at 668.  In *Peoples*

9

1    *Choice*, the Court rejected the claim because of the "countervailing consideration" that

2    sanctioning the defendant's marketplace conduct at issue would "dampen its competitive zeal"

3    and, thus, be inconsistent with the policy and spirit of the antitrust laws. *Id.* at 671-72. VSP

4    cannot make a similar argument because it admits that its conduct here, unlike the conduct at

5    issue in *Peoples Choice*, is *not motivated by competitive zeal or efficiency concerns*. (VSP

6    Mem. 3 (admitting that de-listing "would not be in VSP's economic interest if Aspex were not

7    so litigious").)

8        VSP also relies upon *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363 (2001), but

9    ignores the fact that *Chavez* arose under § 1, which is concerned exclusively with cooperative

10    or joint conduct among competitors through a "contract, combination or conspiracy." In

11    *Chavez*, the plaintiff failed to allege conspiratorial conduct, and its allegations fell *precisely*

12    within a long-established safe harbor from § 1 liability. *Id.* at 373 ("The facts pleaded…allege

13    only behavior permitted under the *Colgate* doctrine.") (citing *United States v. Colgate & Co.*,

14    250 U.S. 300 (1919) and *Monsanto Co. v. Spray Rite Serv. Corp.*, 465 U.S. 752 (1984)). By

15    alleging only conduct that fell within the *Colgate* safe harbor, the plaintiff failed to plead an

16    "incipient" antitrust violation or any violation of the "policy or spirit" of the antitrust laws.

17        In sum, *Chavez* has no application to this case regarding the policy and spirit of § 2 of

18    the Sherman Act under *Aspen Skiing* and *Kodak*, because VSP is acting to disadvantage and

19    potentially exclude a competitor by withholding longstanding access to a key marketplace that

20    is required to compete. Given the foregoing, even if not a full-blown violation, VSP's conduct

21    plainly violates the spirit of the antitrust laws and/or presents an incipient violation; thus, the

22    technical antitrust arguments raised by VSP are not relevant to the analysis under *Cel-Tech*.

23    Moreover, in the present case there is marketplace consumer injury -- VSP's 55 million

24    subscribers will be denied the ability to freely choose Aspex's eyewear on the same economic

25    basis as other eyewear brands (such as Altair and Marchon), thereby affecting *inter*brand

26    competitive choices. Indeed, given that VSP's conduct will cause many, if not most of VSP's

27    26,000 providers to stop carrying Aspex's brand, it will also eliminate the ability of *non*-VSP

28    subscribers to choose Aspex on an *inter*brand competitive basis.

1
2

**C.    VSP's Conduct Is Unlawful Because it Violates California's
False Advertising Law, § 17500 and the Knox-Keene Act**

3    Aspex has shown that it is likely to prevail on its UCL claim based on VSP's violation

4    of California's False Advertising Law (Cal. Bus. & Prof. Code § 17500).  In its Opposition,

5    VSP argues that its advertisements are not false or misleading because it has not *yet* changed its

6    reimbursement for Aspex frames.  This does not pass muster.  VSP's policyholders purchase

7    *forward-looking* coverage for fixed time periods of a year or more.  Thus, an insured or group

8    that purchased a policy during the first quarter of 2010 would have seen advertisements stating

9    that *any* frames would be covered, even though VSP had decided, by late 2009, that it would

10   not provide such benefits.  If VSP has its way, it will alter the terms of that coverage on June 1,

11   2010 -- contrary to its insureds' expectations.  Thus, the insureds will have been deceived with

12   respect to the remaining months of their policy period.   What is more, because VSP made this

13   decision in late 2009, it has publicly disseminated statements concerning its services with no

14   intent to actually offer such services as advertised, in clear violation of California's False

15   Advertising law.  *See* Cal. Bus. & Prof. Code § 17500.

16   Also transparent is VSP's argument that out-of-network coverage is still available for

17   Aspex frames.  VSP knows that such coverage is far less valuable to its insureds.  By de-listing

18   Aspex, its frames will be reimbursed at a lower level, and the consumer must contact VSP to

19   "submit for out-of-network frame reimbursement" rather than allow the ECPs to process the

20   claim transaction, which is itself a significant sales barrier.  Unsurprisingly, over 95% of

21   members stay "in network."   (Doig Decl. Ex. H.)   This renders VSP's advertisements

22   significantly untrue and misleading.  Indeed, "[i]rrespective of its truth or falsity, any statement

23   which is deceptive or merely misleading" even without an intent to deceive, violates the False

24   Advertising Law.  *People v. Lynam*, 253 Cal. App. 2d 959, 966 (1967).

25   Aspex has also shown a likely violation of the Knox-Keene Act, for much the same

26   reason.  VSP serially contacted key ECPs in VSP's network, first telling them that Aspex

27   would be de-listed on April 1, then May 1, and now June 1, 2010.  Yet, *e.g.*, page 9 of the EOC

28   for VSP's Healthy Families Program, which provides coverage to nearly 2 million children

1  whose parents are at or near the Federal Poverty Limit,  provides:  "A frame allowance of $75

2  will be provided by the vision plan.  The frame benefit provides a subscriber choice to select a

3  frame that fits their lifestyle…."  (Doig Decl. Ex. A at 9.)  There is no indication that certain

4  manufacturers are or will be excluded.  Importantly, the EOC is effective from *July 1, 2009 to*

5  *June 30, 2010*.  (*Id.*)  Given that VSP represented that it would de-list Aspex on various dates

6  within that policy period, that EOC, and countless others like it, are deceptive and misleading.

7  Because conduct that is unlawful under Cal. Health & Safety Code § 1360 can serve as a

8  predicate for a UCL violation, *see Samura v. Kaiser Foundation Health Plan*, 17 Cal. App. 4th

9  1284, 1300 (1993), Aspex is likely to prevail on its UCL claim on this basis as well.

10  **IV.    ASPEX WILL PREVAIL ON ITS TORTIOUS INTERFERENCE CLAIM**

11       VSP's  argument  as  to  this  claim  cites  to  *Marin  Tug  &  Barge,  Inc.  v.  Westport*

12  *Petroleum, Inc.*, 271 F.3d 825, 831 (9th Cir. 2001) (holding that to establish "wrongfulness" a

13  plaintiff must plead and prove a violation of some other law) and *Arntz Contracting Co. v. St.*

14  *Paul Fire & Marine Ins. Co.*, 47 Cal. App. 4th 464, 478-79 (1996) (same).  As explained in

15  Point II, *supra*, Aspex complied with *Marin Tug* by pleading independent wrongfulness

16  (Compl. ¶ 100(d)-(g)), and is likely to prove same at trial.

17

18  **V.    ASPEX WILL PREVAIL ON ITS CONTRACT OR PROMISSORY ESTOPPEL CLAIMS**

19       VSP opposes Aspex's contract and promissory estoppel claims on the same ground --

20  that it has the alleged right to terminate Aspex at any time and for any reason.[6]  VSP is wrong.

21       First, VSP omitted any such right from its application.  The VSP Frame Reimbursement

22  Application sets forth two criteria for eligibility -- an agreement to have Aspex's products and

23  prices listed in the *Frames* catalog, and an agreement by Aspex to limit its prices not to exceed

24  a 25% mark-up over the doctor's typical acquisition price. (Brooks Decl. Ex. C.).  In exchange,

25  VSP obtains an audit right and expands the depth of its provider network.   The application

26

27  ────────────────

[6]       VSP also argues a lack of reliance. However, Aspex previously showed that it built a sales and marketing
28  strategy and a network of sales representatives in reliance upon continued status as an approved frames vendor.
(Pedoussaut Decl. ¶¶ 9-12; Aspex Mem. 10.)

ASPEX'S REPLY MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF ITS MOTION FOR A
PRELIMINARY INJUNCTION

1    does not state it is terminable at VSP's whim -- much less that termination will be used by VSP

2    to intentionally harm a vendor, as VSP has admitted is its purpose here.  To the contrary, the

3    application demonstrates an intention that the status would be perpetual, unless Aspex failed to

4    meet the articulated criteria:  The Application states "I understand that if at any time my frame

5    company/line(s) *do not meet these criteria*, it may result in my frame company/line(s) being

6    non-reimbursable by VSP."  (*Id.* (emphasis added).)    VSP does not dispute that Aspex

7    continues to meet these criteria, nor that VSP has *never* terminated a frames vendor for

8    anything other than these criteria.  Accordingly, the VSP Frame Reimbursement Application,

9    conduct of the parties, and the surrounding circumstances clearly illustrate and support the

10   existence of an implied-in-fact contract between Aspex and VSP that would not be terminated

11   without reasonable notice and cause, neither of which exist here.

12        Second, Aspex is entitled to the common law right of fair procedure before it is de-

13   listed by VSP as a "gatekeeper."  *See Potvin v. Metro. Life Ins. Co.*, 22 Cal. 4th 1060, 1066

14   (2000) (when right exists, termination must be both procedurally and substantively fair).  In

15   *Potvin*, a health insurer removed a physician from its preferred provider list under a

16   termination-without-cause provision in the provider agreement.  The physician sued for breach

17   of contract and violation of the common-law right to fair procedure.  *Id.* at 1064-65.  The

18   Supreme Court recognized that certain gatekeeper institutions and enterprises have judicially

19   imposed obligations to the public and the individuals with whom they deal, reflecting the role

20   which they have assumed, apart from and in some cases despite the existence of an express

21   contract.  *Id*. at 1069-73.

22        In this case, VSP, an insurance company with fiduciary obligations to its insureds,

23   maintains a list of authorized frame vendors.  Like the insurer in *Potvin*, VSP wields sufficient

24   power to significantly impair a frames vendor from participating in the ECP market, thereby

25   affecting an important, substantial economic interest.  *Id.* at 1072 ("[l]oss of income may be

26   relevant in determining whether removal from an insurer's [approved list] significantly impairs

27   the ability…" to compete).  The removal of a vendor such as Aspex from the approved list

28   affects the public, who has an interest in the relationships among the insurer, the providers, and

1  the vendors of eye-care products.  The de-listing of any vendor, including Aspex, results in a

2  decrease of choices available to the consumer.   In this manner, VSP acts as a gatekeeper over

3  the right of vendors to be available to ECPs' patients.  Thus, VSP does not have an unfettered

4  right to terminate Aspex; to the contrary, it must show such termination meets the procedural

5  and substantive standards of *Potvin*.   *Id.* (quoting *Pinkser v. Pacific Coast Society of*

6  *Orthodontists*, 12 Cal. 3d 541 (1974)).

7  **VI.    THE "SUBSTANTIAL QUESTIONS GOING TO THE MERITS" STANDARD**
   **SURVIVES *WINTER V. NRDC* -- THUS, ASPEX WOULD BE ENTITLED TO**
8  **RELIEF EVEN IF IT HAD NOT SHOWN A LIKELIHOOD OF SUCCESS**

9          An injunction should also issue under the alternate test for injunctive relief because, *in*

10 *addition to showing irreparable harm* (satisfying the Supreme Court's *Winter* decision), Aspex

11 has shown that (i) the balance of hardships tips sharply in favor of Aspex, and (ii) Aspex has

12 raised "substantial questions going to the merits."   (Aspex Mem. 27 (discussing "serious

13 questions" prong of alternate test).)

14         Although VSP contends that the "sliding scale" standard was overruled in *Winter*, 129

15 S. Ct. 365 (2008), it misconstrues the holding of that case.  The Court did not consider, much

16 less overrule, the "serious questions going to the merits" prong of the alternate test.  Rather, the

17 Court addressed *only* the irreparable harm element and merely held that a preliminary

18 injunction cannot issue based upon the mere possibility of irreparable harm; instead, a

19 *likelihood* of such harm must be shown.  *Id.* at 375.  Accordingly, the judges in this District

20 have continued to apply the alternate test after *Winter* was decided.  *See Protectmarriage.com*

21 *v. Bowen*, 599 F. Supp. 2d 1197, 1204, 1225 (E.D. Cal. 2009); *see also Sterr v. Baptista*, 2010

22 WL 500464 at *2 (E.D. Cal. Feb. 8, 2010) (citing alternate test); *Bezverkhov v. Cal-Western*

23 *Conveyance Corp.*, 2009 WL 4895581 (E.D. Cal. Dec. 11, 2009) (discussing alternate test and

24 citing *Winter*); *Okwuosa v. City of Elk Grove*, 2009 WL 1658110 (E.D. Cal. June 12, 2009)

25 (same); *Dhillan v. City of Stockton*, 2009 WL 1617779 (E.D. Cal. June 9, 2009) (same).

26         Similarly, the Second Circuit has held that its "serious questions going to the merits"

27 standard remains valid after *Winter*.   *Citigroup Global Mkts., Inc. v. VCG Special*

28 *Opportunities Master Fund*, 598 F.3d 30, 38 (2d Cir. 2010).  As the Second Circuit noted, "[i]f

14

1  the Supreme Court had meant for…*Winter*….to abrogate the more flexible standard for a

2  preliminary injunction, one would expect some reference to the considerable history of flexible

3  standards applied in this circuit, seven of our sister circuits, and in the Supreme Court itself."

4  *Id.*

5         VSP erroneously relies on two recent Ninth Circuit cases as contrary authority, but, like

6  *Winter*, neither case presented -- *or even discussed* -- the viability of the "substantial questions"

7  alternate standard.  *Am. Trucking Assoc., Inc. v. City of Los Angeles,* 559 F.3d 1046, 1052 (9th

8  Cir. 2009); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126-27 (9th Cir. 2009).  It would be odd,

9  indeed, for a Ninth Circuit panel (and not the Court *en banc*) to have overruled and invalidated

10 a bedrock of Ninth Circuit preliminary injunction law for more than fifty years without once

11 referencing or discussing the standard.  Thus, the "substantial questions" prong of the alternate

12 test remains good law, and an injunction is appropriate here because Aspex has also shown the

13 likelihood of irreparable harm and that the balance of hardships tips sharply in its favor.

14 **CONCLUSION**

15        For all of the foregoing reasons, the Court should grant the requested relief.

16 DATED: May 13, 2010                GREENBERG TRAURIG, LLP

17

18                            By: /s/ Kathleen E. Finnerty
                               KATHLEEN E. FINNERTY

19                            Attorneys for Plaintiff
                           ASPEX EYEWEAR, INC.

20

21

22

23

24

25

26

27

28

ASPEX'S REPLY MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF ITS MOTION FOR A
PRELIMINARY INJUNCTION